UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
JILL BLOOMBERG,

        Plaintiff,

    v.                                                <u>COMPLAINT</u>

THE NEW YORK CITY DEPARTMENT OF                 <u>With Jury Demand</u>
EDUCATION and CARMEN FARINA,

        Defendants.
------------------------------------------------------------x

        Plaintiff, JILL BLOOMBERG, (hereafter "plaintiff" or "Principal Bloomberg") upon personal knowledge as to herself and upon information and belief as to other matters, alleges as follows:

## NATURE OF THE CLAIM

1.      This is a retaliation case filed by a public school principal who has dedicated her 13-year career to fighting race discrimination in society and in the New York City Public Schools.

2.      The New York City Department of Education ("the DOE" or "defendant") is charged with educating over one million students—70% of whom are Black or Latino.

3.      More than sixty years after the Supreme Court declared "separate but equal is inherently unequal" in *Brown v. the Board of Education*, New York City's schools are more segregated today than they were when segregation was official state policy.

4.      Plaintiff Jill Bloomberg, principal of Park Slope Collegiate (hereafter "PSC"), one of four schools housed on the John Jay Campus in Brooklyn, is now being threatened with an investigation and possible removal in retaliation for her advocacy and organizing against unequal resources being allocated to the students in PSC.

1

5.      Plaintiff brings this action pursuant to Section 601, Title VI of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000d-1("Title VI") and 42 U.S.C. § 1983, by the First Amendment of the United States Constitution ("First Amendment").  Plaintiff also asserts a pendent claim for retaliation under the New York City Human Rights Law ("NYCHRL") Administrative Code of the City of New York §8-101 et seq.

6.      Accordingly, plaintiff seeks temporary and preliminary injunctive and declaratory relief to redress the DOE's violations of her rights under Title VI, the First Amendment, and NYCHRL, and an injunction requiring the DOE to immediately cease and desist the retaliatory investigation against her that has created a chilling effect over plaintiff and other DOE employees and dissuaded them from speaking out against race discrimination and from participating in the instant litigation.

7.      Furthermore, this lawsuit seeks compensatory and punitive damages in order to redress the past deprivation of rights secured to plaintiff under Title VI, the First Amendment, and NYCHRL, and to compensate plaintiff for the emotional distress that she has suffered because of the DOE's unlawful conduct.

## JURISDICTION AND VENUE

8.      This Court has original subject matter jurisdiction over plaintiff's Title VI and First Amendment claims pursuant to 28 U.S.C. §§ 1331 and 1343, respectively, because they arise under the laws of the United States and are brought to recover damages for the violation of plaintiff's civil and constitutional rights.  Supplemental jurisdiction over the NYCHRL claim is exercised pursuant to 28 U.S.C. §1367.

9.      Venue is proper in this judicial district under 29 U.S.C. § 1391(c) and 42 U.S.C. § 2000e-5(f)(3) because defendant conduct business in and can be deemed to reside in this district

and employment records relevant to the unlawful employment practice are maintained and administered here.

## PARTIES

### Plaintiff

10.     Principal Bloomberg has been employed by the DOE since September, 1998—the year she was hired as a teacher. In 2002, she received tenure as a teacher and in 2004, she became a principal, receiving tenure as a principal in 2007.

11.     During her entire 13-year career as a principal, plaintiff has been the principal of PSC.

12.     Plaintiff holds a B.A. in History from Northwestern University, an M.S.Ed. in Public Administration from Baruch College, CUNY, and is a doctoral candidate in Politics and Education at Teachers College, Columbia University in Education Policy and Social Analysis program.

13.     Plaintiff has consistently received outstanding performance ratings at the end of each year that she has been employed with the DOE, both as a teacher and as a principal. She has always had an excellent rapport with colleagues, teachers, students and parents.

14.     Plaintiff, as a citizen and as a principal, has the ability to seek DOE's compliance with Title VI's antidiscrimination provisions.

### Defendants

15.     Defendant DOE is a the public school district and department of the government of New York City.

16.     Carmen Farina is the Chancellor of the DOE whose job is to oversee the Department of Education.

17.    The DOE is the largest school district in the United States, and oversees approximately 1,800 schools and 1.1 million students.

18.    The DOE has nearly 135,000 full-time employees.

19.    The DOE is a person within the meaning of 42 U.S.C. § 2000d, and an employer within the meaning of 42 U.S.C. § 2000d.

20.    The DOE maintains control, oversight, and direction over the operation of its schools, including, *inter alia*, all matters related to student enrollment, student programming and student after school programs.

21.    The DOE is responsible for establishing the terms, conditions, and other practices that bear upon the employment of all DOE employees, including plaintiff and other employees at PSC.

22.    PSC is a DOE school located in District 15 inside the John Jay Campus located at 237 7th Avenue, in the Park Slope neighborhood of Brooklyn, New York.

23.    During all relevant times, the DOE was plaintiff's employer within the meaning of the applicable statutes.

24.    At all times relevant the DOE was and is a recipient of federal funding for purposes of Title VI.

25.    The protected activity upon which this complaint is based took place in January and February, 2017, and was immediately followed by a visit from an investigator with the Office of Special Investigations ("OSI") on March 2, 2017, who informed plaintiff that she was under investigation. Plaintiff was told, however, that the allegations against her and subject of the investigation could not be disclosed to her.

26.     The protected activity involved plaintiff's public written complaint to DOE officials, including her direct supervisor, against a discriminatory DOE policy that both segregated and favored White students over Black and Latino students. Specifically, On January 10, 2017, plaintiff complained about the segregated and unequal allocation of sports teams and resources to an almost majority White school co-located with PSC and other schools (that are comprised of mainly Black and Latino students) within the John Jay Campus. Despite years of efforts to promote integration within the DOE, plaintiff's January, 2017 complaint was the first time plaintiff directly accused the DOE of unlawful race discrimination in allocation of benefits to students. To put these events in some perspective, plaintiff provides background facts below.

## BACKGROUND FACTS

### Race Segregation in Park Slope's Public Schools

27.     PSC is a public secondary school located in District 15 in Park Slope Brooklyn serving grades 6 through 12.

28.     PSC is a majority minority school with an 85% Black and Latino student population in 2014.

29.     Park Slope Brooklyn is an increasingly affluent neighborhood in Brooklyn with a majority White population.

30.     Despite the racial demographics of Park Slope and District 15 generally, PSC remains a majority minority school in a majority White district.

31.     Since the outset of her tenure at PSC, Principal Bloomberg has encouraged desegregation of the school and opposed measures that reinforce and perpetuate *de facto* segregation, such as student tracking, instituting gifted and talented programs that have the effect of further segregating students by race, and opposing the entry of ostensibly selective schools

onto the John Jay Campus which perpetuate segregation by attracting a disproportionately White student body into its own school, thus re-segregating the John Jay Campus.

**2010-2011: Plaintiff's Opposition to Re-Segregation With the Entry of Millennium Brooklyn on the John Jay Campus And First DOE Warning**

32.    In the autumn of 2010, the DOE informed plaintiff that Millennium Brooklyn, an offshoot of the prestigious and predominantly White Millennium High School in Manhattan, would be co-locating in the John Jay Campus. Plaintiff was further informed that the arrival of Millennium Brooklyn was great news for the other schools at John Jay Campus because it would come with $600,000 in funding for refurbishing the building, funds that were unavailable to PSC before a more White school was allocated to the John Jay building.

33.    Nonetheless, plaintiff feared that the offshoot of Millennium Manhattan would continue to disproportionately admit White students, and thus create an all-or majority White enclave on the John Jay Campus.

34.    Seeing the promised funding as tied to the creation of such a racial enclave, students, parents and faculty from PSC and members of the local community surrounding the John Jay Campus in an organized peaceful protest.

35.    On the evening of January 19, 2011, at a Panel for Education Policy ("PEP") meeting with DOE officials, parents, students and members of the community in attendance, and where the PEP was scheduled to vote on the placement of Millennium Brooklyn in the John Jay Campus, the public had the opportunity to voice its concerns with the new school's placement. When it was plaintiff's turn to speak she stated that the placement of Millennium Brooklyn was "an example of putting the interests of upper income white families above those of low-income families of color." Plaintiff's microphone was shut off in the middle of her statement, and she led the crowd in chanting "Integration Yes, Segregation No."

36.     Following the January 19, 2011 PEP meeting, plaintiff was called into a disciplinary conference with her direct supervisor, who admonished her for her statements, and stated, "You are not allowed to say that the DOE is racist." However, plaintiff was not formally disciplined for her statements.

**Fall 2011-Spring 2014: Plaintiff's Successful Desegregation Efforts**

37.     Over the next three years, plaintiff continued to be an outspoken advocate against segregation within the DOE. For example, on June 1, 2012, plaintiff sent a written complaint to defendant complaining that the DOE's plan to install surveillance cameras in the school building would have an adverse impact and disproportionally affect students of color.

38.     On March 25, 2014, plaintiff participated in a panel called "Integration Matters" with Pedro Noguera and David Tipson, two well-known figures in the anti-segregation movement. At this panel, plaintiff discussed her efforts to promote integration in her school and the challenges faced due to lack of systematic support. The panel was well received, and approximately 300 people were in attendance.

39.     Because plaintiff's method of promoting integration without student tracking was considered by many a success story in desegregation, on May 16, 2014, plaintiff's integration model at PSC was highlighted in a story covered by CBS news; and on June 23, 2014, the story was covered by Chris Hayes on MSNBC.

**2014-2015: Plaintiff Encourages Participation in Civil Rights Activism**

40.     In the Fall of 2014, plaintiff, the students, faculty and parents of PSC gathered in front of the John Jay Campus after school and marched to protest the police killings of Michael Brown and Eric Garner.

41.     In the evening of October 10, 2014, the student government of PSC, with the support of the PTA, organized a Town Hall meeting in the school cafeteria to discuss the NYPD's poor treatment of John Jay Campus students (in response to a highly publicized incident of the NYPD telling a John Jay Campus student to "get out of the neighborhood"), as well as John Jay Campus school safety agents' treatment of PSC students at dismissal in general. Several senior schools safety officials were in attendance, and plaintiff supported the students by arguing that they should be permitted to stay on campus after school for as long as they liked. At the end of the meeting, the school safety personnel reluctantly agreed to back down.

42.     Following the non-indictment of the police officers in the Michael Brown and Eric Garner killings, large mass demonstrations across the United States and New York City erupted.  Many students at PSC were upset. At the DOE's suggestion, plaintiff organized a school assembly that was to take place December 5, 2014. Plaintiff asked the Social Studies teachers to present short examples of civil rights protests from history as a way to put the current demonstrations into context. Plaintiff made the assembly optional to students and teachers, and permitted the Physical Education teacher to open the gym during the assembly for those who did not wish to attend the assembly.

43.     The morning of December 5, 2014, before the assembly, plaintiff's direct supervisor Superintendent Watts called plaintiff and, contrary to the DOE's previous suggestion to hold the assembly, attempted to dissuade plaintiff from holding the assembly, telling plaintiff that the assembly was not forbidden, but that the PSC administration had to remain "neutral." Plaintiff informed Superintendent Watts that the purpose of the assembly was to provide the students with a historical context of past violations of African Americans' Civil Rights, and how they have historically been addressed, adding, "We will not be neutral when it comes to racism."

44.     On February 27, 2015, plaintiff organized a Black History Month assembly, and invited a student's grandfather to speak about the "Freedom Summer" campaign during the Civil Rights era, and the high profile murder of his brother, Michael Schwerner, and two other civil rights activists, Chaney and Goodman, who were killed by the Ku Klux Klan in Mississippi in 1964.

45.     On March 27, 2015, a PSC student who was Black was detained and handcuffed by school safety agents in the morning after passing through the school metal detectors with a metal pin in his broken eyeglasses that he had used to temporarily hold them together, as the pin was deemed a "weapon." Plaintiff advocated for the student and demanded that the student be released, but soon after the school safety agents released the student to plaintiff's office, the NYPD stormed in and arrested him. Students and staff were outraged because they felt that the White students from Brooklyn Millenium were not treated in the same manner. After school, the PSC students organized a demonstration outside of the school to protest the unfair treatment of their classmate and called for removal of the metal detectors.

46.     On May 1, 2015, plaintiff was invited to speak at a panel called "Restorative Approaches" at John Jay College of Criminal Justice. Many high level DOE officials were in attendance. During the panel, plaintiff spoke out against metal detectors in schools and harsh punitive disciplinary policies that adversely affect students of color.

47.     On May 4, 2015, Superintendent Watts came to Collegiate to speak with plaintiff, and advised her that her comments at the May 1, 2015 panel were not well received by Chancellor Farina.  She suggested that because plaintiff was a DOE principal, she should remain "neutral about political issues" and not be openly critical of DOE policies.

**2015-2016: Plaintiff's Continued Advocacy for an Integrated Public School System**

48.    On September 25, 2015, plaintiff and four PSC students were invited to Washington D.C. to participate in a panel organized by the National Coalition for School Diversity to speak about school integration.

49.    On February 26, 2016, plaintiff scheduled another Black History Month assembly.

50.    On March 8, 2016, plaintiff was invited to speak on a panel organized by the Brooklyn Historical Society to discuss segregation in New York City public schools, and solutions towards integration. At the panel, plaintiff stated, "segregation did not come about organically, so we cannot expect it to be dismantled organically," in direct contrast to Chancellor Carmen Farina's announcement in favor of "organic integration."

51.    During the 2015-2016 school year, many PSC students participated in an extra-curricular Saturday program called "Integrate NYC for Me," and, together with the organization "Colectivo Amaranta," the students participating in this program explored ways to artistically express solutions that would promote an integrated society and further integration within the DOE. In the end, with the input of the PSC faculty, students, and PTA, they jointly decided to paint a mural, and spent hours creating a beautiful and colorful mural, which was unveiled to parents and faculty on Saturday, May 14, 2016. The mural depicted students in the foreground entering the school through a large metal detector, and a painting of the PSC student who was arrested on March 27, 2015. In the background of the mural, students were marching in protest and holding picket signs with slogans such as "We are Students not Criminals" and "Scholars Not Suspects." In the far corner, a group of students pushed the metal detector off a cliff. Spread

across the front of the mural was a large banner that said "Unity in Diversity; An Injustice to One is an Injustice to All."

## OPERATIVE FACTUAL ALLEGATIONS

### 2016-2017: Plaintiff's Official Opposition to DOE's Unlawful Violations of Title VI

52.     In the year 2016-2017, plaintiff's advocacy against segregation and race discrimination took on the form of more serious complaints against the DOE for unlawful discrimination, and defendant's opposition to plaintiff's protests increased.

53.     On November 1, 2016 the John Jay Campus girls' volleyball coach sent a letter to plaintiff about how the team had been singled out, humiliated and treated like criminals by the school safety agents at another, predominantly White school during the most important game of the season.

54.     On November 29, 2016, plaintiff sent a letter to Ramon Garcia, Assistant Commissioner of the School Safety Division, NYPD, and other DOE officials complaining about the girls' volleyball team incident and demanded an apology to the students, stating, "That our students felt the indignity of racism while entering one of our schools is an outrage."

55.     On January 10, 2017, plaintiff sent a damning complaint to Eric Goldstein, CEO of the DOE sports programs, and Superintendent Michael Prayor, accusing the DOE of race discrimination and segregation within the sports program in her building. Specifically, plaintiff complained about the fact that the John Jay Campus was operating two separate and unequal sports programs, which involved one program for Millennium Brooklyn to share with Millennium Manhattan, and another for the remaining schools at John Jay Campus. In her complaint, plaintiff stated "these separate sports programs, both of which practice and compete at the John Jay Campus, offer vastly unequal opportunities to students." In support of her position, plaintiff included the following graph, highlighting the fact that the Millennium sports

program, consisting of a high percentage of White students, had only 1,261 students yet received 17 sports teams, while the John Jay Campus sports program, consisting of a high percentage of Black and Hispanic students, had 1,859 students, yet was only provided with 9 sports teams.

| School or Program | Number of PSAL Teams | Enrollment (SY 15-16) | % Black & Hispanic |
|---|---|---|---|
| JJL | | 357 | 90.4 |
| SSJ | | 222 | 87.0 |
| PSC | | 356 (HS only) | 85 |
| BHSA | | 924 | 90.7 |
| **John Jay Campus PSAL** | **9** | **1859** | |
| MBHS | | 620 | 51.5 |
| MHS | | 641 | 25.2 |
| **Millennium High School PSAL** | **17** | **1261** | |

56.     That is, plaintiff protested that in violation of the DOE's obligations under Title VI, at the John Jay Campus, students in the predominantly White sports program received one team for every 74 students whereas students at predominantly Black and Hispanic sports program received one team for every 204 students.

57.     Plaintiff received no meaningful response to her January 10, 2017 letter.

58.     Because the DOE failed to take meaningful action to cure the separate and unequal sports programs at the John Jay Campus, on February 13, 2017, the PSC PTA organized a leafleting action where flyers were distributed on the public sidewalk outside of the John Jay Campus to inform the community about the race discrimination and segregation that plaintiff had complained about on January 10, 2017. The flyers were created using plaintiff's January 10, 2017 letter and stated in large bold letters "Separate is Never Equal," and included the above graph.

**March 2017: Defendant's Retaliatory Investigation of Plaintiff**

59.      After plaintiff's accusation of the DOE's unequal and segregated sports teams, that violated Title VI of the Civil Rights Act of 1964, the DOE's retaliation against her was swift, harsh and created a devastating chilling effect that affected the entire staff, student body and parents of PSC.

60.      Within two weeks, on March 2, 2017, an investigator from the DOE's OSI came to PSC and informed plaintiff that she was under investigation, but refused to inform her of the reason.

61.      OSI is an office under the jurisdiction of the DOE. Its primary function is to investigate allegations of violations of the Chancellor's Regulations.

62.      Shortly thereafter, and while still in the meeting, the OSI investigator requested to speak with Assistant Principal Carla Laban. In this conversation, the OSI investigator informed Laban that the investigation of plaintiff related to "communist activities taking place at the school." The OSI investigator then showed Laban a list of names, and asked Laban to identify who from the list she had ever seen "engaging in communist activities." Laban informed the OSI investigator that she did not know what was meant by "engaging in communist activities" and therefore was unable to answer the question.

63.      The list of names contained the name of plaintiff, and four current PSC teachers. It also contained names of people who had no present connection to the school including six former PSC teachers, plaintiff's family members, a few employees from an after-school sports and arts program, and a few former students who had graduated long ago.

64.      Recognizing the OSI investigation against plaintiff to be retaliation for her complaint about the segregated sports programs, on March 16, 2017, at an after school PTA

meeting with several members of staff present, Laban announced that the OSI was investigating plaintiff, and that the OSI investigator had asked her whether she had ever seen plaintiff and others engaging in communist activities at the school.

65.     On March 22, 2017, undersigned counsel sent a letter to defendant demanding them to cease and desist the retaliatory investigation and stated litigation would be filed if the investigation was not halted, given the "chilling effect" it was having on plaintiff and members of the school community. Undersigned counsel's letter referenced the history of people who opposed civil rights labeling those who did promote integration as "communists" and that the DOE should not be repeating the unfortunate mistakes of this history.

66.     In response, on March 27, 2017, the DOE's counsel claimed that the OSI investigation was based on a complaint had been lodged in May, 2016.

67.     Undersigned counsel responded on March 27, 2017 that the DOE's explanation did not undercut plaintiff's belief in the retaliatory nature of the investigation, as it was suspicious that a complaint that was not seen as meritorious enough to open an investigation in May, 2015 would suddenly become viable 10 months later.

68.     On March 28, 2017, undersigned counsel continued to press defendant for the specific regulation that plaintiff had allegedly violated and further details regarding the alleged practices thought to have violated that specific regulation.

69.     In response, defendant continued to press its "McCarthyite" accusation and dissemble, suggesting that plaintiff was under investigation pursuant to Chancellor's Regulation D-130, a regulation limited to "conduct of school employees and officers, with respect to electioneering in support or against ballot approved candidates for public office" that applies only to partisan politics.

70.    The DOE also claimed more evidence was presented in December, 2016, but this also did not explain why an investigation was not opened for another three months, raising the same concerns that allegations which were not considered meritorious in May or December 2016, suddenly became meritorious in March 2017, after plaintiff's complaint in January and February about the sports programs.

71.    Plaintiff asserts that after the events in January and February publicly opposing the segregated and unequal sports teams, the DOE used the third party complaint in order to open a sham investigation into plaintiff in retaliation for her speaking up about Title VI violations and race discrimination against students of color in the John Jay Campus.

72.    Counsel for the DOE also warned that plaintiff, having informed several members of the school community that she sought counsel to challenge the investigation, could be viewed as interfering with an investigation and grounds for removal and dismissal.  Defendant has thus commenced another investigation against plaintiff with the Special Commissioner of Investigation ("SCI") for "interfering with an investigation."

73.    That is defendant sought to bootstrap a disciplinary action onto an investigation that is retaliatory and improper *ab initio*.

74.    Plaintiff affirmatively avers that she has violated no school policy or Chancellor's Regulation by her conduct opposing racism or segregation in schools. Thus, the reasons for this OSI investigation cannot be based on legitimate factors.

75.    Defendant's improper attempt to turn its unlawful retaliation into grounds for dismissal has nonetheless had a further chilling effect on the school community.

76.    The retaliatory investigation of plaintiff is harmful to the point that it could dissuade a reasonable teacher or principal from supporting a charge of discrimination.

77.     Defendants' retaliation against plaintiff has had a significant chilling effect in that plaintiff is afraid to speak out against race discrimination at her school for fear of losing her job. The latest threat involving the SCI complaint about plaintiff's alleged interference with the OSI investigation has been particularly egregious, because DOE employees can be removed from their duties and placed into temporary reassignment centers (formerly referred to as "Rubber Rooms") during the pendency of SCI investigations, which can last indefinitely, and, even if acquitted, a DOE employee who has been removed during such an investigation is not entitled to reinstatement to her former position.

78.     In addition, defendant's retaliation against plaintiff has had a significant chilling effect against other PSC employees, who are now afraid to speak out against race discrimination within the DOE or to support plaintiff as witnesses in the instant action. The chilling effect has been so devastating that teachers at PSC are now afraid to teach lessons about the Cold War, or use terms such as "Communism" and "Fascism" in their lessons.

79.     Moreover, as defendant has asserted that the OSI investigation against plaintiff centers around the activities of known or suspected members of communist organizations, plaintiff and other Collegiate employees have been dissuaded from speaking out against race discrimination for fear of being required to disclose their own political affiliations and/or being required to inform the DOE of the political associations of others.

## FIRST CLAIM FOR RELIEF
### (Retaliation Against Plaintiff in Violation of Title VI)

80.     Plaintiff repeats, reiterates, and incorporates each and every preceding paragraph as if set forth fully herein.

81.     Title VI prohibits intentional discrimination by federally funded programs.

82.     Section 601 of Title VI provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d.

83.     The New York City DOE receives Federal Financial Assistance.

84.     Private individuals may sue to enforce Section 601 and obtain both injunctive relief and damages. *Alexander v. Sandoval*, 532 U.S. 275, 279 (2001).

85.     A private action for damages under Section 601 exists only if an "appropriate person" had actual knowledge of the alleged discrimination and was deliberately indifferent to it. *Rubio v. Turner Unified Sch. Dist.* No. 202, 523 F. Supp.2d 1242, 1250-51 (D. Kan. 2007); see *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290 (1998).

86.     Constructive notice is insufficient. See *Gebser,* 524 U.S. at 285.

87.     An "appropriate person" is one who has authority to take corrective action to end the discrimination. *Rubio*, 523 F. Supp.2d at 1250-51; see *Gebser*, 524 U.S. at 290.

88.     Determining who is an appropriate person under Title VI is a fact-based inquiry, but a school official with authority to halt known abuse by measures such as transferring the harassing student to a different class, suspending her or curtailing her privileges would qualify. *Murrell v. Sch. Dist. No. 1, Denver, Colo.*, 186 F.3d 1238, 1247 (10th Cir. 1999). The knowledge of the wrongdoer herself is "not pertinent to the analysis." *Gebser*, 524 U.S. at 291.

89.     Plaintiff is a person with standing to and who did in January and February 2017 take action to enforce the terms of Title VI.

90.     Defendant was aware of her activities as her complaint was addressed to leaders in the DOE.

91.     Defendants violated Title VI by retaliating against plaintiff by instituting a punitive investigation against her based on her alleged "communist activities" because she complained of the DOE's race discrimination against its students.

92.     As a result of this retaliation plaintiff has suffered damages to her reputation by inappropriately being put under a cloud of suspicion and having her job threatened.

## SECOND CLAIM FOR RELIEF
### (Retaliation Against Plaintiff in Violation Plaintiff's First Amendment Rights to Freedom of Expression)

93.     Plaintiff repeats, reiterates, and incorporates each and every preceding paragraph as if set forth fully herein.

94.     Plaintiff's January and February 2017 speaking out both orally and in writing opposing DOE policies which she believed to be discriminatory on the basis of race is protected speech under the First Amendment as she was speaking as a citizen in much the same way as the police officer in *Matthews v. City of New York,* 779 F.3d 167 (2d Cir. 2015) was found to be speaking as a citizen regarding quotas for arrests and tickets in his precinct.

95.     Plaintiff was speaking on a matter of public concern, to wit: protesting separate and unequal sports teams for students at the John Jay Campus.

96.     As a result of this protected speech, plaintiff is now subjected to an investigation in which she is being labeled as a communist.

97.     By engaging in this investigation and threatening her with discipline for opposing the investigation, defendant has violated plaintiff's rights to freedom of expression under the First Amendment.

98.     As a result of this retaliation plaintiff has suffered damages to her reputation by inappropriately being put under a cloud of suspicion and having her job threatened.

## THIRD  CLAIM FOR RELIEF
### (Retaliation Against Plaintiff in Violation Plaintiff's Rights Under the New York City Human Rights Law)

99.     Plaintiff repeats, reiterates, and incorporates each and every preceding paragraph as if set forth fully herein.

100.    Plaintiff's January and February 2017 speaking out both orally and in writing opposing DOE policies which she believed to be discriminatory on the basis of race is protected activity under the New York City Human Rights Law (NYCHRL) Administrative Code of the City of New York §8-101 et seq. which prohibits race discrimination against students in public schools.

101.    New York City Human Rights Law also prohibits retaliation in any manner against persons who oppose discrimination under the NYCHRL.

102.    Defendants knew of plaintiff's protests of unequal funding of sports programs in January and February 2017 and are using the OSI investigation to retaliate against her.  In so doing the defendants have violated her rights not to be retaliated against under the NYCHRL.

103.    As a result of this retaliation plaintiff has suffered damages to her reputation by inappropriately being put under a cloud of suspicion and having her job threatened.

## PRAYER FOR RELIEF

**WHEREFORE**, plaintiff requests relief as follows:

**A.**     A declaration that defendant retaliated against plaintiff in violation of Title VI and that defendant has retaliated against plaintiff for exercising her rights under the First Amendment to the United States Constitution and has violated her rights under the New York City Human Rights Law.

**B.**     Injunctive relief, temporarily, preliminarily and permanently barring the retaliatory OSI investigation against plaintiff;

**C.**     Injunctive relief preliminarily and permanently barring disciplinary investigation for opposing an illegally retaliatory OSI investigation.

**D.**     An award of compensatory damages for emotional distress and suffering for defendant' violations of Title VI;

**E.**     An award of punitive damages for defendant' violations of Title VI and the New York City Human Rights Law;

**F.**     An award of attorney's fees and costs;

**G.**     Such relief as is authorized by federal law;

**H.**     Such other relief as the Court deems just and proper;

## JURY TRIAL

Plaintiff demands a jury trial for all causes of action and claims for which she has a right to a jury trial.

Dated: New York, New York
         April 28, 2017

Respectfully submitted,

MIRER MAZZOCCHI SCHALET JULIEN &
CHICKEDANTZ, PLLC

By: _____
      Jeanne E. Mirer

& By: _____
         Maria L. Chickedantz

150 Broadway, Suite 1200
New York, NY 10038
Tel. (212) 231-2235
Fax (212) 409-8338
*Attorneys for Plaintiff*
jmirer@mmsjlaw.com, maria@mmsjlaw.com

20