UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------x
JILL BLOOMBERG,

        Plaintiff,

v.

THE NEW YORK CITY DEPARTMENT OF
EDUCATION, and CHANCELLOR CARMEN
FARINA,

        Defendants.
---------------------------------------------------------------x

<u>AFFIDAVIT OF JILL
BLOOMBERG</u>

Jill Bloomberg, being duly sworn deposes and states as follows:

1. I am the plaintiff in the above entitled case.

2. I submit this affidavit in support of my motion for temporary restraining order and preliminary injunction to preserve the *status quo* and to prevent defendants from engaging in the OSI investigation by interviewing teachers and staff at the school, and/or commencing the SCI investigation against me, pending the outcome of this litigation.

3. There is every reason to believe that this investigation is in retaliation for my actions in January and February 2017 on behalf of the Park Slope Collegiate ("PSC") School community in speaking out against unequal and segregated sports programs available to students in the John Jay Campus, at 237 7th Avenue Brooklyn, 11215. Although, as alleged in my complaint, I have been an outspoken advocate against racism in general and racial segregation within the New York City public school system for many years, this complaint was the first time I pressed the DOE to address a specific example of the DOE's unequal treatment of predominately Black and Latino students in relation to benefits provided to the schools.

4. I provide some of my history as an advocate for public school integration below.

5. Specifically, after I became the principal of PSC (formerly the Secondary School for Research), I took an open stance against what I believe are discriminatory education practices with the purpose or effect of racially segregating the school. These practices include student tracking, implementation of Gifted-and-Talented programs that would have attracted several white families to PSC, which I publicly denounced in the media as "*de facto* segregation." In addition, since becoming principal of PSC, I have been openly against the metal detectors in the John Jay Campus, which I have denounced as disproportionally affecting students of color, and I have actively lobbied for their removal from the building.

6. In the Fall of 2010, the DOE informed me that Millennium Brooklyn, an offshoot of the prestigious and predominantly white Millennium High School in Manhattan, would be co-locating in the John Jay Campus. I was further informed that the arrival of Millennium Brooklyn was great news for the other schools at John Jay Campus because it would come with $600,000 in funding.

7. This news demoralized the students, parents and faculty of PSC, who felt that our school had been ignored by the DOE while a school that served white students was preferred and provided with significant funds. Therefore, prior to the arrival of Millennium Brooklyn, PSC students, parents and faculty, and members of the local community organized sidewalk demonstrations and picket lines to protest the creation of separate and unequal schools within the John Jay campus.

8. On the evening of January 19, 2011, at a Panel for Education Policy ("PEP") meeting with DOE officials, parents, students and members of the community in attendance, and where the PEP was scheduled to vote on the placement of Millennium Brooklyn in the John Jay Campus, the public had the opportunity to voice its concerns with the new school's placement.

When it was my turn to speak, I stood up at the microphone, and stated that the placement of Millennium Brooklyn was "an example of putting the interests of upper income white families above those of low-income families of color." Near the end of this critical speech, the microphone was shut off, so I led the crowd in chanting, "Integration, yes. Segregation, no."

9. A few days after, I was called into a disciplinary meeting with my direct supervisor, Superintendent Amy Horowitz, who advised me that my statements at the January 19, 2011 PEP meeting were unacceptable because "you're not allowed to accuse the DOE of being racist because you are the DOE."

10. Despite the DOE's attempt to silence me, I continued my outspoken advocacy against segregation within the DOE. For example, on June 1, 2012, I sent a written complaint to defendants complaining that the DOE's plan to install surveillance cameras in my school building would have an adverse impact and disproportionately affect students of color.

11. On March 25, 2014, I participated in a panel called "Integration Matters" with Pedro Noguera and David Tipson, two well-known figures in the anti-segregation movement. At this panel, I discussed my efforts to promote integration in my school and the challenges faced due to lack of systematic support. The panel was well received, and approximately 300 people were in attendance.

12. On April, 23, 2014, I was interviewed for a New York Magazine article called "New York State has the Most Segregated Schools in the Nation," that criticized DOE policies that promote segregation, and lauded my work as principal of PSC as an example of true integration.

13. In addition, because my method of promoting integration without student tracking was considered by many a success story in desegregation, on May 16, 2014, our successful

integration model at PSC was covered by CBS news; and on June 23, 2014 by Chris Hayes on MSNBC.

14. In the Fall of 2014, PSC students, faculty, parents and myself gathered in front of the John Jay Campus after school and marched to protest the police killings of Michael Brown and Eric Garner.

15. On the evening of October 10, 2014, the student government of PSC, with the support of the PTA, organized a Town Hall meeting in the school cafeteria to discuss the NYPD's poor treatment of John Jay Campus students (in response to a highly publicized incident of the NYPD telling a John Jay Campus student who was Black to "get out of the neighborhood"), as well as John Jay Campus school safety agents' treatment of PSC students at dismissal in general, which also included ordering them to leave the neighborhood. Several senior school safety officials were in attendance, and I supported the students by arguing that they should be permitted to stay on campus after school for as long as they liked. At the end of the meeting, the school safety personnel reacted very critically to the content of the meeting, but ultimately agreed to leave the students from PSC alone at the end of dismissal.

16. Following the non-indictment of the police officers in the Michael Brown and Eric Garner killings, mass demonstrations around the country and in New York erupted. Many students at PSC became very upset about the situation. In response and at the suggestion of the DOE, I announced a school assembly that was to take place December 5, 2014. I asked the Social Studies teachers to present short examples of Civil Rights protests that condemned race discrimination from our country's history as a way to put the current demonstrations in context. I made the assembly optional to students and teachers, and permitted the P.E. teacher to open the gym during the assembly for those who did not wish to attend the assembly.

17. The morning of December 5, 2014, my direct supervisor Superintendent Watts called me and attempted to dissuade me from holding the assembly, telling me that the assembly was not forbidden by the DOE, but that we had to remain "neutral" during the assembly. I informed Superintendent Watts that the purpose of the assembly was to provide the students with a historical context in order to understand what was going on around them, and that we would not remain neutral to racism. Ultimately, most of PSC's students and teachers attended the assembly, as did Mark Rampersant, Deputy CEO for Safety and Security at the DOE.

18. On February 27, 2015, I scheduled a Black History Month assembly, and invited a student's grandfather to speak about the "Freedom Summer" campaign during the Civil Rights era, and the high profile murder of his brother and two other civil rights activists by the Klu Klux Klan in Mississippi in 1964.

19. On March 27, 2015, a PSC student was detained and handcuffed by school safety agents in the morning after passing through the school metal detectors with a metal pin in his broken eyeglasses that he had used to temporarily hold them together, which the safety agents considered to be some sort of dangerous weapon. I advocated for the student and demanded that the school safety agents release the student into my custody, and they agreed. But soon after the student's release, the NYPD stormed into my office and arrested him. The students at PSC were very upset by this event, so after school, the students organized a demonstration outside of the school to protest the unfair treatment of their classmate and called for removal of the metal detectors.

20. On May 1, 2015, I was invited to speak at a panel called "Restorative Approaches" at John Jay College of Criminal Justice. Many high level DOE officials were in

attendance. During the panel, I spoke out against metal detectors in schools and harsh punitive disciplinary policies that adversely affect students of color.

21. On May 4, 2015, Superintendent Watts came to PSC to speak with me, and advised me that my comments at the May 1, 2015 panel were not well received by the Chancellor, and that because I was a DOE principal, I should not be openly critical of DOE policies.

22. On September 25, 2015, four PSC students and I were invited to Washington D.C. to participate in a panel organized by the National Coalition for School Diversity to speak about school integration.

23. On January 12, 2016, ProPublica published an article about how the DOE's use of metal detectors in schools disproportionally affects students of color, and included an interview with me about the struggle to remove metal detectors from my school.

24. On February 26, 2016, I scheduled another Black History Month assembly.

25. On March 8, 2016, I was invited to speak on a panel organized by the Brooklyn Historical Society to discuss segregation in New York City public schools, and solutions towards integration. At this panel, I stated, "segregation did not come about organically, so we cannot expect it to be dismantled organically," in direct contrast to Chancellor Carmen Farina's announcement in favor of "organic integration."

26. During the 2015-2016 school year, many Collegiate students participated in an extra-curricular Saturday program called "Integrate NYC for Me," and, together with the organization "Colectivo Amaranta," the students participating in this program explored ways to artistically express solutions that would promote an integrated society and further integration within the DOE. In the end, with the input of the PSC faculty, students and parents, they decided

to paint a mural, and spent hours creating a beautiful and colorful mural, which was unveiled to parents, faculty and students on Saturday, May 14, 2016. The mural depicted students in the foreground entering the school through a large metal detector, and a painting of the PSC student who was arrested on March 27, 2015. In the background of the mural, students were marching in protest and holding picket signs with slogans such as "We are Students not Criminals" and "Scholars Not Suspects." In the far corner, a group of students pushed the metal detector off a cliff. Spread across the front of the mural was a large banner that said "Unity in Diversity; An Injustice to One is an Injustice to All." (A photo of the Mural is attached hereto as Exhibit 1).

27. On June 4, 2016, the producers of a film called "Profiled" rented the auditorium of John Jay campus to screen their film and hold a panel discussion. "Profiled" is a documentary film about how the NYPD's racial profiling and disproportionate targeting of unarmed people of color has negatively impacted the community, with interviews of families of victims of police shootings. After showing the film, I participated in the panel discussion with three Civil Rights activists who appeared in the film.

28. On November 29, 2016, I sent a letter to Ramon Garcia, Assistant Commissioner School Safety Division, NYPD and other DOE officials complaining about an incident on November 1, 2016 where the John Jay Campus Girls' Volleyball team had been singled out and mistreated by the school safety agents at another, predominantly white school during the most important game of the season. In the letter, I demanded an apology to the students, noting "that our students felt the indignity of racism while entering one of our schools is an outrage." (The November 29, 2016 Letter is attached hereto as Exhibit 2).

29. As noted at the outset of my Affidavit, on January 10, 2017, I sent a complaint to defendants complaining about race discrimination and segregation within the sports program in

my building. Specifically, I complained about the fact that the John Jay Campus was operating two separate and unequal sports programs, which involved one program for Millennium Brooklyn to share with Millennium Manhattan, and another for the remaining schools at John Jay Campus. In my complaint, I stated "these separate sports programs, both of which practice and compete at the John Jay Campus, offer vastly unequal opportunities to students." In support of my position, I included a graph that set forth statistics demonstrating the fact that the Millennium sports program, consisting of a high percentage of white students, had only 1,261 students yet received 17 sports teams, while the John Jay Campus sports program, consisting of a high percentage of Black and Hispanic students, had 1,859 students, yet was only provided with 9 sports teams. (The January 10, 2017 Letter is attached hereto as Exhibit 3).

30. Because the DOE failed to take meaningful action to cure the separate and unequal sports programs at the John Jay Campus, on February 13, 2017, the PSC PTA organized a leafleting action where flyers including the above-described graph were distributed on the public sidewalk outside of the school building to inform the community about the race discrimination and segregation that I had complained about in the January 10, 2017 letter of complaint. (The PTA Flyer that was distributed outside of PSC on February 13, 2017 is attached hereto as Exhibit 4).

31. Two weeks later, on March 2, 2017, an investigator from the DOE's Office of Special Investigations ("OSI") came to PSC and informed me that I was under investigation, but refused to inform me of the reason.

32. Shortly thereafter, the OSI investigator requested to speak with Assistant Principal Carla Laban. In their conversation, the OSI investigator informed Ms. Laban that the investigation of me related to "communist activities taking place at the school." The OSI

investigator then showed Ms. Laban a piece of paper that contained a list of names, and asked Ms. Laban whether she had ever seen any of the people on the list "engaging in communist activities." Ms. Laban informed the OSI investigator that she did not know what was meant by "engaging in communist activities" and therefore was unable to answer the question. The list of names included me, my husband, my daughter, four current PSC teachers, six former Collegiate teachers, a few employees from an after-school sports and arts program, and a few former students who had graduated long ago.

33. On March 16, 2017 at a PTA meeting, Ms. Laban announced to the staff and parents that I was under investigation with the OSI for "engaging in communist activity." Ms. Laban made the announcement because she recognized that I was being retaliated against for speaking out against the segregated sports program. The parents and staff also recognized it as retaliation.

34. On March 20, 2017, at least seven (7) teachers received subpoenas from OSI informing them that they had information that could aid the investigation and requesting that they participate by providing testimony.

35. The notice of the OSI investigation and the resulting subpoenas to teachers to give statements have hit this school like a hammer.

36. The sense of community that we have nurtured over the years which has resulted in our staff being highly supportive of our students with concomitant increased student achievement has been palpably negatively affected, as teachers are being pit against one another and the students. The "esprit de corps" that one could previously feel upon entering the school has been dampened.

37. As a result of the impact of the investigation on the school, I sought legal counsel.

38. On March 22, 2017, my attorney Maria Chickedantz sent a letter to defendants demanding them to cease and desist the retaliatory investigation against me in order to avoid legal action. (The March 22, 2017 Letter from my attorney to the DOE is attached hereto as Exhibit 5).

39. In response, on March 27, 2017, counsel for defendants responded to this letter to my attorney and claimed that the OSI complaint had been lodged in May, 2016 and related to alleged "communist activities" and that I had "engaged students in an inappropriate manner." (The March 27, 2017 Letter from the DOE to my attorney is attached hereto as Exhibit 6).

40. I do not believe I have engaged students in any inappropriate manner and believe that the allegation of communist activities is an outrageous and McCarthyist accusation, and based on a history where the label of "communist" has been put on those who seek to fight racism as a way to silence and punish them.

41. On March 28, 2017, my attorney sent another letter to the DOE stating that, in order to avoid litigation, defendants should advise us "which specific activity the DOE claimed violated which specific DOE regulation." The letter also stated that it was suspicious that the DOE would wait until March of 2017 to respond to a complaint in May of 2016. (The March 28, 2017 Letter from my attorney to the DOE is attached hereto as Exhibit 7).

42. On March 29, 2017, after school hours, in a voluntary meeting with staff and parents, and in response to the several requests I had received for an update, I updated them on the actions I was taking to address the retaliatory investigation.

43. In response to the attorney's letter of March 28, 2017, on April 6, 2017, defendants sent another letter to my attorney informing her that myself and two PSC teachers had been accused of being "members of a communist organization known as the Progressive

Labor Party." Defendants further noted that we had been accused of "actively recruiting students into the organization during school hours," that specifically included "invit[ing] students to participate in the organization's activities, including marches for communism." Defendants further advised that "if substantiated, this could constitute a violation of Chancellor's Regulation D-130." In addition, at the end of the letter defendants included exact quotations of phrases that I, teachers and parents had made during the March 29, 2017 after school voluntary meeting for people seeking information about the DOE's retaliatory actions against me, which everyone already knew about. In their letter, the DOE stated that my statements at that meeting "could constitute an attempt to interfere with or obstruct OSI's investigation" and "for that reason, they have been reported to SCI (Special Commissioner of Investigations) and I could be removed from the school. (The April 6, 2017 Letter from the DOE to my attorney is attached hereto as Exhibit 8).

44. I know that the OSI investigation against me is retaliation because Chancellor's Regulation D-130 only addresses partisan politics related to electioneering.

45. In a letter dated April 8, 2017, 34 professors from Columbia University's Teachers' College where I am a PhD student sent a letter in support of me and opposing the investigation to Chancellor Farina. (The April 8, 2017 Letter from the Columbia University's Teachers' College to the DOE is attached hereto as Exhibit 9).

46. On April 11, 2017, the PSC PTA sent a letter to Chancellor Farina which was signed by 450 people including parents, students, and members of the community also supporting me and opposing the investigation.

47. On April 11, 2017, Chancellor Farina responded by email to the PSC PTA and Columbia University's Teachers College with one sentence: "Special investigations have their own protocols and letters of support not significant in their decisions."

48. So far, as far as I am aware, no PSC employees have been advised that they are the subject of the current OSI investigation, however the letter of April 6, 2017 from DOE counsel informed us that two PSC teachers are also under investigation.

49. The OSI investigation has caused me a significant amount of distress because I am in the dark about what specific actions I have engaged in which have violated any DOE regulation. I am afraid to speak out against race discrimination and segregation at my school, because I am now fearful of losing my job. I am concerned that even if the DOE stops the investigation, I am going to be cautious about speaking out in the future for fear of another OSI investigation against me.

50. The latest threat involving referral of the matter to SCI has made me particularly fearful, because it is well known that in SCI investigations, DOE employees can be removed from their duties and placed into temporary reassignment centers (formerly referred to as "Rubber Rooms") during the pendency of the investigations, which can last indefinitely, and, even if acquitted, a DOE employee who has been removed during such an investigation is not entitled to reinstatement to her former position. If this were to happen to me, it would be devastating to my career, my staff, and my students, because I have worked since 2004 to build a model of integration in my school that resists any initiatives that lead to segregation.

51. The OSI investigation against me has also had a significant chilling effect against other PSC employees, who are now afraid to speak out against race discrimination in general and within the DOE, or other social justice matters. Many have told me that they no longer feel

comfortable teaching lessons about the Cold War, or lessons that involve discussing communism or fascism.

52. I'm very concerned that the OSI investigation will prejudice my ability to prosecute this litigation. Some teachers have told me they are afraid to come out in support of my claims as witnesses, and I am afraid that the number will only increase if OSI is allowed to go forward and interview these teachers some of whom have tenure decisions pending.

53. If I am terminated, all of my 13-years of hard work will be destroyed. I have worked hard to protect the school from policies that promote segregation, and I have built a school that is truly integrated, where all students are treated equally.

FURTHER DEPONENTS SAYETH NOT

_____
Jill Bloomberg

Signed and sworn to
Before me this 27
Day of April 2017

_____
Notary Public

MARIA CHICKEDANTZ
NOTARY PUBLIC-STATE OF NEW YORK
NO 02CH6315888
QUALIFIED IN KINGS COUNTY
MY COMMISSION EXPIRES 12-01-2018