UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------x

JILL BLOOMBERG,

                Plaintiff,

      v.

                                    17-cv-03136 (PGG)

THE NEW YORK CITY DEPARTMENT OF
EDUCATION and CARMEN FARINA,

                Defendants.

-------------------------------------------------------------x

# PLAINTIFF'S MEMORANDUM OF LAW IN FURTHER SUPPORT OF HER MOTION FOR A PRELIMINARY INJUNCTION

**Mirer Mazzocchi Schalet Julien & Chickedantz, PLLC**
By:  Jeanne E. Mirer & Maria L. Chickedantz
150 Broadway, Suite 1200
New York, New York 10038
212-473-8700
*Attorneys for Plaintiff*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES…………………………………………………………...…. i

PRELIMINARY STATEMENT…...……………………………………………………...…1

FACTS…………………………………………………………………………………….2

ARGUMENT……………………………………………………………………………...2

I.    PLAINTIFF'S JANUARY 10, 2017 COMPLAINT WAS "SPEECH MADE AS A
      PRIVATE CITIZEN"………………………………………………..……..………..2

II.   PLAINTIFF HAS DEMONSTRATED A CHILLING EFFECT, AND THEREFORE
      IRREPERABLE HARM……………………………………………………………….8

III.  PLAINTIFF HAS ESTABLISHED THAT THE INITIATION OF THE OSI
      INVESTIGATION IS AN ADVERSE ACTION INDER THE STANDARD FOR
      RETALIATION……………………………………………………..………...……….12

IV.   THE TIMELINE OF THE OSI INVESTIGATION SUPPORTS THAT IT WAS
      INSTIGATED IN RETALIATION FOR PLAINTIFF'S PROTECTED ACTIVITY…. 16

V.    THE DOE HAD KNOWLEDGE OF THE PLAINTIFF'S PARTICIPATION IN
      PROTECTED ACTIVITY……………………………………………………………17

VI.   ALLEGATIONS AGAINST PLAINTIFF, IF TRUE, DO NOT VIOLATE
      CHANCELLOR'S REGULATION D-130……………………………..……………18

CONCLUSION……………………………………………………………………...……….22

## TABLE OF AUTHORITIES

*Birch v. City of New York*
184 F.Supp.2d 21 (E.D.N.Y. 2016)………………………………………………………………...11

*Bronx Household of Faith v. Bd. of Educ. of City of New York*
331 F.3d 342 (2d Cir. 2003)……………………………………………………………………….8

*Cox v. Onondaga Cty. Sheriff's Dep't*
760 F.3d 139 (2d. Cir. 2014)……………………………………………………………………..15

*Cox v. Warwick Valley Cent. School Dist.*
654 F.3d 267 (2d Cir. 2011)……………………………………………………………………….3

*Eldridge v. Rochester City Sch. Dist.*
968 F.Supp.2d 546 (W.D.N.Y. 2013)……………………………………………………………13

*Fincher v. Depository Trust and Clearing Corp.*
604 F.3d 712 (2d Cir. 2010)……………………………………………………………………..12

*Garcetti v. Ceballos*
547 U.S. 410 (2006)………………………………………………………………………………4

*Gordon v. New York City Bd. of Educ.*
232 F.3d 111 (2d Cir. 2000)……………………………………………………………………..17

*Kramer v Board of Education*
715 F. Supp.2d 335 (E.D.N.Y 2010)……………………………………………………………..20

*Lee v. City of Syracuse*
603 F.Supp.2d 417 (N.D.N.Y. 2009)……………………………………………………………13

*Lee v. N.Y. State Dep't of Health*
2001 U.S. Dist. LEXIS 11287 (S.D.N.Y.2001)…………………………………………………13

*Matthews v. City of New York*
779 F.3d 167 (2d Cir. 2015)……………………………………………………………………..2

*Muchmore's Café, LLC v. City of NY*
2016 U.S. Dist. LEXIS 139861 (E.D.N.Y. 2006)……………………………………………..8, 21

*Mullins v. City of New York*
626 F.3d 47 (2d Cir. 2010)………………………………………………………………………11

*O'Neal v. State Univ. of N.Y.*
2006 U.S. Dist. LEXIS 81654 (E.D.N.Y. 2006)……………………………………………13

*Papelino v. Albany Coll. of Pharmacy of Union Univ.*
633 F.3d 81 (2d Cir. 2011)…………………………………………………………………17

*Pickering v. Bd. of Educ. of Twp. High Sch. Dist. 205, Will Cnty.*
391 U.S. 563 (1968)…………………………………………………………………………4

*Richardson v. New York State Office of Mental Health*
2014 U.S. Dist. LEXIS 106306 (N.D.N.Y. 2014)…………………………………………13

*Spaulding v. N.Y. City Dep't of Educ.*
2015 U.S. Dist. LEXIS 127076 (E.D.N.Y. 2015)…………………………………………..14

*Stella v. Brandywine Sr. Living, Inc.*
2012 U.S. Dist. LEXIS 123106 (E.D.N.Y., July 9, 2012)…………………………………17

*VIP of Berlin, LLC v. Town of Berlin*
593 F.3d 179 (2d Cir. 2010)………………………………………………………………..21

*Weber v. City of New York*
973 F.Supp.2d 227 (E.D.N.Y. 2013)…………………………………………………12, 17

*Weingarten v. Board of Education*
680 F.Supp.2d 595 (S.D.N.Y. 2010)………………………………………………………19

*Weintraub v. Bd. of Educ. of City Sch. Distr. of City of. N.Y.,*
593 F.3d 196 (2d Cir. 2010)…………………………………………………………………4

*Widomski v. State Univ. of N.Y. at Orange*
748 F.3d 471 (2d Cir. 2014)………………………………………………………………..13

*Wright v. Monroe Cmty. Hosp.*
2011 U.S. Dist. LEXIS 82809 (W.D.N.Y. 2011)…………………………………………13

*Yerdon v. Henry*
91 F.3d 370 (2d Cir. 1996)…………………………………………………………………14

*Yerdon v. Teamsters Local 1149, Int'l Bhd. Of Teamsters*
886 F.Supp.226 (N.D.N.Y. 1995)…………………………………………………………14

## PRELIMINARY STATEMENT

On April 28, 2017, plaintiff filed the Complaint and Motion for a Preliminary Injunction on an Order to Show Cause, requesting that the Court temporarily halt an OSI investigation that was commenced in retaliation for plaintiff's participation in protected activity under the First Amendment, Title VI and the NYCHRL, on the basis that the chilling effect would cause imminent and irreparable harm to plaintiff. On April 28, 2017, the Court ordered defendants to respond to plaintiff's Motion by May 1, 2017, with a hearing on the Motion scheduled for the same date.

Accordingly, on May 1, 2017, this Court heard arguments from both sides, and requested that plaintiff provide additional briefing in support of her Motion. Specifically, the Court requested further briefing as to (i) whether plaintiff's January 10, 2017 was "speech made as a private citizen" and therefore protected under the First Amendment; (ii) whether plaintiff has demonstrated a chilling effect for the purpose of establishing irreparable harm; (iii) whether plaintiff has established that the initiation of an OSI investigation is an adverse action under the retaliation analysis of the First Amendment, Title VI and NYCHRL; (iv) whether the timeline of the SCI complaints and subsequent OSI investigation supports the fact that plaintiff's January 10, 2017 race discrimination complaint was protected activity for purposes of retaliation under the relevant law; (v) whether defendants had knowledge of plaintiff's January 10, 2017 complaint; (vi) and whether the DOE's allegations against plaintiff, if true, establish violations of Chancellor's Regulation D-130. Plaintiff addresses each point in turn below.

## FACTS

Plaintiff respectfully refers the Court to the Complaint, the Affidavits of plaintiff and five (5) staff members of PSC and the supporting exhibits, and the Affirmation of plaintiff's attorney Maria L. Chickedantz and the supporting exhibits for all relevant and pertinent facts.

As additional support, plaintiff submits a Second Plaintiff's Affidavit ("Bloomberg Sec. Aff.") and a Second Attorney's Affirmation ("Chickedantz Sec. Aff") in Further Support of her Motion.

## ARGUMENT

### I.    PLAINTIFF'S JANUARY 10, 2017 WAS "SPEECH MADE AS A PRIVATE CITIZEN"

Whether a public employer speaks in her capacity as a private citizen for purposes of First Amendment analysis is governed by that section of the *Garcetti-Pickering* test which asks "(A) did the speech fall outside of the employee's "official responsibilities," and (B) does a civilian analogue exist?" *Matthews v. City of New York,* 779 F.3d 167 (2d Cir. 2015) at *9 (citing *Garcetti v. Ceballos*, 547 U.S. 410, 418 [2006] and *Pickering v. Bd. of Educ. of Twp. High Sch. Dist. 205, Will Cnty*., 391 U.S. 563, 568 [1968]). Here, Plaintiff's speech on the PSAL policy fell outside of the scope of her official duties and was made using civilian channels as discussed in light of *Matthews*, *infra*. Accordingly, it was private speech.

### *i. Matthews* Is Controlling And Establishes That Plaintiff's Speech Regarding The PSAL Policy Was Made As A Private Citizen, And Therefore Is Protected Under The First Amendment

a. *Matthews* Holds That The Speech Of Public Employees Regarding Widespread Policies Of Public Concern, When Made Through Channels That Are Also Available To The Public, Is Speech Made In The Public Employee's Capacity As A Private Citizen.

2

Plaintiff submits her First Amendment claim is governed by the holding in *Matthews v. City of New York,* 779 F.3d 167 (2d Cir. 2015) in which the Second Circuit found the plaintiff police officer's speech made to superiors, regarding the deleterious effects of a quota system implemented by his precinct was protected by the First Amendment, as speech made in his capacity as a private citizen. Applying the test set forth in *Garcetti,* in *Matthews* the Second Circuit held that the speech of a public employee that addresses a wide-spread work policy, and its effects on the public at large falls outside a public employees "official responsibility" as it is "neither part of [the public employee's] job description nor part of the practical reality of [the public employee's] everyday work." A similar outcome is warranted here with regard to Plaintiff's speech regarding the deleterious effects of the DOE's policies PSAL promoting racial segregation.

In *Matthews,* the plaintiff, a New York City police officer, complained to his Precinct commanding officer that certain unnamed supervisors had, in 2008, and by 2009, implemented a quota system mandating the number of arrests, summons, and stop-and-frisks that police officers must conduct. Matthews, believing that the quota system was damaging to the NYPD's core mission, reported its existence to then-various Captains at the Precinct. Later in January 2011, Matthews met with the Precinct's then-new commanding officer and two other Captains telling them about the quota system and complaining that it was "causing unjustified stops, arrests, and summonses because police officers felt forced to abandon their discretion in order to meet their numbers," and that it "was having an adverse effect on the precinct's relationship with the community." *Id.* at 169.

Matthews later filed a complaint under 42 U.S.C. § 1983 alleging that the NYPD retaliated against him in violation of the First Amendment to the U.S. Constitution and Article I,

§ 8 of the New York State Constitution because he spoke to the Precinct's leadership about the arrest quota policy.[1]

While the District Court, dismissed, holding that Matthews' speech was pursuant to his official employment duties and thus, unprotected,[2] on appeal the Second Circuit reversed applying the test set forth in *Garcetti*. See *Matthews,* at *9 (citing *Weintraub v. Bd. of Educ. of City Sch. Distr. of City of. N.Y.*, 593 F.3d 196, 203-04 [2d Cir. 2010]). Distinguishing the facts in *Matthews*, the court reasoned:

> Matthews's speech to the Precinct's leadership in this case was not what he was "employed to do," unlike the prosecutor's speech in *Garcetti*, nor was it "part-and-parcel" of his regular job, unlike the case of the teacher in *Weintraub* and the payroll clerk in *Ross*. Matthews's speech addressed a precinct-wide policy. Such policy-oriented speech was neither part of his job description nor part of the practical reality of his everyday work.

> We hold that when a public employee whose duties do not involve formulating, implementing, or providing feedback on a policy that implicates a matter of public concern engages in speech concerning that policy, and does so in a manner in which ordinary citizens would be expected to engage, he or she speaks as a citizen, not as a public employee.

*Matthews*, at 174

The Court went on to hold that existence of a comparable civilian analogue for Matthews's speech "also supports our conclusion that he spoke as a citizen." Speech has a "relevant civilian analogue" if it is made through "channels available to citizens generally."

Matthews pursued the same avenue to complain about a precinct-wide policy--by complaint to a precinct commanding officer--as would a concerned civilian.[3] Rejecting the

---

[1] Matthews had alleged acts of retaliation consisted of punitive assignments, denial of overtime and leave, separation from his career-long partner, humiliating treatment by supervisors, and negative performance evaluations.

[2] See *Matthews v. City of New York*, No. 12 Civ. 1354, 2012 U.S. Dist. LEXIS 53213, 2012 WL 8084831 (S.D.N.Y. Apr. 12, 2012).

[3] The Second Circuit further stated: "Even if Matthews's speech were deemed to fall within Section 207-21, (of the Patrol Guide), this provision would not be determinative of whether that speech was protected by the First Amendment. If the Patrol Guide's general duty to report misconduct were permitted to control whether the speech of any employee—without regard to whether the investigation and reporting of misconduct is an integral part of the

4

District Court's argument that Matthews had better access to his commanding officers than would ordinary citizens, the Second Circuit stated. "We do not consider the relative degree of access to be material; rather what matters is whether the same or a similar channel exists for the ordinary citizen," holding that the fact that "employees always have better access to senior supervisors within their place of employment" than the public was irrelevant to the public analogue analysis. *Id.*, at 175.

> b. The Facts At Bar Are Directly On Point With *Matthews* and a Finding that Plaintiff's Speech Regarding the PSAL and Metal Detector Policies Is Speech of a Private Citizen As Speech Regarding Widespread Policies Of Public Concern Made By a Public Employee Through A Publically Available Channel

Plaintiff submits that holding of *Matthews* supports a finding in the present case that plaintiff's speech was spoken as a citizen, as it was speech regarding a widespread policy of public concern, made through a publically available channel, or analogue.

**The PSAL Policy Is Not A Policy On Which It Is Plaintiff's Job to Formulate, Implement, or Provide Feedback**

During oral argument the Court suggested that seeking resources for one's school generally would likely be part of a principal's job. However as noted below, and in the supplemental Affidavit of Plaintiff, the Public School Athletic League (PSAL) is a separate entity under the Department of Education which is the body responsible for the allocation of sports teams. Plaintiff and all other principals who want sports teams must apply to the PSAL to

---

employee's day-to-day job (i.e. what he or she is "employed to do," *Garcetti*, 547 U.S. at 421)—enjoyed First Amendment protection, public employers could be encouraged to simply prescribe similarly general duties, thereby limiting such protection for wide swaths of employee speech. When Justice Souter's dissent in *Garcetti* flagged this risk, id. at 431 n.2, the Court majority responded by explicitly "reject[ing] . . . the suggestion that employers can restrict employees' rights by creating excessively broad job descriptions," id. at 424. To be sure, the duty to report misconduct has increased relevance in the context of law enforcement, but we believe that it is more properly considered as part of the *Pickering* balancing analysis in determining whether the government employer had an adequate justification for its actions. See supra DISCUSSION, Section II, Legal Framework; see also *Lane*, 134 S.Ct. at 2381 (describing the *Pickering* framework as "balancing the interests of the employee, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees" (citing *Pickering*, 391 U.S. at 568 (internal quotation marks and brackets omitted))).

be allocated the teams. Plaintiff has no control over how PSAL allocates its resources. Plaintiff's complaint to the Public School Athletic League (PSAL) and the District Superintendent about separate and unequal provision of sports teams to the majority minority schools in the John Jay campus was neither "what she was employed to do" nor "part and parcel of her regular job." Like Officer Matthews, plaintiff's job duties did not include making policy on sports team allocations or giving feedback to the PSAL on their decisions. There is no question that raising issues of unequal distribution of resources based on race is a matter of public concern and plaintiff as a person committed to ending segregation and opposing racism had the right, to speak out about it without turning such speech into part and parcel of her regular job.

This Court should be made aware that PSAL is a separate entity within the DOE and Mr. Goldstein who heads it up reports Elizabeth Rose, Deputy Chancellor, who reports directly to Chancellor Farina. (Bloomberg Sec. Aff., ¶ 7). The fact that PSAL is so separate from the schools themselves is further evidence that the complaint plaintiff made to Mr. Goldstein on January 10, 2017 was not "what she was hired to do" or "part and parcel" of her job duties.

**Plaintiff's Email to Eric Goldstein Were Made Through A Publically Available Channel or Citizen Analogue**

Further, like in the case of Officer Matthews, a citizen analogue to her complaint occurred when on February 13, 2017 the parents and community passed out the flyers attached as Exhibit 2 to her original Affidavit, making the same points as she did in her January 10, 2017 email. Further Plaintiff's email to Eric Goldstein was a channel available to the public as well as Plaintiff.

As Plaintiff's facts with respect to the Garcetti factors are analogous to those in *Matthews*, the Court should find here, as it did it did in Matthews, that plaintiff's protest of the PSAL policy and its discriminatory effect was speech made in her capacity as a private citizen,

and thus protected.

Further this Court should be made aware that when plaintiff made this complaint about the separate and unequal allocation of sports teams, she was in actuality kicking a particular hornet's nest, which another administrator kicked before to his detriment. Plaintiff attaches to her supplemental affidavit three articles that were sent to her by a parent at PSC. They involve the case of David Garcia-Rosen who as a Dean of the International Community High School not only raised the issue of unequal allocation of sports teams he also followed up with a formal complaint to the office of civil rights at the Department of Education. He was removed from his school after participating with his students in a protest at City Hall during the budget hearings where Chancellor Farina was testifying.

The *Nation* article quotes Mr. Garcia-Rosen as saying "The schools that had more students of color had less sports opportunities, schools that had more poverty had less sports opportunities. Schools that had more English language learners has less sports opportunities". In fact, New York City Schools with predominantly white student bodies have more than double the number of PSAL sports teams: eighteen on average compared to seven. Mr. Garcia Rosen was suspended as were others in the school for their protests with their students. In the Op-Ed article, Mr. Garcia-Rosen's confrontation with the Chancellor at the Panel for Education Policy meeting on May 20, 2015 is quoted as: "I was a teacher and Dean for 17 years with a perfect record until I was suspended by you, chancellor Farina, for protesting for the civil rights of black and Latino students in New York City." In the *Socialist Worker* article, Mr. Garcia-Rosen quotes Mr. Goldstein. He says: "Mr. Goldstein called me Mr. Fire and Brimstone, and said "There will be no Marxist redistribution of teams… we have been doing it this way for years, and that's not going to change."

7

Mr. Garcia-Rosen's case shows how rare it is that anyone has been willing to take on the PSAL on the issue of racial disparity in sports teams.

Plaintiff further discovered after filing of her case that the DOE certain articles in the media which show not only how separate PSAL is from her day to day work as a principal, but also that the DOE has had a history of retaliating against persons who have spoken out and criticized the PSAL for its unequal distribution of sports teams based on race and poverty.

## II.     PLAINTIFF HAS DEMONSTRATED A CHILLING EFFECT, AND THEREFORE IRREPERABLE HARM

Irreparable harm may be presumed when "a plaintiff alleges injury from a rule or regulation that directly limits speech." *Bronx Household of Faith v. Bd. of Educ. of City of New York,* 331 F.3d 342, 349 (2d Cir. 2003). To demonstrate chilling effect, a plaintiff is "entitled to rely on the impact of the [government action at issue] on the expressive activities of others as well as [her] own." *Muchmore's Café, LLC v. City of NY*, 2016 U.S. Dist. LEXIS 139861 (E.D.N.Y. 2016).

Here, in her Affidavits, plaintiff stated:

- "The notice of the OSI investigation and the resulting subpoenas to teachers to give statements have hit this school like a hammer." (Bloomberg Aff., ¶ 35).

- "I am afraid to speak out against race discrimination and segregation at my school, because I am now fearful of losing my job." (Bloomberg Aff., ¶ 49).

- "The OSI investigation against me has had a significant chilling effect against other PSC employees, who are now afraid to speak out against race discrimination in general and within the DOE, or other social justice matters. Many have told me that they no longer feel comfortable teaching lessons about the Cold War, or lessons that involve discussing Communism or Fascism." (Bloomberg Aff., ¶ 51).

- "I'm very concerned that the OSI investigation will prejudice my ability to prosecute this litigation. Some teachers have told me they are afraid to come out in support of my claims as witnesses, and I am afraid that the number will only increase if OSI is allowed to go forward…" (Bloomberg Aff., ¶ 52).

- "Going forward, I will be fearful that any action I take in defense of my students' civil rights could be deemed misconduct and could result in an investigation and discipline. Although my commitment to stand up for my students hasn't been completely frozen, it has certainly been chilled." (Bloomberg Sec. Aff., ¶ 34).

- "On March 30, 2017, I participated in a panel discussion on 'The Case for School Integration Now,' sponsored by the PSC PTA, with New York Times staff writer Nikole Hannah-Jones and teacher Rhonda Hendrickson. This event had been scheduled months before the OSI investigation. Because of the OSI investigation, I felt nervous about speaking and self-censored my speech." (Bloomberg Sec. Aff., ¶ 32).

In addition, five staff members provided affidavits, and with regard to chilling effect, stated:

- "In early March, I coordinated a Know Your Rights presentation for parents, students, and teachers... Although I was quite proud of the event, I am now more reticent about organizing on behalf of immigrants because of the current investigation and school climate." (Bauso Aff., ¶ 6).

- "[S]ince we learned about the OSI investigation into Jill's activism, many teachers in our school are troubled, including myself, and I now feel very hesitant to engage in more events such as [the civil rights event at PSC called "Know your Rights]." (Jarara Aff., ¶ 7).

- "I am also very hesitant to start an Arabic language club at our school as I had intended before learning of the OSI investigation, because I am afraid that it will be seen as activism and become the subject of an OSI investigation, or worse." (Jarara Aff., ¶ 7).

- "[S]ince this investigation started, there is a deep sense of distrust and division. No one knows specifically what the investigation involves, but we do know that Ms. Bloomberg and some of us are suspected of 'engaging in communist activities' in violation of Chancellor's Regulation D-130. But we do not know which teachers are being investigated yet, so everyone is afraid." (Miller Aff., ¶ 4).

- "This investigation has had a devastating effect on our school as a community, but also as a school – we do not feel merely stifled in our free speech but in our ability to focus on the needs of our students, and in some cases to teach them what we must teach them." (Miller Aff., ¶ 7).

- "I personally have received a summons requiring me to give testimony to the OSI investigator. I feel desperate not knowing whether I am the subject of the investigation, or whether anything that I have done will be somehow considered a violation of Chancellor's Regulation D-130, or any other rule." (Miller Aff., ¶ 8).

9

- "I am overly careful now about saying anything related to race issues that affect young people of color (like our students), other matters related to civil rights, or anything related to Communism." (Miller Aff., ¶ 8).

- "The OSI investigation against Jill has eroded the trust and commitment that we have spent years building. It has made me fearful of standing up for our students and speaking out against race discrimination, because I'm afraid that my speaking out against racism will be seen as investigation-worthy by the DOE." "I submit this affidavit in support of Ms. Bloomberg because I believe it is right, but I'm afraid the DOE will punish me for it. For the same reasons, other teachers are afraid of supporting Ms. Bloomberg and have said that they will not come forward to support her in her legal matter because of it." (Williams Aff., ¶ 7).

- "The investigation has splintered the staff and the school environment that I once considered a second home… Teachers who wholeheartedly support Jill are afraid to provide affidavits of support in fear of retaliation from the DOE." (Williams Aff., ¶ 8).

- "A few other teachers have made it clear that they are considering applying to other schools because of the chilling effect this investigation has had on our school environment." (Williams Aff., ¶ 8).

- "[T]eachers have been noticeably less comfortable speaking out against racism and racist attacks, for fear of retaliation or incriminating themselves in some way." (Sandusky Aff., ¶ 4).

- "This investigation has forced teachers to question and doubt their ability to openly engage in activism and openly support the students in our community." (Sandusky Aff., ¶ 7).

Further, two of the staff members explicitly stated in their affidavits that other staff members are too afraid to come forward in support of plaintiff in her lawsuit:

- "Another teacher at PSC has tome me that he is concerned for his job security because of the investigation, as he is not tenured. This teacher offered to submit an affidavit in suppor of this injunction, but changed his mind and has instead opted not to participate in Jill's case." (Bauso Aff., ¶ 7).

- "I submit this affidavit in support of Ms. Bloomberg because I believe it is right, but I'm afraid the DOE will punish me for it. For the same reasons, other teachers are afraid of supporting Ms. Bloomberg and have said that they will not come forward to support her in her legal matter because of it." (Miller Aff., ¶ 9).

Moreover, five staff members have advised undersigned counsel that they support plaintiff, but are too afraid to submit affidavits in her support in this litigation for fear of becoming targeted by OSI:

- Staff Member 1 stated, "I support Jill, but I'm fearful to speak up for her because I'm afraid the OSI will come after me. I don't want anything to do with that. I don't want my name on any of their lists." (Chickedantz Sec. Aff., ¶ 5).

- Staff Member 2 stated, "I'm an untenured second year teacher. If I put my name on a document, it'll be used against me. I would be nervous to sign anything because they could come after me for any reason. I'm especially concerned now that I've heard the DOE's position, and they still haven't provided any evidence that Jill violated any regulation," and, "I used to feel comfortable discussing civil rights matters at school, but now that the OSI investigation has started, I wouldn't even wear a Black Lives Matter shirt, since it could lead to my discipline for the same reasons Jill's in trouble." (Chickedantz Sec. Aff., ¶ 6).

- Staff Member 3 stated, "I'm not comfortable publicly supporting Jill because I would not want anyone at the DOE to have my name. I do not want to be caught up in the OSI investigation." (Chickedantz Sec. Aff., ¶ 7).

- Staff Member 4 stated, "If I knew that I could support Jill in her lawsuit without any risk of retaliation by the DOE, I would do it. But based on what's going on now against Jill, and the DOE's reasons for going after her, I'm too afraid of being targeted by OSI, especially because I'm only probationary," and, "It's obvious that the DOE is going after Jill for speaking out about racism. And it's now obvious that we aren't allowed to talk about that at school, or anything related to social justice, like openly supporting immigrant or refugee rights." (Chickedantz Sec. Aff., ¶ 8).

- Staff Member 5 stated, "I am hesitant to put my name out there in support of Principal Bloomberg because I am really nervous about being the next person OSI decides to investigate," and, "I'm teaching a lesson about the Cold War, and I have to discuss topics such as Communism, which makes me really nervous because of what's happening to Principal Bloomberg. So I hide my teaching materials every day because I'm afraid someone will turn me in to OSI." (Chickedantz Sec. Aff., ¶ 9).

In short, it is clear that the DOE's instigation of an OSI investigation into plaintiff has had a tremendous chilling effect over many PSC staff members in that they are now afraid to engage in protected speech and are too afraid to support plaintiff as witnesses in her lawsuit. And because a large numbers of PSC employees fear coming forward with affidavits in support

of plaintiff, the only way to include the impact of the OSI investigation on them is through their anonymous statements, which is permitted at this stage in litigation. See, *Mullins v. City of New York*, 626 F.3d 47, 52 (2d Cir. 2010) ("hearsay evidence may be considered by a district court in determining whether to grant a preliminary injunction"). An injunction on the OSI investigation is necessary to put a stop on the chilling effect, which is actual and imminent. If the OSI investigation is permitted to continue, the damage caused by the severe limitations on speech at PSC and PSC staff members' unwillingness to participate in the instant litigation will be irreparable and will not be able to be remediated by an award of damages or other relief available after a judgment on the merits of plaintiff's case.

### III.   PLAINTIFF HAS ESTABLISHED THAT THE INITIATION OF THE OSI INVESTIGATION IS AN ADVERSE ACTION UNDER THE STANDARD FOR RETALIATION

"To establish an adverse employment action for the purpose of a retaliation claim, 'a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which **in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination**.'" *Weber v. City of New York*, 973 F.Supp.2d 227, 268 (E.D.N.Y. 2013)(quoting *Fincher v. Depository Trust and Clearing Corp.*, 604 F.3d 712, 721 [2d Cir. 2010])(emphasis added); See also, *Birch v. City of New York*, 184 F.Supp.2d 21 (E.D.N.Y. 2016)("In the Title VII discrimination context, only adverse employment actions that effect a material change in the terms and conditions of employment are actionable... **In contrast, in retaliation cases, all that is required to maintain a claim is to show action that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights**."[emphasis added]).

Here, as discussed above, there is no question that the OSI investigation would dissuade a reasonable worker from making or supporting a charge of discrimination, and participating in constitutionally protected activity because several reasonable workers have **already been dissuaded** from making their own complaints and supporting plaintiff's charge of discrimination, and have already been deterred from exercising constitutional rights. (see Section II, *supra*).

Cases in this Circuit have consistently decided that the instigation of an investigation is an adverse action for the purpose of establishing a retaliation claim.[4] See *Weber*, cited *supra*, at 270 (since "the commencement of an OEO investigation might 'dissuade a reasonable worker from making or supporting a charge of discrimination,'" it is an "adverse employment action."); *Lee v. City of Syracuse*, 603 F.Supp.2d 417, 436 (N.D.N.Y. 2009)(abrogated on other grounds by *Widomski v. State Univ. of N.Y. at Orange*, 748 F.3d 471 [2d Cir. 2014])(an investigation of an employee constituted an adverse action because "[b]eing investigated by one's employer could deter a reasonable person from complaining about discrimination because investigations can be intrusive and intimidating"); *O'Neal v. State Univ. of N.Y.*, 2006 U.S. Dist. LEXIS 81654 (E.D.N.Y. 2006) (a letter informing plaintiff "that she had to submit to a disciplinary interview and that she was the subject of a disciplinary investigation" was a "materially adverse action" for the purpose of a Title VII retaliation claim); *Richardson v. New York State Office of Mental Health*, 2014 U.S. Dist. LEXIS 106306, at *23-4 (N.D.N.Y. 2014) ("an interrogation and investigation" where the employee was "never disciplined following the interrogation" is an adverse action); *Eldridge v. Rochester City Sch. Dist.*, 968 F.Supp.2d 546 (W.D.N.Y. 2013)("the

---

[4] On the other hand, *Wright v. Monroe Cmty. Hosp.*, 2011 U.S. Dist. LEXIS 82809 (W.D.N.Y. 2011) is a New York district court case that determined that an investigation did not constitute an adverse action for a retaliation claim, but the *Wright* court reached this conclusion by incorrectly applying the standard for Title VII discrimination rather than retaliation, citing *Lee v. N.Y. State Dep't of Health*, 2001 U.S. Dist. LEXIS 11287, at *45-6.

pressure of an internal investigation, coupled with the threat if an involuntary transfer, could dissuade a reasonable employee from engaging in protected activity [for the purpose of a retaliation claim]" and is therefore an adverse action.)

Here, as further articulated below, plaintiff alleges that she engaged in protected activity that was known to defendants who responded by commencing a retaliatory investigation against her on allegations that, even if true, would not constitute misconduct. The OSI investigation has already commenced, and some PSC employees have already been subpoenaed, with many still waiting for their interviews. As detailed above, the OSI investigation has already resulted in a stifling chill over the school, affecting everyone at PSC in very detrimental ways. Moreover, as a result of the investigation, plaintiff will certainly be disciplined, as the DOE has already made clear that it considers anti-racist speech and civil rights activism to be "non-neutral political speech" that is punishable under D-130 (the Due Process implications are discussed below).

The DOE argues that the instigation of the OSI investigation is not an adverse employment action by relying on cases that are in no way dispositive of the issue. In *Yerdon v. Henry*, 91 F.3d 370 (2d Cir. 1996), the Second Circuit deferred to the district court's analysis in determining that "[t]he district court concluded that the filing of internal union charges against Yerdon did not constitute retaliation because the charges had not yet been adjudicated and that, if the charges were ultimately dismissed, Yerdon would not have suffered any adverse effect from them." But the district court's conclusion that the internal union charges were not adverse actions was based on the fact that they did not consist of "discipline" under the LMRDA, noting that "discipline under [the LMRDA] is meant to refer only to punitive actions diminishing membership rights." *Yerdon v. Teamsters Local 1149, Int'l Bhd. Of Teamsters*, 886 F.Supp.226

(N.D.N.Y. 1995). Here, plaintiff asks the Court to determine whether the OSI investigation is an adverse action using the standard articulated above for retaliation claims.

Defendants' reliance on *Spaulding v. N.Y. City Dep't of Educ.*, 2015 U.S. Dist. LEXIS 127076 (E.D.N.Y. 2015) is similarly misplaced, as the plaintiff in *Spaulding* did not even allege that the OSI investigation was an adverse action. Instead, the plaintiff argued that a false accusation against her was an adverse action, and the Court did not agree because "Plaintiff has not presented evidence that Defendant (as opposed to her union representative) accused her of sexual misconduct; she alleged the complaint was made by a student, not Defendant; she agreed that Principal Zucal was required to report the complaint; she produced no evidence of faults in the OSI's investigation of the complaint or in its conclusion; and she resigned before Defendant implemented any discipline or other negative consequences. Thus, Plaintiff has not identified any aspect of Defendant's handling of the student's complaint that might deter a reasonable person from engaging in protected activity." Id. at *151-2. Here, on the other hand, plaintiff clearly identified defendants as the ones responsible for instigating a retaliatory investigation against her 10 months after a receiving a complaint, and only weeks after she engaged in protected activity. She has also articulated several problems with the OSI investigation process thus far, including defendants' failure to advise her of the charges against her; their pursuit of information about plaintiff that would not establish a violation of any rule; their attempt to characterize non-profit social justice organizations, such as Lan Ragozin, as "partisan parties" pursuant to Chancellor's Regulation D-130; their attempt to attribute actions of plaintiff's husband (which are not even true) onto plaintiff.

Defendants reliance on *Cox v. Onondaga Cty. Sheriff's Dep't*, 760 F.3d 139 (2d. Cir. 2014) is similarly off-point. *Cox* is about a group of white lieutenants employed by a sheriff's

department who shaved their heads, and were then harassed and called "skin heads." They first filed an internal complaint with their employer, where they stated that a Black deputy questioned their shaved heads in a non-confrontational manner and that the accusatory harassment came from the inmates. But when their complaint was dismissed, they filed an EEOC charge that contradicted their internal complaint, claiming that the racial hostility and harassment against them came from the Black deputy. The department, pursuant to its own policy and its own legal obligation, was required to investigate the allegations of race discrimination. The Court found that the fact of department's investigation into the plaintiffs' EEOC charge was not in and of itself an adverse action because the provisions of the statute "clearly contemplate that employers must be allowed to inform themselves of all facts relevant to an EEOC complaint. Employers have a right to answer an EEOC complaint and are asked not only to engage in conciliation but also are sometimes asked to present their view of the facts. If employers are at risk of liability from conducting a non-overreaching internal investigation, meaningful conciliation and fact conferences are not possible." *Id.* at *146.

Here, the OSI investigation was commenced unlawfully, and has become an exceedingly overreaching kitchen sink of an investigation, and if permitted to go forward, will adversely affect plaintiff. The DOE is clearly on a fishing expedition, as it could conduct fact-finding on the allegations it claims to be in issue by making a phone call to the DOE permits department to discover who made the film Profiled, whether the filmmakers had permission to film students outside of PSC, and whether the filmmakers held an event in the PSC auditorium, and whether they charged a cover charge or only took donations, as well as a simple Google search of Len Ragozin. (Bloomberg Sec. Aff., ¶¶ 12-17).

**IV.     THE TIMELINE OF THE OSI INVESTIGATION SUPPORTS THAT IT WAS INSTIGATED IN RETALIATION FOR PLAINTIFF'S PROTECTED ACTIVITY**

The DOE contends that plaintiff's history of civil rights activism vitiates her January 10, 2017 complaint, because, as the DOE contends, plaintiff was never disciplined for years of engaging in the same activity. But this argument misses the mark, because, although plaintiff does not dispute her history of activism, which is articulated in her Affidavit and the Complaint, plaintiff's Title VI and NYCHRL retaliation claims hinge on the fact that the January 10, 2017 complaint was different than plaintiff's past complaints in that it involved a specific accusation that the DOE had violated Title VI, while the past years of speech did not involve complaints of violations of Title VI, but instead, involved plaintiff's complaints about DOE policies, such as student tracking and the gifted and talented program, that promote de facto segregation.

**V.      THE DOE HAD KNOWLEDGE OF THE PLAINTIFF'S PARTICIPATION IN PROTECTED ACTIVITY**

The DOE argues that plaintiff does not establish retaliation based on the allegation that at the time OSI initiated the investigation, on February 1, 2017, it did not have knowledge of plaintiff's January 10, 2017 complaint of race discrimination.

But this argument is not supported by the case law in this Circuit. It is well-settled that a "[p]laintiff can establish the 'knowledge' element of the prima facie case [for retaliation] by demonstrating that his employer had general corporate knowledge of his protected acts at the time of the alleged retaliation." *Weber*, at 107 (quoting *Stella v. Brandywine Sr. Living, Inc.*, 2012 U.S. Dist. LEXIS 123106, at *6 (E.D.N.Y., July 9, 2012). See also, *Papelino v. Albany Coll. of Pharmacy of Union Univ.*, 633 F.3d 81, 92 (2d Cir. 2011)("Even if the corporate defendant's agents who carried out the adverse action did not know about the plaintiff's

17

protected activity, the 'knowledge' requirement is met if the legal entity was on notice."); See also, *Gordon v. New York City Bd. of Educ.*, 232 F.3d 111 (2d Cir. 2000).

Plaintiff's January 10, 2017 race discrimination complaint was sent to Eric Goldstein, the CEO of the PSAL and Superintendent Michael Prayor. (Bloomberg Aff., Ex. 3). Eric Goldstein's direct supervisor Elizabeth Rose answers directly to defendant Chancellor Carmen Farina. (Bloomberg Sec. Aff., ¶ 7). Defendants were on notice of plaintiff's complaint on January 10, 2017, so to the extent that they attempt to disclaim knowledge of plaintiff's complaint, plaintiff has established that at the very least, they had corporate knowledge of her participation in protected activity. *Id.*

## VI. ALLEGATIONS AGAINST PLAINTIFF, IF TRUE, DO NOT VIOLATE CHANCELLOR'S REGULATION D-130

### i. On Its Face, Chancellor's Regulation D-130 Applies Only To Partisan Politics

The subject of Chancellor's regulation D-130 is entitled as follows: "USE OF SCHOOL BUILDINGS BY CANDIDATES, ELECTED OFFICIALS AND POLITICAL ORGANIZATIONS, AND CONDUCT OF SCHOOL EMPLOYEES AND OFFICERS WITH RESPECT TO POLITICAL CAMPAIGNS AND ELECTIONS."

In the introduction of the regulation, the DOE sets forth the scope of activity governed by the regulation stating they govern,

> (1) the use of, or access to school buildings by elected officials, candidates for elective office, or organizations working on behalf of such officials or candidates, both during school hours, and non-school hours; (2) use of school facilities, equipment, and supplies for political purposes by school employees, personnel, or staff members and officials, and (3) conduct of school employees, personnel, or staff members and officials with respect to political campaigns and elections. Chancellor's Regulation D-130
> With respect to Conduct of Employees, the regulation states in relevant part at Subsection

C:

> "(1) While on duty or in contact with students, all school personnel shall maintain a posture of complete neutrality with respect to all candidates. Accordingly, while on duty or in contact with students, school personnel may not wear buttons, pins, articles of clothing, or other items advocating a candidate, candidates, slate of candidates or political

18

organization/committee.

"(2) Personnel may not be involved in any activities including fundraising, on behalf of any candidate, candidates, slate of candidates or political organization/committee during working hours." *Id.*

All portions of the regulation expressly refer exclusively to partisan politics, and the Courts that have addressed this issue refer to **partisan** politics as well. *Weingarten v. Board of Education*, 680 F.Supp.2d 595 (S.D.N.Y. 2010). It is apparent on the face of this regulation that when in Section C (2) there is a reference to "political organization"/ "committee", such reference is to organizations referred to in the Introduction, which expressly mentions organizations working on behalf of such officials or candidates. There is no reference to any other type of "political organization" such as those not involved in partisan politics.

Thus, on the face of Chancellor's regulation D-130 and as it has been interpreted, it only applies to partisan politics meaning politics involving candidates who are seeking public office. It does not apply on its face to the allegations against plaintiff. As Plaintiff's activities did not touch partisan politics they are not properly within the scope of the regulation and thus are not properly subject to investigation.

## ii. Any Other Reading of Chancellor's Regulation D-130 Would Run Afoul of Plaintiff's First Amendment Rights.

Even assuming *arguendo,* plaintiff were not alleging retaliation for protected activity or chilling effect as a result of retaliation, plaintiff would have an independent basis for claiming a violation of the First Amendment just arising from the DOE taking the position that it can initiate an OSI investigation into plaintiff's political views and actions outside to parameters of Chancellor's regulation D-130. That is, if D-130 can be said to apply to political or ideological organizations outside of the major ballot eligible partisan political parties, would it definitely run afoul of plaintiff's First Amendment rights as being unconstitutionally vague.

19

In this regard the decision in *Kramer v Board of Education*, 715 F. Supp.2d 335, (E.D.N.Y 2010) is instructive.   In that case, Plaintiff Kramer during a lesion on HIV/AIDS in her sex education class wrote on the chalkboard slang terms used by the students to describe various body parts. A parent complaint ensued.   For this she was reassigned from teaching duties, sent to non-teaching detention, investigated, provisionally determined by her principal to have violated Regulation A-421, denied a satisfactory rating for the school year, and deprived of the extra income she had previously been earning from per session assignments. The adverse measures were based initially on allegations of "corporal punishment prohibited by Chancellor's Regulation A-420, and was ultimately, found by the principal to have violated Regulation A-421, which prohibits the "verbal abuse of students" through discipline by use of, among other things, "language that tends to cause … mental distress."

In finding for Plaintiff, Judge Weinstein stated that:  "The Board has not cited any school policy, rule or guideline charged against the plaintiff that purports to prohibit or regulate teachers' use in the classroom of words that are vulgar, sexually explicit, obscene, or otherwise objectionable being used for appropriate instructional purposes rather than punitively. It is conceded that no school regulation specifically prohibits the use in the classroom of the language that was elicited in the course of Ms. Kramer's lesson. *Kramer v. Board of Education*, 715 F. Supp.2d 335, 360 (E.D.N.Y 2010).

The Court found plaintiff's challenge to the regulations on due process grounds to survive summary judgment because they were unconstitutionally vague for failing to comport with the constitutional guarantee of adequate notice. That is, the regulations that were the basis for administrators' actions failed to inform Ms. Kramer of the nature of the prohibited conduct. In applying the vagueness doctrine, the regulations are required to "[1] give the person of ordinary

intelligence a reasonable opportunity to know what is prohibited and ... [2] provide explicit standards for those who apply them." *VIP of Berlin, LLC v. Town of Berlin*, 593 F.3d 179, 186 (2d Cir. 2010).

In the recent case of *Muchmore's Café LLC v City of New York*, 2016 LEXIS 139861 (E.D.N.Y. 2016) the Court had an opportunity to rule on a challenge to the New York City Cabaret Law.  One of the challenges was to vagueness as to the definition of the word "dancing". The Court stated:

> "[b]y failing to define 'dancing' in a way that would allow a reasonable person to distinguish between unlawful dancing and ostensibly lawful conduct such as swaying or head nodding, the Cabaret Law is unconstitutionally vague." According to *Muchmore's,* "[t]his vagueness has a chilling effect on expression, requiring establishments to take extreme measures to ensure compliance, such as prohibiting the performance of entire genres of music." The City responds that "[a]s the word 'dancing' is sufficiently clear to provide notice to an eating and drinking establishment of what activity by its patrons (here recreational dancing) triggers the requirement for it to be licensed as a cabaret, the statutory scheme is not unconstitutionally vague and therefore does not violate plaintiff's due process rights." *Id.* at *55-56.

> Discussing the law applicable on the question on vagueness the court stated: "A statute can be impermissibly vague for either of two independent reasons. First, if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits. Second, if it authorizes or even encourages arbitrary and discriminatory enforcement." *Farrell*, 449 F.3d at 485 (quoting *Hill v. Colorado*, 530 U.S. 703, 732, 120 S. Ct. 2480, 147 L. Ed. 2d 597 (2000)). As with a facial challenge for over breadth, "[w]hen considering a facial challenge to the . . . vagueness of a statute as measured against the first amendment, 'a court's first task is to determine whether the enactment reaches a substantial amount of constitutionally protected conduct.'" *Muchmore's Café LLC v City of New York*, 2016 LEXIS 139861 at *55-56 (citing *Dorman v. Satti*, 862 F.2d 432, 436 (2d Cir. 1988).

Finding the law unconstitutionally vague the court held that *"First, a reasonable person might have difficulty distinguishing between dancing that would trigger the Cabaret Law and dancing or other conduct that would not." Id.*    Plaintiff raises similar allegations and unconstitutionally vague notice here.

21

When dealing with these types of rights, the Courts must apply strict scrutiny and narrowly tailor any invasion of plaintiff's rights. Even if this Court thinks that there should be a regulation which allows DOE to engage in a full scale, wide ranging OSI fishing expedition into whether plaintiff used her position to advance the beliefs of a political party and engage in "impermissible political activity" Chancellor's Regulation D-130 is not the regulation which makes any conduct of this type of ideological nature impermissible. Furthermore, with such vague allegations as membership in a party or recruiting students for marches for communism etc. as is the present case, such allegations against plaintiff are extremely vague and if they may be prosecuted pursuant to Chancellor's Regulation D-130, then such regulation is unconstitutionally vague for failing to provide adequate notice regarding the prohibited conduct beyond partisan politics.   In fact OSI is investigating Plaintiff for allegedly belonging to a political party, and believing in those ideals. Clearly this is not constitutionally permitted. Throughout plaintiff's career and her life, she has maintained consistent anti-racist positions and taken steps to promote an end to racial segregation.   For this she and the school community should not be subject to a full-scale investigation.

## CONCLUSION

For the foregoing reasons, plaintiff respectfully requests that the Court grant her Motion for Preliminary Injunction, and temporarily halt the OSI investigation.

Dated:  New York, New York
        May 2, 2017

                                Respectfully submitted,

                                MIRER MAZZOCCHI SCHALET JULIEN &
                                CHICKEDANTZ, PLLC

                                By: _____
                                        Jeanne E. Mirer

                                & By: _____
                                        Maria L. Chickedantz

                                150 Broadway, Suite 1200
                                New York, NY 10038
                                Tel. (212) 231-2235
                                Fax (212) 409-8338
                                *Attorneys for Plaintiff*
                                jmirer@mmsjlaw.com, maria@mmsjlaw.com

23