```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   JILL BLOOMBERG,

 4                    Plaintiff,

 5            v.                        17 CV 3136 (PGG)

 6   THE NEW YORK CITY DEPARTMENT
     OF EDUCATION and CARMEN FARINA,
 7                                      Motion Conference

                  Defendants.
 8   ------------------------------x

 9                                      New York, N.Y.
10                                      May 1, 2017
                                        3:10 p.m.
11
     Before:
12
              HON. PAUL G. GARDEPHE
13
                                        District Judge
14

15

16

17

18            APPEARANCES

19
     MIRER MAZZOCCHI SCHALET & JULIEN, PLLC
20        Attorneys for Plaintiff
     BY:  JEANNE E. MIRER
21        MARIA L. CHICKENDANTZ

22
     ZACHARY W. CARTER
23        Corporation Counsel for the City of New York
          Attorney for Defendants
24   ANDREA M. O'CONNOR
     WILLIAM A. GREY
25        Assistant Corporation Counsel
```

1          (Case called)

2          THE COURT:  This is a hearing on plaintiff Jill

3  Bloomberg's application for a contemporary restraining order

4  and preliminary injunction.  The plaintiff is the principal of

5  Park Slope Collegiate, which I will be referring to as "PSC,"

6  which I understand to be one of a number of public secondary

7  schools co-located at the John Jay Educational Complex in

8  Brooklyn.  Citing the complaint docket number 1, paragraphs 4,

9  10 through 11, and 22.

10          The other schools are the Secondary School for

11  Journalism, the John Jay School for Law, and Millennium

12  Brooklyn High School.  According to plaintiff, the students at

13  PSC, Journalism, and Law are predominantly African-American or

14  Hispanic, while the students at Millennium are 50 percent

15  African-American or Hispanic, and the remaining white or

16  Caucasian.  Citing the Bloomberg affidavit docket number 10

17  Exhibit 3.

18          Plaintiff has been employed by the New York City

19  Department of Education since 1998 and has served as PSC's

20  principal for the past 13 years.  Citing the complaint

21  paragraphs 10 through 11.  According to the complaint,

22  throughout her 13 years at PSC, plaintiff has been an

23  "outspoken advocate" and has encouraged desegregation at PSC

24  and "opposed measures that reinforce and perpetuate de facto

25  segregation, such as student tracking and instituting gifted

1    and talented programs." Id. at 31.

2         The complaint alleges that on March 2, 2017, the

3    department of education's office of special investigations, or

4    OSI, informed plaintiff that she is under investigation.

5    Citing the complaint paragraph 60.  The OSI informed plaintiff

6    that it is investigating allegations that plaintiff and two PSC

7    teachers are "members of a Communist organization known as the

8    Progressive Labor Party, that they are actively recruiting

9    students in the organization during school hours, and that they

10   invite students to participate in the organization's

11   activities, including marches for Communism."  Citing the April

12   6, 2017, OSI letter docket number 10-8; the Guerra declaration

13   docket number 17 at paragraphs 11 through 16, 31 through 35.

14        The OSI contends that the allegations, if

15   substantiated, may constitute a violation of certain DOE

16   regulations, including chancellor's regulation D130, which

17   prohibits employee involvement in any activities of political

18   organizations during working hours.  Id.  See also Chickendantz

19   affirmation, docket number 4, Exhibit B, at page 2.

20        As part of the investigation, the OSI has sent

21   subpoenas to other PSC employees requesting their appearance at

22   interviews.  Citing the Bloomberg affidavit docket number 10 at

23   paragraph 34.  Plaintiff contends that the OSI's investigation

24   is baseless and was initiated in retaliation for a January 10,

25   2017, email she sent to Eric Goldstein, who oversees the DOE's

1    Public School Athletic League, and DOE superintendent Michael

2    Prayor, complaining that the DOE is "operating two separate and

3    unequal sports programs" at the John Jay educational complex.

4    Citing the complaint, docket number 1, 55-56 and 71; the Bloom-

5    berg affidavit, docket number 10 Exhibit 3.  The email states

6    that students at the complex's predominantly black and Latino

7    schools, are offered fewer supports teams that the students at

8    Millennium, which, as I noted, is about 50 percent white.  Id.

9         Plaintiff commenced this action on April 28, 2017,

10    asserting claims for retaliation under the First Amendment,

11    Title VI of the Civil Rights Act of 1964, and the New York City

12    Human Rights Law.  Plaintiff has moved for a temporary

13    restraining order and a preliminary injunction enjoining the

14    OSI's investigation pending the outcome of this litigation.

15         Ms. Mirer, I'm happy to hear what you have to say in

16    support of the application.

17         MS. MIRER:  Thank you, your Honor.

18         We received the opposition papers this morning at 10

19    o'clock and have had a chance to review them.  In terms of the

20    application, we believe that, first of all, with respect to the

21    elements of an injunction, we meet all of them.

22         With respect to the First Amendment chilling effect,

23    we have submitted affidavits from not only Ms. Bloomberg but

24    also several teachers and administrative staff who have also

25    made statements, which I can quote if the Court is so inclined.

 1   The affidavits are in the record.  They are basically saying

 2   that they feel there has been a huge impact on the school.

 3          For example, in paragraph 7 of the affidavit of Rahsan

 4   Williams, he says, "The OSI investigation against Jill has

 5   eroded the trust and commitment we have spent years building.

 6   It has made me fearful of standing up for our students and

 7   speaking out against race discrimination because I'm afraid

 8   that my speaking out against racism will be seen as

 9   investigation-worthy by DOE.  It has been difficult to maintain

10   my morale knowing that I can no longer fight integration and

11   anti-racism.  Hence, that activity now comes with the

12   possibility of losing my teaching license."

13          He also says, "The investigation has splintered the

14   staff and the school environment I once considered a second

15   home.  Because of this investigation of Principal Bloomberg,

16   PSC has become a place wrought with tension, fear, and

17   suspicion.  Teachers who wholeheartedly support Jill are afraid

18   to provide affidavits of support in fear of retaliation from

19   the DOE.  A few teachers have made it clear that they are

20   considering applying to other schools because of the chilling

21   effect of this investigation has had on our school environment.

22   The investigation is a great disservice to our students and our

23   families."

24          THE COURT:  Let me break in.  First let me say, let me

25   say this to both sides.  I have read all the papers.  It is

1    pointless to read things that you have already told me, because

2    I have already read it.  I don't need to hear it again.

3           There are a few points that I want you to address, Ms.

4    Mirer, either this afternoon or in papers.  Let me say at the

5    outset that I am going to give you an opportunity to submit a

6    reply to what the city submitted.  Let me identify for you a

7    number of the issues I am concerned about.  You are welcome to

8    tell me whatever you want to tell me, but I am going to tell

9    you what is on my mind.

10          The first thing I would mention that is on my mind is

11   the issue of whether the January 10, 2017, email that you claim

12   was the catalyst for the city's act of retaliation, what you

13   claim to be retaliation.  My question is whether that email was

14   sent by Ms. Bloomberg in connection with her official duties as

15   the principal of PSC or rather simply as a citizen of New York

16   City.  That's question number one.

17          Question number two:  With respect to the point you

18   were telling me about chilling effect, the significance in your

19   view of the fact that you were able to obtain five affidavits

20   from PSC employees who are well aware of the investigation but

21   nonetheless felt free to express their viewpoint in the form of

22   the affidavits they submitted, not to mention the petition that

23   apparently was signed by 500 people or so, both of which would

24   tend to suggest that the First Amendment is alive and well at

25   PSC.

1          A third question: whether the initiation of an

2    investigation is sufficient to constitute adverse action for

3    purposes of the retaliation claim brought under the First

4    Amendment, Title VI, or the New York City Human Rights Law.

5          You repeatedly assert both in your papers, your brief,

6    as well as I think in your affidavit -- or maybe this is Ms.

7    Chickendantz's affidavit, I'm not sure which -- but the point

8    is that you assert that it is obvious that the initiation of

9    the investigation constitutes adverse action.

10         "Adverse action," of course, is a legal term.  We

11   don't speak of it in colloquial terms.  It has a definite

12   meaning under the law.  The question is whether the mere

13   initiation of an investigation here is sufficient to constitute

14   adverse action for purposes of a retaliation claim under the

15   First Amendment, Title VI, or the New York City Human Rights

16   Law.

17         You cited no cases, zero cases, for the proposition

18   that the mere initiation of an investigation is sufficient.

19   Your adversary has cited a number of cases for the proposition

20   that an investigation standing alone is not sufficient.  I am

21   going to want you to address that.  I am going to want you to

22   cite case law to me showing that the mere initiation of

23   investigation is enough to constitute an adverse action for

24   purposes of a retaliation claim.

25         Fourth question.  I want you to address the time line

1    of the investigation and in particular the city's assertion

2    that the investigation was actually opened in May of 2016,

3    after the city received an anonymous tip concerning your

4    client.  The investigation was closed, according to the city,

5    because of a lack of information to substantiate the anonymous

6    tip.  But then it was reopened later, after the city received

7    additional information.  I want you to address that.

8           Then the fifth question, last question.  The

9    defendants have said that neither the special commissioner for

10   investigation nor the OSI knew about Ms. Bloomberg's January

11   10, 2017, email at the time they commenced the investigation.

12   Their point is the January 10, 2017, email couldn't have had

13   anything to do with them commencing the investigation because

14   they didn't even know about it.

15          Those are five issues that I want addressed.  As I

16   said, you are welcome to tell me whatever you wish now, but I

17   am going to give you the opportunity to respond in writing in

18   the nature of a reply which you can submit by 5 o'clock

19   tomorrow.

20          MS. MIRER:  Thank you, your Honor.  I will address

21   some of them just briefly.

22          With respect to your first question, the issue of

23   whether she is speaking as a citizen we think is covered by the

24   case of <u>Matthews v. City of New York</u>, which is I believe

25   directly on point.  It's a case of a police officer who

1    reported the use of quotas for tickets and stop-and-frisks, and

2    the court found that he was speaking as a public citizen on an

3    issue of public concern.

4         THE COURT:  Isn't the difference that the officer

5    wasn't responsible for the quota system, if there was one, but

6    here, as part of Ms. Bloomberg's daily responsibilities, she

7    presumably has some responsibility for resources at the school?

8    She has an obligation to see that the students at PSC are

9    receiving adequate resources.

10        I have to tell you that when I reviewed her email, it

11   sounded much to me like an email you might expect to see from

12   any person of authority at a school who feels that their

13   students are not receiving what they should be receiving in

14   terms of resources from the department of education.

15        This was in the context of sports and the number of

16   sports teams that were made available at PSC versus the number

17   of sports teams made available at Millennium.  The point was

18   made that the PSC and the other schools were principally

19   African-American and Hispanic students whereas the Millennium

20   school was about 50-50.  That point was made.

21        Other than that, it seemed to me very similar to what

22   I would expect countless principals have communicated to DOE on

23   other occasions: that they feel like their school is not being

24   properly treated, is not receiving the resources that it is

25   entitled to, and that the students are being shortchanged as a

 1    result.  That's what it read like to me.

 2         I'm familiar with the case you cited.  I wonder

 3    whether it is exactly on point as you say.  It seems to me that

 4    it might be the case here that Ms. Bloomberg's responsibilities

 5    actually involve the allocation of resources at her school, and

 6    that in speaking or in sending an email communication to DOE

 7    about her level of unhappiness with the resources that the

 8    school is receiving, it seems to me she might have been acting

 9    in her position as the principal of PSC rather than as a

10    concerned citizen.

11         MS. MIRER:  I understand your point, your Honor.  I

12    also would like to point out that part of the reason why we

13    claim there is retaliation for the speaking out and raising

14    these issues is this is not something that has been happening.

15    In fact, it is something that principals have not been doing,

16    and it's not been viewed as part of their job to do.  In fact,

17    a concerned citizen could do the same.  A concerned parent

18    could do the same.

19         That was the kind of thing that was raised also in

20    Matthews.  But we will provide you a step-by-step analysis of

21    the Matthews case and why we think it is on point.  We believe

22    the citizen analog point is very well taken and that Ms.

23    Bloomberg has, in essence, been doing things that the DOE seems

24    not to have taken up as an issue and in fact never resolved the

25    issue of resources.  Even though they gave more sports teams to

1    the three majority black and Latino schools, they are still

2    segregated within the school in terms of who they play with.

3          Nevertheless, we will definitely get you a step-by-

4    step brief as to why we think she acted as a private citizen,

5    understanding that she also has a claim under Title VI, which

6    doesn't require that, and retaliation is outlawed under Title

7    VI as well.

8          THE COURT:  I understand that.  I was speaking in

9    terms of your First Amendment claim.

10          MS. MIRER:  Absolutely.

11          With respect to the chilling effect in the affidavits

12    and the fact that some people have been willing to come forward

13    and say yes, I feel chilled, usually that doesn't happen.  We

14    are very glad at least some people are willing to say, I feel

15    chilled, I feel this is a bad thing that is happening to the

16    school, it's impacting the school in a very negative way.  And

17    they are saying, I'm afraid also in the future to speak out,

18    which is another part of the chilling effect of the First

19    Amendment.

20          So it is not something that we can say we just had

21    some affidavits of people who say, yes, I'm chilled.  There are

22    50 teachers at the school.  Five of them were willing to come

23    forward and complain about this investigation, just the mere

24    initiation of it, and the basis of which it is has been

25    initiated.

1        Your Honor I don't think we would be here if on March

2   2nd Ms. Berchey came in and said there has been an allegation

3   that the school was used wrongly after hours or that there was

4   some kind of question of students being filmed in a movie that

5   they didn't give authorizations for, the things that are now

6   being said as the reason.

7        What they came in and said is she is being

8   investigated for alleged Communist activities, which to me

9   really does throw a whole different spin and a whole different

10   McCarthyite kind of chill over the school.  That's our

11   position.  I think the affidavits support it.  But they also

12   said there were others who are afraid to speak up in their

13   affidavit.  We will address that more in detail for the Court.

14        With respect to the question of initiation, whether or

15   not it is an adverse action, with respect to First Amendment

16   adverse action, the standard is that in retaliation cases all

17   that is required to maintain a claim is to show that the action

18   would deter a similarly situated individual of ordinary

19   firmness from exercising his or her constitutional right.  This

20   is stated in <u>Birch v. City of New York</u>, which is 184 F.Supp.3d

21   21, decided May 3, 2016, in the Eastern District of New York.

22        THE COURT:  There are cases that actually have talked

23   about whether the mere initiation of an investigation, without

24   anything having happened in terms of negative consequences,

25   whether that is good enough.  There is a case called <u>Weber v.</u>

1    The City of New York, 973 F.Supp.2d 227, 269 (E.D.N.Y. 2013),

2    which includes the following quote.

3           "Some courts have found that the commencement of an

4    investigation, even without attendant negative consequences, is

5    sufficient to establish an adverse employment action.  However,

6    there are other cases that have gone the opposite direction,

7    specifically, Spaulding v. New York City Department of

8    Education, 2015 Westlaw 12645530, at *39 (E.D.N.Y. February 19,

9    2015), where the court found that allegations of sexual conduct

10   and a resulting OSI investigation did not constitute an adverse

11   employment action."

12          Also, Wright v. Monroe Community Hospital, 2011

13   Westlaw 3236224, at *7 (W.D.N.Y. July 28, 2011).  "Employee

14   investigations, unwanted scrutiny from supervisors in negative

15   performance evaluations without attendant negative results, or

16   deprivation of position/opportunity do not sufficiently

17   constitute adverse employment actions under Title VII."

18          So there is a bit of a split of authority on the

19   point.  It appears we haven't completed our research on it.  I

20   welcome your citations.  But suffice it to say that some courts

21   have found that the mere initiation of an investigation is not

22   sufficient to constitute an adverse action for purposes of a

23   retaliation claim.

24          MS. MIRER:  We will definitely follow up on that, your

25   Honor.  I do not believe in Spaulding that the actual

 1    allegation was that the OSI investigation was commenced.  I

 2    believe it was allegations of false accusations.  We will

 3    definitely address this issue in our brief to be filed by 5

 4    o'clock tomorrow.

 5           On the issue of the date of the investigation starting

 6    in May, obviously we do believe that that supports our claim of

 7    retaliation in the sense that something was made anonymously in

 8    May, not viewed as sufficient to be a basis for an

 9    investigation, and closed.

10           THE COURT:  They say they got more information I think

11    it is on December 22, 2016.  They say they got more

12    information, and they say that the additional information

13    allowed them to identify the person who provided the tip, and

14    they say that they then interviewed that person and got

15    additional information.  And because of all of that, they say

16    they reopened the investigation on February 1st.

17           MS. MIRER:  We understand that that is their position,

18    your Honor.  We also know that on January 25th they sent this

19    information to both the DOE, defendant in this case, and the

20    OSI, making it clear that the DOE had notice of what was in

21    these claims.

22           I do want to point out that with respect to each of

23    those claims, for example, there is a theory or a statement

24    made that the concern was that there was a movie -- many of

25    these allegations are allegations that do not require an OSI

1    invite.  All of them we would say don't require an OSI

2    investigation.  If there is a concern as to whether or not an

3    entity used a school building after hours, there are permits

4    that are required to do that.  They can check the permits.

5         There was a permit for the showing of a movie called

6    Profiled in June of 2016.  There was a permit for that.  If

7    there is an allegation that plaintiff's husband was somehow

8    involved with a foundation that they claim is somehow connected

9    to this political party, the foundation has a website.  You can

10   call up the foundation.  You can find out what they did in

11   terms of whether or not they gave money to the filmmaker.  Not

12   Jill Bloomberg, the filmmaker.

13        This film has been shown at Sun Dance, the Brooklyn

14   Academy, the Brooklyn Museum, other places.  It has won awards.

15   This is a movie that they are talking about.  This is

16   information that could be --

17        THE COURT:  I thought their point about the move was

18   that, first of all, some students were shown in it without

19   their permission.  Then I thought they were saying that the

20   movie was shown and people were charged admission to see it at

21   the school.  Did I misunderstand?

22        MS. MIRER:  That's what their allegation is.  But this

23   is something that could have been verified with the filmmaker.

24   The filmmaker, Karen Foster, is listed as the maker of the

25   film.  It's her obligation to get whatever releases she needs.

1    Ms. Bloomberg had nothing to do with that.  She had nothing to

2    do with the filming.

3          The fact that a foundation that is a public charity

4    gave a grant along with many other funding institutions gave

5    grants to help fund this movie has nothing to do with whether

6    or not Jill Bloomberg did anything wrong.  And these are things

7    that could have been easily, easily looked into and found and

8    verified with the filmmaker, with the foundation, with the

9    permitting.

10          My understanding is that nobody was charged a fee.

11    They were allowed to give a contribution if they so wanted.

12    This is the kind of thing that could have easily been

13    investigated independent of an OSI investigation.

14          THE COURT:  You're saying it could easily be

15    investigated but it can't be investigated by OSI?

16          MS. MIRER:  What I'm saying is that the allegations

17    that have come forward have really nothing to do with Jill

18    Bloomberg.

19          THE COURT:  I thought the city's position was that

20    they had received a tip that they did have something to do with

21    Ms. Bloomberg.  Isn't that what they are saying?

22          MS. MIRER:  They may have had a tip.  But what we are

23    saying is that if you're going to start an OSI investigation,

24    which is no small matter -- it's no small matter for somebody

25    to be under an OSI investigation.  If you read the allegations

in terms of what does it mean, you're not told what it is

about, you can be asked questions, you don't get to sign

anything, it could be used against you.  It could be a fishing

expedition for somebody else's political vendetta.  This is not

any small matter, to open an investigation.

What I'm saying is that if there is a complaint and if

one of the allegations is there was a movie shown at the

building after hours, there is a way for them to find out

without opening an investigation into Jill Bloomberg.  There is

a permit that is signed.  You know who asked for the permit.

You can talk to that person.

If there is an allegation that there is a foundation

behind it, if there is an allegation that people didn't have

signed releases, you talk to the filmmaker.  You don't open an

investigation into the principal of the school.

All I'm saying is that the reasonable person would

know this.  So unless they were really trying to find something

that they could start an investigation on in retaliation for

the actions that we say are protected, there would be no reason

to rely on this kind of accusation.

There is an allegation that her husband was involved

in this.  That has nothing to do with Jill Bloomberg being a

principal.  Frankly, your Honor, if you read D130, it is

absolutely clearly that D130 relates only to elected office.

It does not relate to anybody's political views.

1         THE COURT:  It is clear, is it not, that a teacher or

2    principal or an assistant principal can't promote any political

3    organization, period?  They are not allowed to do that during

4    working hours at the school, are they?  They are not allowed to

5    promote any particular political party, are they?

6         MS. MIRER:  This is what D130 days.  "School buildings

7    are not public forums for purposes of community or political

8    expression.  The following sets forth the rules which govern

9    the use of access to the buildings," etc.

10        There are visits by people who are candidates for

11   public office.  It says while on duty or in contact with

12   students, all school personnel.

13        THE COURT:  I'm sorry.  I can't hear you.

14        MS. MIRER:  This is subsection (c)(1) of D130.  "While

15   on duty or in contact with students, all school personnel shall

16   maintain a posture of complete neutrality with respect to all

17   candidates.  Accordingly, while on duty in contact with

18   students, school personnel may not wear buttons, pins, articles

19   of clothing, or other items indicating a candidate, slate of

20   candidates, or police organization committee."

21        The political organization that they are referring to

22   is a political organization supporting a particular elective

23   candidate.

24        THE COURT:  You're arguing that it actually would be

25   appropriate for a teacher or principal to actively recruit

1    students to become members of a political organization during

2    school hours?  Is that your position?  There isn't any

3    regulation that prohibits that?

4         MS. MIRER:  We don't think that D130 prohibits that,

5    first of all.  And Ms. Bloomberg has not done that.  Ms.

6    Bloomberg is a principal.

7         THE COURT:  There is an allegation that she did that.

8    I read it to you at the outset.  The city is alleging that they

9    received a tip, an allegation from someone who says that she

10   was recruiting students to join something called the

11   Progressive Labor Party and that she was inviting them to

12   participate in that organization's activities during school

13   hours.  That's what the city says.  Whether that is true or

14   not, I don't know, but they have definitely alleged that, no

15   question about it.

16        I hear what you are saying about D130.  But are you

17   telling me there is no regulation that would prohibit a teacher

18   or principal from attempting to recruit students who join a

19   political party or to participate in the activities of a

20   political party during school hours?  Is it your position that

21   there is no such regulation and that teachers and principals

22   are in fact free to do that?

23        MS. MIRER:  Your Honor, first of all, this reminds me

24   of the Kramer case.

25        I want to back out a little bit because there has been

1    no specific allegation of time, place, date, specific students,

2    what specific things, etc., that my client was alleged to do.

3    She denies doing that.  She knows that her job is to be the

4    principal and to advocate for the students, and she has put

5    forward in her affidavit all of the things that she has done

6    with respect to fighting against racism, fighting against

7    criminalization of students, all of the things she feels had

8    fostered the kind of very nurturing environment at that school.

9          With respect to the question of what happened in the

10   Kramer case, your Honor -- I don't know if we mentioned it, but

11   we will -- a teacher was giving a course on HIV/AIDS and she

12   wound up asking the students what they thought in terms of --

13   it was part of sex education.  She wound up putting on the

14   board some words that were maybe vernacular for certain body

15   parts having to do with sex.  She was taken out of the

16   classroom for eight months for doing this.  Judge Weinstein

17   found this particular rule that they cited for her was

18   unconstitutionally vague.

19          At this point, if the school system wants to create

20   some type of rule about what is or is not permissible speech

21   during the day, about whether or not you can say I happen to

22   believe this way but I'm not making anybody believe that way,

23   or so on, if the school system wants to come out with some kind

24   of regulation that is not vague and unconstitutionally

25   overbroad, maybe we would say there might be a problem.  But

H5lcblcc

1   right now under these allegations we don't know what she is

2   charged with.

3        We know that there is some vague allegation of

4   recruiting, there is some vague allegation of asking people to

5   participate in marches.  This is not something that you make an

6   investigation for and put a well-respected principal under a

7   microscope for.  That's my position.  We will argue it more

8   specifically in our brief.  We think that at this point what's

9   happening is that the school system has backed off quite

10  substantially from claiming that that is the issue.

11       (Pause)

12            THE COURT:  Go ahead.

13            MS. MIRER:  I'm not exactly sure where I was.

14            THE COURT:  The point you were making is you feel that

15  the city has backed off some of the allegations that it made.

16  I assume you're referring to the April 6th letter to Ms.

17  Chickendantz.  I think what you were telling me is you felt the

18  city had backed off some of the allegations that were made in

19  that letter.  That's the point you were making a moment ago.

20            MS. MIRER:  First of all, I want to say that I think

21  the allegation about recruiting Communist activities, etc., I

22  think that was in the May allegation which they closed.  That's

23  what my understanding is, and that they didn't revive it until

24  there were these other things that related to the movie which

25  was called Profile.

 1          THE COURT:  All I know is I'm looking at an April 6th

 2   letter from I believe it is OSI to Ms. Chickendantz, and it

 3   says, "The complaint being investigated is that Jill Bloomberg

 4   and two teachers at the Park Slope Collegiate School are

 5   members of a Communist organization known as the Progressive

 6   Labor Party, that they are actively recruiting students in the

 7   organization during school hours, and that they invite students

 8   to participate in the organization's activities, including

 9   marches for Communism."  That's April 6th.  That's what they

10   say on their investigation.

11          MS. MIRER:  Right.  In their affirmation to this

12   Court, they say different things.  They don't reiterate that.

13   They talk about that her husband is involved in --

14          THE COURT:  I agree with that.  I'm looking at Charity

15   Guerra's declaration.  Paragraph 37 reads as follows.  "OSI is

16   conducting an investigation to ascertain whether plaintiff used

17   her position as a DOE employee to advance the beliefs of a

18   particular political party and engage in impermissible

19   political activity in violation of chancellor's regulations and

20   conflicts of interest law.  DOE regulations do not prohibit

21   exposing students to the complete spectrum of political

22   ideologies.  Similarly, OSI's investigation will determine

23   whether plaintiff violated academic policy and conflict of

24   interest rules."

25          It seems to me that is consistent with what they said

1 they were investigating on April 6th

2       MS. MIRER:  That's true.  That is the only place where

3 it is consistent, your Honor.

4       But I do want to point out that really if you look at

5 this closely, they are claiming that they are not investigating

6 her for believing, but they are saying they are investigating

7 her as to whether or not she used this position to advance a

8 political party.

9       The political parties at issue in D130 are ballot-

10 accessed political parties, not an organization that may or may

11 not have any kind of basis for running an election or having

12 run an election.  That is number one.  So we think that D130

13 can't be violated, and they don't have a right to investigate

14 that.

15       Whether or not she has advanced the beliefs of a

16 political party -- the thing that I got most incensed about,

17 having myself a civil rights background and knowing, from

18 Dombrowski v. Pfister forward, is that people who support civil

19 rights and integration have often been called Communists.

20       So, when you put that together, this is really what is

21 being investigated, her political belief, and whether or not

22 she, as someone who has been outspoken on behalf of her

23 students and fighting racism in society and in the school

24 system, can have that label put on her or should have that

25 label put on her to the point that it would be investigated.

1    That's what is bringing this case within the First Amendment,

2    your Honor.

3        Frankly, I don't see a difference.  You're saying you

4    can have the belief but you can't state what your beliefs are?

5    I'm sorry.  That to me is the same thing as investigating the

6    beliefs.

7        THE COURT:  To repeat, I think what the city is

8    alleging -- again, I don't know whether there is any basis for

9    it or not -- the city is asserting that your client was

10    recruiting students to join this political party and to

11    participate in their activities.  That is the complaint they

12    say they received.  That is the complaint they claim they are

13    investigating.  I understand your position that your client

14    didn't do either of those things.  But that is what they are

15    saying they were told in the complaint they received and that's

16    what they say they are investigating.

17        MS. MIRER:  Your Honor, if it was anything else

18    besides raising the specter of Communism, they would have been

19    required to say how, who, what, when, tell me the dates and

20    times, give me specifics, and they are not.  That's why this

21    investigation is so dangerous.  That's why this investigation

22    is so dangerous.  We will, of course, address this in more

23    detail.

24        THE COURT:  Is it your contention that either the

25    special commissioner for investigation or OSI knew about your

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1  client's January 10, 2017, email at the time they opened this

2  investigation?  Is that your contention?

3       MS. MIRER:  Our contention is that they either knew

4  about it or they could have easily found out and could have had

5  constructive knowledge.  Certainly by January 25, 2017, the DOE

6  had knowledge of the allegations, and OSI is a part of DOE.

7  There is no question that they would have had knowledge.

8       THE COURT:  I'll hear from the city.

9       MS. MIRER:  Thank you, your Honor.

10       MS. O'CONNOR:  Thank you, your Honor.  I'll be very

11  brief.

12       With respect to the issues raised by your Honor that

13  were addressed by plaintiff's counsel, with respect to the

14  issue of whether or not the plaintiff was speaking as a

15  concerned citizen on a matter of public concern, we share the

16  same view that Matthews v. City is not on point, that it is

17  distinguishable, and that the topics that were discussed in the

18  January 10th email are squarely within her job duties as a

19  principal in terms of allocating resources to her students and

20  to advocate on behalf of the students for resources that she

21  believes they are entitled to.  Again, these are the job duties

22  of a principal.

23       With respect to the chilling effect, it's counter-

24  intuitive to believe that there would be affidavits submitted

25  by teachers who say I am feeling chilled but not chilled enough

1    to not submit this affidavit, and that is essentially what the

2    argument is.  The case law is quite clear that there has to be

3    an actual chilling of the First Amendment speech in order to

4    suffice as irreparable harm.

5          THE COURT:  Who do I look to to figure out whether

6    there is a chilling effect?  You have mentioned the five

7    individuals who put in affidavits.  Your adversary says there

8    are lots of other people that weren't willing to put in

9    affidavits because they are chilled by the initiation of this

10   investigation.  Who do you contend I look to in order to

11   determine whether there is a chilling effect or not?

12         MS. O'CONNOR:  With respect the allegations that there

13   are unidentified teachers unwilling to come forward, obviously

14   those allegations in the affidavits are hearsay.  I understand

15   we have an issue of how can we identify people who don't wish

16   to be identified.  But those are hearsay statements.

17         THE COURT:  Do the rules of evidence apply to a

18   hearing on a preliminary injunction?  The answer is no, they

19   don't.  The answer is no, they don't.

20         MS. O'CONNOR:  They are relaxed.

21         THE COURT:  The answer is no, they don't.  Again, I

22   return to my original question, which is who do I look to to

23   determine whether there has been a chilling effect?  Do I

24   understand you to be conceding that I can look at people who

25   didn't submit affidavits who plaintiff alleges were chilled and

1    are sufficiently concerned about the initiation of the

2    investigation that they wish to play no part in challenging

3    what plaintiff says is discriminatory conduct taking place at

4    the John Jay complex?  Who do I look to?

5            MS. O'CONNOR:  Your Honor, I would ask you to look at

6    this courtroom.  You have indicated that the First Amendment

7    expression at PSC is alive and well, and I think that this

8    courtroom is evidence of that.  So to the extent there is some

9    allegation that the First Amendment rights of PSC employees,

10   parents, students have been chilled, this very courtroom

11   demonstrates otherwise.

12           With respect to unidentified teachers -- may I

13   proceed, your Honor?

14           THE COURT:  Please.  There will be silence.  Go ahead.

15           (Continued on next page)

16

17

18

19

20

21

22

23

24

25

 1          MS. O'CONNOR:  With respect to looking to unidentified

 2    teachers who refuse to come forward, again, the evidence that's

 3    in the record now suggests otherwise.  We have five individual

 4    teachers who have put forth affidavits in relatively short

 5    order in support of this motion, one of whom is going to be

 6    questioned by OSI herself.  And even in spite of that, she

 7    decided to put in an affidavit.  The balance of the evidence

 8    certainly tips in favor of that there is no chill at all.

 9          And with respect to the plaintiff individually, there

10    is evidence that she has continued to engage in the same

11    activities that she was before March 2, when she was advised of

12    the OSI investigation.  She met with teachers and parents

13    wherein she discussed the investigation and her belief that it

14    was retaliatory.  It is our understanding that she was a

15    speaker at a council sponsored by Park Slope Civic Council on

16    March 30, again discussing school segregation.  So she's

17    continuing to engage in the same activities that she was

18    engaging in, in advance of learning about the OSI

19    investigation.

20          So I think, when looking at the evidence in the

21    record, it overwhelmingly shows that there is no actual chill.

22          THE COURT:  But are you conceding that in determining

23    whether there is a chill, I can look beyond the plaintiff to

24    consider others, for example, other employees of the DOE at

25    PSC.  Are you conceding I can look to them as well as the

1   plaintiff, in determining whether there's been a chilling of

2   First Amendment rights?

3            MS. O'CONNOR:  Your Honor, plaintiffs have cited to no

4   such case law that can allow the Court to consider unidentified

5   individuals in considering whether or not there has been an

6   actual chill.  I don't know how they can prove an actual chill

7   without any evidence of such.  So, no, I'm not conceding that.

8            THE COURT:  All right.  Go ahead.

9            MS. O'CONNOR:  With respect to, counsel also brought

10  up the point that she believed that the fact that OSI

11  essentially tabled or closed the complaints made in 2015 is

12  evidence of retaliation.  We would --

13           THE COURT:  2016.

14           MS. O'CONNOR:  2016.  Thank you, your Honor.  We would

15  argue that it's the exact opposite.  If DOE's motives were

16  retaliatory, why not move on the first allegation?

17           THE COURT:  Well, but they're saying that the premise

18  is that the urge to retaliate happened on or about January 10,

19  2017, when she sent the e-mail.  That's their position.  So the

20  fact that they didn't take action against her in May 2016, from

21  plaintiff's point of view, is kind of irrelevant because

22  they're pegging the desire to retaliate on the January 10, 2017

23  e-mail.  So that's their position.

24           MS. O'CONNOR:  Well, also, your Honor, in looking at

25  all of the plaintiff's affidavit, she has, according to her,

1    has a very long history of engaging in the same activities,

2    over the course of a decade.  So the activities have been going

3    on for quite some time.  The only difference here is that the

4    OSI received an allegation against Ms. Bloomberg that they

5    needed to investigate.

6          With respect to counsel's, essentially her questioning

7    of why an OSI investigation was needed into these allegations,

8    I mean, I think it's quite clear what counsel was describing

9    was in fact an investigation.  Interview witnesses, interview

10   the film maker, find out whether or not there was a permit,

11   look to the web site.  This is the definition of an

12   investigation and what OSI will do unless the Court stops the

13   investigation in its tracks.  This is what the DOE is trying to

14   do.  OSI is the entity within DOE that is charged with

15   conducting the very investigations that counsel is describing.

16          THE COURT:  Now, your adversary says that there is

17   actually no chancellor's regulation that prohibits a principal

18   or other employee of DOE from promoting political organizations

19   during school hours.  What regulation is it that you're

20   relying -- are you relying on this D-130 or are you relying on

21   something else?

22          MS. O'CONNOR:  Yes, your Honor, it's D-130, and I can

23   hand a copy up to the Court.

24          THE COURT:  That would be great.

25          MS. O'CONNOR:  Your Honor, and I can direct your

1    attention to the bottom of the third page, subsection C, that's

2    titled "Conduct of Officers and Employees."

3             THE COURT:  Yes.

4             MS. O'CONNOR:  Plaintiff's counsel has represented

5    that it seems to only apply when there is a specific candidate

6    that is at issue.  That's against the plain reading of

7    subsection C.1, which refers to "a candidate, candidates, slate

8    of candidates, or political organizations or committees."  So

9    it involves not just a particular candidate; it involves whole

10    political organizations.

11             And to the extent that counsel is somehow arguing that

12    it is impermissible for the DOE to impose --

13             THE COURT:  Well, let's just stick with that for a

14    second.

15             MS. O'CONNOR:  Yes, your Honor.

16             THE COURT:  That sentence that you read says,

17    "Accordingly, while on duty or in contact with students, school

18    personnel may not wear buttons, pins, articles of clothing, or

19    any other items advocating a candidate, candidates, slate of

20    candidates, or political organization committee."

21             MS. O'CONNOR:  Subsection 2, your Honor -- I should

22    have pointed that out as well -- reads, "Personnel may not be

23    involved in any activities, including fundraising on behalf of

24    any candidate, candidates, slates of candidates, or any

25    political/organization committee during working hours."

1          THE COURT:  OK.

2          MS. O'CONNOR:  And to the extent plaintiff's counsel

3     is contending that there is no basis for the DOE to require

4     that its employees maintain a posture of political neutrality

5     during working hours, that contention has been rejected by the

6     Southern District in a case that's cited in our brief.  It's

7     Weingarten v. Board of Education, cited on page 25 of

8     defendants' brief, that finds that the DOE does in fact have a

9     legitimate pedagogical interest in avoiding partisan politics,

10    essentially.  So that contention has already been rejected by

11    courts of this Circuit.

12         With respect -- and the only additional item I'd ask

13    the Court is, since plaintiff is going to be permitted to

14    submit a reply brief tomorrow, I would ask that defendants have

15    the opportunity to review the brief and then request oral

16    argument if needed, if we believe that there are any

17    outstanding issues that we need to address with the Court, or

18    we can, if the Court would prefer a surreply in lieu of an

19    argument, that we be permitted to submit one.

20         THE COURT:  You can review plaintiff's brief when you

21    get it and then make an application, and I certainly will

22    consider it.  You should say in the application whether you

23    want the opportunity to put in a letter or whether you want to

24    argue points, and I will rule on the application.

25         What is your position on when SCI and/or OSI learned

 1   of plaintiff's January 10, 2017 e-mail?

 2            MS. O'CONNOR:  When OSI learned of the e-mail?

 3            THE COURT:  Either SCI or OSI.

 4            MS. O'CONNOR:  I can't speak for SCI.  They are an

 5   entity separate and apart from DOE.  In terms of when OSI

 6   learned of the e-mail, I can address that in a supplemental

 7   briefing.  I can't say a specific date now.  I do know, based

 8   on the declaration submitted by Ms. Guerra, that they were not

 9   aware of the e-mails at the time the decision was made to

10   reopen the investigation.

11            THE COURT:  All right.

12            So anything else you want to say?

13            MS. O'CONNOR:  Unless your Honor has questions.

14            THE COURT:  All right.  Ms. Mirer, anything else you

15   want to say?

16            I guess there is one thing I would ask you to respond

17   to right now, which is, I would have to make a finding of

18   chilling effect.  Are you really contending that your client

19   has been chilled, and do the facts support that, given the fact

20   that she's made a number of public statements about the matter,

21   as I understand it, after she found out about the

22   investigation?

23            MS. MIRER:  She has said in her affidavit that she

24   does feel chilled.

25            THE COURT:  But subjective assertions of being chilled

1    aren't going to cut it.  You have to look at what the facts

2    are.  And when someone continues to advocate for their position

3    after an investigation of this sort has been initiated, it does

4    raise the issue whether someone has actually been chilled or

5    not.  And this frequently comes up in First Amendment cases,

6    where people say their rights have been chilled but yet they're

7    advocating with the same vigor the point that they were

8    advocating before the alleged retaliatory act took place.  So

9    it's a common question.  It comes up in a lot of these cases:

10   has the person been chilled or not and if so why are they

11   basically saying the same things after the alleged retaliation.

12            MS. MIRER:  First of all, the only thing that was

13   alleged that she said after the fact was to -- after knowing of

14   the investigation -- was to explain to the school community

15   that her beliefs that this was a retaliatory investigation, the

16   fact that she spoke at an outside forum, unrelated to her work

17   at DOE, would not be evidence of her not being chilled.  The

18   fact that she was asked to speak at a forum on her views

19   outside the DOE, which is what my co-counsel mentioned, is not

20   something that would impact her conduct within the school.

21            THE COURT:  Anything else you want to say?

22            MS. MIRER:  I have two things.  One is that, obviously

23   we'll put this in our brief, but we do think that there is

24   strong evidence of likelihood of success on the merits.  And we

25   would ask if the Court would, at least for now -- the

1    investigation is on hold, and if it would be possible to not

2    have to have any of the school community go to investigations

3    while this matter is pending, we would appreciate the Court

4    asking the DOE to refrain until such time as we have the

5    ability to have the hearing -- I mean have your Court's

6    decision.

7              THE COURT:  Well, let me tell you what I intend to do.

8              I've already given you the right to submit a reply,

9    which I've asked you to submit by 5 o'clock tomorrow,

10   addressing the five questions I had as well as anything else

11   you want to say.  And then the city will have an opportunity to

12   request, either the opportunity to put in a surreply or to

13   raise points that it wishes to make at oral argument.  But it

14   is my intention to rule on the matter at a 5 o'clock hearing on

15   Wednesday, May 3.  So the matter is not going to sit for a long

16   time.

17             Anything else?

18             All right.  We will issue an order with the schedule

19   that I've outlined.  If there's nothing else, we're adjourned.

20             MS. MIRER:  Could I just clarify, until May 3rd,

21   should there continue to be investigation --

22             THE COURT:  Does the city have any intention of

23   attempting to interview people between now and 5 o'clock on

24   Wednesday, May 3?

25             MS. O'CONNOR:  Certainly if the Court is instructing

1    us not to, we will not do so.

2              THE COURT:  Well, let me say this.  I think any

3    intelligent lawyer understands that when a matter is sub judice

4    before the Court, it's probably not a great idea to take

5    action?

6              MS. O'CONNOR:  Understood, your Honor.

7              THE COURT:  OK.

8              MS. MIRER:  Thank you, your Honor.

9              THE COURT:  All right.  Thank you both.

10                              o0o

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25