h532bloA

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  JILL BLOOMBERG,

4              Plaintiff,                New York, N.Y.

5         v.                             17 Civ. 3136(PGG)

6  THE NEW YORK CITY DEPARTMENT
   OF EDUCATION  AND CARMEN
7  FARINA,

8              Defendants.

9  ------------------------------x

10                                      May 3, 2017
                                        5:20 p.m.
11
   Before:
12
                      HON. PAUL G. GARDEPHE,
13
                                        District Judge
14

15
                          APPEARANCES
16

17
   MIRER MAZZOCCHI SCHALET JULIEN & CHICKEDANTZ, PLLC
18       Attorneys for Plaintiff
   BY:   JEANNE I. MIRER
19       MARIA L. CHICKEDANTZ

20

21  ZACHARY W. CARTER
        Corporation Counsel of the City of New York
22  BY:  ANDREA M. O'CONNOR
        WILLIAM A. GREY
23       Assistant Corporation Counsel

24

25

1          (Case called)

2          MS. MIRER:  Jeanne Mirer, Mirer Mazzocchi Schalet

3     Julien & Chickedantz, for the plaintiff.

4          MS. O'CONNOR:  Andrea O'Connor for the Department of

5     Education and Chancellor Farina.

6          THE COURT:  I have read the papers.  I am happy to

7     hear any additional argument the parties want to make.

8          Ms. Mirer, anything else you want to say?

9          MS. MIRER:  Nothing, your Honor, except just in terms

10    of the adverse action standard, we clearly believe that it is a

11    test that, whether or not the OSI investigation would dissuade

12    a reasonable worker from participating in protected activity.

13          Thank you.

14          THE COURT:  All right.  Does the city want to offer

15    any additional argument?

16          MS. O'CONNOR:  No, your Honor.

17          THE COURT:  This is a continuation of a hearing on

18    plaintiff's application for a temporary restraining order and

19    preliminary injunction.

20          Plaintiff Jill Bloomberg is the principal of Park

21    Slope Collegiate, which I will be referring to as "PSC," which

22    is a high school located at the John Jay Educational Complex,

23    which I will be referring to as "John Jay," located in the Park

24    Slope section of Brooklyn.  (Cmplt. (Dkt. No. 1) ¶¶ 4, 10-11,

25    22)  Plaintiff has worked for the New York City Department of

h532bloA

1    Education, or "DOE," since 1998, and she has served as PSC's

2    principal for the past 13 years.  *(Id.* ¶¶ 10-11)

3        PSC is one of four secondary schools co-located at

4    John Jay.  The other schools co-located at John Jay are the

5    Secondary School for Journalism, which I will refer to as

6    "Journalism," the John Jay School for Law, which I will refer

7    to as "Law," and Millennium Brooklyn High School*.  (Id.* ¶¶ 4,

8    55; Bloomberg Aff. Exhibit 3 (Dkt. No. 10-3))  PSC's student

9    body is 85 percent black and Latino.  Journalism's student body

10   is 87 percent black and Latino, and Law is 90.4 percent black

11   and Latino.  *(Id.* at ¶¶ 28, 30, 55)  Millennium Brooklyn --

12   which is an offshoot of Millennium High School in Manhattan, a

13   school with a predominantly white student body -- joined the

14   John Jay complex in 2011*.  (Id.* at ¶ 32)  According to the

15   complaint, Millennium Brooklyn maintains a "high percentage" of

16   white students.  The student body at Millennium Brooklyn is

17   nonetheless majority black and Latino*.  (Id.* ¶ 55)

18       In the complaint, plaintiff asserts that -- throughout

19   her nearly 20-year career at DOE -- she has been an "outspoken

20   advocate against [race discrimination] and segregation within

21   the DOE*." (Id.* ¶ 37).  The complaint sets forth a number of

22   instances -- dating back to 2011 -- in which plaintiff has

23   publicly addressed these issues and advocated for greater

24   equality within the DOE.  (*See Id.* ¶¶ 32-54)  This lawsuit

25   relates not to plaintiff's alleged long record of opposing

h532bloA

segregation in DOE schools, however, but instead to a January

10, 2017 e-mail that plaintiff sent to two DOE officials on

January 10, 2017, complaining about the alleged "segregated and

unequal allocation of sports teams and resources" at John Jay.

(*Id.* at ¶ 26)

Plaintiff sent her January 10, 2017 e-mail to Eric

Goldstein, who is the head of DOE's Office of School Support

Services, which is responsible for the Public School Athletic

League, or "PSAL."  The other addressee was DOE superintendent

Michael Prayor, who is plaintiff's direct supervisor.  (*Id.* ¶

55; Bloomberg Aff. Ex. 3 (Dkt. No. 10-3); Supp. Bloomberg Aff.

(Dkt. No. 21) ¶ 7)  In her e-mail, plaintiff asserts that the

DOE is operating "separate and unequal [sports] programs" at

John Jay.  (Bloomberg Aff., Ex. 3 (Dkt. No. 10-3))

DOE offers two sports programs at John Jay.  The

first -- the John Jay Campus PSAL -- is offered to students at

PSC, at Journalism, at Law, and at the nearby Brooklyn High

School of the Arts, which is also predominantly black and

Latino*.  (Id.)*  The second sports program at John Jay is the

Millennium High School PSAL.  This program is offered to

students at Millennium Brooklyn and Millennium High School in

Manhattan.  (*Id.*)  Because Millennium Manhattan does not have a

gym, its students participate in sports programs with

Millennium Brooklyn at the John Jay campus.  (*Id.*)  The student

body at Millennium Manhattan is about 75 percent white and

1    about 25 percent black and Latino.  *(Id.)*

2          Because plaintiff's January 10, 2017 e-mail is

3    critical to this lawsuit -- plaintiff alleges that it provoked

4    DOE to launch a retaliatory investigation against her -- I am

5    going to read that e-mail in its entirety.

6          The sender of the e-mail is Jill Bloomberg.  It is

7    dated January 10, 2017, at 6:49 a.m.  It is addressed to Eric

8    Goldstein and Michael Prayor, with cc's to Donald Douglas, Marc

9    Williams, Oneatha Swinton, and Kevin Conway.  The papers don't

10   explain to me who these people are.  I assume they are somehow

11   associated with the sports program at John Jay.

12         The subject line for the e-mail reads "PSAL at the

13   John Jay Campus."

14         The e-mail reads as follows:

15         "Dear CEO Goldstein and Superintendent Prayor:

16         "I am writing to request your assistance in uniting

17   the PSAL sports teams on the John Jay campus in Brooklyn.  Our

18   campus houses the Secondary School for Journalism, the John Jay

19   School for law, Millennium Brooklyn High School, and Park Slope

20   Collegiate.  Currently the John Jay Campus Schools PSAL teams

21   include students from Journalism, Law, PSC, and students from

22   Brooklyn High School of the Arts on Dean Street.  Millennium

23   Brooklyn High School students belong to the Millennium High

24   School PSAL teams that also include students from Millennium

25   High School in Manhattan.  The separate school programs, both

h532bloA

1  of which practice and compete at the John Jay Campus

2  (Millennium High School does not have a gym) offer vastly

3  unequal opportunities to students.

4  "Prior to this school year, the John Jay Campus had

5  only four teams.  We were recently granted girls' cross country

6  and girls' and boys' indoor and outdoor track, though we

7  requested and were denied girls' and boys' swimming; girls'

8  softball, flag football, double-dutch, and JV volleyball, as

9  well as boys' volleyball and soccer.  Meanwhile, the number of

10  Millennium High School teams continues to grow.

11  "The principals of the schools at the John Jay Campus

12  meet weekly to manage our shared campus.  From the time that

13  Millennium Brooklyn High School joined our campus community in

14  2011, I have argued that they should be a part of our PSAL

15  team.  Nonetheless, they opted to join with Millennium High

16  School (which opened in 2002) and, over the years, has been

17  granted 17 teams.  In spite of repeated requests to unite the

18  teams and open up the opportunities that exist on the campus

19  but that are denied to students from three of the four schools,

20  Millennium Brooklyn High School maintains its exclusive

21  alliance with Manhattan Millennium High School.

22  "The PTA at PSC has also raised these inequities with

23  Executive Director Donald Douglas, but have heard nothing in

24  response.

25  "The benefits of these separate and unequal programs

h532bloA

to the students at Millennium Brooklyn High School and
Manhattan Millennium High School do not justify the
disadvantages imposed on the students from Brooklyn High School
for the Arts, Law, Journalism, and PSC.  Nor do whatever
logistical difficulties may arise from uniting them.  The
students at all six schools are equally deserving of
opportunities to participate in extracurricular sports, and it
is the responsibility of the DOE and of PSAL to facilitate that
equity.

        "I look forward to hearing from you soon.

        "Sincerely, Jill Bloomberg, Principal, Park Slope
Collegiate," address, telephone numbers, fax and BlackBerry
provided.

        In addition to the text of the e-mail that I just
read, plaintiff's e-mail also includes a chart showing that the
John Jay Campus PSAL has nine sports teams for 1859 students,
while the Millennium High School PSAL has 17 sports teams for
1261 students.  The chart also lists the enrollment at each of
the relevant high schools along with the percentage of black
and Hispanic students at each school.  *(Id.)*

        Plaintiff received no immediate response to her
January 10, 2017 e-mail, (Cmplt. (Dkt. No. 1) ¶ 57)  I say no
immediate response because, on March 3, 2017 -- after the
alleged retaliatory investigation had been initiated against
plaintiff, Donald Douglas, the executive director of the PSAL,

h532bloA

informed plaintiff and the other principals at the John Jay

schools that the John Jay Campus PSAL would be granted five

additional sports teams.  (Supp. Bloomberg Aff. (Dkt. No. 21) ¶

10)  Douglas stated, however, that the two sports programs at

John Jay would not be merged.  *(Id.)*

I will now discuss the alleged retaliatory

investigation that is the premise for this lawsuit.

On May 12, 2016, the Special Commissioner of

Investigation for the New York City Public Schools, the "SCI,"

received an anonymous tip that plaintiff was engaged in

improper political activities with her students at PSC.  SCI is

an independent investigative agency that is part of the New

York City Department of Investigation.  SCI is not part of the

Department of Education.

The unanimous tipper reported to SCI that plaintiff

was "a member of a political organization known as the

Progressive Labor Party and was actively recruiting students

into the organization and inviting them to participate in

organizational activities, including marches."  (Guerra Decl.

(Dkt. No. 17) ¶¶ 5-6, 11)  Consistent with its normal practice

concerning complaints of this sort, the next day -- May 13,

2016 -- SCI referred the matter to the Office of Special

Investigations, or "OSI."  OSI is an investigative unit within

the Department of Education that investigates matters SCI

refers to OSI.  *(Id.* ¶¶ 5, 12)

1    OSI concluded that there was insufficient information

2  to pursue the complaint; and, given that the identity of the

3  complain apartment was unknown, OSI marked the complaint as

4  closed pending additional information.  (*Id.* ¶ 13)

5    On December 20, 2016, however, the anonymous tipper

6  contacted SCI again, and provided SCI with additional

7  information concerning plaintiff.  (*Id.* ¶ 14)  The complainant

8  said, among other things, that plaintiff's husband had filmed a

9  documentary for a foundation affiliated with the Progressive

10  Labor Party; that plaintiff's husband is the president of the

11  foundation; that students and staff were included in the

12  documentary without having given their permission; that the

13  documentary was screened on the premises of PSC and that a $20

14  admission fee was charged to those who attended; and that a

15  bake sale was held at PSC to raise funds for a May Day march.

16  (*Id.* ¶¶ 14-16)

17    On January 25, 2017, about two weeks after plaintiff

18  had sent her January 10, 2017 e-mail regarding the sports

19  programs at John Jay, SCI sent the new information on to OSI

20  (*Id.* ¶ 17).  Based on the new information, OSI was able to

21  identify and interview the previously anonymous complainant.

22  (*Id.* ¶ 19)  On February 1, 2017, OSI decided to reopen its

23  investigation based on the information provided by the

24  complainant, and OSI assigned the complaint to an investigator.

25  (*Id.* ¶¶ 18, 21)

On March 2, 2017, the OSI investigator began conducting witness interviews at PSC *(Id.* ¶ 22) and the investigator informed plaintiff that she was under investigation. (Cmplt. (Dkt. No. 1) ¶ 60). The investigator refused to tell plaintiff why she was under investigation, however. *(Id.)*

That same day, the investigator told PSC's assistant principal that the investigation of plaintiff related to "Communist activities taking place at the school." *(Id.* ¶ 62) The investigator showed the assistant principal a list of names and asked her to identify who from the list had engaged in Communist activities. *(Id.)* The list included plaintiff, four current teachers at PSC, six former PSC teachers, plaintiff's family members, employees associated with after-school programs, and former students. *(Id.)*

On March 20, 2017, a number of PSC teachers received subpoenas from the OSI asking them to appear for an interview. (Bloomberg Aff. (Dkt. No. 10) ¶ 34)

On March 22, 2017, plaintiff's lawyer sent a letter to the Department of Education's general counsel demanding that the investigation of plaintiff be stopped and threatening a lawsuit if the investigation was not immediately closed. (March 22, 2017 Pltf. Ltr. (Dkt. No. 10-5)). The letter claimed that OSI's investigation was being conducted in retaliation for plaintiff's January 10, 2017 e-mail to

h532bloA

Goldstein and Prayor, in which she complained about the allegedly segregated sports programs being offered at John Jay. *(Id.)*

In a March 27, 2017 letter, DOE provided further details about the nature of its investigation of plaintiff. As an initial matter, DOE stated that OSI's investigation was unrelated to plaintiff's complaint about the sports teams at John Jay. DOE pointed out that the investigation was originally opened in May 2016, based on a complaint received at that time. DOE also states that, in deciding to pursue the investigation, OSI had "no knowledge of any complaint lodged by Ms. Bloomberg within the Public Schools Athletic League concerning racial segregation in the sports teams." DOE also pointed out that "it would not be appropriate for school staff to solicit students to participate in any political events or to encourage them to support a particular political group or party." (March 27, 2017 DOE Ltr. (Dkt. No. 10-6))

Plaintiff's counsel responded in a March 28, 2017 letter that OSI's decision to "sit on a complaint for a year" and then commence an investigation after plaintiff complained about the sports programs demonstrated that the investigation was retaliatory. As to DOE's references to improper political activities, plaintiff complained that DOE had not provided any specifics concerning plaintiff's alleged improper conduct, or cited any regulation that had been violated. Plaintiff

h532bloA

reiterated her demand that the investigation be terminated and her threat to move forward with a lawsuit if it was not. (March 28, 2017 Pltf. Ltr. (Dkt. No. 10-7))

In an April 6, 2017 letter, DOE addressed plaintiff's demand for specifics concerning the complaint OSI was investigating and provided an explanation for the delay in pursuing the May 2016 complaint:

"The complaint being investigated is that plaintiff and two teachers at the Park Slope Collegiate school are members of a Communist organization known as the Progressive Labor Party, that they are actively recruiting students into the organization during school hours, and that they invite students to participate in the organization's activities, including marches for communism. If substantiated, this could constitute a violation of Chancellor's Regulation D-130, which provides, in part, that staff may not be involved in any activities on behalf of a political organization during working hours." (April 6, 2017 DOE Ltr. (Dkt. No. 10-8))

Chancellor's Regulation D-130 states that "the use of any Department of Education school during school/business hours by any person, group, organization, committee, etc., on behalf of or for the benefit of any political organization/committee is prohibited."

This regulation further provides that DOE "personnel may not be involved in any activities, including fundraising on

behalf of any political organization/committee during working

hours." (Chickedantz Affirm. (Dkt. No. 4) Ex. B at 2)    In

connection with this lawsuit, DOE has also asserted that

plaintiff may have violated Chancellor's Regulation D-180,

which forbids the use of school facilities, equipment, and

supplies on behalf of political organizations; Chancellor's

Regulation C-110, which concerns conflicts of interest; as well

as the City of New York's conflict of interest laws.  (Guerra

Decl. (Dkt. No. 17) ¶¶ 31-34)

          As to the delay in pursuing the investigation of the

complaint, the DOE responded as follows:

          "You also inquired about the delay in the OSI

investigation.  The complaint was initially filed with a

Special Commissioner of Investigation for the New York City

public schools (SCI) in May of 2016.  As permitted by the

Mayoral Executive Order establishing SCI, SCI referred the

complaint to OSI.  The complainant supplied further information

in December 2016, and thereafter, OSI began its investigation."

(April 6, 2017 DOE Ltr. (Dkt. No. 10-8))

          Plaintiff filed this action on April 28, 2017,

asserting claims for retaliation under the First Amendment to

the United States Constitution, Title VI of the Civil Rights

Act of 1964, 42 United States Code § 2000d-1 *et seq.*, as well

as the New York City Human Rights Law, New York City

Administrative Code 8-101 *et seq.*  (Dkt. No. 1)  Plaintiff has

moved for a temporary restraining order and a preliminary injunction enjoining the DOE's investigation of her pending the outcome of this litigation.  (Dkt. No. 3)

As to the standard for the issuance of injunctive relief, a court may issue injunctive relief only where, first, the plaintiff has demonstrated either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the plaintiff's favor.  Second, the court may issue the injunction only if the plaintiff has demonstrated that she is likely to suffer irreparable injury in the absence of an injunction.  Third, a court must consider the balance of hardships between the plaintiff and defendant and issue the injunction only if the balance of hardships tips in the plaintiff's favor.  Finally, the court must ensure that the public interest would not be disserved by the issuance of a preliminary injunction. *Salinger v. Colting*, 607 F.3d 68, at pages 79-80 (2d Cir. 2010).

"However, when a party seeks an injunction that will affect governmental action taken in the public interest pursuant to a statutory or regulatory scheme, the plaintiff must typically show a likelihood of success on the merits.  A serious question going to the merits is usually insufficient, even if the balance of hardships tips decidedly in the

applicant's favor." *Mullins v. City of New York*, 626 F.3d 47,
53 (2d Cir. 2010).

Here, plaintiff seeks an injunction prohibiting the
DOE from proceeding with its investigation of her.
Accordingly, plaintiff asks this court to block the Department
of Education from taking governmental action pursuant to a
statutory or regulatory scheme, namely, the Chancellor's
regulations and the New York City conflict of interest laws.  I
conclude that plaintiff must show a likelihood of success on
the merits in order to obtain the injunction she seeks.  *See
Id.*

I will first address whether plaintiff has shown a
likelihood of success on her First Amendment retaliation claim:

With respect to likelihood of success:

As a DOE employee, plaintiff is considered a public
employee.  A public employee asserting a First Amendment
retaliation claim "must establish that:  (1) her speech or
conduct was protected by the First Amendment; (2) the defendant
took an adverse action against her; and (3) there was a causal
connection between this adverse action and the protected
speech," *Matthews v. City of New York*, 779 F.3d 167, 172 (2d
Cir. 2015).

The first factor, whether the speech was protected by
the First Amendment, "encompasses two separate subquestions:
(1) whether the subject of the employee's speech was a matter

h532bloA

of public concern; and (2) whether the employee spoke as a citizen rather than solely as an employee." *Id.* "If the answer to either question is no, that is the end of the matter." *Id.*

With respect to the first subquestion, "a matter of public concern is one that relates to a matter of public, social, or other concern to the community." *Looney v. Black*, 702 F.3d 701, 710 (2d Cir. 2012). As to the second subquestion, in determining whether a plaintiff was speaking as an employee or as a citizen, courts consider whether (1) the speech "falls outside of the employee's official responsibilities," and (2) whether a "civilian analogue" for the speech exists. *Matthews*, 779 F.3d at 173.

"In the First Amendment context, the state has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general." *Ross v. Breslin*, 693 F.3d 300, 305 (2d Cir. 2012). Speech by a public employee is protected by the First Amendment only when the employee is speaking "as a citizen on a matter of public concern." *Id.* In *Garcetti v. Ceballos*, the Supreme Court held that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer

discipline." *Id.* This is the case even when the subject of an
employee's speech is a matter of public concern. *Id.*

A plaintiff speaks pursuant to her official job duties
when the speech at issue "owes its existence to those job
duties" *(Id.* at 308) or when the speech is "part-and-parcel [of
the employee's] concerns about her ability to properly execute
her duties." *Weintraub v. Board of Education*, 593 F.3d 196,
203 (2d Cir. 2010).

Here, plaintiff has not shown a likelihood of success
as to the first element of a First Amendment retaliation claim.
Although plaintiff's January 10, 2017 e-mail complains about
"separate and unequal sports programs" at John Jay, and that is
certainly a matter of public concern, the evidence before the
court demonstrates that plaintiff made her complaint to her
supervisor and to the overseer of the PSAL program "pursuant to
her official duties" as PSC's principal, rather than as a
citizen. *See Ross*, 693 F.3d at 305.

Indeed, plaintiff concedes that fighting for an
appropriate number of sports teams for PSC students was part of
her job as PSC's principal. In her supplemental affidavit,
plaintiff says the following:

"Throughout my career, the Public School Athletic
League ('PSAL') has had the budget for sports programs. I, as
a principal, do not have any dedicated funds for sports
programs. Any sports programs we want must be applied for to

h532bloA

1    PSAL.  It is part of a principal's or other school employee's

2    regular job duties to request sports teams of the PSAL.  For

3    years, principals and coaches in the John Jay program had been

4    making these formal requests, but our requests were regularly

5    rejected."  (Supp. Bloomberg Aff. (Dkt. No. 21 at ¶ 5))

6         The essence of plaintiff's January 10, 2017 e-mail is

7    that the schools that make up the John Jay Campus PSAL are not

8    being treated fairly with respect to the number of sports teams

9    their schools are authorized to have, and plaintiff

10   demonstrates that unfairness by pointing out that the

11   Millennium schools, which have fewer students, are authorized

12   for more sports teams.  And while it is true that plaintiff

13   includes statistics showing that the percentage of black and

14   Hispanic students is higher at the John Jay Campus schools as

15   opposed to the Millennium schools, the essence of her argument

16   is that "the students at all six schools are equally deserving

17   of opportunities to participate in extracurricular sports, and

18   it is the responsibility of the DOE and of PSAL to facilitate

19   that equity."  (Bloomberg Aff., Ex. 3 (Dkt. No. 10-3))

20        Plaintiff's January 10 e-mail was a plea for resources

21   and a plea for fairness as to the availability of

22   extracurricular sports teams at John Jay.  And plaintiff made

23   this appeal in the form of an internal e-mail to her direct

24   supervisor and the DOE manager responsible for overseeing the

25   PSAL program.  I conclude that sending this e-mail falls well

within the scope of plaintiff's duties and responsibilities as PSC's principal. This e-mail was "part-and-parcel of plaintiff's concerns about her ability to properly execute her duties" as PSC's principal. More specifically, it was part of plaintiff's duties as PSC's principal to request appropriate sports teams from PSAL and, more broadly, to do what she could to ensure that DOE was providing programs and services for her students on an equitable basis. *See Weintraub*, 593 F.3d at 203.

*Matthews v. City of New York*, 779 F.3d 167 (2d Cir. 2015), cited by plaintiff, is not to the contrary. In *Matthews*, the Second Circuit held that a police officer -- in complaining to a supervisor about a precinctwide quota system, which he argued was "causing unjustified stops" and harming the precinct's relationship with the community -- had engaged in speech in his capacity as a private citizen and not as a police officer. *Matthews*, 779 F.3d at 173-75. The *Matthews* court found that the police officer's "speech to the precinct's leadership was not what he was employed to do, nor was it part-and-parcel of his regular job. The officer's policy-oriented speech was neither part of his job description nor part of the practical reality of his everyday work." *Id.* at 174.

The circumstances here are entirely different. As I noted, plaintiff concedes that it was part of her job as PSC's

h532bloA

1   principal to request sports teams and to do what she could to

2   ensure that her students received adequate resources and

3   funding on an equitable basis with other schools.  This was

4   "part of the practical reality of plaintiff's everyday work" as

5   principal of PSC.  *Cf. id.*; *see also* Ross 693 F.3d at 305

6   (payroll clerk -- whose responsibilities included "making sure

7   pay rates were correct" and flagging "payroll

8   irregularities" -- acted pursuant to her official duties even

9   though she had gone "outside the chain of command by writing to

10  the Board of Education" about pay discrepancies).

11          Although plaintiff also argues that her e-mail has a

12  "citizen analogue*," (See* Pltf. Reply Br. (Dkt. No. 23) at pages

13  10-11) the existence of a citizen analogue is not dispositive.

14  *See Weintraub*, 593 F.3d at 203-204 ("When a public employee

15  speaks pursuant to employment responsibilities, there is no

16  relevant analogue to speech by citizens who are not government

17  employees")  *See also Garcetti*, 547 U.S. at 421 ("controlling

18  factor" was whether the speech was "made pursuant to a party's

19  duties as a calendar deputy").

20          Because the evidence before the court demonstrates

21  that plaintiff sent her January 10, 2017 e-mail to her

22  supervisor and to the DOE manager of the district's sports

23  programs as part of her official duties as PSC's principal, she

24  has not shown a likelihood of success as to the first element

25  of her First Amendment retaliation claim.

With respect to the second element of a First Amendment retaliation claim, the adverse employment action requirement, retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action. *Rivers v. New York City Housing Authority*, 176 F.Supp.3d 229, 244 (S.D.N.Y. 2016); *see also Manon v. Pons* 131 F.Supp.3d 219, 232 (S.D.N.Y. 2015) ("The standard for an adverse action in the context of First Amendment retaliation is substantially similar to the same inquiry in the Title VII retaliation context"). "in this it context, adverse employment actions include discharge, refusal to hire, refusal to promote, demotion, reduction in pay, and reprimand." *Zelnik v. Fashion Institute of Technology*, 464 F.3d, 217, 226 (2d Cir. 2006). The Second Circuit has stated that "lesser actions may also be considered adverse employment actions," including negative evaluation letters, assignment of undesirable duties, or transfers under certain circumstances. *Morris v. Lindau*, 196 F.3d 102, 110 (2d Cir. 1999).

At issue here is whether the mere initiation of an OSI investigation into plaintiff constitutes an adverse employment action. Some courts have found that an investigation, without attendant negative consequences, does not constitute adverse action. *See Alvarez v. City of New York*, 2 F.Supp.2d 509, 514 (S.D.N.Y. 1998) ("Although plaintiff argues that the

investigation itself has chilled his speech, I am not persuaded that the mere initiation of an internal investigation [by the NYPD] itself would cause irreparable harm.").  Other courts have come to the opposite conclusion, however.  *See Eldridge v. Rochester City School District*, 968 F.Supp.2d 546, 560 (W.D.N.Y. 2013) (concluding that "the pressure of an internal investigation coupled with a veiled threat of an involuntary transfer could dissuade a reasonable employee from engaging in protected activity"); *Mullins*, 634 F.Supp.2d 373, 389 (recognizing that "an active IAB investigation constituted an adverse action to plaintiffs" because the investigation deterred reasonable police officers from pursuing rights in court").

          For purposes of resolving the motion for a TRO and preliminary injunction, I have assumed that the commencement of an OSI investigation would plausibly deter a similarly situated individual of ordinary firmness from exercising their First Amendment rights.  *See Rivers,* 176 F.Supp.3d at 244. Accordingly, I have assumed that plaintiff has shown a likelihood of success on this element.

          As to the last element, "the causal connection must be sufficient to warrant the inference that the protected speech was a substantial motivating factor in the adverse employment action, that is to say, the adverse employment action would not have been taken absent the employee's protected speech."

*Stajic v. City of New York*, 2016 WL 5717573, at *4 (S.D.N.Y.

Sept. 30, 2016). "Causation can be established either

indirectly by means of circumstantial evidence, for example, by

showing that the protected activity was followed by adverse

treatment in employment, or directly by evidence of retaliatory

animus." *Id*. A plaintiff may rely on temporal proximity to

demonstrate a causal connection.

Here, plaintiff argues that the requisite causal

connection between her protected activity -- that is, the

January 10 e-mail -- and the adverse action is established by

the temporal proximity between the two events. Here, about

three weeks passed between plaintiff's January 10, 2017 e-mail

and the reopening of the investigation. Three weeks "fits

comfortably within" the "time period that can give rise to an

inference of causation." *Nagle v. Marron*, 663 F.3d 100, 111

(2d Cir. 2011) (discussing six-week period).

Despite this temporal proximity, plaintiff has not

shown a likelihood of success on the causation element of her

retaliation claim, because there is no evidence that the

"specific decision-maker responsible for the adverse action" --

that is, OSI -- was aware of plaintiff's January 10, 2017

e-mail at the time OSI reopened its investigation of plaintiff.

Indeed, defendants have offered evidence affirmatively

demonstrating that "OSI was not aware that plaintiff had sent

the January 10, 2017 e-mail regarding sports programs at PSC."

h532bloA

(Guerra Decl. (Dkt. No. 17) at ¶ 20)  A DOE lawyer has

submitted an affidavit citing that prior to a March 13, 2017

meeting with the complainant, the OSI investigator assigned to

investigate the complaint had no knowledge of plaintiff's

January 10, 2017 e-mail.  It was only during the March 13, 2017

interview of the complainant, at which the complainant produced

a newsletter issued by the PSC PTA, that the OSI investigator

learned of PSC's complaints concerning sports teams.  Even

then, the investigator was not made aware that it was plaintiff

who had made the complaint.  (Supp. Guerra Aff. (Dkt. No. 27)

¶¶ 7-10 and Ex. A) there is no evidence before the court

rebutting or tending to rebut DOE's showing.

Moreover, the circumstances surrounding the initiation

of the investigation do not suggest that plaintiff's January

10, 2017 e-mail was a "substantial motivating factor" in the

investigation.  The record shows that SCI -- an independent

investigative agency that is not part of the Department of

Education -- received the original complaint against plaintiff

in May 2016.  (Guerra Decl. (Dkt. No. 17) ¶ 11)

SCI referred the matter to OSI, but OSI decided to

close the complaint because there was insufficient information

and there was no ability to follow up with the anonymous

complainant.  (*Id.* ¶¶ 5, 12-13)  On December 20, 2016, however,

SCI received additional information concerning the May 2016

complaint, and SCI forwarded that information to OSI on January

25, 2017.  (*Id.* ¶¶ 14, 18)  Because there was now sufficient information to identify the anonymous complainant, OSI was able to interview the complainant about the complainant's allegations*.  (Id.* ¶ 19)  And OSI then decided to reopen the investigation on February 1, 2017, after having conducted that interview*.  (Id.,* ¶ 18)  Given that the reopening of the investigation turned on the receipt of additional information from the complainant -- information received by an investigative agency independent of the Department of Education -- the circumstances do not suggest that the reopening of the investigation of plaintiff was the product of retaliatory animus.

Accordingly, plaintiff has not demonstrated a likelihood of success on the causation element of her First Amendment retaliation claim.

Plaintiff has also not demonstrated that she will suffer irreparable harm with respect to her First Amendment retaliation claim.  Plaintiff argues that, if an injunction is not granted, she will suffer irreparable harm because the OSI investigation "will have a chilling effect on [her and other PSC employees'] willingness to continue to speak out against racial segregation [and discrimination]."  (Def. Opp. Br. (Dkt. No. 11) at pages 12-16).

It is well established that "violations of First Amendment rights are commonly considered irreparable injuries

for the purposes of a preliminary injunction." *Bery v. City of New York*, 97 F.3d 689, 693 (2d Cir. 1996). However, as the Second Circuit has explained, "Courts treat claims of First Amendment abridgment differently, depending on the nature of the restriction on speech:

"On the one hand, where a plaintiff alleges injury from a rule or regulation that directly limits speech, the irreparable nature of the harm may be presumed. On the other hand, in instances where a plaintiff alleges injury from a rule or regulation that may only potentially affect speech, the plaintiff must establish a causal link between the injunction sought and the alleged injury. In those instances, the plaintiff must establish an actual chilling effect. And allegations of a subjective chill [of First Amendment rights] are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm." *Greer v. Mehiel*, 2016 WL 828128 at *10 (S.D.N.Y. Feb. 24, 2016).

Here, plaintiff's claim fits into the second category of First Amendment claims, but because she argues not that a rule or regulation is directly restricting her speech, but rather that defendants' actions in conducting an OSI investigation will chill her and other employees at PSC from making future complaints of alleged racial discrimination. Plaintiff has not made an adequate showing of actual chilling effect, however.

h532bloA

As to the chilling effect on her own speech, plaintiff states in her affidavit that "the OSI investigation has caused her a significant amount of distress" and that she is "afraid to speak out against race discrimination and segregation at her school." (Bloomberg Aff. (Dkt. No. 10) ¶ 49) Allegations of "subjective chill are not an adequate substitute" for an actual chilling effect, however. *See Greer*, 2016 WL 828128 *10. "Where a party can show no change in her behavior, she has quite plainly shown no chilling of her First Amendment right to free speech." *Curley v. Village of Suffern*, 268 F.3d 65, 73 (2d Cir. 2001) (plaintiff was not actually chilled by arrest made allegedly in retaliation for comments during 1993 mayoral campaign, because plaintiff ran again for public office in 1995).

Here, the record shows that plaintiff has continued to challenge DOE's actions in this case and continued to speak out on issues of race more generally. For example, on March 29, 2017, plaintiff held a meeting with staff and parents at PSC in which she discussed and provided an update concerning the OSI investigation. (Bloomberg Aff. (Dkt. No. 10) ¶ 42). Plaintiff discussed the alleged retaliatory nature of the investigation and the legal steps she was taking to address the investigation. (Guerra Decl. (Dkt. No. 17) at ¶ 28) She told those present that OSI's investigation "would end as a result of the cease-and-desist letter [her lawyers sent] or would be

temporarily halted when her attorneys filed suit and requested a preliminary injunction." *Id.*

Moreover, on March 30, 2017, plaintiff participated in a panel discussion which was entitled "The Case for School Integration Now," and which was sponsored by the PSC PTA. (Supp. Bloomberg Aff. (Dkt. No. 14) at ¶ 32). These are not the actions of someone who has been actually chilled from speaking out on issues regarding discrimination in the New York City public school system.

As to the chilling effect of the OSI investigation on other teachers and staff at PSC, the chilling effect on these employees' speech -- as opposed to their willingness to report violations of federal statutes -- is not relevant to plaintiff's First Amendment retaliation claim. *See Alvarez v. City of New York*, 2 F.Supp.2d 509, 514 (S.D.N.Y. 1998) ("to the extent that plaintiff speculates that other employees' speech may be chilled by the [NYPD's internal affairs] investigation, their First Amendment rights are not at issue.") Although plaintiff cites *Muchmore's Café, LLC* v. *City of New York*, 2016 U.S. Dist. LEXIS 139861 (E.D.N.Y. 2016) for the proposition that a plaintiff is "entitled to rely on the impact of the [government action] on the expressive activities of others as well as her own" (Pltf. Reply Br. (Dkt. No. 23) at page 12), plaintiff's reliance on this case is misplaced. In *Muchmore*, the plaintiff proceeded on a theory of third-party standing in

1  challenging the constitutionality of the New York City Cabaret

2  Law.  *See Id.* at *14-17.  Under those circumstances, the

3  chilling effect of the government ordinance was relevant to

4  plaintiff's claim.  In the context of First Amendment

5  retaliation, however, where the claim at issue is asserted on

6  behalf of plaintiff only, the chilling effect on others is not

7  relevant.  Stated another way, where the record demonstrates

8  that the named plaintiff has not been actually chilled, this

9  defect cannot be cured or remedied by attempting to show that

10  third parties' exercise of First Amendment rights has been

11  actually chilled.

12          With respect to the First Amendment retaliation claim,

13  I conclude that plaintiff has not demonstrated a likelihood of

14  success or irreparable harm.

15          I will now turn to the Title VI and New York City

16  Human Rights Law claims, beginning with the likelihood of

17  success on the merits of those claims.

18          Title VI provides that "no person in the United States

19  shall, on the ground of race, color, or national origin, be

20  excluded from participation in, be denied the benefits of, or

21  be subjected to discrimination under any program or activity

22  receiving federal financial assistance."  42 U.S.C. § 2000d.

23  It is undisputed that the DOE receives federal financial

24  assistance.

25          "The same analysis that applies to claims of

retaliation under Title VII also applies to claims under Title VI." *Belgrave v. City of New York,* 1999 WL 692034, at *38 (E.D.N.Y. Aug. 31, 1999). "Specifically, a plaintiff must make out a *prima facie* case by showing that: (1) she was engaged in a protected the activity; (2) her employer was aware of that activity; (3) she suffered an adverse employment action; and (4) there was a causal connection between the protected activity and the adverse action." *Id.* If, after a plaintiff establishes a *prima facie* case of retaliation, the defendant "offers a legitimate, nonretaliatory reason for [the adverse action], the presumption of retaliation drops from the case and the burden shifts to plaintiff to show that the "proffered reason was a pretext for unlawful retaliation." *Koumantaros v. City University of New York,* 2007 WL 840115, at *12 (S.D.N.Y. March 19, 2007).

With respect to the first factor, there is no question that plaintiff engaged in a protected activity when she sent the January 10, 2017 e-mail to her supervisor and the overseer of PSAL programs complaining about racial discrimination in the sports programs offered at the John Jay complex.

As to the second factor, it is also clear that the DOE was aware of her complaint. As a general matter, the "knowledge requirement is met if the legal entity was on notice" of the protected activity. *Papelino v. Albany College of Pharmacy*, 633 F.3d 81, 92 (2d Cir. 2011); *see also Gordon v.*

h532bloA

*New York City Board of Education,* 232 F.3d 111, 116 (2d Cir.

2000) ("neither this nor any other circuit has ever held that,

to satisfy the knowledge requirement, anything more is

necessary than general corporate knowledge that the plaintiff

had engaged in protected activity").  Because plaintiff sent

her January 10, 2017 e-mail to her superiors within the DOE --

specifically the individual in charge of DOE's PSAL programs

and to her direct supervisor, who serves as superintendent of

District 15 -- the DOE had corporate knowledge of her protected

activity.  *See Joseph v. Owens & Minor Distribution, Inc.,* 5

F.Supp.3d 295, 318 (E.D.N.Y. 2014) (defendant's knowledge of

protected activity established where "at least two managers

were aware" of the activity).

      With respect to the third factor, I have assumed that

the initiation of an OSI investigation constitutes an adverse

employment action.

      With respect to the fourth element, "plaintiff may

show a causal connection either (1) indirectly, by presenting

evidence of temporal proximity between the protected activity

and adverse action, or through other evidence such as different

treatment of similarly situated individuals, or (2) directly,

through evidence of retaliatory animus directed against

plaintiff by the defendant.  *Koumentaros*, 2007 WL 840115, at

*10.  Here, plaintiff relies on temporal proximity between the

protected activity and the adverse action to demonstrate a

h532bloA

1  causal connection.  As I stated earlier, about three weeks

2  passed between plaintiff's January 10 e-mail and the reopening

3  of the OSI investigation of her.

4       While a plaintiff need only show "general corporate

5  knowledge" to establish that her employer was aware of her

6  protected activity, *see Gordon*, 232 F.3d at 116, "evidence that

7  the specific decision-makers responsible for the adverse action

8  were not aware of a plaintiff's protected activity is relevant

9  "as some evidence of a lack of causal connection countering

10  plaintiff's circumstantial evidence of proximity." *Giscombe v.*

11  *New York City Department of Education,* 39 F.Supp.3d 396, 402

12  (S.D.N.Y. 2014).

13       Here, as I explained in the context of the First

14  Amendment retaliation claim, DOE has offered evidence rebutting

15  the inference flowing from temporal proximity.  There is no

16  evidence before me suggesting that the "specific decision-maker

17  responsible for the adverse action," that is, OSI, was aware of

18  the January 10, 2017 e-mail at the time it reopened its

19  investigation of plaintiff.  Indeed, the evidence is all to the

20  contrary.  *See* Guerra Decl. (Dkt. No. 17) at ¶ 20; Supp. Guerra

21  Aff. (Dkt. No. 27) ¶¶ 7-10 and Ex. A.  Moreover, as I explained

22  earlier, the process by which the investigation was reopened --

23  in particular the fact that it was initiated based on a

24  referral from SCI, an independent investigative agency outside

25  of the DOE -- tends to undermine any assertion of retaliatory

1  animus.

2       I find that plaintiff has not demonstrated a

3  likelihood of success as to causation, which is the fourth

4  element of a Title VI retaliation claim.

5       With respect to the New York City Human Rights Law

6  claim, although the retaliation inquiry under the city Human

7  Rights Law is broader than its federal counterpart, *Fincher v.*

8  *Deposit Trust & Clearing Corporation,* 604 F.3d 712, 723 (2d

9  Cir. 2010), "a plaintiff must still establish that there was a

10  causal connection between her protected activity and the

11  employer's subsequent action." *Peña-Barrero v. City of New*

12  *York*, 2017 WL 1194477, at *19 (S.D.N.Y. March 30, 2017).  I

13  have concluded that plaintiff has not shown a likelihood of

14  success as to the causation element of her Title VI claim.  I

15  reach the same conclusion as to her city Human Rights Law

16  claim.

17       As to irreparable injury, plaintiff argues that she

18  has shown irreparable injury because (1) she and other DOE

19  employees will be "chilled from speaking out against

20  discrimination" if an injunction is not granted, and (2) "PSC

21  employees will feel dissuaded from participating in the instant

22  litigation for fear of retaliation."  (Pltf. Moving Br. (Dkt.

23  No. 14) at page 12; and Bloomberg Aff. (Dkt. No. 10) at ¶¶ 50,

24  53).  Plaintiff also states that she fears being removed from

25  her position as principal at PSC (Bloomberg Aff. (Dkt. No. 10)

1  ¶¶ 50, 53).

2        To the extent that plaintiff argues that she

3  personally has been or will be chilled or deterred from making

4  future complaints about racial discrimination in the New York

5  City public school system, as I explained previously, I

6  conclude that plaintiff has not actually been chilled by the

7  initiation of the OSI investigation.

8        As to plaintiff's contention that other employees will

9  be deterred from making similar complaints of racial

10 discrimination or from participating in the present lawsuit as

11 witnesses on her behalf, the Second Circuit has recognized that

12 "unchecked retaliation subverts the purpose of" certain federal

13 statutes and that "the resulting weakened enforcement of

14 federal law can itself be irreparable harm in the context of a

15 preliminary injunction application." *Mullins*, 626 F.3d at 55;

16 *see also, Holt v. Control Group, Inc.*, 708 F.2d 87, 91 (2d Cir.

17 1983). "A retaliatory discharge carries with it the distinct

18 risk that other employees may be deterred from protecting their

19 rights under the law or from providing testimony for a

20 plaintiff in her effort to protect her own rights. These risks

21 may be found to constitute irreparable injury." *Moore v.*

22 *Consolidated Edison Company of New York,* 409 F.3d 506, 511–12

23 (2d Cir. 2005).

24        The Second Circuit, however, has rejected the notion

25 that "there is irreparable injury sufficient to warrant a

h532bloA

preliminary injunction in every retaliation case." *Holt*, 708
F.2d at 91.

Here, plaintiff has submitted affidavits from a number
of PSC employees concerning the effect of the OSI
investigation. *(See* Dkt. Nos. 5-9, 22.)  The affidavits state,
among other things, that teachers are "fearful of standing up
for their students and speaking out against race
discrimination" and "noticeably less comfortable speaking out
against racism." *(See* Williams Aff. (Dkt. No. 9) at ¶ 7,
Sandusky Aff. (Dkt. No. 8) ¶ 4).  The affidavits also reference
at least five other PSC employees who have chosen to remain
anonymous and state that they will not publicly support
plaintiff's case for fear of retaliation. (*See* Supp.
Chickedantz Affirm. (Dkt. No. 22)).

This court takes very seriously -- as DOE should --
plaintiff's allegations about the negative effects of the OSI
investigation on the PSC community.  There has been, however,
an enormous outpouring of support for plaintiff in the short
lifespan of this litigation.  At the hearing on Monday, the
courtroom was standing room only.  I would estimate that 150
people or so showed up in support of plaintiff.  There has been
a similar turnout today.

In addition to the affidavits from the PSC teachers,
including from one teacher who had been subpoenaed by OSI,
(Dkt. No. 7) hundreds of people in the PSC community have

signed petitions supporting plaintiff. (Bloomberg Aff. (Dkt.
No. 10) ¶¶ 45-46). These circumstances do not warrant a
finding of irreparable harm based on the investigation's
alleged effect on others or based on the argument that the OSI
investigation presents a significant risk of weakening
enforcement of federal law or prejudice in plaintiff's case.

        Finally, to the extent that plaintiff asserts
irreparable harm based on her fears that she may lose her job
(Bloomberg Aff. (Dkt. No. 10) at ¶ 49) her concerns do not rise
to the level of irreparable harm. As an initial matter, the
OSI investigation presents no immediate risk of plaintiff
losing her job. Plaintiff has due process rights that would be
triggered in the event of any effort by DOE to terminate her
employment. Moreover, "irreparable injury is one that cannot
be addressed through a monetary award. Where money damages are
adequate compensation, a preliminary injunction should not
issue." *JSG Trading Corp. v. Tray-Wrap, Inc.,* 917 F.2d 75, 79
(2d Cir. 1990). It is well established that, in the employment
context, "reinstatement and money damages are both forms of a
trial court's remedies" that can be used to make a plaintiff
whole for any loss suffered as a result of an adverse
employment action. *Bagley v. Yale University*, 2014 WL 7370021
at *10 (D. Conn. Dec. 29, 2014). Similarly, on an appropriate
record, damages related to emotional distress are compensable
at the conclusion of a litigation such as this.

1    I conclude that plaintiff has not shown a likelihood

2 of success or irreparable injury with respect to her

3 retaliation claims under the First Amendment, under Title VI,

4 or under the New York City Human Rights Law.  Accordingly,

5 plaintiff's application for a temporary restraining order and a

6 preliminary injunction is denied.

7    Plaintiff will advise the court by May 10, 2017, how

8 she wishes to proceed with this litigation.

9    Is there anything further?

10    MS. MIRER:  Your Honor, I do have a few points that I

11 would like to raise with the court.

12    THE COURT:  Go ahead.

13    MS. MIRER:  First of all, with respect to D-130, when

14 the court described what D-130 is, it was not the actual

15 description --

16    THE COURT:  It actually was a direct quote.

17    MS. MIRER:  Well, the direct quote --

18    THE COURT:  It was a direct quote from the regulation.

19 It wasn't a full quote.  It was a direct quote.

20    MS. MIRER:  Okay.  Your Honor, I want --

21    THE COURT:  I read the relevant parts of the

22 regulation.

23    MS. MIRER:  With respect to the issue of D-130, if you

24 noticed in our brief, we raised the issue of the idea --

25    THE COURT:  The lawsuit is not about the alleged

h532bloA

1  unconstitutionality of D-130 that you mentioned for the first

2  time in your reply brief.  The lawsuit is about whether the OSI

3  investigation is retaliatory.  That's what the lawsuit is

4  about.

5          MS. MIRER:  I certainly understand that, your Honor.

6  What I am raising is a question of the idea that we are going

7  to be -- in terms of the OSI investigation, it has no

8  parameters.  It could be a total fishing expedition.  And I

9  think, with respect to the issues involved, there should be at

10  least some narrow tailoring to the question of these

11  allegations put forth, in that we are not going into a

12  wholesale investigation of people's political beliefs.  And

13  that is the question I have in terms of whether or not -- you

14  are saying that investigation could go forward; but given the

15  concerns that have been raised and the very vague nature of

16  these claims, and if you saw in our supplemental affidavit and

17  the documents presented, most of the December 20 allegations

18  were demonstrably false.  That's number one.

19          THE COURT:  Let me respond to that before you move on.

20          The lawsuit that you brought is not a challenge to the

21  disciplinary system of the New York City Department of

22  Education.  The lawsuit you brought alleges that the initiation

23  of the OSI investigation was retaliatory and was done because

24  your client sent an e-mail to her supervisor and to the

25  overseer of the PSAL program, and I have ruled on whether you

1　are entitled to a temporary restraining order and preliminary

2　injunction with respect to those claims.

3　　　　Now, if your argument now is that you think the DOE

4　disciplinary process, to the extent it involves OSI

5　investigations of this sort, to the extent you are arguing that

6　there is something unlawful about the disciplinary process,

7　that's a different claim.  If you want to raise that claim, I

8　suppose you can amend the complaint.  But I'm not here today,

9　nor does your lawsuit fairly implicate, the notion that there

10　is something illegal about the entire investigative process

11　under the OSI regime.  If that's your argument and you think

12　you have a claim on that point, you can amend your complaint to

13　add it.  It is not presently before me.

14　　　　MS. MIRER:  Well, it is to the extent that it raises

15　the issue of D-130 being, in essence -- it being characterized

16　beyond partisan politics, and that's where the concern is,

17　because that is raised in the lawsuit as a result of the

18　statements by the DOE as to the alleged legal basis for their

19　claim as to why they are investigating her.  And if it is based

20　on D-130, then it seems to me that's where we have to be

21　looking to determine whether any ideological belief can be the

22　subject of an investigation.

23　　　　THE COURT:  I read D-130 to clearly prohibit DOE

24　employees during working hours from soliciting students, for

25　example, to join any particular political party or to engage in

1    political activities, and I see D-130 as neutral.  So whether a

2    teacher were to solicit a student to participate, to join a

3    march sponsored by the Democratic party or the Republican party

4    or some other party, that would not be permissible.  I don't

5    see anything in D-130 that discriminates on the basis of

6    political party or political committee.  To me it seems

7    neutral.  Again, if you disagree, you can point that out to me,

8    but the language reads neutral to me.

9         MS. MIRER:  Your Honor, it is in our brief, and on the

10   10th we will obviously raise these issues.

11        But the other question I have is, in the affidavit,

12   initial affidavit presented by Ms. Guerra, there is a statement

13   at paragraph 17 that on January 25, 2017, the SCI sent a letter

14   with these additional allegations to both DOE and OSI.  And

15   while it doesn't identify who, we certainly know that OSI had

16   knowledge as of January 25, 2017 of the complaints or the

17   supplemental complaints.

18        THE COURT:  I'm sorry.  I am just trying to put my

19   hand on the Guerra affidavit.  Just give me a minute.

20        MS. MIRER:  It is document 17.

21        THE COURT:  You say paragraph 17?

22        MS. MIRER:  Yes.

23        THE COURT:  So paragraph 17 reads, and I quote, "On

24   January 25, 2017, SCI sent the additional information it had

25   received to DOE and OSI."  I understand the additional

h532bloA

1   information referenced to be the information received from the

2   complainant, including the information obtained from the

3   interview of the complainant.  Now what's your point with

4   respect to that?

5          MS. MIRER:  The point is that Mr. Goldstein, who

6   received the January 10 letter, is basically in the

7   headquarters of DOE.

8          THE COURT:  I understand that.

9          MS. MIRER:  So I think that this point, the idea that

10  we would have to pinpoint that the investigator would be the

11  one that had knowledge, as opposed to others in OSI who would

12  at this point have to make a determination whether to open an

13  investigation, which they did on February 1, it just seems to

14  me the temporal proximity between January 25 and February 1,

15  when the DOE itself had the information about her complaint as

16  to the PSAL and these allegations, and I believe I submitted to

17  you three articles concerning this particular sensitivity, the

18  sensitivity of Mr. Goldstein to allegations regarding race

19  discrimination in the PSAL, and that to the extent you can

20  assume that they don't talk to each other or that it is not

21  circumstantial evidence that there was specific knowledge

22  within the DOE --

23         THE COURT:  Well, no, the issue is not whether there

24  is knowledge in the DOE.  That's kind of the flaw in your

25  argument.

1          MS. MIRER:  Well --

2          THE COURT:  The issue is whether the people at OSI at

3    the time they decided to reopen the investigation on February

4    1, 2017, had knowledge that your client had made a complaint on

5    January 10, 2017; and, on that point, I have received evidence

6    from the Department of Education, they say, no, and they have

7    put in affidavits in support of that.  And you haven't offered

8    me anything.  You haven't offered me evidence.  You have

9    offered me the time proximity.  I addressed that.  That gets

10   you part way down the pike.  But when your adversary puts in

11   affidavits, we are no longer in a situation where, in my

12   judgment, temporal proximity carries the day.  At that point

13   there has to be evidence that someone at OSI knew about your

14   client's January 10, 2017 e-mail, and I don't have that

15   evidence.

16         MS. MIRER:  All I am saying, your Honor, is that an

17   affidavit that says that the investigator didn't know doesn't

18   address the issue of whether Eric Goldstein talked to the

19   head --

20         THE COURT:  Eric Goldstein doesn't work at OSI.

21         MS. MIRER:  But OSI is a division of the DOE.

22         THE COURT:  I understand, but the Department of

23   Education is a very large institution.  I don't know how many

24   people are employed at the Department of Education.  I would

25   guess it is many thousands.  And so to say that, well, Eric

h532bloA

1    Goldstein works at DOE and he knew about it, so therefore OSI

2    must have known about it, I am missing the connection.  I don't

3    see the connection.

4            MS. MIRER:  Well, obviously discovery would have to --

5    discovery in this case would have to suss out whether or not

6    there is a --

7            THE COURT:  And we are at a preliminary stage here.

8            MS. MIRER:  Exactly.

9            THE COURT:  There hasn't been discovery.  And I have

10   ruled on the basis of what I have before me.  And if discovery

11   shows something different, then you are welcome to come back

12   and seek relief.  But I have to operate on the basis of what's

13   in front of me now.  And based on what's in front of me now, I

14   can't make a finding that anyone at OSI had any knowledge

15   whatsoever about your client's January 10, 2017 e-mail.

16           MS. MIRER:  Well, we certainly know that the people at

17   DOE knew about the e-mail; and, to the extent there is a

18   connection between DOE and --

19           THE COURT:  We know Mr. Goldstein knew and we know

20   that your client's direct supervisor knew.  Other than that,

21   I'm not sure who knew.  But, more importantly, I don't have any

22   evidence that anyone at OSI knew --

23           MS. MIRER:  But we did --

24           THE COURT:  -- and that's what matters for purposes of

25   where we are today.

1    MS. MIRER:  Well, those are the points I wanted to

2    raise.

3        I do think the court has misconstrued the issue with

4    respect to *Matthews* as to the policy aspects of what *Matthews*

5    was –– that the court really turned on whether or not –– the

6    decision in *Matthews* was whether or not Matthews had –– it was

7    part of his job to comment on the policy issue with respect to

8    the issue of the quota, and I think we have submitted

9    significant evidence that it was not, indeed, and it was

10   extremely rare that anybody did stand up to address the policy,

11   which is what she did in that January 10 e-mail.

12       THE COURT:  Your client admitted in her affidavit that

13   part of her job was to make sure that PSC got the sports teams

14   it should get.  This situation couldn't be more different from

15   *Matthews*.  Matthews was a patrol officer.  He was a street cop.

16   And he spoke to a supervisor about a policy issue.  And in that

17   context, the Second Circuit said it is not the responsibility

18   of a street cop, a patrol officer, to be blabbing about policy

19   to a captain at the NYPD.

20       Your client is a completely different category.  She

21   is the principal of a school.  And she has said that part of

22   her job was to make sure that her school got the sports teams

23   that it fairly was entitled to.  And so she sent an e-mail, an

24   internal communication, to her supervisor and the overseer of

25   the PSAL program and said, Hey, my school is not being fairly

1   treated.  I view that as part of her direct responsibility.  I

2   see the issue as very clear.  Part of her job involved this.

3   She admits that.  I see the e-mail as being part and parcel, as

4   the law says, of her direct responsibilities as the principal

5   of the school.

6           MS. MIRER:  Obviously we disagree in terms of whether

7   or not it's part of her job to do anything more than request

8   sports teams; and in terms of commenting on discrimination by a

9   higher level, a different division, I don't think that's -- I

10  don't necessarily see that relationship.  However, you have

11  ruled.

12          THE COURT:  To the extent --

13          MS. MIRER:  You have ruled --

14          THE COURT:  Excuse me, ma'am.

15          MS. MIRER:  Yes.

16          THE COURT:  To the extent she points out the racial

17  makeup of the high schools involved, I don't think that changes

18  the nature of her e-mail which was, as I have said, a plea for

19  additional sports teams for her school and the other schools

20  located at John Jay complex.  I don't believe that the

21  reference to the racial makeup of the high schools changes the

22  essential nature of her communication to her supervisor and to

23  the head of the PSAL program.

24          MS. MIRER:  She was asking not just for more teams,

25  but combining the two, which was the issue in terms of

h532bloA

1  segregation.

2          THE COURT:  I understand that she was asking for the

3  merger.  That's the first line of the e-mail.  I read it.  But

4  her argument for the merger was that the schools located at

5  John Jay, at the John Jay complex, had far fewer teams and more

6  students than the Millennium schools had with fewer students.

7  That was her point.  That's the point of her e-mail.  We have

8  nine sports teams, they have many more, and that's not fair.

9          MS. MIRER:  It was actually separate but unequal.

10  That was the point of the e-mail.  That is definitely what was

11  being raised by Mr. Garcia Rosen and --

12          THE COURT:  I'm sorry?  That was the point made by

13  who?

14          MS. MIRER:  The other administrator who had been taken

15  out of his school and disciplined.  We provided three

16  affidavits -- three articles about that situation just within

17  the previous few years.  It really took a lot of -- it was very

18  difficult for Ms. Bloomberg to be able to write that letter, to

19  comment on this particular policy, which is something that is

20  extremely sensitive to Mr. Goldstein, and maybe when we do the

21  discovery we will find out --

22          THE COURT:  I don't see that as a comment on policy.

23  I saw it as a request for more sports teams.

24          MS. MIRER:  Well, I'm -- this is the particular -- the

25  way I read it was it was a statement about the policy of the

h532bloA

1    DOE, PSAL not providing -- providing, in essence, the separate

2    but unequal teams in that context.

3         THE COURT:  All right.  Well, let's look at the

4    e-mail.  You say that it is about policy.  I say it is about

5    teams.  So let's look at it.  And you can point out to me what

6    is in it that you believe is about policy.  I actually don't

7    see the word "policy" in the e-mail.  I don't see any reference

8    to any other schools other than the John Jay schools and the

9    Millennium schools.  So show me where in the January 10 e-mail

10   your client is talking about a Department of Education policy,

11   because I don't see it.  I see it as a very specific e-mail

12   about her school and the other schools that make up the John

13   Jay Campus versus the Millennium High School.  That's what I

14   see.  I don't see any reference to any other schools.  I don't

15   see any reference to general policies.  I don't know what you

16   are talking about.  But I am looking at the e-mail, and if you

17   want to direct my attention to something, I am happy to look at

18   it.

19        MS. MIRER:  Your Honor, I don't have the e-mail.  The

20   policy she is requesting is to unite.

21        THE COURT:  It's not a policy, ma'am.  She is asking

22   for action.  "I'm writing to request your assistance in uniting

23   the PSAL sports teams on the John Jay Campus in Brooklyn."

24   That is a request for action.  It is not a request for a policy

25   change.  It is a request for action.  And she is very specific

h532bloA

1    about the action she wants.  And she is not talking about any

2    other schools other than the schools of the John Jay Campus and

3    the Millennium high schools.

4              MS. MIRER:  I believe this is the only campus with

5    separate teams.

6              Having said that, your Honor, I believe that this

7    e-mail is fairly read -- is a statement with respect to the

8    fact that they have been turned down for many teams.  It is

9    stating that there is a racial component to this.  It is

10   commenting on that racial component.  And I do believe that,

11   fairly read, this could be both a plea as well as a comment on

12   the PSA policies with respect to allowing separate teams for a

13   predominantly white school in Manhattan combined with a most

14   majority white school in Brooklyn, using the same facility as

15   three other schools.  That --

16             THE COURT:  How could it be a comment on a policy when

17   you just said that as far as you know this is the only

18   situation where there are separate teams at the same school?

19   If that's true, and I don't know whether it is true or not, but

20   that's what you just said, accepting it is true, then how could

21   this be about a policy other than a specific situation?

22             MS. MIRER:  Because we are talking about the issue of

23   having separate but unequal allocation of resources to this

24   campus where there are six schools involved.  Now, obviously we

25   read it differently.  I read this as a comment with respect to

1    the way in which the PSAL was racially segregating Millennium

2    schools together and the other schools together.  And that, to

3    me, is a statement with respect to a disagreement with that

4    approach and policy.  Now, obviously, you know, she didn't use

5    the words, the exact word of "policy," but I think a fair

6    reading of this letter is in fact a criticism of a policy that

7    allows this separation to continue.

8         THE COURT:  It is a specific complaint about sports

9    teams at two campuses, Millennium and John Jay.  That's what it

10   is about.  It couldn't be more specific.  We are told how many

11   students are at each school, we are told what percentage at

12   each school, what the racial makeup is.  It couldn't be more

13   specific.  There is no suggestion in the e-mail this is some

14   kind of comment on DOE's general policy.  That is just not

15   there.  It is not there.  It is a complaint about what's going

16   on at John Jay.  That's what it is about.  And it is a request

17   that it be fixed.  You are correct that the request is that the

18   teams be united, but the essential point is, We here at John

19   Jay have nine sports teams and we have got 1859 students.  Look

20   at Millennium.  They have 17, and they have only got 1261 kids.

21   That's the point.  The point is, there is an inequity that

22   needs to be addressed.  It's not a general comment on the DOE's

23   policy about sports teams.  I don't think that's a fair reading

24   of the e-mail.

25         MS. MIRER:  Well, there was a parent demonstration

1  with a leaflet that's also attached which makes it very clear

2  that this was about separate segregation and unequal, and

3  that's a policy question for PSAL.  It is not a strict resource

4  issue.

5       Having said that, your Honor, you have ruled.  I

6  understand your ruling.  I am just raising these concerns

7  because, with respect to the *Matthews* case, I do think -- and

8  with respect to whether she spoke as a citizen and in that

9  context, I do think that the emphasis on official job duties

10  versus whether it was part of her job to in fact make a comment

11  with respect to the issues of segregation and so forth, I do

12  think make it more closely related to the *Matthews* decision,

13  and what I think is the focal point there of a person within a

14  precinct raising a concern about the impact that a policy was

15  having on the community and this quota system and it was a

16  precinct -- it was only in the precinct that he was complaining

17  about it.

18       So, having said that, your Honor, my concern is that

19  there -- with respect to the analysis, we obviously have

20  differences, and we will address those in some other fashion,

21  but I do think that it was surprising that the court did not

22  mention the fact that this particular issue of PSAL allocation

23  of resource, which we did bring to the court's attention in our

24  reply because we got this other information, about how there

25  has been an historical raising of these kinds of concerns about

1    PSAL's racial discrimination and allocation of teams, and that

2    that putting it in that context, not to be able to see the

3    knowledge of DOE of her complaint in that context, not raising

4    some kind of specter --

5         THE COURT:  You want to talk about DOE.  It's not

6    about DOE.  I have explained to you it's not about DOE.

7    It's --

8         MS. MIRER:  I mean DOE relating to --

9         THE COURT:  You have to show, you have got to give me

10   some evidence that the folks at OSI who decided to reopen this

11   investigation had some knowledge of her January 10, 2017

12   e-mail.  You haven't shown me that.

13        MS. MIRER:  Here is my concern:  My concern is that

14   Goldstein gets the allegations and he goes to OSI -- I don't

15   know this.  I don't have it.  But I don't think it is beyond

16   belief that he is upset about this similar allegation.  He goes

17   with this information to OSI and they get their marching

18   orders.  That's all I am saying, your Honor.  I don't think it

19   is beyond circumstantially --

20        THE COURT:  I understand that's your theory, and

21   that's why we have discovery.  You can take depositions here

22   and you can put those questions to people, and you can find out

23   what their answers are.  In particular, you can ask

24   Mr. Goldstein whether he spoke with anyone at OSI or directed

25   anyone else to speak with OSI and to make sure that they

1    reopened their investigation or did something negative towards

2    your client.  You have that right.

3          But as I said, I have to operate not on the basis of

4    what might happen down the road or what a deposition might

5    reveal that hasn't been taken yet, but rather based on what I

6    have before me now.  And the evidentiary record before me now

7    includes affidavits from the defendants in which they say that

8    the investigator at OSI who is involved in this had no

9    knowledge of the January 10 e-mail, that the organization as a

10   whole didn't know anything about it.  That hasn't been

11   contradicted with any evidence.  So I have to operate on the

12   basis of the evidence that is currently before me.  Could that

13   change?  Absolutely.  And if it did change, it might affect the

14   availability of injunctive relief.  But I have to operate on

15   the basis of what I have now, and right now the record is

16   unrebutted as to whether OSI knew.  The evidence is they did

17   not.

18          MS. MIRER:  Okay, your Honor.

19          And then the last point is that I think we definitely

20   will be raising the question of whether D-130 applies in the

21   context of the question of ideological discussion as opposed to

22   the issue of participation in electoral politics, which is

23   clearly -- and partisan politics, which is clearly what OSI

24   regulation D-130 goes to on its face.

25          THE COURT:  All right.  Well, I'm looking at D-130,

1  and if you have a copy of it, we can look at it together.

2  MS. MIRER:  Sure.

3  THE COURT:  I am looking at D-130(I)(c)(1), and I

4  quoted it, but I can quote it again:  "While on duty or in

5  contact with students, all school personnel shall maintain a

6  posture of complete neutrality with respect to all candidates.

7  Accordingly, while on duty or in contact with students, school

8  personnel may not wear buttons, pins, articles of clothing, or

9  any other items advocating a candidate, candidates, slate of

10  candidates, or political organizations/committees."

11  Paragraph 2 reads, "personnel may not be involved in

12  any activities, including fundraising, on behalf of any

13  candidate, candidates, slate of candidates, or political

14  organizations/committee during working hours."  Now, to me,

15  when it says "personnel," meaning DOE personnel, may not be

16  involved in any activities on behalf of any political

17  organization/committee during working hours, that seems very

18  clear to me.  I don't see ambiguity there.

19  MS. MIRER:  The reference to committees, I believe,

20  refers to committees supporting those candidates and

21  organizations supporting those candidates, and that's what I

22  referred to, which is in the introduction and it refers to --

23  for some reason I am not seeing it, but I read it.  In the

24  title it says, "Use of School Buildings by Candidates, Elected

25  Officials and Political Organizations and Conduct of School

1    Employees and Officers with respect to Political Campaigns and

2    Elections," but I believe there is a section where it says that

3    the political organizations are the ones supporting those

4    candidates.

5         Here it says -- that's number one -- "Use or access of

6    school by elected officials, candidates for elected office, or

7    organizations working on behalf of such officials or

8    candidates," and that's in subparagraph 1 of the introduction.

9    So the organizations they are referring to there are the ones

10   that are working on behalf of officials or candidates.

11        THE COURT:  All right.  I told you how I read it.  You

12   read it differently, I guess.  But to me I don't find it

13   ambiguous.  To me the clear import of what is stated in

14   paragraph (I)(c)(2) is that DOE personnel are not supposed to

15   be involved in activities on behalf of political organizations

16   during working hours.  That's how I read it.

17        MS. MIRER:  It is organizations --

18        THE COURT:  Let me ask you this:  So is it your

19   contention that DOE personnel are permitted to be involved in

20   activities on behalf of political organizations during working

21   hours?  Is that your contention?

22        MS. MIRER:  What I am saying is that there is no

23   regulation with respect to what we might call ideological

24   organizations.

25        THE COURT:  I don't know what that means.

1    MS. MIRER:  Okay, well they are --

2    THE COURT:  This says political organizations.

3    MS. MIRER:  Well, the Progressive Labor Party is an

4  ideological organization.  It does not run candidates.  It does

5  not have a slate of candidates.  It does not have organizations

6  supporting those candidates.  It does not have committees

7  supporting those candidates.  It is an organization that

8  believes in certain ideas and espouses those ideas.

9    Now, what I am saying here, and that's why the

10  analogy, the *Kramer* --

11    THE COURT:  Let me stop you there.  So you are telling

12  me that the Progressive Labor Party is actually not a political

13  organization?  Is that what you are telling me?

14    MS. MIRER:  It's not a political -- it's not a

15  partisan political organization.

16    THE COURT:  I don't know what that means.  Let me go

17  back.  Is the Progressive Labor Party a political organization?

18  Because I have to tell you, by its name, I would think it was a

19  political organization.  So if you are telling me it is not a

20  political organization, I need to understand why it is not a

21  political organization.

22    MS. MIRER:  It might be a, quote, political

23  organization, but it is not a partisan political organization,

24  which is what D-130 is really confined to and which the cases

25  that challenge that section of the D-130 said.  They

1  specifically said this is related to partisan politics.

2  Partisan politics is typically Democrats, Republicans, maybe

3  working families parties, ballot access parties which are in

4  fact running candidates.  The school isn't supposed to be

5  showing -- pushing one candidate or another.  And that's the

6  overwhelming aspect of this.  This is why we had meetings

7  with -- we were having conversation with the New York Civil

8  Liberties Union and general counsel to try to talk about the

9  fact, and I think they admit that D-130 really goes to partisan

10  politics, and the real question is, how do you get at the

11  question of things not covered by D-130, which is potentially

12  protected speech, advocacy, beliefs?  Where do you draw the

13  line?  And that's what we raised the *Kramer* case for, because

14  that's where the vagueness comes in.  That's where we raise the

15  *Muchmore* case.  That's the vagueness issues.  And if this is

16  perceived to be a legal avenue for inquiry and the kind of

17  open-ended investigation that OSI typically does, it seems to

18  me that the court at least should narrowly tailor or at least

19  address the question of narrowly tailoring this issue, and

20  maybe we should come back on that question, because --

21          THE COURT:  I think you would have to amend the

22  complaint --

23          MS. MIRER:  I will do that.

24          THE COURT:  -- because it is not what your complaint

25  is about now.  Your complaint now is very clear.  OSI reopened

h532bloA

1    an investigation of your client as a result of her sending the

2    January 10, 2017 e-mail. That's what your complaint is about.

3    I have addressed your application for injunctive relief with

4    respect to that. Now you are saying that there are problems

5    with the regulatory scheme, and there is ambiguity in a

6    Chancellor's regulation. That's --

7            MS. MIRER: No.

8            THE COURT: -- not before me at present.

9            MS. MIRER: Your Honor, when we filed the complaint,

10   except for general statements in the letters that we got from

11   the DOE attorneys, we had no idea what they are alleging

12   specifically are the issues. We then get some allegations with

13   respect to a movie, a foundation, a bake sale, and some vague

14   allegation that students are afraid to talk and express their

15   views.

16           THE COURT: But I don't understand what you just said

17   because the complaint was filed on April 28. I read or

18   summarized the entire correspondence between the parties here,

19   and that included an April 6, 2017 letter in which it seems to

20   me DOE was very clear about what your client was being

21   investigated for, and I read that language into the record

22   already. DOE said in the April 6 letter that the complaint

23   they had received was that your client was a member of the

24   Progressive Labor Party; that she had been actively recruiting

25   students into that organization during school hours; that she

1 had invited students to participate in that organization's

2 activities, including marches.  They laid all that out of in

3 the April 6 letter.  You didn't file the complaint until April

4 28.

5      MS. MIRER:  In part because we were in discussions

6 with DOE general counsel and the New York Civil Liberties Union

7 about this very issue of the question of what is it that is

8 beyond -- that is being actually investigated here?  That is

9 not a specific claim, frankly, your Honor.  I am just saying

10 that generally she is a member of something and she is doing

11 things, there is no who, what, where, why, and when.  It is

12 totally unspecific.  And so we filed the case in part to find

13 out what are the actual allegations, and what we got back was

14 they didn't think there was enough evidence in May and the

15 subsequent evidence that they provided refers to a movie, a

16 permit.

17      These are the things that -- where is this going to

18 go?  Where is this investigation going to go?  Are people going

19 to be asked whether they believe in antiracism or

20 antisegregation?  I mean, that's the problem with an

21 investigation that has no parameters and is looking at

22 somebody's ideology and to see whether or not at any time Jill

23 Bloomberg advocated in front of students that we should support

24 integration.  And if they say, well, that's the position of the

25 Progressive Labor Party, therefore you must be doing -- this is

1  the danger in this type of freewheeling investigation, your

2  Honor, and we will amend the complaint to raise these issues

3  because this is far beyond what D-130 is meant to regulate, far

4  beyond.  And it really gets into the kind of vague

5  understanding of what is wrong and what is not wrong, and I'm

6  sure the DOE could not tell you that what specifically would be

7  a violation.

8  　　　　THE COURT:  All right.  Well, you will tell me by May

9  10 how you wish to proceed.  If that includes filing an amended

10  complaint, you will tell me that, and you will ask permission

11  for when you can file the amended complaint, and we will take

12  it from there.

13  　　　　MS. MIRER:  Thank you, your Honor.

14  　　　　THE COURT:  Anything the city wants to say?

15  　　　　MS. O'CONNOR:  No, your Honor.

16  　　　　THE COURT:  All right.  We are adjourned.

17  　　　　　　　　　　　　　- - -

18

19

20

21

22

23

24

25