UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x

JILL BLOOMBERG,

                      Plaintiff,

     v.

THE NEW YORK CITY DEPARTMENT OF
EDUCATION and CARMEN FARINA,

                     Defendants.
-----------------------------------------------------------------x

17-cv-03136 (PGG)

**SECOND AMENDED COMPLAINT**

With Jury Demand

        Plaintiff, JILL BLOOMBERG, (hereafter "plaintiff" or "Principal Bloomberg") upon personal knowledge as to herself and upon information and belief as to other matters, alleges as follows:

## NATURE OF THE CLAIM

        1.     This Complaint raises fundamental constitutional and statutory issues regarding the authority of the Department of Education ("DOE" or, with Chancellor Carmen Farina, the "defendants") and their application of Chancellor's Regulation D-130 ("D-130") which has to do with electioneering in public schools. Plaintiff, a public high school principal, alleges in this case that an unconstitutional application of D-130 was used to investigate and retaliate against her for speaking out at times as a private citizen on topics such as race discrimination against DOE studentsThe New York City Department of Education is charged with educating over one million students—70% of whom are Black or Latino.

        2.     More than sixty years after the Supreme Court declared "separate but equal is inherently unequal" in *Brown v. the Board of Education*, New York City's schools are more segregated today than they were when segregation was official state policy.

3.     Plaintiff Jill Bloomberg, principal of Park Slope Collegiate (hereafter "PSC"), one of four schools housed on the John Jay Campus in Brooklyn, was investigated by the DOE's Office of Special Investigations ("OSI"), which conducted an aggressive and wide-sweeping investigation into the protected activities of plaintiff, PSC employees, students, and their families. As a result of the investigation, plaintiff's and other PSC employees' rights to engage in First Amendment protected activities have been chilled and curtailed, plaintiff was disciplined, and another investigation by the Conflict of Interest Board ("COIB") was commenced against her, all in retaliation for her advocacy and organizing against race segregation taking place in the John Jay Campus sports programs.  Defendants' basis for commencing the investigation into plaintiff's activities was because she was alleged to have violated Chancellor's Regulation D-130—a regulation designed to limit DOE employees from engaging in partisan electoral politics while on duty.

4.     Plaintiff brings this action pursuant to Section 601, Title VI of the Civil Rights Act of 1964, 42 U.S.C. §§2000d-1 and 42 U.S.C. §1983 pursuant to the First Amendment of the United States Constitution, and the Fourteenth Amendment's Due Process Clause. Plaintiff also asserts a pendent claim for retaliation under the New York City Human Rights Law ("NYCHRL"), Administrative Code of the City of New York §8-101 et seq.

5.     Plaintiff seeks appropriate equitable and declaratory relief as well as compensatory and punitive damages in order to redress the past deprivation of rights secured to her under Title VI, the First Amendment, the Fourteenth Amendment and NYCHRL, and to compensate her for the emotional distress that she has suffered because of the DOE's unlawful conduct.

## JURISDICTION AND VENUE

6.      This Court has original subject matter jurisdiction over plaintiff's federal and constitutional claims pursuant to 28 U.S.C. §§1331 and 1343, respectively, because they arise under the laws of the United States and are brought to recover damages for the violation of plaintiff's civil and constitutional rights.  Supplemental jurisdiction over the NYCHRL claim is exercised pursuant to 28 U.S.C. §1367.

7.      Venue is proper in this judicial district under 29 U.S.C. §1391(c) and 42 U.S.C. §2000e-5(f)(3) because defendants conduct business in and can be deemed to reside in this district and employment records relevant to the unlawful employment practices are maintained and administered here.

## PARTIES

### Plaintiff

8.      Principal Bloomberg has been employed by the DOE since September, 1998—the year she was hired as a teacher. In 2003, she received tenure as a teacher and in 2004, she became a principal, receiving tenure as a principal in 2007.

9.      During her entire 14-year career as a principal, plaintiff has been the principal of PSC.

10.      Plaintiff holds a B.A. in History from Northwestern University, an M.S.Ed. in Public Administration from Baruch College, CUNY, and is a doctoral candidate in Politics and Education at Teachers College, Columbia University in the Education Policy and Social Analysis program.

11.     Plaintiff has consistently received outstanding performance ratings at the end of each year that she has been employed with the DOE, both as a teacher and as a principal. She has always had an excellent rapport with colleagues, teachers, students and parents.

12.     Plaintiff, as a citizen and as a principal, has the ability to seek DOE's compliance with Title VI's antidiscrimination provisions.

**Defendants**

13.     Defendant DOE is a public school district and department of the government of New York City.

14.     Carmen Farina is the Chancellor of the DOE whose job is to oversee the Department of Education.  The DOE's regulations are codified in the Chancellor's Regulations which have been developed over the years.

15.     The DOE is the largest school district in the United States, and oversees approximately 1,800 schools and 1.1 million students.

16.     The DOE has nearly 135,000 full-time employees.

17.     The DOE is a person within the meaning of 42 U.S.C. § 2000d, and an employer within the meaning of 42 U.S.C. § 2000d.

18.     The DOE maintains control, oversight, and direction over the operation of its schools, including, *inter alia*, all matters related to student enrollment, student programming and student after school programs.

19.     The DOE is responsible for establishing the terms, conditions, and other practices that bear upon the employment of all DOE employees, including plaintiff and other employees at PSC.

20.     PSC is a DOE school located in District 15 inside the John Jay Campus located at 237 7th Avenue, in the Park Slope neighborhood of Brooklyn, New York.

21.     During all relevant times, the DOE was plaintiff's employer within the meaning of the applicable statutes.

22.     At all times relevant the DOE was and is a recipient of significant federal funding for purposes of Title VI.

23.     The protected activity that precipitated the investigation which is at the heart of plaintiff's claims took place in January and February, 2017. On March 2, 2017, an investigator with the OSI visited plaintiff's school and informed her that she was under investigation. Plaintiff was told, however, that the allegations against her and the subject of the investigation could not be disclosed to her.

24.     The protected activity involved plaintiff's written complaint to DOE officials, including the Public School Athletic League (PSAL) as well as her direct supervisor, in which she cited a discriminatory DOE policy that both segregated and favored White students over Black and Latino students. Although in no way related to her duties as principal of PSC, on January 10, 2017, plaintiff sent an email to Eric Goldstein the CEO of the Office of School Support Services as well as Michael Prayor, the Superintendent of District 15 (where PSC is located), in whichplaintiff complained about the PSAL policy of allowing segregated and unequal allocation of sports teams and resources to a disproportionately White school co-located with PSC and other schools (that are comprised of mainly Black and Latino students) within the John Jay Campus. Plaintiff requested that the sports teams be united, and no longer segregated so that the inequality of the segregation would end.

25.    Despite years of efforts to promote integration within the DOE, plaintiff's January, 2017 complaint was the first time plaintiff directly accused the DOE of unlawful race discrimination and segregation. To put these events in some perspective, plaintiff provides background facts below.

26.    In 2015 similar complaints against PSAL's policy of racial discrimination by other DOE employees have resulted in similar adverse employment actions to them.

## BACKGROUND FACTS

### Race Segregation in Park Slope's Public Schools

27.    PSC is a public secondary school located in District 15 in Park Slope Brooklyn serving grades 6 through 12.

28.    PSC is a majority minority school with an 85% Black and Latino student population in 2014.

29.    Park Slope Brooklyn is an increasingly affluent neighborhood in Brooklyn with a majority White population.

30.    Despite the racial demographics of Park Slope and District 15 generally, PSC remains a majority minority school in a majority White district.

31.    Since the outset of her tenure at PSC, Principal Bloomberg has encouraged desegregation of the school and opposed measures that reinforce and perpetuate *de facto* segregation, such as the creation of White enclaves within Black and Latino schools through the institution of, *inter alia*, student tracking programs and gifted and talented programs, both having the effect of further segregating students by race. Moreover, and in this spirit, plaintiff opposed the entry of an ostensibly selective school onto the John Jay Campus on the basis that it would

6

perpetuate segregation by attracting a disproportionately White student body, thus re-segregating the John Jay Campus.

**2010-2011: Plaintiff's Opposition to Re-Segregation With the Entry of Millennium Brooklyn on the John Jay Campus And First DOE Warning**

32.     In the Autumn of 2010, the DOE informed plaintiff that Millennium Brooklyn, an offshoot of the prestigious and predominantly White Millennium High School in Manhattan, would be co-locating in the John Jay Campus. Plaintiff was further informed that the arrival of Millennium Brooklyn was great news for the other schools at John Jay Campus because it would come with $600,000 in funding for refurbishing the building, funds that were unavailable to PSC before a more White school was assigned to the John Jay building.

33.     Nonetheless, plaintiff feared that the offshoot of Millennium Manhattan would continue to disproportionately admit White students, and thus create an all-or majority White enclave on the John Jay Campus.

34.     Seeing the promised funding as tied to the creation of such a racial enclave, students, parents and faculty from PSC and members of the local community surrounding the John Jay Campus organized a peaceful protest.

35.     On the evening of January 19, 2011, at a Panel for Education Policy ("PEP") meeting with DOE officials, parents, students and members of the community in attendance, and where the PEP was scheduled to vote on the placement of Millennium Brooklyn in the John Jay Campus, the public had the opportunity to voice its concerns with the new school's placement. When it was plaintiff's turn to speak she stated that the placement of Millennium Brooklyn was "an example of putting the interests of upper income white families above those of low-income families of color." Plaintiff's microphone was shut off in the middle of her statement, and she led the crowd in chanting "Integration Yes, Segregation No."

36.     Following the January 19, 2011 PEP meeting, plaintiff was called into a disciplinary conference with her direct supervisor, who admonished her for her statements, and stated, "You are not allowed to say that the DOE is racist." However, plaintiff was not formally disciplined for her statements.

**Fall 2011-Spring 2014: Plaintiff's Successful Desegregation Efforts**

37.     Over the next three years, plaintiff continued to be an outspoken advocate against segregation within the DOE. For example, on June 1, 2012, plaintiff sent a written complaint to defendant complaining that the DOE's plan to install surveillance cameras in the school building would have an adverse impact and disproportionally affect students of color.

38.     On March 25, 2014, plaintiff participated in a panel called "Integration Matters" with Pedro Noguera and David Tipson, two well-known figures in the anti-segregation movement. At this panel, plaintiff discussed her efforts to promote integration in her school and the challenges faced due to lack of systematic support. The panel was well received, and approximately 300 people were in attendance.

39.     Because plaintiff's method of promoting integration without student tracking was considered by many a success story in desegregation, on May 16, 2014, plaintiff's integration model at PSC was highlighted in a story covered by CBS news; and on June 23, 2014, the story was covered by Chris Hayes on MSNBC.

**2014-2015: Plaintiff Encourages Participation in Civil Rights Activism**

40.     In the Fall of 2014, plaintiff, the students, faculty and parents of PSC gathered in front of the John Jay Campus after school and marched to protest the police killings of Michael Brown and Eric Garner.

41.     In the evening of October 10, 2014, the student government of PSC, with the support of the PTA, organized a Town Hall meeting in the school cafeteria to discuss the NYPD's poor treatment of John Jay Campus students (in response to a highly publicized incident of the NYPD telling a John Jay Campus student to "get out of the neighborhood"), as well as John Jay Campus school safety agents' treatment of PSC students at dismissal in general. Several senior schools safety officials were in attendance, and plaintiff supported the students by arguing that they should be permitted to stay on campus after school for as long as they liked. At the end of the meeting, the school safety personnel reluctantly agreed to back down.

42.     Following the non-indictment of the police officers in the Michael Brown and Eric Garner killings, large mass demonstrations across the United States and New York City erupted.   Many students at PSC were upset by the two non-indictments. At the DOE's suggestion, plaintiff organized a school assembly that was to take place December 5, 2014. Plaintiff asked the Social Studies teachers to present short examples of civil rights protests from history as a way to put the current demonstrations into context. Plaintiff made the assembly optional to students and teachers, and permitted the Physical Education teacher to open the gym during the assembly for those who did not wish to attend the assembly.

43.     The morning of December 5, 2014, before the assembly, plaintiff's direct supervisor Superintendent Watts called plaintiff and, contrary to the DOE's previous suggestion to hold the assembly, attempted to dissuade plaintiff from holding the assembly, telling plaintiff that the assembly was not forbidden, but that the PSC administration had to remain "neutral." Plaintiff informed Superintendent Watts that the purpose of the assembly was to provide the students with a historical context of past violations of African Americans' Civil Rights, and how

they have historically been addressed, adding—"We will not be neutral when it comes to racism."

44.     On February 27, 2015, plaintiff organized a Black History Month assembly, and invited a student's grandfather to speak about the "Freedom Summer" campaign during the Civil Rights era, and the high profile murder of his brother, Michael Schwerner, and two other civil rights activists, Chaney and Goodman, who were killed by the Ku Klux Klan in Mississippi in 1964.

45.     On March 27, 2015, a PSC student who was Black was detained and handcuffed by school safety agents in the morning after passing through the school metal detectors with a metal pin in his broken eyeglasses that he had used to temporarily hold them together, as the pin was deemed a "weapon." Plaintiff advocated for the student and demanded that the student be released, but soon after the school safety agents released the student to plaintiff's office, the NYPD stormed in and arrested him. Students and staff expressed outrage at this treatment because they felt that the brutality and mistreatment of the student were a direct result of the policy of daily scanning which disproportionately impacts students of color within the DOE and that if the student had been a White student from Brooklyn Millennium he would not have been treated in the same manner. After school, the PSC students organized a demonstration outside of the school to protest the unfair treatment of their classmate and called for removal of the metal detectors.

46.     On May 1, 2015, plaintiff was invited to speak at a panel called "Restorative Approaches" at John Jay College of Criminal Justice. Many high level DOE officials were in attendance. During the panel, plaintiff spoke out against metal detectors in schools and harsh punitive disciplinary policies that adversely affect students of color.

47.    On May 4, 2015, Superintendent Watts came to PSC to speak with plaintiff, and advised her that her comments at the May 1, 2015 panel were not well received by Chancellor Farina. She suggested that because plaintiff was a DOE principal, she should remain "neutral about political issues" and not be openly critical of DOE policies.

**2015-2016: Plaintiff's Continued Advocacy for an Integrated Public School System**

48.    On September 25, 2015, plaintiff and four PSC students were invited to Washington D.C. to participate in a panel organized by the National Coalition for School Diversity to speak about school integration.

49.    On February 26, 2016, plaintiff scheduled another Black History Month assembly.

50.    On March 8, 2016, plaintiff was invited to speak on a panel organized by the Brooklyn Historical Society to discuss segregation in New York City public schools, and solutions towards integration. At the panel, plaintiff stated, "segregation did not come about organically, so we cannot expect it to be dismantled organically," in direct contrast to Chancellor Carmen Farina's announcement in favor of "organic integration."

51.    During the 2015-2016 school year, many PSC students participated in an extra-curricular Saturday program called "Integrate NYC for Me," and, together with the organization "Colectivo Amaranta," the students participating in this program explored ways to artistically express solutions that would promote an integrated society and further integration within the DOE. In the end, with the input of the PSC faculty, students, and PTA, they jointly decided to paint a mural, and spent hours creating a beautiful and colorful mural, which was unveiled to parents and faculty on Saturday, May 14, 2016. The mural depicted students in the foreground entering the school through a large metal detector, and a painting of the PSC student who was

arrested on March 27, 2015. In the background of the mural, students were marching in protest and holding picket signs with slogans such as "We are Students not Criminals" and "Scholars Not Suspects." In the far corner, a group of students pushed the metal detector off a cliff. Spread across the front of the mural was a large banner that said "Unity in Diversity; An Injustice to One is an Injustice to All."

**2016-2017: Plaintiff's Official Opposition to DOE's Unlawful Violations of Title VI**

52.     In the year 2016-2017, plaintiff's advocacy against segregation and race discrimination took on the form of more serious complaints against the DOE for unlawful discrimination, and defendant's opposition to plaintiff's protests increased.

53.     On November 1, 2016 the John Jay Campus girls' volleyball coach sent a letter to plaintiff about how the team had been singled out, humiliated and treated like criminals by the school safety agents at another, predominantly White school during the most important game of the season.

54.     On November 29, 2016, plaintiff sent a letter to Ramon Garcia, Assistant Commissioner of the School Safety Division, NYPD, and other DOE officials complaining about the girls' volleyball team incident and demanded an apology to the students, stating, "That our students felt the indignity of racism while entering one of our schools is an outrage."

55.     On January 10, 2017, plaintiff sent a damning complaint to Eric Goldstein, CEO of the DOE sports programs, and Superintendent Michael Prayor, accusing the DOE of race discrimination and segregation within the sports program in her building. Although not part and/or parcel of plaintiff's duties as principal of PSC, nor in any way related to her duties, plaintiff complained about the fact that the John Jay Campus was operating two separate and unequal sports programs. That is, there was one program for Millennium Brooklyn to share with Millennium Manhattan, and another for the remaining schools at John Jay Campus. Plaintiff

sought PSAL's help in uniting and thereby desegregating and equalizing the teams. Moreover, and in support of her assertion that the programs were also unequal, plaintiff included the following graph, highlighting the fact that the Millennium sports program, consisting of a high percentage of White students, had only 1,261 students yet received 17 sports teams, while the John Jay Campus sports program, consisting of a high percentage of Black and Hispanic students, had 1,859 students, yet was only provided with 9 sports teams and that the teams were not allowed to play together, thus creating a condition not only of racially separated, but also of unequal opportunities in sports programs.

| School or Program | Number of PSAL Teams | Enrollment (SY 15-16) | % Black & Hispanic |
|---|---|---|---|
| JJL | | 357 | 90.4 |
| SSJ | | 222 | 87.0 |
| PSC | | 356 (HS only) | 85 |
| BHSA | | 924 | 90.7 |
| **John Jay Campus PSAL** | **9** | **1859** | |
| MBHS | | 620 | 51.5 |
| MHS | | 641 | 25.2 |
| **Millennium High School PSAL** | **17** | **1261** | |

56.     Plaintiff's primary protest was the segregation of the programs based on race. But she also protested the fact that the John Jay Campus students in the predominantly White sports program received one team for every 74 students whereas students at predominantly Black and Hispanic sports program received one team for every 204 students.

57.     Plaintiff received no meaningful response to her January 10, 2017 letter requesting that the two programs be combined.

58.     Because the DOE failed to take meaningful action to cure the segregation of the sports programs at the John Jay Campus, on February 13, 2017, the PSC PTA organized a leafleting action where flyers were distributed on the public sidewalk outside of the John Jay Campus to inform the community about the race discrimination and segregation that plaintiff had complained about on January 10, 2017 (the "Title VI Complaint"). The flyers were created using the Title VI Complaint and stated in large bold letters "Separate is Never Equal," and included the above graph.

59.     Upon information and belief, including information provided by a former OCR employee, all Title VI complaints made to DOE officials are immediately referred to the Office of Civil Rights ("OCR"). Furthermore, the person directly responsible for responding to OCR complaints on behalf of the DOE is Robin Greenfield, the Executive Deputy Counsel for Employment and General Practice, within the Office of the General Counsel. Ms. Greenfield's office also oversees the Office of Special Investigations ("OSI").

60.     Based on DOE policy and upon information and belief, plaintiff's Title VI Complaint, which was made on January 10, 2017, was referred to OCR by at least on or about January 15, 2017.

**March 2017: Defendants' Allegation that Plaintiff Violated Chancellor's Regulation D-130 and Subsequent OSI Investigation**

61.     OSI, being part of the DOE's Office of General Counsel, has the primary function of investigating alleged violations of the Chancellor's Regulations.

62.     Within six weeks of plaintiff's Title VI Complaint, and two weeks after the February 13, 2017 leafleting action, on March 2, 2017, an investigator from OSI named Michelle Archie came to PSC and informed plaintiff that she was under investigation, but refused to inform her of the reason.

14

63.     Archie requested to speak with Assistant Principal Carla Laban. In this conversation, Archie informed Laban that the investigation of plaintiff related to "communist activities taking place at the school." Archie then showed Laban a list of names, and asked Laban to identify who from the list she had ever seen "engaging in communist activities." Laban informed Archie that she did not know what was meant by "engaging in communist activities" and therefore was unable to answer the question.

64.     Archie's list of names contained the name of plaintiff and four current PSC teachers.  It also contained names of people who had no present connection to the school including six former PSC teachers, plaintiff's family members, a few employees from an after-school sports and arts program, and a few former students who had graduated long ago.

65.     At that time plaintiff believed, and still believes, that the OSI investigation against her was retaliation for her complaint about the segregated sports programs.

66.     On March 16, 2017, at an after school PTA meeting with several members of staff present, Laban announced that the OSI was investigating plaintiff, and that the OSI investigator had asked her whether she had ever seen plaintiff and/or others engaging in communist activities at the school.

67.     On March 22, 2017, undersigned counsel sent a letter to defendant requesting they cease and desist from what counsel in good faith alleged to be the retaliatory investigation and stated litigation would be filed if the investigation was not halted, given the "chilling effect" it was having on plaintiff and members of the school community. Undersigned counsel's letter referenced this country's shameful history of labeling people who promoted integration as "communists" and noted that the DOE should not be repeating the unfortunate mistakes of this history.

68.     In response, on March 27, 2017, Robin Greenfield claimed that the OSI investigation was based on a complaint that had been lodged in May, 2016.

69.     Undersigned counsel responded on March 28, 2017 that the DOE's explanation did not undercut plaintiff's belief in the retaliatory nature of the investigation, as it was suspicious that a complaint that was not seen as meritorious enough to open an investigation in May, 2016 would suddenly become viable 10 months later.

70.     The March 28, 2017, letter from undersigned counsel also requested the DOE to identify the specific regulation that plaintiff had allegedly violated and further details regarding the alleged practices thought to have violated that specific regulation.

71.     In response, on April 6, 2017, Greenfield continued to make the "McCarthyite" accusation by informing plaintiff that she and two teachers at PSC stood accused of being members of a communist organization known as the Progressive Labor Party and that they had been accused of actively recruiting students into the organization during school hours, and that they invited students to participate in marches for Communism.  Greenfield advised plaintiff that this conduct constituted a violation of Chancellor's Regulation D-130 ("Political Activities in School Buildings").

72.     However, according to the OSI's August 25, 2017 Investigative Report (the "OSI Report"), *see infra*, at the time Greenfield made the April 6, 2017 representations regarding the nature of the allegations against plaintiff, OSI investigators had already twice interviewed the confidential complainant who filed the original May 2016 compliant referred to in Greenfield's April 6, 2017 letter, and as of March 13, 2017, the OSI had already determined that the confidential complainant had no evidence to support the May 2016 accusation.

73.     The April 6, 2017 letter stated that more but unspecified evidence was presented to the DOE through the Special Commissioner of Investigation ("SCI") in December, 2016, but this also did not explain why an investigation was not opened for another three months, raising the same concerns that allegations which were not considered meritorious in May or December 2016 suddenly became meritorious in March 2017, after plaintiff's and the PTA's complaints in January and February 2017 about the segregated sports programs.

74.     Greenfield also warned in the April 6, 2017 letter that plaintiff, having informed several members of the school community that she sought counsel to challenge the investigation, could be viewed as interfering with the investigation which was grounds for removal and dismissal.  Defendant has thus commenced another investigation against plaintiff with SCI for "interfering with an investigation."

75.     That is defendant sought to bootstrap a disciplinary action onto an investigation that is retaliatory and improper *ab initio.*

76.     The DOE has admitted that on January 25, 2017, the DOE and OSI received the updated information from the confidential complainant. Because Robin Greenfield would have received the information about plaintiff's January 10, 2017 Title VI Complaint on at least January 15, 2017, as she is the person responsible for receiving OCR complaints (including all Title VI complaints), and she also received the information regarding the complaints from OSI, she had specific knowledge of both the Title VI Complaint and the OSI complaints prior to the time the investigation was officially commenced.

77.     Thereafter and for several weeks prior to the initial filing of the instant complaint, plaintiff's counsel along with Arthur Eisenberg, the Legal Director of the New York Civil Liberties Union ("NYCLU") had discussions with General Counsel for the DOE Howard

17

Friedman regarding the issue of whether Chancellor's Regulation D-130 could apply to the allegations against plaintiff. It was hoped that the investigation could be held in abeyance pending a meeting of all concerned could occur and perhaps some agreements made to address the matter.  Due to travel schedules of both plaintiff's counsel and Mr. Eisenberg it was hoped that the meeting would occur in the first week of May, 2017.  The investigation was held in abeyance for a few weeks.

78.     However, in the late afternoon of April 27, 2017, Mr. Freidman stated that the DOE would no longer hold the OSI investigation in abeyance.

**Court Proceedings on the Initial April 28, 2017 Complaint**

79.     The initial Complaint was then filed on April 28, 2017, seeking a temporary restraining order and preliminary injunction of the investigation pending the outcome of the litigation.

80.     The Court, rather than issuing a TRO, gave defendants until noon on May 1, 2017 to respond and thereafter held a hearing at 3:00 p.m. on that date.

81.     In response to plaintiff's motion for a preliminary injunction, defendants included an affirmation of DOE attorney Charity Guerra (the "Charity Guerra Affirmation"), which included the specific details of the December 20, 2016 allegations against plaintiff, and were stated as follows:

>   a.   That plaintiff's husband filmed a documentary for the Len Ragozin Foundation an organization alleged to be associated with the Progressive Labor Party;

>   b.   That the Confidential Complainant stated that plaintiff's husband is the president of the Len Ragozin Foundation;

>   c.   Students and staff were included in the documentary without their authorization;

>   d.   That plaintiff engaged in a conflict of interest when the documentary was screened at PSC and a $20 fee admission was charged;

    e.   That academic policy is being violated at the school because a mandated course was not being taught;

    f.   A bake sale was held to raise funds for a May Day march;  and

    g.   Students who voice opinions different from those of plaintiff are not allowed to express them.

82.    However, that the DOE's stated rationale for commencing the D-130 investigation against plaintiff is a pretext for retaliation is demonstrated by the contradictory rationales provided by Ms. Guerra and the OSI. According to the August 25, 2017 OSI Report, the OSI's stated rationale for investigating whether plaintiff had violated D-130 is because the OSI received documentation on January 25, 2017 indicating that a May Day bakesale had taken place at PSC. The OSI Report omits any reference whatsoever to the Len Ragozin Foundation's alleged connection with the PLP as a basis for commencing the D-130 Investigation.

83.    Moreover, also in contradiction to the information provided to the Court in Ms. Guerra's declaration, the OSI Report explicitly states that the allegation that students with different opinions than plaintiff's were not allowed to express them was directly contradicted on March 13, 2017 by the documentary evidence supplied to the OSI by the confidential complainant.

84.    During the May 1, 2017 hearing, the Court invited plaintiff to respond to the defendants' brief by Tuesday May 2, 2017, and directed her to respond to various questions posed by the Court, one of which was whether the DOE's allegations against plaintiff, if true, established a violation of Chancellor's Regulation D-130. The Court also stated defendants would have the opportunity to reply if they asked, but the Court intended to issue an opinion from the bench on May 3, 2017 at 5:00 p.m.

85.    On May 2, 2017 plaintiff filed a brief addressing the questions raised by the Court as well as providing, *inter alia*, a supplemental affidavit of plaintiff.

86.     In plaintiff's supplemental affidavit, she addressed each of the allegations in the

Charity Guerra Affirmation. Plaintiff included supporting documentation and her own sworn

testimony establishing that:

    a.  The Len Ragozin Foundation is a public charity which supports the Arts. Plaintiff
attached the "About" page from Len Ragozin website as proof;

    b.  While plaintiff's husband is president of the foundation, as a public charity the
Foundation is not engaged in electoral politics;

    c.  Plaintiff's husband did not make the documentary which is called "Profiled". The
documentary was screened at the PSC Campus in June of 2016. Plaintiff attached
a document to her affidavits showing that the filmmaker is Kathleen Foster;

    d.  Plaintiff also stated that whether students and/or staff were in the documentary
without their authorizations, it is the responsibility of the filmmaker to have
handled those matters, and that plaintiff advised her of such obligation. Plaintiff
further noted that as she was not involved in the making of the film, and no
investigation of her would illuminate the issue of authorizations;

    e.  The film was screened pursuant to a permit which was granted by the DOE to the
Len Ragozin Foundation. Plaintiff provided the Court with a copy of the permit;

    f.  Plaintiff further attached documentation which showed that that the permit was
granted by Karen Seara in the Chief Engineer's office based on an extended use
application which was filed in May of 2016. Special requests on the application
included the right to sell goods and ask for donations. There was no violation of
the conflict of interest policy as the sponsors were permitted to sell goods and ask
for donations to support the distribution of the film;

    g.  Plaintiff further stated there is no course which is mandated which is not taught at
PSC. The DOE regularly reviews and approves the curriculum through an audit
of transcripts and PSC has always been found to be teaching the required courses
for student graduation;

    h.  Plaintiff denied that there was ever a bake sale for a May Day march; and

    i.  Plaintiff also stated that her students disagree with her often and with much
confidence.

87.     The allegations presented by defendants to the Court as supplemental information

     regarding the

May 2016 SCI complaint were false, on their face. The DOE could have easily discovered all of the allegations regarding the Len Ragozin Foundation and the screening of the movie "Profiled" without opening an OSI investigation into plaintiff's activities and disrupting the entire school. The OSI Report's complete omission of these facts is also proof that the DOE knew they were false.

88.     Plaintiff also argued that none of these allegations or the original allegations implicate D-130 so even if they were true there would be no violation of D-130.

89.     Plaintiff also argued that a more expansive reading of D-130 would violate plaintiff's First Amendment rights and was unconstitutionally vague and in violation of her rights under the Fourteenth Amendment.

90.     The OSI investigation was based on an allegation that plaintiff has beliefs that are shared with some organizations which are considered to be "communist", such as being opposed to racism and segregation.

91.     There are many historical parallels to persons who have advocated for civil rights and against racism being automatically considered subversive or communist.

92.     Plaintiff is aware of many instances where the DOE has endorsed political activities such as protests against Donald Trump, Voter Registration drives, marches regarding climate change, and many others. (See, e.g., URL http://www.amny.com/news/politics/nyc-students-protest-trump-s-ban-on-refugees-immigrants-1.13074563).

**Post Denial of Injunctive Relief Actions by OSI and DOE**

93.     On May 3, 2017 the Court denied plaintiff's preliminary injunction claiming that plaintiff had not shown either a likelihood of success on the merits or irreparable harm on her retaliation claims.

94.     During oral argument, plaintiff argued, *inter alia*, that D-130 did not apply to the allegations made against her and that the investigation was in fact an infringement of her due process rights, as it was unclear what conduct was prohibited by the regulation. In support, plaintiff provided affidavits from several teachers who stated that they were afraid to denounce racism and segregation; were afraid to wear "Black Lives Matter" t-shirts to school; and were afraid to teach lessons about the Cold War, because no one understood the breadth of D-130.

95.     The Court informed the parties that the constitutionality of the application of D-130 to this issue was not before the Court, as the complaint only alleged retaliation, and accordingly, did not render a decision as to the constitutionality of D-130.

96.     Plaintiff stated her intention to amend the complaint to add a claim that the DOE's application of D-130 against her was a violation of her Due Process rights under the Void for Vagueness Doctrine.

97.     In light of the fact that the OSI had already determined the allegation that plaintiff was a member of the PLP and had recruited students to the organization to be entirely baseless, combined with plaintiff's evidence at the injunction hearing which refuted many of the allegations of the confidential complainant with respect to the Len Ragozin Foundation and the making of and screening of the movie "Profiled", and the OSI Report's total omission of the DOE's initial assertion that the Len Ragozin Foundation was connected to the PLP, the DOE and OSI were on notice that the allegations against plaintiff are untrue, and yet they nonetheless continued the investigation.

98.     Since the Court denied plaintiff's requested relief, defendant has proceeded with a wide-ranging investigation that has included captive audience interrogations of students without their parents' consent, and questions having nothing to do with anything that could even

conceivably be deemed a violation of D-130. This has been in violation of the DOE's obligation to pursue the investigation in a narrowly tailored fashion.

99.    Specifically, on May 16, 2017, two investigators from OSI and the District Superintendent Michael Prayor came to PSC, and pulled several students from their classes. The students that were targeted by the OSI were the most outspoken students, the children of outspoken PTA members, and children of DOE employees.

100.    Plaintiff was asked to accommodate the OSI in their interrogation of students, and she cooperated fully. However, she believed that the students' rights were being violated because their parents were not contacted. She asked them if they intended to contact the students' parents, and was advised "yes, we will tell them that they can call their parents if they would like to." Plaintiff did not protect the students more aggressively for fear of retaliation, as she feared any protest on her end would be considered "obstruction" of the investigation, and grounds for further discipline.

101.    The OSI, without the consent of their parents, required these students to provide answers to their questions. Many students requested the opportunity to first speak with their parents, but were not permitted to do so.

102.    At the end of their interrogations, the students were seen crying at the school.  On information and belief, the students felt violated because a large portion of the OSI's questions related to their parents' political associations.

103.    On information and belief, none of the OSI's questions to the students related to anything that could be considered a violation of D-130.

**The OSI's Findings and Defendants' Subsequent Discipline of Plaintiff**

104.    On August 25, 2017, the OSI issued the OSI Report, which acknowledged that as of March 13, 2017, the OSI was aware that the confidential complainant had no evidence to support the assertion that plaintiff was a member of the PLP and was actively recruiting students to join the organization. Instead, the OSI Report stated that the investigation into whether plaintiff had violated D-130 was commenced based on an allegation that a May Day bakesale had taken place at PSC.

105.    The OSI Report detailed how the investigation focused on the political activities of plaintiff, PSC employees, students, and family members, with a particular focus on whether anyone had attended May Day and/or Black Lives Matters rallies.

106.    The OSI Report ultimately determined that the OSI did not substantiate the initial allegation that plaintiff had violated D-130. Implicit in this finding was a chilling message to plaintiff that had the OSI determined that a May Day bakesale had taken place, it would have determined that plaintiff had violated D-130. This message was chilling because plaintiff has no way of knowing what other types of activities the DOE considers to be proscribed by D-130.

107.    Moreover, although the OSI investigation focused almost exclusively on the activist and civic activities of plaintiff, other PSC employees, students and their familes, the OSI nonetheless substantiated that plaintiff was guilty of conduct that essentially amounted to three alleged clerical mistakes—not conduct that would merit the commencement of an OSI investigation or discipline.

108.    The OSI Report further noted that based on the OSI's findings, an investigation by the COIB against plaintiff had been commenced.

109.    On October 3, 2017, as a result of the OSI Report, plaintiff was disciplined with a written reprimand.

110.    The issue of segregation and discrimination against students of color with respect to the allocation of sports teams by the PSAL has been an issue which other DOE employees have spoken out about and have been punished for their advocacy. Specifically, in plaintiff's second affirmation to the Court in support of her motion for preliminary injunction, plaintiff provided three articles to the Court which documented the actions taken against certain DOE personnel who had publicly revealed racial disparities in allocation of sports teams by the PSAL in 2015.

111.    Plaintiff affirmatively avers that she has violated no school policy or Chancellor's Regulation. She further avers that her conduct opposing racism and segregation in schools is not prohibited by any Chancellor's Regulation. Moreover, even if plaintiff were to concede that a DOE employee's involvement with the Progressive Labor Party was covered by Chancellor's Regulation D-130, plaintiff has made it explicitly clear to defendants that she is not a member of the Progressive Labor Party. Thus, the reasons for this OSI investigation cannot be based on legitimate factors.

**It is Not Credible that Defendants Believed the Allegations Against Plaintiff Constituted A Violation of D-130**

112.    The OSI Report stated that the reason the OSI launched an investigation into whether plaintiff had violated D-130 was because of an allegation that a May Day bakesale had taken place at PSC.

113.    That is, defendants would have plaintiff believe that their position is that a May Day bakesale is political activity proscribed by Chancellor's Regulation D-130.

114.     Chancellor's Regulation D-130 is titled "USE OF SCHOOL BUILDINGS BY CANDIDATES, ELECTED OFFICIALS AND POLITICAL ORGANIZATIONS, AND CONDUCT OF SCHOOL EMPLOYEES AND OFFICERS WITH RESPECT TO POLITICAL CAMPAIGNS AND ELECTIONS", and on its face is clearly limited to partisan political activities, and does not prohibit the conduct of DOE employees related to the free expression of their ideological beliefs.

115.     The Special Commissioner of Investigations for the New York City School District ("SCI")—the independent body charged with investigating and rendering determinations as to whether the Chancellor's Regulations have been violated—has taken the official position that D-130 is limited to partisan political advocacy. In a 2014 report written for both the Mayor's Office and Chancellor's Office, SCI director Richard Condon explicitly stated that the term "political organization" under D-130 was limited to partisan electoral political organizations.  In that same report, Robin Greenfield's office did not take issue with a de Blasio campaign rally taking place at a school because it was not "explicitly prohibited by Chancellor's Regulation D-130." Moreover, even though the campaign rally involved a speech by Mayor de Blasio about his parties' position on worker-protection laws, immigration reform, a social safety net for all Americans, income inequality, and union rights, the SCI could not determine whether the rally constituted "political activity" pursuant to D-130 because the Mayor's prepared remarks were not "overtly political."

116.     Moreover, the Commissioner of Education has taken a similar position, and in several decisions has determined that "political activity" pursuant to D-130 is limited to partisan political activity.

117.     In addition, the Chancellor's office has also issued statements that support a limited construction of D-130. In his formal capacity as Chancellor, Joel Klein stated that the

rationale for enacting D-130 was to promote the DOE's interest in protecting the "rights of students to learn in an environment free of partisan political influence" because "[p]artisan political activity by staff in the presence of students . . . sends the message that the view expressed carries the support of the school system."

**The DOE's Unfair and Arbitrary Administration of D-130 Demonstrates a Pretext and an Intent to Retaliate Against Plaintiff and Regulate Her Viewpoint**

118.    That the DOE's application of D-130 against plaintiff is an unconstitutional attempt to retaliate against her and discriminate against her viewpoint is demonstrated by several instances where DOE employees have engaged in partisan Democratic Party political activities at DOE schools for campaigning purposes. Yet in all of those instances, the DOE's official position has been that those activities *did not* violate D-130.

119.    One of those instances occurred in the Fall of 2017, when a principal of a DOE school used school resources to recruit students, during school hours, to join the de Blasio campaign. He posted on his school's website and Facebook page the contact information for the de Blasio Campaign's regional organizer so students could "make phone calls, knock on doors, and talk to people in high traffic areas… to get the word out about Bill de Blasio." Another post encouraged students to "Get involved in politics with this great opportunity to work with the mayor Bill De Blasio in his campaign!" Yet the DOE insisted that no rules were broken despite D-130's explicit proscription that "No Department of Education duplicating, communication, electronic or other equipment may be used to produce, reproduce, record, or disseminate information on behalf of any candidate, candidates, slate of candidates or political organization/committee." (See URL http://nypost.com/2017/10/25/school-persuaded-students-to-volunteer-for-de-blasio-campaign/).

**Plaintiff's Constitutional Rights Continue to be Harmed by Defendants Continued Broad Reading of D-130 to Regulate Her Viewpoint**

120.     On November 14, 2017, plaintiff was required to attend an investigative hearing after PSC employee Alissa Lembo falsely accused her of harassment through a mechanism exclusively reserved for employee complaints about supervisor harassment. At the investigatory proceeding, Alan Lichtenstein, defendant Chancellor Farina's designee (who was selected to investigate the matter), asked plaintiff about her personal political beliefs as well as all of the allegations made by Ms. Siegel and Ms. Lembo to the OSI that had already been investigated and found unsubstantiated by the OSI. None of Mr. Lichtenstein's questions involved harassment or intimidation on the part of plaintiff. Mr. Lichtenstein's questions made it clear to plaintiff that the DOE's reception of her personal viewpoints were motivating the investigation of an otherwise frivolous claim of harassment, and it was clear that Mr. Lichtenstein felt authorized to ask such questions based on the Chancellor's and the DOE's unconstitutionally broad reading of D-130 to proscribe plaintiff's political viewpoints.

**Defendants' Arbitrary and Unfair Administration of D-130 To Retaliate Against Plaintiff and Regulate her Viewpoint Has Caused a Chilling Effect That Is Ongoing**

121.     Defendant's improper attempt to turn its unlawful retaliation into grounds for dismissal by the arbitrary application of D-130 has resulted in an ongoing chilling effect on the school community. Based on the OSI investigator's focus into whether plaintiff, PSC employees, students and their families had attended May Day rallies and Black Lives Matters rallies, plaintiff and other PSC employees are afraid of engaging in protected activities that could be deemed "political expression" that could subject them to discipline by the DOE's unfair administration of D-130 against them. Plaintiff's fear to engage in First Amendment protected activity has been exacerbated by the fact that the DOE does not view Partisan electoral

campaigning and the recruitment of students in schools, during school hours, and using school resources, as violations of D-130. But vague and untrue allegations of recruitment to an organization which does not run candidates for office is the basis for a full-scale intrusive and intimidating investigation.

122.     For example, since school began in the Fall of 2017, out of fear that the DOE will again retaliate against her and accuse her of violating D-130, plaintiff continues to refrain from engaging in First Amendment protected activities, including both speech as a private citizen on matters of public concern, as well as conduct that should not be proscribed by D-130 (but that defendants may consider a violation given the fact that they consider a May Day bakesale to be a violation of D-130). These specific instances have so far included, *inter alia*: plaintiff refrained from making a public statement to the news media about the tragic events in Charlottesville; plaintiff refrained from making a public statement to the news media criticizing the de Blasio administration's recent integration initiative; plaintiff refrained from attending a panel discussion about desegregating public schools; plaintiff refrained from organizing an opening assembly to reaffirm the school's commitment to integration and anti-racism; plaintiff refrained from continuing to push for an integrated PSAL sports program at the John Jay Campus; plaintiff refrained from attending a Black Lives Matters rally; and many other similar protected activities that plaintiff would otherwise engage in as an active participant.

123.     Furthermore, due the OSI investigation and the risk that it posed for her job, plaintiff's right to speak out against the DOE's unlawful treatment of students was chilled on May 16, 2017, barring her from protesting violations of her students' constitutional rights to not be interrogated by OSI investigators without parental knowledge or consent.

124.    Moreover, the ultimate discipline of plaintiff, the commencement of a COIB investigation, and the Chancellor's Designee's investigation questions about plaintiff's political affiliation during the harassment proceeding have severely chilled plaintiff from engaging in activities protected by the First Amendment that she would otherwise be engaging in.

125.    The retaliatory OSI investigation itself, and the way it was broadly conducted, continues to cause harm as it has dissuaded reasonable DOE employees from engaging in protected activities, such as supporting a charge of discrimination and speaking out on issues of public concern. Further, many are too afraid to support plaintiff as witnesses in the instant action, including parents of PSC students who are also DOE employees. Moreover, now that students have been targeted, students are afraid of speaking out against racism, and their parents are afraid of participating in the PTA or protected activity for fear of subjecting their students to humiliating and intimidating interrogations.

126.    In fact, SCI director Richard Condon has acknowledged the chilling effect at PSC that was caused by the OSI investigation. On October 26, 2017, in an interview with the New York Times, Mr. Condon acknowledged that plaintiff's investigation was an example of an investigation that left a culture of fear at a school, noting that it was "fairly disruptive" to her school.

127.    Moreover, defendants asserted that the OSI investigation against plaintiff centered around the activities of known or suspected members of communist organizations, and the recent harassment investigation against plaintiff focused on questioning her about her political beliefs. Because it is unclear what exactly is covered by D-130, plaintiff and other PSC employees have been dissuaded from speaking out against race discrimination for fear of being required to

disclose their own political affiliations and/or ideological beliefs, or being required to inform the DOE of the political associations and/or ideological beliefs of others.

## FIRST CLAIM FOR RELIEF
### (the OSI Investigation Violates Plaintiff's Due Process Rights under the Fourteenth Amendment)

128.    Plaintiff repeats, reiterates, and incorporates each and every preceding paragraph as if set forth fully herein.

129.    The subject of Chancellorein., and incorporates each and every preceding paragraph e discrimination for fear of being required to disclose their own politicaAND CONDUCT OF SCHOOL EMPLOYEES AND OFFICERS WITH RESPECT TO POLITICAL CAMPAIGNS AND ELECTIONS."

130.    In the introduction of the regulation, the DOE sets forth the scope of activity governed by the regulation stating they govern, (1) the use of, or access to school buildings by elected officials, candidates for elective office, **or organizations working on behalf of such officials or candidates,** both during school hours, and non-school hours; (2) use of school facilities, equipment, and supplies for political purposes by school employees, personnel, or staff members and officials, and (3) conduct of school employees, personnel, or staff members and officials with respect to political campaigns and elections. Chancellor's Regulation D-130.

131.    With respect to Conduct of Employees, the regulation states in relevant part at Subsection C: "(1) While on duty or in contact with students, all school personnel shall maintain a posture of complete neutrality with respect to all candidates.  Accordingly, while on duty or in contact with students, school personnel may not wear buttons, pins, articles of clothing, or other items advocating a candidate, candidates, slate of candidates or political organization/committee and (2) Personnel may not be involved in any activities including fundraising, on behalf of any

candidate, candidates, slate of candidates or political organization/committee during working hours."

132.    All portions of the regulation expressly refer exclusively to partisan electoral politics, and the Courts that have addressed this issue refer to partisan politics as well. *Weingarten v. Board of Education*, 680 F.Supp.2d 595 (S.D.N.Y. 2010).

133.    It is apparent on the face of this regulation that when in Section C (2) there is a reference to "political organization"/ "committee", such reference is to organizations referred to in the Introduction, which expressly mentions **organizations working on behalf of such officials or candidates.** There is no reference to conduct beyond any other type of "political organization" not involved in electoral partisan politics.

134.    The DOE has consistently involved itself and its school employees and students to political activity such as protests against Donald Trump, Voter Registration drives, marches regarding climate change, and many others. (See URL http://www.amny.com/news/politics/nyc-students-protest-trump-s-ban-on-refugees-immigrants-1.13074563).

135.    Any effort to extend Chancellor's Regulation D-130 to make improper thebeliefs or advocacy of beliefs that might also be held by and ideological organizations which does not run candidates and are not engaged in electoral politics **contravene** the First and Fourteenth Amendment to the United States Constitution.

136.    The DOE's application of D-130 does not give notice to a reasonable person in plaintiff's shoes that the conduct plaintiff is under investigation for is a violation of this policy. Plaintiff and other DOE employees do not know what conduct is prohibited by D-130, and therefore, the DOE is able to take this opportunity to abuse its power and freely retaliate against plaintiff and other DOE employees who engage in protected activity.

137. To the extent defendants assert D-130 is the basis for this investigation, it must be held unconstitutional on the ground that it is void for vagueness and violates plaintiff's right to due process under the Fourteenth Amendment, see *Kramer v. New York Department of Education* 715 F.Supp 2d 335 (E.D.N.Y. 2010).

138. By engaging in an unrestricted investigation of plaintiff in order to discipline her for violating a Chancellor's Regulation that does not prohibit her conduct, the DOE has violated plaintiff's Fourteenth Amendment Rights.

139. Plaintiff's constitutional rights have been harmed by defendants' application of D-130 against her because, *inter alia*, (1) plaintiff's First Amendment Rights have been severely chilled as a result of the retaliatory, unfair and arbitrary administration of D-130 to commence an OSI investigation against her; (2) The sweeping manner in which the OSI investigation was conducted chilled plaintiff's First Amendment Rights; (3) The D-130 investigation resulted in plaintiff's discipline; (4) the DOE's broad reading of D-130 as applied to plaintiff has allowed defendants to continue to regulate plaintiff's viewpoints through use of other investigatory mechanisms that could lead to plaintiff's discipline; (5) The DOE's failure to consider clear violations of D-130 as violations of D-130 have severely chilled plaintiff's First Amendment Rights, as they demonstrate the DOE's true motive is to regulate plaintiff's viewpoint; (6) The DOE's continued use of other investigatory mechanisms to question plaintiff on her political beliefs.

140. Plaintiff is therefore entitled to all relief the Court deems proper, including but not limited to equitable relief, compensatory damages, economic damages and punitive damages.

### SECOND CLAIM FOR RELIEF
**(Retaliation Against Plaintiff in Violation of Title VI)**

141.    Plaintiff repeats, reiterates, and incorporates each and every preceding paragraph as if set forth fully herein.

142.    Title VI prohibits intentional discrimination by federally funded programs.

143.    Section 601 of Title VI provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d.

144.    The New York City DOE receives Federal Financial Assistance.

145.    Private individuals may sue to enforce Section 601 and obtain both injunctive relief and damages. *Alexander v. Sandoval*, 532 U.S. 275, 279 (2001).

146.    A private action for damages under Section 601 exists only if an "appropriate person" had actual knowledge of the alleged discrimination and was deliberately indifferent to it. *Rubio v. Turner Unified Sch. Dist*. No. 202, 523 F. Supp.2d 1242, 1250-51 (D. Kan. 2007); see *Gebser v. Lago Vista Indep. Sch. Dist*., 524 U.S. 274, 290 (1998).

147.    Constructive notice is insufficient. See *Gebser,* 524 U.S. at 285.

148.    An "appropriate person" is one who has authority to take corrective action to end the discrimination. *Rubio*, 523 F. Supp.2d at 1250-51; see *Gebser*, 524 U.S. at 290.

149.    Determining who is an appropriate person under Title VI is a fact-based inquiry, but a school official with authority to halt known abuse by measures such as transferring the harassing student to a different class, suspending her or curtailing her privileges would qualify. *Murrell v. Sch. Dist. No. 1, Denver, Colo*., 186 F.3d 1238, 1247 (10th Cir. 1999). The knowledge of the wrongdoer herself is "not pertinent to the analysis." *Gebser*, 524 U.S. at 291.

34

150.     Plaintiff is a person with standing to and who did in January and February 2017 take action to enforce the terms of Title VI.

151.     Defendant was aware of her activities as her complaint was addressed to leaders in the DOE.

152.     Defendants violated Title VI by retaliating against plaintiff by instituting a punitive investigation against her based on her alleged "communist activities" because she complained of the DOE's race discrimination against its students.

153.     As a result of this retaliation plaintiff has suffered damages to her reputation by inappropriately being put under a cloud of suspicion and having her job threatened.

**THIRD CLAIM FOR RELIEF**
**(Defendants' Violation of Plaintiff's First Amendment Rights to Freedom of Expression)**

154.     Plaintiff repeats, reiterates, and incorporates each and every preceding paragraph as if set forth fully herein in particular the allegations in the First Claim for Relief describing Chancellor's Regulation D-130 and its limited application to electoral partisan politics occurring at the school.

155.     Throughout her employment as principal at PSC plaintiff has spoken out against racism and segregation.  In some instances she has spoken and acted in her capacity as a school principal and in some instances she spoke out, for example in public fora, as a private citizen on issues of public concern in a manner which was not disruptive to the school community.

156.     Defendants continued use of investigatory mechanisms that could lead to discipline in order to discriminate against plaintiffs' viewpoint has resulted in a chill that has stopped plaintiff from engaging in countless activities protected by the First Amendment.

157.    That defendants intent is to censor plaintiffs' non-partisan political viewpoint is demonstrated by the arbitrary and unfair application of D-130 and defendants' own past position that D-130 is limited to partisan, electoral political advocacy. Defendants have created a limited fora where DOE employees are permitted to advocate for Democratic party candidates and their platforms, while at the same time proscribing DOE employees, including plaintiff, from advocating for non-partisan political viewpoints that the DOE disagrees with, such as desegregation and anti-racism.

158.    The letter of complaint plaintiff wrote on January 10, 2017 to the PSAL leadership complaining about the policy of separate and unequal sports teams was not something plaintiff was "employed to do", nor was it "part and parcel" of her regular job. This type of policy oriented complaint was neither part of her job nor "the practical reality of her everyday work".   That is, when she spoke out about this policy as applied to PSC she was speaking as a public citizen.

159.    Plaintiff's January and February 2017 speaking out both orally and in writing opposing DOE policies which she believed to be discriminatory on the basis of race is protected speech under the First Amendment as she was speaking as a citizen in much the same way as the police officer in *Matthews v. City of New York,* 779 F.3d 167 (2d Cir. 2015) was found to be speaking as a citizen when he spoke out to his command structure about how quotas for arrests and tickets in his precinct impacting community relations.

160.    The complaint plaintiff made regarding separate and unequal allocation of sports teams was followed up with citizen complaints of the same issue when the PTA leafletted the school on February 13, 2017.

161.     Plaintiff was speaking on a matter of public concern, to wit: protesting separate and unequal sports teams for students at the John Jay Campus.

162.     As a result of this protected speech, plaintiff is now subjected to an investigation in which she is being labeled as a communist.

163.     By engaging in this investigation and threatening her with discipline for opposing the investigation, defendant has violated plaintiff's rights to freedom of expression under the First Amendment.

164.     The initial allegations against plaintiff were that she was allegedly recruiting students to the Progressive Labor Party during school hours, and having them participate in marches for Communism, even if true, which it is not, is not the kind of activity Chancellor's Regulation D-130 was designed to address as these allegations relate to political beliefs and actions consistent with those beliefs which do not fall within the definition of electioneering.  Thus, the broad reading of Chancellor's Regulation D-130 is impermissibly bringing within its orbit first amendment rights to freedom of speech and beliefs.

165.     All restrictions of first amendment speech must be subjected to strict scrutiny and only supported if there is a compelling governmental interest.

166.     There is no compelling governmental interest which would allow Chancellor's Regulation D-130 to be interpreted so as to bring within its sweep protected speech, such as a person's advocacy of the need to end racism and to oppose its manifestations in society.

167.     Also, even if there were such an interest, all restrictions on speech should be narrowly tailored to the situation.

168.    Contrary to any narrowly tailoring of the investigation, the DOE has engaged in an overly intrusive investigation including disrupting the school day and interviewing students without their parent's consent or presence.

169.    Also, after providing in her May 2, 2017 supplemental affidavit plaintiff has provided significant evidence which refutes the supplemental allegations of the confidential complainant of December 2016, the DOE and OSI should have been on notice that the confidential complainant's allegations lacked credibility and decided themselves to halt or curtail the investigation.

170.    Instead defendants through OSI are continuing the investigation as if nothing had been shown to be false.

171.    The abusive nature of the investigation is itself ongoing retaliation, but this time for plaintiff having sought to protect her rights by protesting the investigation in the first instance, first in letters and then in Court.

172.    As a result of defendants' misapplication of D-130 and their continued use of investigatory mechanisms to investigate plaintiffs' political beliefs, plaintiff's rights under the First Amendment have been violated, as described above, and she has suffered damages to her reputation by inappropriately being put under a cloud of suspicion and having her job threatened. She seeks all appropriate equitable and legal relief allowable for these violations.

<u>**FOURTH  CLAIM FOR RELIEF**</u>
**(Retaliation Against Plaintiff in Violation Plaintiff's Rights Under the New York City Human Rights Law)**

173.    Plaintiff repeats, reiterates, and incorporates each and every preceding paragraph as if set forth fully herein.

174.    Plaintiff's January and February 2017 speaking out both orally and in writing opposing DOE policies which she believed to be discriminatory on the basis of race is protected activity under the New York City Human Rights Law (NYCHRL) Administrative Code of the City of New York §8-101 et seq. which prohibits race discrimination against students in public schools.

175.    New York City Human Rights Law also prohibits retaliation in any manner against persons who oppose discrimination under the NYCHRL.

176.    Defendants knew of plaintiff's protests of unequal funding of sports programs in January and February 2017 and are using the OSI investigation to retaliate against her.  In so doing the defendants have violated her rights not to be retaliated against under the NYCHRL.

177.    As a result of this retaliation plaintiff has suffered damages to her reputation by inappropriately being put under a cloud of suspicion and having her job threatened.

## PRAYER FOR RELIEF

**WHEREFORE**, plaintiff requests relief as follows:

**A.**    A declaration that Chancellor's Regulation D-130 does not authorize an investigation of plaintiff for the reasons given by the DOE as none of those allegation violate any Chancellor's regulation.

**B.**    A declaration an effort to investigate plaintiff for beliefs and advocacy beyond the electoral and electioneering purposes of D-130 is void as being unconstitutionally vague and/or an infringement of plaintiff's due process rights under the First Amendment and Fourteenth Amendment.

**C.**     A declaration that any investigation to the extent it occurs is narrowly tailored and limited to investigating whether plaintiff was involved in electoral activities as implicated in Chancellor's Regulation D-130.

**D.**     Injunctive relief requiring the DOE to cease and desist from any investigation which goes beyond allegations of partisan electoral politics by plaintiff.

**E.**     Injunctive relief preventing the DOE from using any information obtained in the investigation of plaintiff on matters beyond the strictures of Chancellor's regulation D-130 which was obtained before the requested declaratory relief is granted to discipline or otherwise adversely affect plaintiff's employment.

**F.**     A declaration that defendant retaliated against plaintiff in violation of Title VI and that defendant has retaliated against plaintiff for exercising her rights under the First Amendment to the United States Constitution and has violated her rights under the New York City Human Rights Law.

**G.**     Injunctive relief, temporarily, preliminarily and permanently barring the retaliatory OSI investigation against plaintiff;

**H.**     Injunctive relief preliminarily and permanently barring disciplinary action against plaintiff for opposing an illegally retaliatory OSI investigation.

**I.**     An award of compensatory damages for emotional distress and suffering for defendant' violations of Title VI, the First and Fourteenth Amendments, and the New York City Human Rights Law;

**J.**     An award of punitive damages for defendant' violations of Title VI, the First and Fourteenth Amendments, and the New York City Human Rights Law;

**K.**     An award of attorney's fees and costs;

**L.**     Such relief as is authorized by federal law;

**M.**     Such other relief as the Court deems just and proper;

## JURY TRIAL

Plaintiff demands a jury trial for all causes of action and claims for which she has a right

to a jury trial.

Dated: New York, New York
　　　　November ___, 2017

　　　　　　　　　　　　　　　Respectfully submitted,

　　　　　　　　　　　　　　　MIRER MAZZOCCHI JULIEN &
　　　　　　　　　　　　　　　CHICKEDANTZ, PLLC


　　　　　　　　　　　　　　　_____
　　　　　　　　　　　　　　　Maria L. Chickedantz
　　　　　　　　　　　　　　　150 Broadway, Suite 1200
　　　　　　　　　　　　　　　New York, NY 10038
　　　　　　　　　　　　　　　Tel. (212) 231-2235
　　　　　　　　　　　　　　　Fax (212) 409-8338
　　　　　　　　　　　　　　　*Attorneys for Plaintiff*
　　　　　　　　　　　　　　　maria@mmsjlaw.com