h532bloA

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

JILL BLOOMBERG,

           Plaintiff,                New York, N.Y.

        v.                    17 Civ. 3136(PGG)

THE NEW YORK CITY DEPARTMENT
OF EDUCATION  AND CARMEN
FARINA,

           Defendants.

------------------------------x

                              May 3, 2017
                              5:20 p.m.

Before:

                HON. PAUL G. GARDEPHE,

                            District Judge

                      APPEARANCES

MIRER MAZZOCCHI SCHALET JULIEN & CHICKEDANTZ, PLLC
     Attorneys for Plaintiff
BY:  JEANNE I. MIRER
     MARIA L. CHICKEDANTZ

ZACHARY W. CARTER
     Corporation Counsel of the City of New York
BY:  ANDREA M. O'CONNOR
     WILLIAM A. GREY
     Assistant Corporation Counsel

h532bloA

1          (Case called)

2          MS. MIRER:  Jeanne Mirer, Mirer Mazzocchi Schalet

3    Julien & Chickedantz, for the plaintiff.

4          MS. O'CONNOR:  Andrea O'Connor for the Department of

5    Education and Chancellor Farina.

6          THE COURT:  I have read the papers.  I am happy to

7    hear any additional argument the parties want to make.

8          Ms. Mirer, anything else you want to say?

9          MS. MIRER:  Nothing, your Honor, except just in terms

10   of the adverse action standard, we clearly believe that it is a

11   test that, whether or not the OSI investigation would dissuade

12   a reasonable worker from participating in protected activity.

13         Thank you.

14         THE COURT:  All right.  Does the city want to offer

15   any additional argument?

16         MS. O'CONNOR:  No, your Honor.

17         THE COURT:  This is a continuation of a hearing on

18   plaintiff's application for a temporary restraining order and

19   preliminary injunction.

20         Plaintiff Jill Bloomberg is the principal of Park

21   Slope Collegiate, which I will be referring to as "PSC," which

22   is a high school located at the John Jay Educational Complex,

23   which I will be referring to as "John Jay," located in the Park

24   Slope section of Brooklyn.  (Cmplt. (Dkt. No. 1) ¶¶ 4, 10-11,

25   22)  Plaintiff has worked for the New York City Department of

Education, or "DOE," since 1998, and she has served as PSC's

principal for the past 13 years.  *(Id.* ¶¶ 10-11)

PSC is one of four secondary schools co-located at

John Jay.  The other schools co-located at John Jay are the

Secondary School for Journalism, which I will refer to as

"Journalism," the John Jay School for Law, which I will refer

to as "Law," and Millennium Brooklyn High School.  *(Id.* ¶¶ 4,

55; Bloomberg Aff. Exhibit 3 (Dkt. No. 10-3))  PSC's student

body is 85 percent black and Latino.  Journalism's student body

is 87 percent black and Latino, and Law is 90.4 percent black

and Latino.  *(Id.* at ¶¶ 28, 30, 55)  Millennium Brooklyn --

which is an offshoot of Millennium High School in Manhattan, a

school with a predominantly white student body -- joined the

John Jay complex in 2011.  *(Id.* at ¶ 32)  According to the

complaint, Millennium Brooklyn maintains a "high percentage" of

white students.  The student body at Millennium Brooklyn is

nonetheless majority black and Latino.  *(Id.* ¶ 55)

In the complaint, plaintiff asserts that -- throughout

her nearly 20-year career at DOE -- she has been an "outspoken

advocate against [race discrimination] and segregation within

the DOE."  *(Id.* ¶ 37).  The complaint sets forth a number of

instances -- dating back to 2011 -- in which plaintiff has

publicly addressed these issues and advocated for greater

equality within the DOE. (*See Id.* ¶¶ 32-54)  This lawsuit

relates not to plaintiff's alleged long record of opposing

h532bloA

1   segregation in DOE schools, however, but instead to a January

2   10, 2017 e-mail that plaintiff sent to two DOE officials on

3   January 10, 2017, complaining about the alleged "segregated and

4   unequal allocation of sports teams and resources" at John Jay.

5   (*Id.* at ¶ 26)

6        Plaintiff sent her January 10, 2017 e-mail to Eric

7   Goldstein, who is the head of DOE's Office of School Support

8   Services, which is responsible for the Public School Athletic

9   League, or "PSAL."  The other addressee was DOE superintendent

10  Michael Prayor, who is plaintiff's direct supervisor.  (*Id.* ¶

11  55; Bloomberg Aff. Ex. 3 (Dkt. No. 10-3); Supp. Bloomberg Aff.

12  (Dkt. No. 21) ¶ 7)  In her e-mail, plaintiff asserts that the

13  DOE is operating "separate and unequal [sports] programs" at

14  John Jay.  (Bloomberg Aff., Ex. 3 (Dkt. No. 10-3))

15       DOE offers two sports programs at John Jay.  The

16  first -- the John Jay Campus PSAL -- is offered to students at

17  PSC, at Journalism, at Law, and at the nearby Brooklyn High

18  School of the Arts, which is also predominantly black and

19  Latino.  *(Id.)*  The second sports program at John Jay is the

20  Millennium High School PSAL.  This program is offered to

21  students at Millennium Brooklyn and Millennium High School in

22  Manhattan.  (*Id.*)  Because Millennium Manhattan does not have a

23  gym, its students participate in sports programs with

24  Millennium Brooklyn at the John Jay campus.  (*Id.*)  The student

25  body at Millennium Manhattan is about 75 percent white and

1     about 25 percent black and Latino.  *(Id.)*

2              Because plaintiff's January 10, 2017 e-mail is

3     critical to this lawsuit -- plaintiff alleges that it provoked

4     DOE to launch a retaliatory investigation against her -- I am

5     going to read that e-mail in its entirety.

6              The sender of the e-mail is Jill Bloomberg.  It is

7     dated January 10, 2017, at 6:49 a.m.  It is addressed to Eric

8     Goldstein and Michael Prayor, with cc's to Donald Douglas, Marc

9     Williams, Oneatha Swinton, and Kevin Conway.  The papers don't

10    explain to me who these people are.  I assume they are somehow

11    associated with the sports program at John Jay.

12             The subject line for the e-mail reads "PSAL at the

13    John Jay Campus."

14             The e-mail reads as follows:

15             "Dear CEO Goldstein and Superintendent Prayor:

16             "I am writing to request your assistance in uniting

17    the PSAL sports teams on the John Jay campus in Brooklyn.  Our

18    campus houses the Secondary School for Journalism, the John Jay

19    School for law, Millennium Brooklyn High School, and Park Slope

20    Collegiate.  Currently the John Jay Campus Schools PSAL teams

21    include students from Journalism, Law, PSC, and students from

22    Brooklyn High School of the Arts on Dean Street.  Millennium

23    Brooklyn High School students belong to the Millennium High

24    School PSAL teams that also include students from Millennium

25    High School in Manhattan.  The separate school programs, both

h532bloA

1    of which practice and compete at the John Jay Campus

2    (Millennium High School does not have a gym) offer vastly

3    unequal opportunities to students.

4         "Prior to this school year, the John Jay Campus had

5    only four teams.  We were recently granted girls' cross country

6    and girls' and boys' indoor and outdoor track, though we

7    requested and were denied girls' and boys' swimming; girls'

8    softball, flag football, double-dutch, and JV volleyball, as

9    well as boys' volleyball and soccer.  Meanwhile, the number of

10   Millennium High School teams continues to grow.

11        "The principals of the schools at the John Jay Campus

12   meet weekly to manage our shared campus.  From the time that

13   Millennium Brooklyn High School joined our campus community in

14   2011, I have argued that they should be a part of our PSAL

15   team.  Nonetheless, they opted to join with Millennium High

16   School (which opened in 2002) and, over the years, has been

17   granted 17 teams.  In spite of repeated requests to unite the

18   teams and open up the opportunities that exist on the campus

19   but that are denied to students from three of the four schools,

20   Millennium Brooklyn High School maintains its exclusive

21   alliance with Manhattan Millennium High School.

22        "The PTA at PSC has also raised these inequities with

23   Executive Director Donald Douglas, but have heard nothing in

24   response.

25        "The benefits of these separate and unequal programs

h532bloA

to the students at Millennium Brooklyn High School and

Manhattan Millennium High School do not justify the

disadvantages imposed on the students from Brooklyn High School

for the Arts, Law, Journalism, and PSC.  Nor do whatever

logistical difficulties may arise from uniting them.  The

students at all six schools are equally deserving of

opportunities to participate in extracurricular sports, and it

is the responsibility of the DOE and of PSAL to facilitate that

equity.

     "I look forward to hearing from you soon.

     "Sincerely, Jill Bloomberg, Principal, Park Slope

Collegiate," address, telephone numbers, fax and BlackBerry

provided.

     In addition to the text of the e-mail that I just

read, plaintiff's e-mail also includes a chart showing that the

John Jay Campus PSAL has nine sports teams for 1859 students,

while the Millennium High School PSAL has 17 sports teams for

1261 students.  The chart also lists the enrollment at each of

the relevant high schools along with the percentage of black

and Hispanic students at each school.  *(Id.)*

     Plaintiff received no immediate response to her

January 10, 2017 e-mail, (Cmplt. (Dkt. No. 1) ¶ 57)  I say no

immediate response because, on March 3, 2017 -- after the

alleged retaliatory investigation had been initiated against

plaintiff, Donald Douglas, the executive director of the PSAL,

h532bloA

informed plaintiff and the other principals at the John Jay

schools that the John Jay Campus PSAL would be granted five

additional sports teams. (Supp. Bloomberg Aff. (Dkt. No. 21) ¶

10) Douglas stated, however, that the two sports programs at

John Jay would not be merged. *(Id.)*

I will now discuss the alleged retaliatory

investigation that is the premise for this lawsuit.

On May 12, 2016, the Special Commissioner of

Investigation for the New York City Public Schools, the "SCI,"

received an anonymous tip that plaintiff was engaged in

improper political activities with her students at PSC. SCI is

an independent investigative agency that is part of the New

York City Department of Investigation. SCI is not part of the

Department of Education.

The unanimous tipper reported to SCI that plaintiff

was "a member of a political organization known as the

Progressive Labor Party and was actively recruiting students

into the organization and inviting them to participate in

organizational activities, including marches." (Guerra Decl.

(Dkt. No. 17) ¶¶ 5-6, 11) Consistent with its normal practice

concerning complaints of this sort, the next day -- May 13,

2016 -- SCI referred the matter to the Office of Special

Investigations, or "OSI." OSI is an investigative unit within

the Department of Education that investigates matters SCI

refers to OSI. *(Id.* ¶¶ 5, 12)

1      OSI concluded that there was insufficient information

2  to pursue the complaint; and, given that the identity of the

3  complain apartment was unknown, OSI marked the complaint as

4  closed pending additional information.  (*Id.* ¶ 13)

5      On December 20, 2016, however, the anonymous tipper

6  contacted SCI again, and provided SCI with additional

7  information concerning plaintiff.  (*Id.* ¶ 14)  The complainant

8  said, among other things, that plaintiff's husband had filmed a

9  documentary for a foundation affiliated with the Progressive

10  Labor Party; that plaintiff's husband is the president of the

11  foundation; that students and staff were included in the

12  documentary without having given their permission; that the

13  documentary was screened on the premises of PSC and that a $20

14  admission fee was charged to those who attended; and that a

15  bake sale was held at PSC to raise funds for a May Day march.

16  (*Id.* ¶¶ 14-16)

17      On January 25, 2017, about two weeks after plaintiff

18  had sent her January 10, 2017 e-mail regarding the sports

19  programs at John Jay, SCI sent the new information on to OSI

20  (*Id.* ¶ 17).  Based on the new information, OSI was able to

21  identify and interview the previously anonymous complainant.

22  (*Id.* ¶ 19)  On February 1, 2017, OSI decided to reopen its

23  investigation based on the information provided by the

24  complainant, and OSI assigned the complaint to an investigator.

25  (*Id.* ¶¶ 18, 21)

On March 2, 2017, the OSI investigator began conducting witness interviews at PSC *(Id.* ¶ 22) and the investigator informed plaintiff that she was under investigation.  (Cmplt. (Dkt. No. 1) ¶ 60).  The investigator refused to tell plaintiff why she was under investigation, however.  *(Id.)*

That same day, the investigator told PSC's assistant principal that the investigation of plaintiff related to "Communist activities taking place at the school."  *(Id.* ¶ 62) The investigator showed the assistant principal a list of names and asked her to identify who from the list had engaged in Communist activities.  *(Id.)*  The list included plaintiff, four current teachers at PSC, six former PSC teachers, plaintiff's family members, employees associated with after-school programs, and former students.  *(Id.)*

On March 20, 2017, a number of PSC teachers received subpoenas from the OSI asking them to appear for an interview. (Bloomberg Aff. (Dkt. No. 10) ¶ 34)

On March 22, 2017, plaintiff's lawyer sent a letter to the Department of Education's general counsel demanding that the investigation of plaintiff be stopped and threatening a lawsuit if the investigation was not immediately closed. (March 22, 2017 Pltf. Ltr. (Dkt. No. 10-5)).  The letter claimed that OSI's investigation was being conducted in retaliation for plaintiff's January 10, 2017 e-mail to

Goldstein and Prayor, in which she complained about the allegedly segregated sports programs being offered at John Jay. *(Id.)*

In a March 27, 2017 letter, DOE provided further details about the nature of its investigation of plaintiff. As an initial matter, DOE stated that OSI's investigation was unrelated to plaintiff's complaint about the sports teams at John Jay. DOE pointed out that the investigation was originally opened in May 2016, based on a complaint received at that time. DOE also states that, in deciding to pursue the investigation, OSI had "no knowledge of any complaint lodged by Ms. Bloomberg within the Public Schools Athletic League concerning racial segregation in the sports teams." DOE also pointed out that "it would not be appropriate for school staff to solicit students to participate in any political events or to encourage them to support a particular political group or party." (March 27, 2017 DOE Ltr. (Dkt. No. 10-6))

Plaintiff's counsel responded in a March 28, 2017 letter that OSI's decision to "sit on a complaint for a year" and then commence an investigation after plaintiff complained about the sports programs demonstrated that the investigation was retaliatory. As to DOE's references to improper political activities, plaintiff complained that DOE had not provided any specifics concerning plaintiff's alleged improper conduct, or cited any regulation that had been violated. Plaintiff

1    reiterated her demand that the investigation be terminated and

2    her threat to move forward with a lawsuit if it was not.

3    (March 28, 2017 Pltf. Ltr. (Dkt. No. 10-7))

4            In an April 6, 2017 letter, DOE addressed plaintiff's

5    demand for specifics concerning the complaint OSI was

6    investigating and provided an explanation for the delay in

7    pursuing the May 2016 complaint:

8            "The complaint being investigated is that plaintiff

9    and two teachers at the Park Slope Collegiate school are

10   members of a Communist organization known as the Progressive

11   Labor Party, that they are actively recruiting students into

12   the organization during school hours, and that they invite

13   students to participate in the organization's activities,

14   including marches for communism.  If substantiated, this could

15   constitute a violation of Chancellor's Regulation D-130, which

16   provides, in part, that staff may not be involved in any

17   activities on behalf of a political organization during working

18   hours."  (April 6, 2017 DOE Ltr. (Dkt. No. 10-8))

19           Chancellor's Regulation D-130 states that "the use of

20   any Department of Education school during school/business hours

21   by any person, group, organization, committee, etc., on behalf

22   of or for the benefit of any political organization/committee

23   is prohibited."

24           This regulation further provides that DOE "personnel

25   may not be involved in any activities, including fundraising on

behalf of any political organization/committee during working

hours." (Chickedantz Affirm. (Dkt. No. 4) Ex. B at 2)    In

connection with this lawsuit, DOE has also asserted that

plaintiff may have violated Chancellor's Regulation D-180,

which forbids the use of school facilities, equipment, and

supplies on behalf of political organizations; Chancellor's

Regulation C-110, which concerns conflicts of interest; as well

as the City of New York's conflict of interest laws. (Guerra

Decl. (Dkt. No. 17) ¶¶ 31-34)

As to the delay in pursuing the investigation of the

complaint, the DOE responded as follows:

"You also inquired about the delay in the OSI

investigation.  The complaint was initially filed with a

Special Commissioner of Investigation for the New York City

public schools (SCI) in May of 2016.  As permitted by the

Mayoral Executive Order establishing SCI, SCI referred the

complaint to OSI.  The complainant supplied further information

in December 2016, and thereafter, OSI began its investigation."

(April 6, 2017 DOE Ltr. (Dkt. No. 10-8))

Plaintiff filed this action on April 28, 2017,

asserting claims for retaliation under the First Amendment to

the United States Constitution, Title VI of the Civil Rights

Act of 1964, 42 United States Code § 2000d-1 *et seq.*, as well

as the New York City Human Rights Law, New York City

Administrative Code 8-101 *et seq.* (Dkt. No. 1)  Plaintiff has

moved for a temporary restraining order and a preliminary

injunction enjoining the DOE's investigation of her pending the

outcome of this litigation.  (Dkt. No. 3)

As to the standard for the issuance of injunctive

relief, a court may issue injunctive relief only where, first,

the plaintiff has demonstrated either (a) a likelihood of

success on the merits or (b) sufficiently serious questions

going to the merits to make them a fair ground for litigation

and a balance of hardships tipping decidedly in the plaintiff's

favor.  Second, the court may issue the injunction only if the

plaintiff has demonstrated that she is likely to suffer

irreparable injury in the absence of an injunction.  Third, a

court must consider the balance of hardships between the

plaintiff and defendant and issue the injunction only if the

balance of hardships tips in the plaintiff's favor.  Finally,

the court must ensure that the public interest would not be

disserved by the issuance of a preliminary injunction.

*Salinger v. Colting*, 607 F.3d 68, at pages 79-80 (2d Cir.

2010).

"However, when a party seeks an injunction that will

affect governmental action taken in the public interest

pursuant to a statutory or regulatory scheme, the plaintiff

must typically show a likelihood of success on the merits.  A

serious question going to the merits is usually insufficient,

even if the balance of hardships tips decidedly in the

1   applicant's favor."  *Mullins v. City of New York*, 626 F.3d 47,

2   53 (2d Cir. 2010).

3          Here, plaintiff seeks an injunction prohibiting the

4   DOE from proceeding with its investigation of her.

5   Accordingly, plaintiff asks this court to block the Department

6   of Education from taking governmental action pursuant to a

7   statutory or regulatory scheme, namely, the Chancellor's

8   regulations and the New York City conflict of interest laws.  I

9   conclude that plaintiff must show a likelihood of success on

10  the merits in order to obtain the injunction she seeks.  *See*

11  *Id.*

12         I will first address whether plaintiff has shown a

13  likelihood of success on her First Amendment retaliation claim:

14         With respect to likelihood of success:

15         As a DOE employee, plaintiff is considered a public

16  employee.  A public employee asserting a First Amendment

17  retaliation claim "must establish that:  (1) her speech or

18  conduct was protected by the First Amendment; (2) the defendant

19  took an adverse action against her; and (3) there was a causal

20  connection between this adverse action and the protected

21  speech," *Matthews v. City of New York*, 779 F.3d 167, 172 (2d

22  Cir. 2015).

23         The first factor, whether the speech was protected by

24  the First Amendment, "encompasses two separate subquestions:

25  (1) whether the subject of the employee's speech was a matter

h532bloA

of public concern; and (2) whether the employee spoke as a citizen rather than solely as an employee." *Id.*  "If the answer to either question is no, that is the end of the matter."  *Id.*

    With respect to the first subquestion, "a matter of public concern is one that relates to a matter of public, social, or other concern to the community." *Looney v. Black*, 702 F.3d 701, 710 (2d Cir. 2012).  As to the second subquestion, in determining whether a plaintiff was speaking as an employee or as a citizen, courts consider whether (1) the speech "falls outside of the employee's official responsibilities," and (2) whether a "civilian analogue" for the speech exists.  *Matthews*, 779 F.3d at 173.

    "In the First Amendment context, the state has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general." *Ross v. Breslin*, 693 F.3d 300, 305 (2d Cir. 2012). Speech by a public employee is protected by the First Amendment only when the employee is speaking "as a citizen on a matter of public concern." *Id.*  In *Garcetti v. Ceballos*, the Supreme Court held that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer

discipline."  *Id.*  This is the case even when the subject of an

employee's speech is a matter of public concern.  *Id.*

A plaintiff speaks pursuant to her official job duties

when the speech at issue "owes its existence to those job

duties" *(Id.* at 308) or when the speech is "part-and-parcel [of

the employee's] concerns about her ability to properly execute

her duties." *Weintraub v. Board of Education*, 593 F.3d 196,

203 (2d Cir. 2010).

Here, plaintiff has not shown a likelihood of success

as to the first element of a First Amendment retaliation claim.

Although plaintiff's January 10, 2017 e-mail complains about

"separate and unequal sports programs" at John Jay, and that is

certainly a matter of public concern, the evidence before the

court demonstrates that plaintiff made her complaint to her

supervisor and to the overseer of the PSAL program "pursuant to

her official duties" as PSC's principal, rather than as a

citizen.  *See Ross*, 693 F.3d at 305.

Indeed, plaintiff concedes that fighting for an

appropriate number of sports teams for PSC students was part of

her job as PSC's principal.  In her supplemental affidavit,

plaintiff says the following:

"Throughout my career, the Public School Athletic

League ('PSAL') has had the budget for sports programs.  I, as

a principal, do not have any dedicated funds for sports

programs.  Any sports programs we want must be applied for to

1  PSAL.  It is part of a principal's or other school employee's

2  regular job duties to request sports teams of the PSAL.  For

3  years, principals and coaches in the John Jay program had been

4  making these formal requests, but our requests were regularly

5  rejected."  (Supp. Bloomberg Aff. (Dkt. No. 21 at ¶ 5))

6          The essence of plaintiff's January 10, 2017 e-mail is

7  that the schools that make up the John Jay Campus PSAL are not

8  being treated fairly with respect to the number of sports teams

9  their schools are authorized to have, and plaintiff

10  demonstrates that unfairness by pointing out that the

11  Millennium schools, which have fewer students, are authorized

12  for more sports teams.  And while it is true that plaintiff

13  includes statistics showing that the percentage of black and

14  Hispanic students is higher at the John Jay Campus schools as

15  opposed to the Millennium schools, the essence of her argument

16  is that "the students at all six schools are equally deserving

17  of opportunities to participate in extracurricular sports, and

18  it is the responsibility of the DOE and of PSAL to facilitate

19  that equity."  (Bloomberg Aff., Ex. 3 (Dkt. No. 10-3))

20          Plaintiff's January 10 e-mail was a plea for resources

21  and a plea for fairness as to the availability of

22  extracurricular sports teams at John Jay.  And plaintiff made

23  this appeal in the form of an internal e-mail to her direct

24  supervisor and the DOE manager responsible for overseeing the

25  PSAL program.  I conclude that sending this e-mail falls well

1   within the scope of plaintiff's duties and responsibilities as

2   PSC's principal.  This e-mail was "part-and-parcel of

3   plaintiff's concerns about her ability to properly execute her

4   duties" as PSC's principal.  More specifically, it was part of

5   plaintiff's duties as PSC's principal to request appropriate

6   sports teams from PSAL and, more broadly, to do what she could

7   to ensure that DOE was providing programs and services for her

8   students on an equitable basis.  *See Weintraub*, 593 F.3d at

9   203.

10          *Matthews v. City of New York*, 779 F.3d 167 (2d Cir.

11  2015), cited by plaintiff, is not to the contrary.  In

12  *Matthews*, the Second Circuit held that a police officer -- in

13  complaining to a supervisor about a precinctwide quota system,

14  which he argued was "causing unjustified stops" and harming the

15  precinct's relationship with the community -- had engaged in

16  speech in his capacity as a private citizen and not as a police

17  officer.  *Matthews*, 779 F.3d at 173-75.  The *Matthews* court

18  found that the police officer's "speech to the precinct's

19  leadership was not what he was employed to do, nor was it

20  part-and-parcel of his regular job.  The officer's

21  policy-oriented speech was neither part of his job description

22  nor part of the practical reality of his everyday work."  *Id.*

23  at 174.

24          The circumstances here are entirely different.  As I

25  noted, plaintiff concedes that it was part of her job as PSC's

1   principal to request sports teams and to do what she could to

2   ensure that her students received adequate resources and

3   funding on an equitable basis with other schools.  This was

4   "part of the practical reality of plaintiff's everyday work" as

5   principal of PSC.  *Cf. id.*; *see also* Ross 693 F.3d at 305

6   (payroll clerk -- whose responsibilities included "making sure

7   pay rates were correct" and flagging "payroll

8   irregularities" -- acted pursuant to her official duties even

9   though she had gone "outside the chain of command by writing to

10  the Board of Education" about pay discrepancies).

11         Although plaintiff also argues that her e-mail has a

12  "citizen analogue*," (See* Pltf. Reply Br. (Dkt. No. 23) at pages

13  10-11) the existence of a citizen analogue is not dispositive.

14  *See Weintraub*, 593 F.3d at 203-204 ("When a public employee

15  speaks pursuant to employment responsibilities, there is no

16  relevant analogue to speech by citizens who are not government

17  employees")  *See also Garcetti*, 547 U.S. at 421 ("controlling

18  factor" was whether the speech was "made pursuant to a party's

19  duties as a calendar deputy").

20         Because the evidence before the court demonstrates

21  that plaintiff sent her January 10, 2017 e-mail to her

22  supervisor and to the DOE manager of the district's sports

23  programs as part of her official duties as PSC's principal, she

24  has not shown a likelihood of success as to the first element

25  of her First Amendment retaliation claim.

1         With respect to the second element of a First

2    Amendment retaliation claim, the adverse employment action

3    requirement, retaliatory conduct that would deter a similarly

4    situated individual of ordinary firmness from exercising his or

5    her constitutional rights constitutes an adverse action.

6    *Rivers v. New York City Housing Authority*, 176 F.Supp.3d 229,

7    244 (S.D.N.Y. 2016); *see also Manon v. Pons* 131 F.Supp.3d 219,

8    232 (S.D.N.Y. 2015) ("The standard for an adverse action in the

9    context of First Amendment retaliation is substantially similar

10    to the same inquiry in the Title VII retaliation context").

11    "in this it context, adverse employment actions include

12    discharge, refusal to hire, refusal to promote, demotion,

13    reduction in pay, and reprimand." *Zelnik v. Fashion Institute*

14    *of Technology*, 464 F.3d, 217, 226 (2d Cir. 2006).  The Second

15    Circuit has stated that "lesser actions may also be considered

16    adverse employment actions," including negative evaluation

17    letters, assignment of undesirable duties, or transfers under

18    certain circumstances.  *Morris v. Lindau*, 196 F.3d 102, 110 (2d

19    Cir. 1999).

20         At issue here is whether the mere initiation of an OSI

21    investigation into plaintiff constitutes an adverse employment

22    action.  Some courts have found that an investigation, without

23    attendant negative consequences, does not constitute adverse

24    action.  *See Alvarez v. City of New York*, 2 F.Supp.2d 509, 514

25    (S.D.N.Y. 1998) ("Although plaintiff argues that the

investigation itself has chilled his speech, I am not persuaded
that the mere initiation of an internal investigation [by the
NYPD] itself would cause irreparable harm.").  Other courts
have come to the opposite conclusion, however.  *See Eldridge v.*
*Rochester City School District*, 968 F.Supp.2d 546, 560
(W.D.N.Y. 2013) (concluding that "the pressure of an internal
investigation coupled with a veiled threat of an involuntary
transfer could dissuade a reasonable employee from engaging in
protected activity"); *Mullins*, 634 F.Supp.2d 373, 389
(recognizing that "an active IAB investigation constituted an
adverse action to plaintiffs" because the investigation
deterred reasonable police officers from pursuing rights in
court").

     For purposes of resolving the motion for a TRO and
preliminary injunction, I have assumed that the commencement of
an OSI investigation would plausibly deter a similarly situated
individual of ordinary firmness from exercising their First
Amendment rights.  *See Rivers,* 176 F.Supp.3d at 244.
Accordingly, I have assumed that plaintiff has shown a
likelihood of success on this element.

     As to the last element, "the causal connection must be
sufficient to warrant the inference that the protected speech
was a substantial motivating factor in the adverse employment
action, that is to say, the adverse employment action would not
have been taken absent the employee's protected speech."

1    *Stajic v. City of New York*, 2016 WL 5717573, at *4 (S.D.N.Y.

2    Sept. 30, 2016).  "Causation can be established either

3    indirectly by means of circumstantial evidence, for example, by

4    showing that the protected activity was followed by adverse

5    treatment in employment, or directly by evidence of retaliatory

6    animus."  *Id*.  A plaintiff may rely on temporal proximity to

7    demonstrate a causal connection.

8            Here, plaintiff argues that the requisite causal

9    connection between her protected activity -- that is, the

10   January 10 e-mail -- and the adverse action is established by

11   the temporal proximity between the two events.  Here, about

12   three weeks passed between plaintiff's January 10, 2017 e-mail

13   and the reopening of the investigation.  Three weeks "fits

14   comfortably within" the "time period that can give rise to an

15   inference of causation."  *Nagle v. Marron*, 663 F.3d 100, 111

16   (2d Cir. 2011) (discussing six-week period).

17           Despite this temporal proximity, plaintiff has not

18   shown a likelihood of success on the causation element of her

19   retaliation claim, because there is no evidence that the

20   "specific decision-maker responsible for the adverse action" --

21   that is, OSI -- was aware of plaintiff's January 10, 2017

22   e-mail at the time OSI reopened its investigation of plaintiff.

23   Indeed, defendants have offered evidence affirmatively

24   demonstrating that "OSI was not aware that plaintiff had sent

25   the January 10, 2017 e-mail regarding sports programs at PSC."

1    (Guerra Decl. (Dkt. No. 17) at ¶ 20)   A DOE lawyer has

2    submitted an affidavit citing that prior to a March 13, 2017

3    meeting with the complainant, the OSI investigator assigned to

4    investigate the complaint had no knowledge of plaintiff's

5    January 10, 2017 e-mail.  It was only during the March 13, 2017

6    interview of the complainant, at which the complainant produced

7    a newsletter issued by the PSC PTA, that the OSI investigator

8    learned of PSC's complaints concerning sports teams.  Even

9    then, the investigator was not made aware that it was plaintiff

10   who had made the complaint.  (Supp. Guerra Aff. (Dkt. No. 27)

11   ¶¶ 7-10 and Ex. A) there is no evidence before the court

12   rebutting or tending to rebut DOE's showing.

13            Moreover, the circumstances surrounding the initiation

14   of the investigation do not suggest that plaintiff's January

15   10, 2017 e-mail was a "substantial motivating factor" in the

16   investigation.  The record shows that SCI -- an independent

17   investigative agency that is not part of the Department of

18   Education -- received the original complaint against plaintiff

19   in May 2016.  (Guerra Decl. (Dkt. No. 17) ¶ 11)

20            SCI referred the matter to OSI, but OSI decided to

21   close the complaint because there was insufficient information

22   and there was no ability to follow up with the anonymous

23   complainant.  *(Id.* ¶¶ 5, 12-13)  On December 20, 2016, however,

24   SCI received additional information concerning the May 2016

25   complaint, and SCI forwarded that information to OSI on January

25, 2017. (*Id.* ¶¶ 14, 18)  Because there was now sufficient information to identify the anonymous complainant, OSI was able to interview the complainant about the complainant's allegations. *(Id.* ¶ 19)  And OSI then decided to reopen the investigation on February 1, 2017, after having conducted that interview. *(Id.,* ¶ 18)  Given that the reopening of the investigation turned on the receipt of additional information from the complainant -- information received by an investigative agency independent of the Department of Education -- the circumstances do not suggest that the reopening of the investigation of plaintiff was the product of retaliatory animus.

Accordingly, plaintiff has not demonstrated a likelihood of success on the causation element of her First Amendment retaliation claim.

Plaintiff has also not demonstrated that she will suffer irreparable harm with respect to her First Amendment retaliation claim.  Plaintiff argues that, if an injunction is not granted, she will suffer irreparable harm because the OSI investigation "will have a chilling effect on [her and other PSC employees'] willingness to continue to speak out against racial segregation [and discrimination]." (Def. Opp. Br. (Dkt. No. 11) at pages 12-16).

It is well established that "violations of First Amendment rights are commonly considered irreparable injuries

1  for the purposes of a preliminary injunction." *Bery v. City of*

2  *New York*, 97 F.3d 689, 693 (2d Cir. 1996).  However, as the

3  Second Circuit has explained, "Courts treat claims of First

4  Amendment abridgment differently, depending on the nature of

5  the restriction on speech:

6  "On the one hand, where a plaintiff alleges injury

7  from a rule or regulation that directly limits speech, the

8  irreparable nature of the harm may be presumed.  On the other

9  hand, in instances where a plaintiff alleges injury from a rule

10  or regulation that may only potentially affect speech, the

11  plaintiff must establish a causal link between the injunction

12  sought and the alleged injury.  In those instances, the

13  plaintiff must establish an actual chilling effect.  And

14  allegations of a subjective chill [of First Amendment rights]

15  are not an adequate substitute for a claim of specific present

16  objective harm or a threat of specific future harm." *Greer v.*

17  *Mehiel*, 2016 WL 828128 at *10 (S.D.N.Y. Feb. 24, 2016).

18  Here, plaintiff's claim fits into the second category

19  of First Amendment claims, but because she argues not that a

20  rule or regulation is directly restricting her speech, but

21  rather that defendants' actions in conducting an OSI

22  investigation will chill her and other employees at PSC from

23  making future complaints of alleged racial discrimination.

24  Plaintiff has not made an adequate showing of actual chilling

25  effect, however.

As to the chilling effect on her own speech, plaintiff states in her affidavit that "the OSI investigation has caused her a significant amount of distress" and that she is "afraid to speak out against race discrimination and segregation at her school." (Bloomberg Aff. (Dkt. No. 10) ¶ 49)  Allegations of "subjective chill are not an adequate substitute" for an actual chilling effect, however.  *See Greer*, 2016 WL 828128 *10. "Where a party can show no change in her behavior, she has quite plainly shown no chilling of her First Amendment right to free speech." *Curley v. Village of Suffern*, 268 F.3d 65, 73 (2d Cir. 2001) (plaintiff was not actually chilled by arrest made allegedly in retaliation for comments during 1993 mayoral campaign, because plaintiff ran again for public office in 1995).

Here, the record shows that plaintiff has continued to challenge DOE's actions in this case and continued to speak out on issues of race more generally.  For example, on March 29, 2017, plaintiff held a meeting with staff and parents at PSC in which she discussed and provided an update concerning the OSI investigation. (Bloomberg Aff. (Dkt. No. 10) ¶ 42).  Plaintiff discussed the alleged retaliatory nature of the investigation and the legal steps she was taking to address the investigation. (Guerra Decl. (Dkt. No. 17) at ¶ 28)  She told those present that OSI's investigation "would end as a result of the cease-and-desist letter [her lawyers sent] or would be

1    temporarily halted when her attorneys filed suit and requested

2    a preliminary injunction." *Id.*

3         Moreover, on March 30, 2017, plaintiff participated in

4    a panel discussion which was entitled "The Case for School

5    Integration Now," and which was sponsored by the PSC PTA.

6    (Supp. Bloomberg Aff. (Dkt. No. 14) at ¶ 32).  These are not

7    the actions of someone who has been actually chilled from

8    speaking out on issues regarding discrimination in the New York

9    City public school system.

10        As to the chilling effect of the OSI investigation on

11   other teachers and staff at PSC, the chilling effect on these

12   employees' speech -- as opposed to their willingness to report

13   violations of federal statutes -- is not relevant to

14   plaintiff's First Amendment retaliation claim.  *See Alvarez v.*

15   *City of New York*, 2 F.Supp.2d 509, 514 (S.D.N.Y. 1998) ("to the

16   extent that plaintiff speculates that other employees' speech

17   may be chilled by the [NYPD's internal affairs] investigation,

18   their First Amendment rights are not at issue.")  Although

19   plaintiff cites *Muchmore's Café, LLC* v. *City of New York*, 2016

20   U.S. Dist. LEXIS 139861 (E.D.N.Y. 2016) for the proposition

21   that a plaintiff is "entitled to rely on the impact of the

22   [government action] on the expressive activities of others as

23   well as her own" (Pltf. Reply Br. (Dkt. No. 23) at page 12),

24   plaintiff's reliance on this case is misplaced.  In *Muchmore*,

25   the plaintiff proceeded on a theory of third-party standing in

challenging the constitutionality of the New York City Cabaret

Law.  *See Id.* at *14-17.  Under those circumstances, the

chilling effect of the government ordinance was relevant to

plaintiff's claim.  In the context of First Amendment

retaliation, however, where the claim at issue is asserted on

behalf of plaintiff only, the chilling effect on others is not

relevant.  Stated another way, where the record demonstrates

that the named plaintiff has not been actually chilled, this

defect cannot be cured or remedied by attempting to show that

third parties' exercise of First Amendment rights has been

actually chilled.

       With respect to the First Amendment retaliation claim,

I conclude that plaintiff has not demonstrated a likelihood of

success or irreparable harm.

       I will now turn to the Title VI and New York City

Human Rights Law claims, beginning with the likelihood of

success on the merits of those claims.

       Title VI provides that "no person in the United States

shall, on the ground of race, color, or national origin, be

excluded from participation in, be denied the benefits of, or

be subjected to discrimination under any program or activity

receiving federal financial assistance."  42 U.S.C. § 2000d.

It is undisputed that the DOE receives federal financial

assistance.

       "The same analysis that applies to claims of

retaliation under Title VII also applies to claims under Title
VI." *Belgrave v. City of New York,* 1999 WL 692034, at *38
(E.D.N.Y. Aug. 31, 1999). "Specifically, a plaintiff must make
out a *prima facie* case by showing that: (1) she was engaged in
a protected the activity; (2) her employer was aware of that
activity; (3) she suffered an adverse employment action; and
(4) there was a causal connection between the protected
activity and the adverse action." *Id.* If, after a plaintiff
establishes a *prima facie* case of retaliation, the defendant
"offers a legitimate, nonretaliatory reason for [the adverse
action], the presumption of retaliation drops from the case and
the burden shifts to plaintiff to show that the "proffered
reason was a pretext for unlawful retaliation." *Koumantaros v.
City University of New York,* 2007 WL 840115, at *12 (S.D.N.Y.
March 19, 2007).

     With respect to the first factor, there is no question
that plaintiff engaged in a protected activity when she sent
the January 10, 2017 e-mail to her supervisor and the overseer
of PSAL programs complaining about racial discrimination in the
sports programs offered at the John Jay complex.

     As to the second factor, it is also clear that the DOE
was aware of her complaint. As a general matter, the
"knowledge requirement is met if the legal entity was on
notice" of the protected activity. *Papelino v. Albany College
of Pharmacy*, 633 F.3d 81, 92 (2d Cir. 2011); *see also Gordon v.*

*New York City Board of Education,* 232 F.3d 111, 116 (2d Cir.

2000) ("neither this nor any other circuit has ever held that,

to satisfy the knowledge requirement, anything more is

necessary than general corporate knowledge that the plaintiff

had engaged in protected activity").  Because plaintiff sent

her January 10, 2017 e-mail to her superiors within the DOE --

specifically the individual in charge of DOE's PSAL programs

and to her direct supervisor, who serves as superintendent of

District 15 -- the DOE had corporate knowledge of her protected

activity.  *See Joseph v. Owens & Minor Distribution, Inc.,* 5

F.Supp.3d 295, 318 (E.D.N.Y. 2014) (defendant's knowledge of

protected activity established where "at least two managers

were aware" of the activity).

With respect to the third factor, I have assumed that

the initiation of an OSI investigation constitutes an adverse

employment action.

With respect to the fourth element, "plaintiff may

show a causal connection either (1) indirectly, by presenting

evidence of temporal proximity between the protected activity

and adverse action, or through other evidence such as different

treatment of similarly situated individuals, or (2) directly,

through evidence of retaliatory animus directed against

plaintiff by the defendant.  *Koumentaros*, 2007 WL 840115, at

*10.  Here, plaintiff relies on temporal proximity between the

protected activity and the adverse action to demonstrate a

1   causal connection.  As I stated earlier, about three weeks

2   passed between plaintiff's January 10 e-mail and the reopening

3   of the OSI investigation of her.

4           While a plaintiff need only show "general corporate

5   knowledge" to establish that her employer was aware of her

6   protected activity, *see Gordon*, 232 F.3d at 116, "evidence that

7   the specific decision-makers responsible for the adverse action

8   were not aware of a plaintiff's protected activity is relevant

9   "as some evidence of a lack of causal connection countering

10  plaintiff's circumstantial evidence of proximity." *Giscombe v.*

11  *New York City Department of Education,* 39 F.Supp.3d 396, 402

12  (S.D.N.Y. 2014).

13          Here, as I explained in the context of the First

14  Amendment retaliation claim, DOE has offered evidence rebutting

15  the inference flowing from temporal proximity.  There is no

16  evidence before me suggesting that the "specific decision-maker

17  responsible for the adverse action," that is, OSI, was aware of

18  the January 10, 2017 e-mail at the time it reopened its

19  investigation of plaintiff.  Indeed, the evidence is all to the

20  contrary.  *See* Guerra Decl. (Dkt. No. 17) at ¶ 20; Supp. Guerra

21  Aff. (Dkt. No. 27) ¶¶ 7-10 and Ex. A.  Moreover, as I explained

22  earlier, the process by which the investigation was reopened --

23  in particular the fact that it was initiated based on a

24  referral from SCI, an independent investigative agency outside

25  of the DOE -- tends to undermine any assertion of retaliatory

1   animus.

2          I find that plaintiff has not demonstrated a

3   likelihood of success as to causation, which is the fourth

4   element of a Title VI retaliation claim.

5          With respect to the New York City Human Rights Law

6   claim, although the retaliation inquiry under the city Human

7   Rights Law is broader than its federal counterpart, *Fincher v.*

8   *Deposit Trust & Clearing Corporation,* 604 F.3d 712, 723 (2d

9   Cir. 2010), "a plaintiff must still establish that there was a

10  causal connection between her protected activity and the

11  employer's subsequent action." *Peña-Barrero v. City of New*

12  *York*, 2017 WL 1194477, at *19 (S.D.N.Y. March 30, 2017).  I

13  have concluded that plaintiff has not shown a likelihood of

14  success as to the causation element of her Title VI claim.  I

15  reach the same conclusion as to her city Human Rights Law

16  claim.

17         As to irreparable injury, plaintiff argues that she

18  has shown irreparable injury because (1) she and other DOE

19  employees will be "chilled from speaking out against

20  discrimination" if an injunction is not granted, and (2) "PSC

21  employees will feel dissuaded from participating in the instant

22  litigation for fear of retaliation."  (Pltf. Moving Br. (Dkt.

23  No. 14) at page 12; and Bloomberg Aff. (Dkt. No. 10) at ¶¶ 50,

24  53).  Plaintiff also states that she fears being removed from

25  her position as principal at PSC (Bloomberg Aff. (Dkt. No. 10)

1 | ¶¶ 50, 53).

2 |      To the extent that plaintiff argues that she

3 | personally has been or will be chilled or deterred from making

4 | future complaints about racial discrimination in the New York

5 | City public school system, as I explained previously, I

6 | conclude that plaintiff has not actually been chilled by the

7 | initiation of the OSI investigation.

8 |      As to plaintiff's contention that other employees will

9 | be deterred from making similar complaints of racial

10 | discrimination or from participating in the present lawsuit as

11 | witnesses on her behalf, the Second Circuit has recognized that

12 | "unchecked retaliation subverts the purpose of" certain federal

13 | statutes and that "the resulting weakened enforcement of

14 | federal law can itself be irreparable harm in the context of a

15 | preliminary injunction application." *Mullins*, 626 F.3d at 55;

16 | *see also, Holt v. Control Group, Inc.*, 708 F.2d 87, 91 (2d Cir.

17 | 1983).  "A retaliatory discharge carries with it the distinct

18 | risk that other employees may be deterred from protecting their

19 | rights under the law or from providing testimony for a

20 | plaintiff in her effort to protect her own rights.  These risks

21 | may be found to constitute irreparable injury." *Moore v.*

22 | *Consolidated Edison Company of New York,* 409 F.3d 506, 511-12

23 | (2d Cir. 2005).

24 |      The Second Circuit, however, has rejected the notion

25 | that "there is irreparable injury sufficient to warrant a

1    preliminary injunction in every retaliation case." *Holt*, 708

2    F.2d at 91.

3          Here, plaintiff has submitted affidavits from a number

4    of PSC employees concerning the effect of the OSI

5    investigation*.  (See* Dkt. Nos. 5-9, 22.)  The affidavits state,

6    among other things, that teachers are "fearful of standing up

7    for their students and speaking out against race

8    discrimination" and "noticeably less comfortable speaking out

9    against racism*."  (See* Williams Aff. (Dkt. No. 9) at ¶ 7,

10   Sandusky Aff. (Dkt. No. 8) ¶ 4).  The affidavits also reference

11   at least five other PSC employees who have chosen to remain

12   anonymous and state that they will not publicly support

13   plaintiff's case for fear of retaliation.  (*See* Supp.

14   Chickedantz Affirm. (Dkt. No. 22)).

15         This court takes very seriously -- as DOE should --

16   plaintiff's allegations about the negative effects of the OSI

17   investigation on the PSC community.  There has been, however,

18   an enormous outpouring of support for plaintiff in the short

19   lifespan of this litigation.  At the hearing on Monday, the

20   courtroom was standing room only.  I would estimate that 150

21   people or so showed up in support of plaintiff.  There has been

22   a similar turnout today.

23         In addition to the affidavits from the PSC teachers,

24   including from one teacher who had been subpoenaed by OSI,

25   (Dkt. No. 7) hundreds of people in the PSC community have

signed petitions supporting plaintiff. (Bloomberg Aff. (Dkt. No. 10) ¶¶ 45-46). These circumstances do not warrant a finding of irreparable harm based on the investigation's alleged effect on others or based on the argument that the OSI investigation presents a significant risk of weakening enforcement of federal law or prejudice in plaintiff's case.

Finally, to the extent that plaintiff asserts irreparable harm based on her fears that she may lose her job (Bloomberg Aff. (Dkt. No. 10) at ¶ 49) her concerns do not rise to the level of irreparable harm. As an initial matter, the OSI investigation presents no immediate risk of plaintiff losing her job. Plaintiff has due process rights that would be triggered in the event of any effort by DOE to terminate her employment. Moreover, "irreparable injury is one that cannot be addressed through a monetary award. Where money damages are adequate compensation, a preliminary injunction should not issue." *JSG Trading Corp. v. Tray-Wrap, Inc.,* 917 F.2d 75, 79 (2d Cir. 1990). It is well established that, in the employment context, "reinstatement and money damages are both forms of a trial court's remedies" that can be used to make a plaintiff whole for any loss suffered as a result of an adverse employment action. *Bagley v. Yale University*, 2014 WL 7370021 at *10 (D. Conn. Dec. 29, 2014). Similarly, on an appropriate record, damages related to emotional distress are compensable at the conclusion of a litigation such as this.

1              I conclude that plaintiff has not shown a likelihood

2     of success or irreparable injury with respect to her

3     retaliation claims under the First Amendment, under Title VI,

4     or under the New York City Human Rights Law.  Accordingly,

5     plaintiff's application for a temporary restraining order and a

6     preliminary injunction is denied.

7              Plaintiff will advise the court by May 10, 2017, how

8     she wishes to proceed with this litigation.

9              Is there anything further?

10             MS. MIRER:  Your Honor, I do have a few points that I

11    would like to raise with the court.

12             THE COURT:  Go ahead.

13             MS. MIRER:  First of all, with respect to D-130, when

14    the court described what D-130 is, it was not the actual

15    description --

16             THE COURT:  It actually was a direct quote.

17             MS. MIRER:  Well, the direct quote --

18             THE COURT:  It was a direct quote from the regulation.

19    It wasn't a full quote.  It was a direct quote.

20             MS. MIRER:  Okay.  Your Honor, I want --

21             THE COURT:  I read the relevant parts of the

22    regulation.

23             MS. MIRER:  With respect to the issue of D-130, if you

24    noticed in our brief, we raised the issue of the idea --

25             THE COURT:  The lawsuit is not about the alleged

1  unconstitutionality of D-130 that you mentioned for the first

2  time in your reply brief.  The lawsuit is about whether the OSI

3  investigation is retaliatory.  That's what the lawsuit is

4  about.

5          MS. MIRER:  I certainly understand that, your Honor.

6  What I am raising is a question of the idea that we are going

7  to be -- in terms of the OSI investigation, it has no

8  parameters.  It could be a total fishing expedition.  And I

9  think, with respect to the issues involved, there should be at

10  least some narrow tailoring to the question of these

11  allegations put forth, in that we are not going into a

12  wholesale investigation of people's political beliefs.  And

13  that is the question I have in terms of whether or not -- you

14  are saying that investigation could go forward; but given the

15  concerns that have been raised and the very vague nature of

16  these claims, and if you saw in our supplemental affidavit and

17  the documents presented, most of the December 20 allegations

18  were demonstrably false.  That's number one.

19          THE COURT:  Let me respond to that before you move on.

20          The lawsuit that you brought is not a challenge to the

21  disciplinary system of the New York City Department of

22  Education.  The lawsuit you brought alleges that the initiation

23  of the OSI investigation was retaliatory and was done because

24  your client sent an e-mail to her supervisor and to the

25  overseer of the PSAL program, and I have ruled on whether you

1    are entitled to a temporary restraining order and preliminary

2    injunction with respect to those claims.

3            Now, if your argument now is that you think the DOE

4    disciplinary process, to the extent it involves OSI

5    investigations of this sort, to the extent you are arguing that

6    there is something unlawful about the disciplinary process,

7    that's a different claim.  If you want to raise that claim, I

8    suppose you can amend the complaint.  But I'm not here today,

9    nor does your lawsuit fairly implicate, the notion that there

10   is something illegal about the entire investigative process

11   under the OSI regime.  If that's your argument and you think

12   you have a claim on that point, you can amend your complaint to

13   add it.  It is not presently before me.

14           MS. MIRER:  Well, it is to the extent that it raises

15   the issue of D-130 being, in essence -- it being characterized

16   beyond partisan politics, and that's where the concern is,

17   because that is raised in the lawsuit as a result of the

18   statements by the DOE as to the alleged legal basis for their

19   claim as to why they are investigating her.  And if it is based

20   on D-130, then it seems to me that's where we have to be

21   looking to determine whether any ideological belief can be the

22   subject of an investigation.

23           THE COURT:  I read D-130 to clearly prohibit DOE

24   employees during working hours from soliciting students, for

25   example, to join any particular political party or to engage in

1    political activities, and I see D-130 as neutral.  So whether a

2    teacher were to solicit a student to participate, to join a

3    march sponsored by the Democratic party or the Republican party

4    or some other party, that would not be permissible.  I don't

5    see anything in D-130 that discriminates on the basis of

6    political party or political committee.  To me it seems

7    neutral.  Again, if you disagree, you can point that out to me,

8    but the language reads neutral to me.

9             MS. MIRER:  Your Honor, it is in our brief, and on the

10   10th we will obviously raise these issues.

11            But the other question I have is, in the affidavit,

12   initial affidavit presented by Ms. Guerra, there is a statement

13   at paragraph 17 that on January 25, 2017, the SCI sent a letter

14   with these additional allegations to both DOE and OSI.  And

15   while it doesn't identify who, we certainly know that OSI had

16   knowledge as of January 25, 2017 of the complaints or the

17   supplemental complaints.

18            THE COURT:  I'm sorry.  I am just trying to put my

19   hand on the Guerra affidavit.  Just give me a minute.

20            MS. MIRER:  It is document 17.

21            THE COURT:  You say paragraph 17?

22            MS. MIRER:  Yes.

23            THE COURT:  So paragraph 17 reads, and I quote, "On

24   January 25, 2017, SCI sent the additional information it had

25   received to DOE and OSI."  I understand the additional

h532bloA

1    information referenced to be the information received from the

2    complainant, including the information obtained from the

3    interview of the complainant.  Now what's your point with

4    respect to that?

5              MS. MIRER:  The point is that Mr. Goldstein, who

6    received the January 10 letter, is basically in the

7    headquarters of DOE.

8              THE COURT:  I understand that.

9              MS. MIRER:  So I think that this point, the idea that

10   we would have to pinpoint that the investigator would be the

11   one that had knowledge, as opposed to others in OSI who would

12   at this point have to make a determination whether to open an

13   investigation, which they did on February 1, it just seems to

14   me the temporal proximity between January 25 and February 1,

15   when the DOE itself had the information about her complaint as

16   to the PSAL and these allegations, and I believe I submitted to

17   you three articles concerning this particular sensitivity, the

18   sensitivity of Mr. Goldstein to allegations regarding race

19   discrimination in the PSAL, and that to the extent you can

20   assume that they don't talk to each other or that it is not

21   circumstantial evidence that there was specific knowledge

22   within the DOE --

23             THE COURT:  Well, no, the issue is not whether there

24   is knowledge in the DOE.  That's kind of the flaw in your

25   argument.

1            MS. MIRER:  Well --

2            THE COURT:  The issue is whether the people at OSI at

3     the time they decided to reopen the investigation on February

4     1, 2017, had knowledge that your client had made a complaint on

5     January 10, 2017; and, on that point, I have received evidence

6     from the Department of Education, they say, no, and they have

7     put in affidavits in support of that.  And you haven't offered

8     me anything.  You haven't offered me evidence.  You have

9     offered me the time proximity.  I addressed that.  That gets

10    you part way down the pike.  But when your adversary puts in

11    affidavits, we are no longer in a situation where, in my

12    judgment, temporal proximity carries the day.  At that point

13    there has to be evidence that someone at OSI knew about your

14    client's January 10, 2017 e-mail, and I don't have that

15    evidence.

16            MS. MIRER:  All I am saying, your Honor, is that an

17    affidavit that says that the investigator didn't know doesn't

18    address the issue of whether Eric Goldstein talked to the

19    head --

20            THE COURT:  Eric Goldstein doesn't work at OSI.

21            MS. MIRER:  But OSI is a division of the DOE.

22            THE COURT:  I understand, but the Department of

23    Education is a very large institution.  I don't know how many

24    people are employed at the Department of Education.  I would

25    guess it is many thousands.  And so to say that, well, Eric

h532bloA

1    Goldstein works at DOE and he knew about it, so therefore OSI

2    must have known about it, I am missing the connection.  I don't

3    see the connection.

4            MS. MIRER:  Well, obviously discovery would have to --

5    discovery in this case would have to suss out whether or not

6    there is a --

7            THE COURT:  And we are at a preliminary stage here.

8            MS. MIRER:  Exactly.

9            THE COURT:  There hasn't been discovery.  And I have

10   ruled on the basis of what I have before me.  And if discovery

11   shows something different, then you are welcome to come back

12   and seek relief.  But I have to operate on the basis of what's

13   in front of me now.  And based on what's in front of me now, I

14   can't make a finding that anyone at OSI had any knowledge

15   whatsoever about your client's January 10, 2017 e-mail.

16           MS. MIRER:  Well, we certainly know that the people at

17   DOE knew about the e-mail; and, to the extent there is a

18   connection between DOE and --

19           THE COURT:  We know Mr. Goldstein knew and we know

20   that your client's direct supervisor knew.  Other than that,

21   I'm not sure who knew.  But, more importantly, I don't have any

22   evidence that anyone at OSI knew --

23           MS. MIRER:  But we did --

24           THE COURT:  -- and that's what matters for purposes of

25   where we are today.

1          MS. MIRER:  Well, those are the points I wanted to

2     raise.

3          I do think the court has misconstrued the issue with

4     respect to *Matthews* as to the policy aspects of what *Matthews*

5     was -- that the court really turned on whether or not -- the

6     decision in *Matthews* was whether or not Matthews had -- it was

7     part of his job to comment on the policy issue with respect to

8     the issue of the quota, and I think we have submitted

9     significant evidence that it was not, indeed, and it was

10    extremely rare that anybody did stand up to address the policy,

11    which is what she did in that January 10 e-mail.

12         THE COURT:  Your client admitted in her affidavit that

13    part of her job was to make sure that PSC got the sports teams

14    it should get.  This situation couldn't be more different from

15    *Matthews*.  Matthews was a patrol officer.  He was a street cop.

16    And he spoke to a supervisor about a policy issue.  And in that

17    context, the Second Circuit said it is not the responsibility

18    of a street cop, a patrol officer, to be blabbing about policy

19    to a captain at the NYPD.

20         Your client is a completely different category.  She

21    is the principal of a school.  And she has said that part of

22    her job was to make sure that her school got the sports teams

23    that it fairly was entitled to.  And so she sent an e-mail, an

24    internal communication, to her supervisor and the overseer of

25    the PSAL program and said, Hey, my school is not being fairly

h532bloA

1    treated.  I view that as part of her direct responsibility.  I

2    see the issue as very clear.  Part of her job involved this.

3    She admits that.  I see the e-mail as being part and parcel, as

4    the law says, of her direct responsibilities as the principal

5    of the school.

6             MS. MIRER:  Obviously we disagree in terms of whether

7    or not it's part of her job to do anything more than request

8    sports teams; and in terms of commenting on discrimination by a

9    higher level, a different division, I don't think that's -- I

10   don't necessarily see that relationship.  However, you have

11   ruled.

12            THE COURT:  To the extent --

13            MS. MIRER:  You have ruled --

14            THE COURT:  Excuse me, ma'am.

15            MS. MIRER:  Yes.

16            THE COURT:  To the extent she points out the racial

17   makeup of the high schools involved, I don't think that changes

18   the nature of her e-mail which was, as I have said, a plea for

19   additional sports teams for her school and the other schools

20   located at John Jay complex.  I don't believe that the

21   reference to the racial makeup of the high schools changes the

22   essential nature of her communication to her supervisor and to

23   the head of the PSAL program.

24            MS. MIRER:  She was asking not just for more teams,

25   but combining the two, which was the issue in terms of

h532bloA

1    segregation.

2              THE COURT:  I understand that she was asking for the

3    merger.  That's the first line of the e-mail.  I read it.  But

4    her argument for the merger was that the schools located at

5    John Jay, at the John Jay complex, had far fewer teams and more

6    students than the Millennium schools had with fewer students.

7    That was her point.  That's the point of her e-mail.  We have

8    nine sports teams, they have many more, and that's not fair.

9              MS. MIRER:  It was actually separate but unequal.

10   That was the point of the e-mail.  That is definitely what was

11   being raised by Mr. Garcia Rosen and --

12             THE COURT:  I'm sorry?  That was the point made by

13   who?

14             MS. MIRER:  The other administrator who had been taken

15   out of his school and disciplined.  We provided three

16   affidavits -- three articles about that situation just within

17   the previous few years.  It really took a lot of -- it was very

18   difficult for Ms. Bloomberg to be able to write that letter, to

19   comment on this particular policy, which is something that is

20   extremely sensitive to Mr. Goldstein, and maybe when we do the

21   discovery we will find out --

22             THE COURT:  I don't see that as a comment on policy.

23   I saw it as a request for more sports teams.

24             MS. MIRER:  Well, I'm -- this is the particular -- the

25   way I read it was it was a statement about the policy of the

1    DOE, PSAL not providing -- providing, in essence, the separate

2    but unequal teams in that context.

3              THE COURT:  All right.  Well, let's look at the

4    e-mail.  You say that it is about policy.  I say it is about

5    teams.  So let's look at it.  And you can point out to me what

6    is in it that you believe is about policy.  I actually don't

7    see the word "policy" in the e-mail.  I don't see any reference

8    to any other schools other than the John Jay schools and the

9    Millennium schools.  So show me where in the January 10 e-mail

10   your client is talking about a Department of Education policy,

11   because I don't see it.  I see it as a very specific e-mail

12   about her school and the other schools that make up the John

13   Jay Campus versus the Millennium High School.  That's what I

14   see.  I don't see any reference to any other schools.  I don't

15   see any reference to general policies.  I don't know what you

16   are talking about.  But I am looking at the e-mail, and if you

17   want to direct my attention to something, I am happy to look at

18   it.

19             MS. MIRER:  Your Honor, I don't have the e-mail.  The

20   policy she is requesting is to unite.

21             THE COURT:  It's not a policy, ma'am.  She is asking

22   for action.  "I'm writing to request your assistance in uniting

23   the PSAL sports teams on the John Jay Campus in Brooklyn."

24   That is a request for action.  It is not a request for a policy

25   change.  It is a request for action.  And she is very specific

1    about the action she wants.  And she is not talking about any

2    other schools other than the schools of the John Jay Campus and

3    the Millennium high schools.

4           MS. MIRER:  I believe this is the only campus with

5    separate teams.

6           Having said that, your Honor, I believe that this

7    e-mail is fairly read -- is a statement with respect to the

8    fact that they have been turned down for many teams.  It is

9    stating that there is a racial component to this.  It is

10   commenting on that racial component.  And I do believe that,

11   fairly read, this could be both a plea as well as a comment on

12   the PSA policies with respect to allowing separate teams for a

13   predominantly white school in Manhattan combined with a most

14   majority white school in Brooklyn, using the same facility as

15   three other schools.  That --

16          THE COURT:  How could it be a comment on a policy when

17   you just said that as far as you know this is the only

18   situation where there are separate teams at the same school?

19   If that's true, and I don't know whether it is true or not, but

20   that's what you just said, accepting it is true, then how could

21   this be about a policy other than a specific situation?

22          MS. MIRER:  Because we are talking about the issue of

23   having separate but unequal allocation of resources to this

24   campus where there are six schools involved.  Now, obviously we

25   read it differently.  I read this as a comment with respect to

1   the way in which the PSAL was racially segregating Millennium

2   schools together and the other schools together.  And that, to

3   me, is a statement with respect to a disagreement with that

4   approach and policy.  Now, obviously, you know, she didn't use

5   the words, the exact word of "policy," but I think a fair

6   reading of this letter is in fact a criticism of a policy that

7   allows this separation to continue.

8           THE COURT:  It is a specific complaint about sports

9   teams at two campuses, Millennium and John Jay.  That's what it

10  is about.  It couldn't be more specific.  We are told how many

11  students are at each school, we are told what percentage at

12  each school, what the racial makeup is.  It couldn't be more

13  specific.  There is no suggestion in the e-mail this is some

14  kind of comment on DOE's general policy.  That is just not

15  there.  It is not there.  It is a complaint about what's going

16  on at John Jay.  That's what it is about.  And it is a request

17  that it be fixed.  You are correct that the request is that the

18  teams be united, but the essential point is, We here at John

19  Jay have nine sports teams and we have got 1859 students.  Look

20  at Millennium.  They have 17, and they have only got 1261 kids.

21  That's the point.  The point is, there is an inequity that

22  needs to be addressed.  It's not a general comment on the DOE's

23  policy about sports teams.  I don't think that's a fair reading

24  of the e-mail.

25          MS. MIRER:  Well, there was a parent demonstration

1    with a leaflet that's also attached which makes it very clear

2    that this was about separate segregation and unequal, and

3    that's a policy question for PSAL.  It is not a strict resource

4    issue.

5             Having said that, your Honor, you have ruled.  I

6    understand your ruling.  I am just raising these concerns

7    because, with respect to the *Matthews* case, I do think -- and

8    with respect to whether she spoke as a citizen and in that

9    context, I do think that the emphasis on official job duties

10   versus whether it was part of her job to in fact make a comment

11   with respect to the issues of segregation and so forth, I do

12   think make it more closely related to the *Matthews* decision,

13   and what I think is the focal point there of a person within a

14   precinct raising a concern about the impact that a policy was

15   having on the community and this quota system and it was a

16   precinct -- it was only in the precinct that he was complaining

17   about it.

18            So, having said that, your Honor, my concern is that

19   there -- with respect to the analysis, we obviously have

20   differences, and we will address those in some other fashion,

21   but I do think that it was surprising that the court did not

22   mention the fact that this particular issue of PSAL allocation

23   of resource, which we did bring to the court's attention in our

24   reply because we got this other information, about how there

25   has been an historical raising of these kinds of concerns about

h532bloA

```
 1    PSAL's racial discrimination and allocation of teams, and that
 2    that putting it in that context, not to be able to see the
 3    knowledge of DOE of her complaint in that context, not raising
 4    some kind of specter --
 5              THE COURT:  You want to talk about DOE.  It's not
 6    about DOE.  I have explained to you it's not about DOE.
 7    It's --
 8              MS. MIRER:  I mean DOE relating to --
 9              THE COURT:  You have to show, you have got to give me
10    some evidence that the folks at OSI who decided to reopen this
11    investigation had some knowledge of her January 10, 2017
12    e-mail.  You haven't shown me that.
13              MS. MIRER:  Here is my concern:  My concern is that
14    Goldstein gets the allegations and he goes to OSI -- I don't
15    know this.  I don't have it.  But I don't think it is beyond
16    belief that he is upset about this similar allegation.  He goes
17    with this information to OSI and they get their marching
18    orders.  That's all I am saying, your Honor.  I don't think it
19    is beyond circumstantially --
20              THE COURT:  I understand that's your theory, and
21    that's why we have discovery.  You can take depositions here
22    and you can put those questions to people, and you can find out
23    what their answers are.  In particular, you can ask
24    Mr. Goldstein whether he spoke with anyone at OSI or directed
25    anyone else to speak with OSI and to make sure that they
```

1    reopened their investigation or did something negative towards

2    your client.  You have that right.

3            But as I said, I have to operate not on the basis of

4    what might happen down the road or what a deposition might

5    reveal that hasn't been taken yet, but rather based on what I

6    have before me now.  And the evidentiary record before me now

7    includes affidavits from the defendants in which they say that

8    the investigator at OSI who is involved in this had no

9    knowledge of the January 10 e-mail, that the organization as a

10   whole didn't know anything about it.  That hasn't been

11   contradicted with any evidence.  So I have to operate on the

12   basis of the evidence that is currently before me.  Could that

13   change?  Absolutely.  And if it did change, it might affect the

14   availability of injunctive relief.  But I have to operate on

15   the basis of what I have now, and right now the record is

16   unrebutted as to whether OSI knew.  The evidence is they did

17   not.

18           MS. MIRER:  Okay, your Honor.

19           And then the last point is that I think we definitely

20   will be raising the question of whether D-130 applies in the

21   context of the question of ideological discussion as opposed to

22   the issue of participation in electoral politics, which is

23   clearly -- and partisan politics, which is clearly what OSI

24   regulation D-130 goes to on its face.

25           THE COURT:  All right.  Well, I'm looking at D-130,

1    and if you have a copy of it, we can look at it together.

2             MS. MIRER:  Sure.

3             THE COURT:  I am looking at D-130(I)(c)(1), and I

4    quoted it, but I can quote it again:  "While on duty or in

5    contact with students, all school personnel shall maintain a

6    posture of complete neutrality with respect to all candidates.

7    Accordingly, while on duty or in contact with students, school

8    personnel may not wear buttons, pins, articles of clothing, or

9    any other items advocating a candidate, candidates, slate of

10   candidates, or political organizations/committees."

11            Paragraph 2 reads, "personnel may not be involved in

12   any activities, including fundraising, on behalf of any

13   candidate, candidates, slate of candidates, or political

14   organizations/committee during working hours."  Now, to me,

15   when it says "personnel," meaning DOE personnel, may not be

16   involved in any activities on behalf of any political

17   organization/committee during working hours, that seems very

18   clear to me.  I don't see ambiguity there.

19            MS. MIRER:  The reference to committees, I believe,

20   refers to committees supporting those candidates and

21   organizations supporting those candidates, and that's what I

22   referred to, which is in the introduction and it refers to --

23   for some reason I am not seeing it, but I read it.  In the

24   title it says, "Use of School Buildings by Candidates, Elected

25   Officials and Political Organizations and Conduct of School

1   Employees and Officers with respect to Political Campaigns and

2   Elections," but I believe there is a section where it says that

3   the political organizations are the ones supporting those

4   candidates.

5          Here it says -- that's number one -- "Use or access of

6   school by elected officials, candidates for elected office, or

7   organizations working on behalf of such officials or

8   candidates," and that's in subparagraph 1 of the introduction.

9   So the organizations they are referring to there are the ones

10  that are working on behalf of officials or candidates.

11         THE COURT:  All right.  I told you how I read it.  You

12  read it differently, I guess.  But to me I don't find it

13  ambiguous.  To me the clear import of what is stated in

14  paragraph (I)(c)(2) is that DOE personnel are not supposed to

15  be involved in activities on behalf of political organizations

16  during working hours.  That's how I read it.

17         MS. MIRER:  It is organizations --

18         THE COURT:  Let me ask you this:  So is it your

19  contention that DOE personnel are permitted to be involved in

20  activities on behalf of political organizations during working

21  hours?  Is that your contention?

22         MS. MIRER:  What I am saying is that there is no

23  regulation with respect to what we might call ideological

24  organizations.

25         THE COURT:  I don't know what that means.

h532bloA

1          MS. MIRER:  Okay, well they are --

2          THE COURT:  This says political organizations.

3          MS. MIRER:  Well, the Progressive Labor Party is an

4     ideological organization.  It does not run candidates.  It does

5     not have a slate of candidates.  It does not have organizations

6     supporting those candidates.  It does not have committees

7     supporting those candidates.  It is an organization that

8     believes in certain ideas and espouses those ideas.

9          Now, what I am saying here, and that's why the

10    analogy, the *Kramer* --

11         THE COURT:  Let me stop you there.  So you are telling

12    me that the Progressive Labor Party is actually not a political

13    organization?  Is that what you are telling me?

14         MS. MIRER:  It's not a political -- it's not a

15    partisan political organization.

16         THE COURT:  I don't know what that means.  Let me go

17    back.  Is the Progressive Labor Party a political organization?

18    Because I have to tell you, by its name, I would think it was a

19    political organization.  So if you are telling me it is not a

20    political organization, I need to understand why it is not a

21    political organization.

22         MS. MIRER:  It might be a, quote, political

23    organization, but it is not a partisan political organization,

24    which is what D-130 is really confined to and which the cases

25    that challenge that section of the D-130 said.  They

1   specifically said this is related to partisan politics.

2   Partisan politics is typically Democrats, Republicans, maybe

3   working families parties, ballot access parties which are in

4   fact running candidates.  The school isn't supposed to be

5   showing -- pushing one candidate or another.  And that's the

6   overwhelming aspect of this.  This is why we had meetings

7   with -- we were having conversation with the New York Civil

8   Liberties Union and general counsel to try to talk about the

9   fact, and I think they admit that D-130 really goes to partisan

10  politics, and the real question is, how do you get at the

11  question of things not covered by D-130, which is potentially

12  protected speech, advocacy, beliefs?  Where do you draw the

13  line?  And that's what we raised the *Kramer* case for, because

14  that's where the vagueness comes in.  That's where we raise the

15  *Muchmore* case.  That's the vagueness issues.  And if this is

16  perceived to be a legal avenue for inquiry and the kind of

17  open-ended investigation that OSI typically does, it seems to

18  me that the court at least should narrowly tailor or at least

19  address the question of narrowly tailoring this issue, and

20  maybe we should come back on that question, because --

21              THE COURT:  I think you would have to amend the

22  complaint --

23              MS. MIRER:  I will do that.

24              THE COURT:  -- because it is not what your complaint

25  is about now.  Your complaint now is very clear.  OSI reopened

1    an investigation of your client as a result of her sending the

2    January 10, 2017 e-mail.  That's what your complaint is about.

3    I have addressed your application for injunctive relief with

4    respect to that.  Now you are saying that there are problems

5    with the regulatory scheme, and there is ambiguity in a

6    Chancellor's regulation.  That's --

7              MS. MIRER:  No.

8              THE COURT:  -- not before me at present.

9              MS. MIRER:  Your Honor, when we filed the complaint,

10   except for general statements in the letters that we got from

11   the DOE attorneys, we had no idea what they are alleging

12   specifically are the issues.  We then get some allegations with

13   respect to a movie, a foundation, a bake sale, and some vague

14   allegation that students are afraid to talk and express their

15   views.

16             THE COURT:  But I don't understand what you just said

17   because the complaint was filed on April 28.  I read or

18   summarized the entire correspondence between the parties here,

19   and that included an April 6, 2017 letter in which it seems to

20   me DOE was very clear about what your client was being

21   investigated for, and I read that language into the record

22   already.  DOE said in the April 6 letter that the complaint

23   they had received was that your client was a member of the

24   Progressive Labor Party; that she had been actively recruiting

25   students into that organization during school hours; that she

1    had invited students to participate in that organization's

2    activities, including marches.  They laid all that out of in

3    the April 6 letter.  You didn't file the complaint until April

4    28.

5              MS. MIRER:  In part because we were in discussions

6    with DOE general counsel and the New York Civil Liberties Union

7    about this very issue of the question of what is it that is

8    beyond -- that is being actually investigated here?  That is

9    not a specific claim, frankly, your Honor.  I am just saying

10   that generally she is a member of something and she is doing

11   things, there is no who, what, where, why, and when.  It is

12   totally unspecific.  And so we filed the case in part to find

13   out what are the actual allegations, and what we got back was

14   they didn't think there was enough evidence in May and the

15   subsequent evidence that they provided refers to a movie, a

16   permit.

17             These are the things that -- where is this going to

18   go?  Where is this investigation going to go?  Are people going

19   to be asked whether they believe in antiracism or

20   antisegregation?  I mean, that's the problem with an

21   investigation that has no parameters and is looking at

22   somebody's ideology and to see whether or not at any time Jill

23   Bloomberg advocated in front of students that we should support

24   integration.  And if they say, well, that's the position of the

25   Progressive Labor Party, therefore you must be doing -- this is

h532bloA

1    the danger in this type of freewheeling investigation, your

2    Honor, and we will amend the complaint to raise these issues

3    because this is far beyond what D-130 is meant to regulate, far

4    beyond.  And it really gets into the kind of vague

5    understanding of what is wrong and what is not wrong, and I'm

6    sure the DOE could not tell you that what specifically would be

7    a violation.

8            THE COURT:  All right.  Well, you will tell me by May

9    10 how you wish to proceed.  If that includes filing an amended

10   complaint, you will tell me that, and you will ask permission

11   for when you can file the amended complaint, and we will take

12   it from there.

13           MS. MIRER:  Thank you, your Honor.

14           THE COURT:  Anything the city wants to say?

15           MS. O'CONNOR:  No, your Honor.

16           THE COURT:  All right.  We are adjourned.

17                                    -  -  -

18

19

20

21

22

23

24

25