UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------x
JILL BLOOMBERG,

        Plaintiff,

                                                  Index No. 17-cv-3136 (PGG)

    v.

THE NEW YORK CITY DEPARTMENT OF
EDUCATION, and CHANCELLOR CARMEN
FARINA,

        Defendants.
----------------------------------------------------------------x

# PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF HER CROSS-MOTION FOR PARTIAL JUDGMENT ON THE PLEADINGS

**Mirer Mazzocchi Julien & Chickedantz, PLLC**
By: Maria L. Chickedantz
150 Broadway, Suite 1200
New York, New York 10038
212-231-2235
Attorneys for Plaintiff

# TABLE OF CONTENTS

TABLE OF AUTHORITIES............................................................................i-ii

INTRODUCTION....................................................................................1

STATEMENT OF FACTS RELEVANT TO THIS MOTION.........................................1

    The DOE's Failure to Regulate Political Speech of DOE Employees
    Related to Democratic Party Politics.................................................................2

    January 25, 2017: OSI Opens D-130 Investigation Based on
    Allegations of a May Day Bake Sale and a Brooklyn History Course...........................2

    March 13, 2017: OSI Determines the PLP Accusation to be False...............................4

    March 27, 2017 and April 6, 2017: Defendants Advised Plaintiff's
    Counsel that the D-130 Investigation Related to Plaintiff's Alleged
    Membership in the PLP and her Recruitment of Students into the PLP...........................4

    May 1, 2017: Defendants Advise the Court that OSI was Investigating
    Whether Plaintiff Advanced the Beliefs of a Particular
    Political Party and Engaged in Impermissible Political Activity...................................5

    May 16, 2017: Defendants Expand the D-130 Investigation to Civic
    Activities and Social Justice Activism of PSC Students, Parents, and Staff.....................6

    August 25, 2017: The OSI's Ultimate Findings.....................................................7

    October 3, 2017: the D-130 Investigation Ended with Plaintiff's Discipline.....................8

    Defendants Application of D-130 Against Plaintiff is Ongoing....................................8

STANDARD OF REVIEW...........................................................................9

ARGUMENT........................................................................................10

Chancellor's Regulation D-130 is Unconstitutionally Vague as Applied to Plaintiff..............10

I.    The DOE's Prior Pronouncements Related to Chancellor's
    Regulation D-130 Are Consistent with Plaintiff's Reading of
    the Regulation......................................................................................11

    A. SCI Interprets "Political Organization" Under Chancellor's
    Regulation D-130 As Encompassing Partisan Politics Only...................................12

B. The Commissioner of Education's Interpretation of "Political Activity"...........14

C. The Chancellor's Office's Stated Rationale for Enacting D-130......................15

II. A Plain Reading of D-130 Demonstrates that it Applies Only
to Partisan, Electoral Political Advocacy...............................................16

A. A Plain Reading of D-130.................................................................17

B. Defendants' Expansive Reading of D-130 Cannot Be Reconciled
with the Rest of the Regulation..........................................................18

III. The DOE's Expansive Reading of D-130 as a Blanket
Ban on Political Expression Is Unconstitutional.......................................19

A. Defendants' Expansive Reading of D-130 Unduly Restricts
Protected Speech to an Extent Far Greater Than is Essential
to the Furtherance of the DOE's Interests..............................................19

B. Defendants' Unfair and Arbitrary Administration of D-130
Demonstrates that Defendants' Unconstitutional Purpose
is to Regulate Viewpoints.................................................................21

IV. Plaintiff Has Been, and Continues to be Harmed By the
DOE's Application of D-130................................................................23

CONCLUSION...................................................................................25

# TABLE OF AUTHORITIES

*Appeal of Allen*
1992 Op. Comm. Ed. No. 12,761............................................................................14

*Appeal of Nolan, et al.*
1996 Op. Comm. Ed. No. 13,643............................................................................15

*Auer v. Robbins*
519 U.S. 452 (1997)............................................................................................11

*Board of Educ. v. Mills*
250 A.D.2d 122 (N.Y. App. Div. 3rd Dep't 1988)...................................................14

*Broadrick v. Oklahoma*
413 U.S. 601 (1973)............................................................................................12

*Celotex Corp. v. Catrett*
477 U.S. 317 (1986)..............................................................................................9

*Dickerson v. Napolitano*
604 F.3d 732 (2d Cir. 2010)..........................................................................10, 11

*Eisner v. Stamford Board of Education*
440 F.2d 803 (2d Cir. 1971)................................................................................21

*Gustafson v. Alloyd Co.*
513 U.S. 561 (1995)......................................................................................15-6, 18

*James v. Board of Education of Central Dist. No. 1 et al.*
461 F.2d 566 (2d Cir. 1982)............................................................................19, 20

*Keyishian v. Board of Regents*
385 U.S. 589 (1967)............................................................................................21

*Kramer v. N.Y. City Bd. of Educ.*
715 F.Supp.2d 335 (E.D.N.Y. 2010)..................................................................10, 23

*Laird v. Tatum*
408 U.S. 1 (1972)..........................................................................................11, 24

*Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*
508 U.S. 384 (1993)............................................................................................13

*Marino v. Shoreham-Wading River Cent. Sch. Dist.*
2008 U.S. Dist. LEXIS 95178 (E.D.N.Y. 2008).................................................11, 23-4

*Murray v. Murphy*
24 N.Y.2d 150 (N.Y. 1969)............................................................................24

*N.A.A.C.P. v. Button*
371 U.S. 415 (1963).....................................................................................20

*Pico v. Board of Education*
638 F.2d 404 (2d Cir. 1980)...............................................................19, 20-1, 23

*Sellers v. M.C. Floor Crafters, Inc.*
842 F.2d 639 (2d Cir. 1988)............................................................................9

*Speiser v. Randall*
357 U.S. 513 (1958).....................................................................................20

*Taylor v. Vt. Dep't of Educ.*
313 F.3d 768 (2d Cir. 2002)...........................................................................11

*United States v. Booker*
543 U.S. 220 (2005).....................................................................................19

*United States v. Castleman*
134 S. Ct. 1405 (2014)..................................................................................18

*Village of Arlington Heights v. Metropolitan Housing Development Corporation*
429 U.S. 252 (1977).....................................................................................22

*Weingarten v. Bd. of Educ.*
680 F.Supp. 2d 595 (S.D.N.Y. 2010)...........................................................15, 20

## INTRODUCTION

Plaintiff files this Memorandum in Support of her Cross-Motion for Partial Judgment on the Pleadings, pursuant to F.R.C.P. 12(c), as to the proper application of Chancellor's Regulation D-130 ("Political Activities in School Buildings")(hereinafter "D-130"). At issue is defendants' expansive reading of D-130 to include all forms of political expression, which is inconsistent with the plain meaning of D-130, with the DOE's prior interpretations of D-130, and which is unconstitutionally vague as it sweeps in all protected activities related to political expression of DOE employees. As a result of defendants' application of D-130, plaintiff's constitutional rights have been, and continue to be, deprived.

Upon this motion, the pleadings and other motions in this Action, plaintiff's supporting affidavit and her attorney's affirmation, plaintiff respectfully requests that the Court declare that D-130 is limited in scope to partisan, electoral political advocacy. Plaintiff further requests that the Court determine the D-130 investigation void *ab initio*, and any information gleaned from this improper investigation be expunged from plaintiff's records, and the discipline that was imposed upon plaintiff be formally withdrawn. Furthermore, plaintiff requests that the Court enjoin the DOE from enforcing Chancellor's Regulation D-130 as a way to improperly suppress and discriminate against the viewpoints of DOE employees.

## STATEMENT OF FACTS RELEVANT TO THIS MOTION

Plaintiff is the principal of Park Slope Collegiate ("PSC"), a secondary school located in the John Jay Campus in the Park Slope neighborhood of Brooklyn, New York. (Plaintiff's First Amended Complaint ["Comp."] ¶ 9). Plaintiff has been the principal of PSC for fourteen years, and has cultivated a school environment that encourages staff and student discourse over civil

and social justice matters, such as institutional racism, income inequality, desegregation and integration, among other topics. (Comp. ¶¶ 9, 32-52).

## The DOE's Failure to Regulate Political Speech of DOE Employees Related to Democratic Party Politics

By way of background, there are several recent examples of DOE employees engaged in political activities that have taken place on DOE campuses and/or in the presence of students. These activities have consistently involved Democratic Party advocacy, and have not resulted in OSI investigations into whether D-130 was ever violated, or any other type of sanctions from the DOE. (Plaintiff's Affidavit ["Bloomberg Aff."] ¶ 23).

Some specific examples are:

- On February 7, 2017 students from many public schools, including Beacon High School, walked out of class in a mass protest of Trump's immigration ban with the support of staff and administration. They met at Foley Square, during school hours, where the students were addressed by Public Advocate Leticia James who said, "My scholars, you've got to rise like so many have done before you. You have to resist like so many before you and when you rise up, your class, your assignment is to organize." She then led them in a chant "Rise up! Resist! Repeat!" (Id.)

- On Wednesday October 19, 2016, the DOE organized a Hillary Clinton campaign event at Mayor DeBlasio's house with 20 DOE students in attendance, that was live-streamed through the DOE's Facebook page. (Id.)

- The Earth School, the Cornerstone Academy for Social Action Middle School, and the P.S. 705 PTA all endorsed the People's March for Educational Justice. This was a protest against Donald Trump and Betsy Davos, and was sponsored by the DOE. (Id.)

On the other hand, as described below, plaintiff was accused of certain activities that would have clearly been permissible had they involved a political viewpoint that the DOE approved.

## January 25, 2017: OSI Opens D-130 Investigation Based on Allegations of a May Day Bake Sale and a Brooklyn History Course

Defendants have advised plaintiff that in May, 2016, a complaint was filed with the Office of Special Investigations ("OSI") alleging that plaintiff was a member of the Progressive Labor Party ("PLP"), and that she had actively recruited students to join the PLP and attend PLP events, including "marches for communism." (Comp. ¶ 72; Bloomberg Aff., Ex. B). The DOE has further advised plaintiff that no supporting evidence was provided to the OSI at that time, and therefore, OSI closed the complaint. (Comp. ¶¶ 74-5; Bloomberg Aff., Ex. B).[1]

According to the OSI Report: "On January 25, 2017, OSI received a duplicate referral from SCI, citing the SCI case number referred in the May 13, 2016 referral but including a substantial amount of supporting documentation. Due to this new information, the case was reopened and an investigation into the matter was initiated." (OSI Investigative Report ["OSI Report"], at 2, attached to the Bloomberg Aff. as Ex. D). The OSI Report states that the additional information that formed the impetus for OSI to initiate a D-130 Investigation were allegations that a May Day bake sale had taken place at PSC, and that a course on Brooklyn History was being taught. (Id.).

Therefore, on March 2, 2017, the OSI's D-130 Investigation against plaintiff for alleged "communist activities taking place at the school" began. (Comp. ¶ 63). The OSI began the investigation by showing staff members a list containing the names of plaintiff, four current PSC teachers, six former PSC teachers, plaintiff's husband and daughter, a few employees from an after-school sports and arts program, and a few former students who had graduated long ago, and

---

[1]The PLP is an ideological progressive organization that promotes workers' rights and opposes race discrimination. It holds meetings, organizes actions around social justice matters, and publishes a bimonthly newsletter called Challenge. It is not a partisan political party, and it does not run candidates for election. (Bloomberg Aff., ¶ 4).

asking whether any of the individuals had ever been witnessed "engaging in communist activities." (Comp. ¶¶ 64-5).

**March 13, 2017: OSI Determines the PLP Accusation to be False**

Also on March 2, 2017, and again on March 13, 2017, the OSI investigator interviewed Colleen Siegel, the teacher who filed the original OSI complaint. (OSI Report, at 4). Of Ms. Siegel's complaint and the information gathered during those two interviews, the OSI investigator stated the following:

> Ms. Siegel made a complaint regarding the alleged political activities and recruitment of students at K464 by principal Bloomberg, [REDACTED], and [REDACTED], however, **she failed to provide any evidence in support of this allegation and she failed to state during her interview that she observed Principal Bloomberg, [REDACTED], or [REDACTED] engage in the recruitment of students into a political organization.**

OSI Report, at 18 (redactions in original).

**March 27, 2017 and April 6, 2017: Defendants Advised Plaintiff's Counsel that the D-130 Investigation Related to Plaintiff's Alleged Membership in the PLP and her Recruitment of Students into the PLP**

On March 27, 2017, the DOE, through Robin Greenfield, advised plaintiff's counsel of the following:

- "the complaint being investigated was filed in May 2016." (Greenfield's March 27, 2017 Letter, attached to the Bloomberg Aff. as Ex. A).

- "it would not be appropriate for school staff to solicit students to participate in any political events or to encourage them to support a particular political group or party." (Id.)

- "it is entirely proper for the OSI investigator to ask questions about communist activities at your client's school and about whether staff is engaging students in an inappropriate manner." (Id.)

In addition, on April 6, 2017, Ms. Greenfield made the following representations to plaintiff's counsel:

- "The complaint being investigated is that Jill Bloomberg and two teachers at the Park Slope Collegiate School are members of a communist organization known as the Progressive Labor Party, that they are actively recruiting students into the organization during school hours, and that they invite students to participate in the organization's activities, including marches for communism." (Greenfield's April 6, 2017 Letter, attached to the Bloomberg Aff. as Ex. B).

- "If substantiated, this could constitute a violation of Chancellor's Regulation D-130, which provides, in part, that staff may not be involved in any activities on behalf of a political organization during working hours." (Id.)

Ms. Greenfield oversees the OSI (Comp. ¶ 60), so she certainly had knowledge of the fact that as of March 13, 2017, the OSI had already determined that the accusations that plaintiff was a member of the PLP, that she had actively recruited students to join the PLP, and that she had invited them to PLP events were entirely false.

## May 1, 2017: Defendants Advise the Court that OSI was Investigating Whether Plaintiff Advanced the Beliefs of a Particular Political Party and Engaged in Impermissible Political Activity

On April 28, 2017, plaintiff filed the instant action and sought a temporary restraining order and preliminary injunction of the D-130 Investigation pending the outcome of the litigation. (Comp. ¶ 81). The Court, rather than issuing a TRO, gave defendants until noon on May 1, 2017 to respond and thereafter held a hearing at 3:00 p.m. on that date. (Comp. ¶ 82),

In response to plaintiff's motion for a preliminary injunction, defendants included a declaration of DOE attorney Charity Guerra which stated "OSI is conducting an investigation to ascertain whether plaintiff used her position as a DOE employee to advance the beliefs of a particular political party and engage in impermissible political activity in violation of the Chancellor's Regulations and Conflicts of Interest Law." (The Declaration of Charity Guerra ["Guerra Decl."] ¶ 37, attached to the Bloomberg Aff. as Ex. C).

According to defendants, the evidence that triggered the D-130 investigation was an allegation that "plaintiff's husband filmed a documentary for the Len Ragozin Foundation, an

5

organization associated with the PLP," and that plaintiff's husband "is the president of the organization." According to Ms. Guerra, the film was filmed at PSC and it was later screened at PSC for a $20 cover charge. (Guerra Decl. ¶¶ 14-5). In addition, Ms. Guerra also stated that "a bake sale was held to raise funds for a May Day march." (Guerra Decl. ¶ 16).

It bears highlighting that the OSI Report offers a different basis for the initiation of the D-130 Investigation than the basis provided to the Court by defendants through Ms. Guerra. In fact, the OSI Report completely omits any references to the allegation that plaintiff's husband had made the film Profiled and the allegation connecting the Len Ragozin Foundation to the PLP. (See, OSI Report).

## May 16, 2017: Defendants Expand the D-130 Investigation to Civic Activities and Social Justice Activism of PSC Students, Parents, and Staff

On May 16, 2017, the OSI expanded the investigation to the student of PSC. The students who were selected to be interviewed were seven (7) students who were known to be involved in civic and social justice activities, or whose parents were social justice activists. Over half of the students interviewed have parents who are also DOE employees. (Bloomberg Aff., 15).

According to the OSI report, the OSI Investigator asked intrusive and abusive questions about students' civic and social justice activities and conversations, including questions about whether they had ever heard of or attended any May Day rallies, Black Lives Matters activities, protests related to events in Ferguson, and the screening of Profiled. (OSI Report, at 5-7). These students were also asked if they had ever heard of the PLP, who had mentioned it, and details surrounding the conversation. (Id.) If the students answered yes to any of the questions, the follow-up questions involved an inquiry as to who had discussed the activity, where had the discussion taken place, who else was present at these discussions, what other specific topics were discussed, and whether any PSC staff or students were also involved. (Id.) Some students

answered that they had heard of May Day or the PLP through their parents. These students were asked about their parents' activities, as well as questions related to meetings they had attended outside of school, who was present at these meetings, where these meetings took place, what topics were discussed, and whether they had ever seen any PSC staff of students at these meetings. (Id., at 7)

Notably absent from the OSI's interviews with the students were any questions related to a May Day bake sale or anything related to the Brooklyn History Course. In addition, the questions related to the film Profiled all involved whether plaintiff or any PSC staff members promoted the film to students, and no questions were asked related to Ms. Guerra's allegation of the film's $20 cover charge or about whether any students had been filmed without their prior permission. In addition, with regard to the substitute teacher referenced on pages 19 and 20 of the OSI report, the only questions asked about this person related to his political association and involvement in political activities—both in and away from PSC. (See, id.)

**August 25, 2017: The OSI's Ultimate Findings**

On August 25, 2017, the OSI investigator provided plaintiff with the OSI Investigative Report, detailing his findings. (See, OSI Report). Although defendants represented to the Court on May 1, 2017 that the basis of the D-130 Investigation was that "plaintiff's husband filmed a documentary for the Len Ragozin Foundation, an organization associated with the PLP," and that plaintiff's husband "is the president of the organization," the OSI provided a completely different version as to the basis for the initiation of the D-130 Investigation against plaintiff. According to the OSI Report, as discussed *supra*, the investigation was initiated due to allegations of a May Day bake sale that took place at PSC and a Brooklyn History Course. (OSI Report, at 2).

Although the OSI Report makes it clear that the focus of the investigation related to PSC staff and student attendance at May Day rallies, the film Profiled and whether PSC staff encouraged students to attend the film, any rallies that took place after the film, PSC staff and student attendance at Black Lives Matters rallies, and whether the any staff member belonged to, spoke about, or attempted to recruit students into the PLP, the OSI ultimately determined that plaintiff was guilty of failing to ensure that proper permits were obtained by the filmmakers of Profiled, for permitting a substitute to teach two lessons without the proper authorization, and for allowing Brooklyn History to be taught in lieu of a government course. (OSI Report, at 19-20). None of these substantiated allegations were the subject of the investigation, and the only regulation cited by the OSI that plaintiff had allegedly violated was Chancellor's Regulation A-640—a regulation that was never mentioned or referenced prior to the OSI Report.

**October 3, 2017: the D-130 Investigation Ended with Plaintiff's Discipline**

On October 3, 2017, the D-130 Investigation resulted in plaintiff's discipline through a written reprimand. (The October 3, 2017 Written Reprimand is attached to the Bloomberg Aff. as Ex. E).

**Defendants Application of D-130 Against Plaintiff is Ongoing**

Because of the OSI's focus on the social justice activities of plaintiff, PSC staff, students, and their parents, especially related to May Day rallies, Black Lives Matters events related to events in Ferguson, and other activities related to protesting social injustice, it is clear that those activities are considered by defendants to be "political activities" covered by Chancellor's Regulation D-130. Because of this, plaintiff has been too afraid to engage in numerous activities that should be protected by the First Amendment, such as making a statement to the PSC community about the events in Charlottesville, holding an assembly at the beginning of the year

8

to reinforce PSC's commitment to integration and anti-racism, re-engaging the other schools within the John Jay Campus about ways to de-segregate the PSAL sports programs, inviting Colin Kaepernick to speak to the students about his activism against police shootings, speaking to the student body about May Day and its historical significance with the struggle for the eight-hour work-day, and broaching general topics related to social and civic justice. (Bloomberg Aff. ¶ 28). Moreover, PSC staff members have expressed a fear of openly taking stances on social justice matters, or engaging in social justice activities at school, for fear of being targeted by OSI for violating D-130. (Bloomberg Aff. ¶¶ 28-9).

## STANDARD OF REVIEW

"Judgment on the pleadings is appropriate where material facts are undisputed and where a judgment on the merits is possible merely by considering the contents of the pleadings." *Sellers v. M.C. Floor Crafters, Inc.*, 842 F.2d 639, 642 (2d Cir. 1988). "Under Fed.R.Civ.P. 12(c), the court may consider, in its discretion and upon notice to all parties, materials outside the pleadings." *Id.* (citation omitted). "If it does so, however, the motion is treated as one for summary judgment under Fed.R.Civ.P. 56." *Id.*

Under Federal Rule of Civil Procedure 56(a), summary judgment should be granted if the evidence shows "that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Furthermore, "a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Here, plaintiff bases the instant cross-motion on the pleadings, the motion papers that have already been filed related to plaintiff's motion for an injunction, defendants' motion to dismiss, plaintiff's opposition papers, and the documents submitted in support of this cross-motion. If the Court, in its discretion, decides not to consider the materials annexed hereto that are not in the pleadings, plaintiff respectfully requests leave to amend her Complaint on the basis that many facts necessary to this motion occurred after plaintiff filed her First Amended Complaint.

## ARGUMENT

### Chancellor's Regulation D-130 is Unconstitutionally Vague as Applied to Plaintiff

"The vagueness doctrine voids on due process grounds a rule that contains prohibitions that are not clearly defined. The need for notice is at the heart of the vagueness doctrine. A punitive enactment is unconstitutionally vague when it (1) does not allow a person of ordinary intelligence a reasonable opportunity to know what is prohibited, or (2) lacks explicit standards, thus permitting arbitrary or discriminatory enforcement. A statute or rule is inadequate under the second criterion when it fails to provide sufficiently explicit standards for those who apply it, and impermissibly delegates basic policy matters for resolution on an ad hoc and subjective basis." *Kramer v. N.Y. City Bd. of Educ.*, 715 F.Supp.2d 335, 356 (E.D.N.Y. 2010)(citations omitted).

"All vagueness challenges, including those made as-applied, require us to answer whether the statute gives adequate notice. A plaintiff making an as-applied challenge must show that the statute in question provided insufficient notice that his or her behavior at issue was prohibited. The standard is an objective one. Courts ask whether the law presents an ordinary person with sufficient notice of or the opportunity to understand what conduct is prohibited or proscribed, not whether a particular plaintiff actually received a warning that alerted him or her

to the danger of being held to account for the behavior in question." *Dickerson v. Napolitano*, 604 F.3d 732, 745-6 (2d Cir. 2010)(citations omitted).

"A statute or rule that by its terms does not apply to a particular type of conduct fails to provide adequate notice to those engaging in such acts that their conduct is prohibited or subject to penalty. Application of a penal rule to conduct that the rule does not cover is a violation of the constitutional guarantee of adequate notice." *Id.,* at 355.

In addition, a plaintiff must demonstrate that the sanctions imposed by the application of the regulation implicated a constitutionally protected interest. *Kramer,* at 372. Recognized as constitutional deprivations in similar challenges have been OSI deprivations accompanied by incidental negative consequences, (*Kramer,* at 372); discipline of tenured teachers (*Marino,* cited *infra,* at *11); and a chilling effect on First Amendment rights (*Laird,* cited *infra,* at 12-3).

In support of their position that D-130 should be read broadly to include all types of political expression, defendants focus on one sentence in D-130: "School buildings are not public forums for purposes of community or political expression" (D-130, Introduction), which is cited four times in their Memorandum of Law in Support of their Motion to Dismiss plaintiff's First Amended Complaint. (See, Def.'s Mem. in Sup. of Motion to Dis., at 3, 14, 16, 17). Defendants argue that this sentence means that the DOE has the authority to regulate all political expression that takes place by DOE employees on school grounds, and not just expression related to partisan electoral political advocacy. But defendants' reading of D-130 as granting the DOE such expansive authority to curtail all political expression of DOE employees is plainly erroneous and inconsistent with (1) the DOE's prior pronouncements related to D-130; (2) the plain language of D-130; and (3) the First Amendment of the U.S. Constitution.

**I.**   **The DOE's Prior Pronouncements Related to Chancellor's Regulation D-130 Are Consistent with Plaintiff's Reading of the Regulation**

The DOE cites to *Auer v. Robbins*, 519 U.S. 452 (1997) and *Taylor v. Vt. Dep't of Educ.*, 313 F.3d 768 (2d Cir. 2002) for the proposition that deference should be given to agencies in interpreting their own regulations. Yet defendants offer no official DOE statement interpreting Chancellor's Regulation D-130 in support of their contention that D-130 should be read broadly to include all political expression.

On the other hand, the DOE's prior pronouncements related to D-130 are consistent with plaintiff's reading of the regulation. As the Supreme Court has stated, "[s]urely a court cannot be expected to ignore these authoritative pronouncements in determining the breadth of a statute." *Broadrick v. Oklahoma*, 413 U.S. 601, 618 (1973).

## A. SCI Interprets "Political Organization" Under Chancellor's Regulation D-130 As Encompassing Partisan Politics Only

On November 25, 2014, the SCI issued an investigative report related to allegations that D-130 had been violated when Mayor DeBlasio held a meeting at a DOE school. (SCI's Nov. 25, 2014 Report ["SCI Report"], at 3, attached to the Chickedantz Affirmation as Ex. 2).

In its report, the SCI notes that D-130 was enacted to implement New York Education Law § 414, and further states "[a]lthough the term **"political organization"** is not defined in the Educational Law, the Public Officers Law states that it **"means any party or independent body as defined in the election law or any organization that is affiliated with or a subsidiary of a party or independent body."** N.Y. Pub. Off. § 73-a. According to the Election law, an **"independent body"** is **"any organization or group of voters which nominates a candidate or candidates for office to be voted for at an election**…. N.Y. Elec. § 1-104(12)." SCI Report, at 3 (emphasis added).

Furthermore, the SCI Report noted that "SCI cannot determine whether the meeting at issue was 'political activity' as restricted by the Chancellor's Regulations. The Mayor's prepared remarks for the meeting were not overtly political." (SCI Report, at 3). Mayor DeBlasio's prepared remarks included the following statements:

- "New York is a city with a long and proud union tradition"
- "And a city that continues to respect unions today"
- "We have shown that in my Administration"
- "Negotiated in a respectful way with the ATF, 1199"
- "And agreed to contracts that took care of the interests of workers"
- "And the fiscal needs of the City"
- "And included important reforms in education and health care"
- "Clarence [a Cablevision worker] says his experience taught him we need stronger worker-protection laws"
- "He is right"
- "I urge you to stay strong"
- "Because unions do not just fight for their members"
- "They are bulwarks of progressivism in our nation today"
- "Fighting against income inequality"
- "For immigration reform"
- "For a social safety network for all Americans"
- "You can count on our support"

The SCI investigator noted that Robin Greenfield and other attorneys from the DOE's Office of Legal Services ("OLS") did not believe that Mayor DeBlasio's meeting at P.S. 66 was prohibited by Chancellor's Regulation D-130 because nothing that was to take place at the meeting was "explicitly prohibited by Chancellor's Regulation D-130." (SCI Report, at 6).

In short, neither the SCI nor Robin Greenfield believed that a meeting held on DOE school grounds, where Mayor DeBlasio advocated his campaign platform on matters such as union labor rights, immigration reform, education reform, and healthcare reform, was "overtly political" to constitute the type of "political activity" proscribed by Chancellor's Regulation D-130. Moreover, SCI made it explicitly clear that "political organization" under D-130 only encompasses partisan, electoral organizations.

13

## B. The Commissioner of Education's Interpretation of "Political Activity"

"New York Educ. Law § 414 authorizes local school boards to adopt reasonable regulations for the use of school property for 10 specified purposes when the property is not in use for school purposes." *Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*, 508 U.S. 384 (1993). One of the listed purposes is: "for polling places for holding primaries and elections and for the registration of voters and for holding political meetings. But no meetings sponsored by political organizations shall be permitted unless authorized by a vote of a district meeting..." N.Y. Educ. Law § 414(1)(e). In New York City, Chancellor's Regulation D-130 was enacted to implement Education Law § 414(1)(e)'s restrictions on political activities in public school buildings. (See, SCI Report, Ex. 2). Furthermore, "[t]he Commissioner [of Education] has the power to interpret statutes and provide guidelines with regard to their construction." *Board of Educ. v. Mills*, 250 A.D.2d 122, 125 (N.Y. App. Div. 3rd Dep't 1988)

The Commissioner of Education has determined that "political activities" encompassed by Education Law § 414 is limited to partisan politics. *Appeal of Allen* involved teachers who distributed a PTA flyer to their students during school board elections and advising which candidates their parents should vote for. With regard to the type of political activities encompassed by Education Law § 414, the Commissioner of Education stated "Because the PTA flyer exhorts a partisan position and indirectly utilizes school district resources to impart that message, respondent is directed to revise its policy on the use of the schoolhouse and grounds pursuant to Education Law '414 to ensure that other parties are restricted in a manner that limits their activities regarding elections to the same extent as the board of education, **without affecting the established non-partisan activities**." *Appeal of Allen*, 1992 Op. Comm. Ed. No. 12,761 (emphasis added) (Attached to the Chickedantz Affirmation as Ex. 3).

The Commissioner of Education has also determined that non-partisan political expression is specifically permitted, noting that "It is clear that respondent district has generally allowed the use of its facilities for public speech and for the public discussion of a variety of issues. To bar the discussion of issues deemed by some members of the community as propaganda, political or religious is impermissible." *Appeal of Nolan, et al*, 1996 Op. Comm. Ed. No. 13,643 (Attached to the Chickedantz Affirmation as Exhibit 4).

## C. The Chancellor's Office's Stated Rationale for Enacting D-130

This Court has addressed a constitutional challenge to the application of Chancellor's Regulation D-130 in a matter called *Weingarten v. Bd. of Educ.*, 680 F.Supp. 2d 595 (S.D.N.Y. 2010). *Weingarten* involved a First Amendment challenge to the DOE's ban against the wearing of election campaign buttons by DOE employees in school buildings during the 2008 presidential elections, and the use of teacher mailboxes and union bulletin boards in teacher resource rooms to leaflet for candidates running for election.

*Weingarten* is relevant to the instant matter because the then-Chancellor Joel Klein articulated that the rationale for enacting Chancellor's Regulation D-130 involved the DOE's interest in protecting the "rights of students to learn in an environment free of partisan political influence" because "[p]artisan political activity by staff in the presence of students. . . . sends the message that the view expressed carries the support of the school system." *Weingarten*, at 597-8.

Chancellor Klein's stated rationale for the enactment of D-130 should be considered in interpreting the proper scope of the regulation, as a well-recognized canon for resolving constructional problems is "a word is known by the company it keeps (the doctrine of *noscitur a sociis*)." *Gustafson* v. *Alloyd Co.,* 513 U.S. 561, 575 (1995). The Supreme Court applied the

doctrine of *noscitur a sociis* to limit the definition of a term in the Securities Act that otherwise would have been overly broad and inconsistent with its accompanying terms:

> This rule we rely upon to avoid ascribing to one word a meaning so broad that it is inconsistent with its accompanying words, thus giving unintended breadth to the Acts of Congress. The rule guided our earlier interpretation of the word "security" under the 1934 Act. The 1934 Act defines the term "security" to mean, *inter alia*, "any note." We concluded, nevertheless, that in context the phrase "any note" should not be interpreted to mean literally "any note," but must be understood against the background of what Congress was attempting to accomplish in enacting the Securities Acts.

*Gustafson* v. *Alloyd Co.,* 513 U.S. 561, 575 (1995).

Here, under the doctrine of *noscitur a sociis*, the terms "political expression" and "political organization" must be understood against the background of what the Chancellor's Office has stated about the DOE's interest with respect to implementing D-130. It is clear that D-130 is limited to partisan, electoral political advocacy.

## II.     A Plain Reading of D-130 Demonstrates that it Applies Only to Partisan, Electoral Political Advocacy

According to defendants, "OSI [conducted] an investigation to ascertain whether plaintiff used her position as a DOE employee to advance the beliefs of a particular political party and engage in impermissible political activity in violation of the Chancellor's Regulations and Conflicts of Interest Law." ("Guerra Decl." ¶ 37, Ex. F).

As plaintiff has been advised, OSI decided to initiate the investigation based on Ms. Siegel's allegations that a May Day Bake Sale had taken place at PSC, a Brooklyn History Course was being taught, and a film called Profiled was screened at PSC. (OSI Report, at 2; Guerra Decl. ¶ 14). But these three allegations in no way violated Chancellor's Regulation D-130 (Chancellor's Regulation D-130 is attached to the Affirmation of Maria Chickedantz ["Chickedantz Aff."] as Ex. 1).

## A. A Plain Reading of D-130

That D-130 is limited to partisan, electoral political advocacy is unambiguous and clearly evident upon a plain reading of the entire text of Chancellor's Regulation D-130. The title of D-130 is "POLITICAL ACTIVITIES IN SCHOOL BUILDINGS," and the subject of the regulation is "USE OF SCHOOL BUILDINGS BY CANDIDATES, ELECTED OFFICIALS AND POLITICAL ORGANIZATIONS, AND CONDUCT OF SCHOOL EMPLOYEES AND OFFICERS **WITH RESPECT TO POLITICAL CAMPAIGNS AND ELECTIONS**." (emphasis added). Further, D-130, by the plain language in its introduction, limits the type of "community or political expression" proscribed by the regulation to the three categories enumerated within the introduction, which also makes clear what types of political organizations fall within the scope of the regulation:

> School buildings are not public forums for purposes of community or political expression. The following sets forth the rules which govern: (1) the use of, or access to, Department of Education school buildings by elected officials, candidates for elective office, or **organizations working on behalf of such officials or candidates**, both during school and non-school hours; (2) use of school facilities, equipment and supplies for political purposes by school employees, personnel, or staff members and officials; and (3) conduct of school employees, personnel, or staff members and officials with respect to political campaigns and elections.

Chancellor's Reg. D-130, Introduction (emphasis added).

In addition, D-130 also provides that "all school personnel shall maintain a posture of complete neutrality **with respect to all candidates**." Chancellor's Reg. D-130(1)(C)(emphasis added). It also provides that "no rallies, forums, programs, etc., on behalf of, or for the benefit of any elected official, particular candidate, candidates, slate of candidates or political organization/committee may be held in a school building." Chancellor's Reg. D-130(1)(B)(2).

Defendants' position that D-130's restrictions extend beyond partisan, electoral politics is wholly inconsistent with the plain language of D-130. The term "community or political

expression" is clearly and unambiguously limited to political expression covered by the three explicitly enumerated examples in the introduction, all of which relate to partisan, electoral politics. (See, Chancellor's Regulation D-130, Introduction, quoted *supra*).

**B. Defendants' Expansive Reading of D-130 Cannot Be Reconciled with the Rest of the Regulation**

Defendants broad reading of "political expression" in D-130 to also encompass non-partisan, electoral political advocacy does not square with the rest of the regulation, as it renders the terms "candidates," "elected officials," "slate of candidates," and "elections" within D-130 redundant, since each of those terms necessarily falls within the general ambit of "political expression." It is well settled that "the Court will avoid a reading which renders some words altogether redundant. If 'communication' included every written communication, it would render 'notice, circular, advertisement, [and] letter' redundant, since each of these are forms of written communication as well." *Gustafson v. Alloyd Co.*, 513 U.S. 561, 574-5 (1995).

Moreover, references to D-130 in other Chancellor's Regulations support plaintiff's reading of D-130. Chancellor's Regulation A-660 includes the following: "Under Chancellor's Regulation D-130, PA/PTAs are prohibited from holding candidate forums for any political or community-based organization. PA/PTAs may hold candidate forums only for the election of their officers." Chancellor's Reg. A-660(K)(3)(a). A-660's narrow reading of "political or community-based organizations" under D-130 to encompass only those organizations that hold "candidate forums" indicates that the term "political organizations" in the text of D-130 is also similarly limited in scope. "[T]he presumption of consistent usage [is] the rule of thumb that a term generally means the same thing each time it is used." *United States v. Castleman*, 134 S. Ct. 1405, 1417 (2014).

Based on the plain language of D-130, and taking the context of the entire regulation as well as its references in other Chancellor's Regulations, it is clear that the regulation was meant to encompass only partisan, electoral political advocacy, and therefore, it did not apply to the allegations against plaintiff that caused the OSI to initiate the D-130 Investigation.

**III.** **The DOE's Expansive Reading of D-130 as a Blanket Ban on Political Expression Is Unconstitutional**

Notwithstanding the foregoing, plaintiff's interpretation of D-130 should be adopted by this Court, because the DOE's expansive reading of D-130 to include any form of political expression has serious First Amendment implications. It is well settled Supreme Court law that "where a statute is susceptible of two constructions, by one of which grave and doubtful constitutional questions arise and by the other of which such questions are avoided, our duty is to adopt the latter." *United States v. Booker*, 543 U.S. 220, 286 (2005).

**A. Defendants' Expansive Reading of D-130 Unduly Restricts Protected Speech to an Extent Far Greater Than is Essential to the Furtherance of the DOE's Interests**

It is well settled that a board of education may not impose blanket restrictions on all political expression by employees while they are on duty. See, *James v. Board of Education of Central Dist. No. 1 et al.*, 461 F.2d 566, 568 (2d Cir. 1972). It is also recognized that "[t]he ultimate goal of school officials is to insure that the discipline necessary to the proper functioning of the school is maintained among both teachers and students." *Id.* at 571. Therefore, in cases where a board of education regulates the First Amendment protected activities of its employees, the analysis used in this Circuit is whether "the policy [is] as narrowly drawn as may reasonably be expected so as to advance the social interests that justify it or, to the contrary, does it unduly restrict protected speech, to an extent greater than is essential to the furtherance of those interests?" *Pico v. Board of Education*, 638 F.2d 404, 415 (2d Cir. 1980)(citations

omitted). "[T]he burden of demonstrating such defenses rests with the school officials and the burden is one of persuasion, not of pleading…. Nor is the burden a light one." *Id.* "Any limitation on the exercise of constitutional rights can be justified only by a conclusion, based upon reasonable inferences flowing from concrete facts and not abstractions, that the interests of discipline or sound education are materially and substantially jeopardized, whether the danger stems initially from the conduct of students or teachers." *James*, at 571.

"Because First Amendment freedoms need breathing space to survive, government may regulate in the area only with narrow specificity." *Pico,* at 416 (citing *N.A.A.C.P. v. Button*, 371 U.S. 415, 432-3 [1963]). "When one must guess what conduct or utterance may lose him his position, one necessarily will steer far wider of the unlawful zone." *Id.* (citing *Speiser v. Randall*, 357 U.S. 513, 526 [1958]).

Here, the DOE's stated interest in enacting D-130 was to further the DOE's educational mission of protecting children from "[p]artisan political activity by staff in the presence of students" that could "improperly influence children and impinge on the rights of students to learn in an environment free of partisan political influence." *Weingarten*, 680 F.Supp. 2d at 597-8. Yet here, defendants' investigation into whether plaintiff violated D-130 focused on a May Day rallies, Black Lives Matters rallies, a film about racial profiling called Profiled, and other social justice related activities not related to partisan political activities. None of the conduct that the OSI investigated related to the DOE's stated mission of protecting children from the improper influence of partisan political influence. On the other hand, as described in plaintiff's affidavit, defendants' reading of D-130 to include all "political expression" continues to unduly restrict plaintiff's and other PSC employees' protected speech, to a far greater extent than is essential to the furtherance of the DOE's stated interests. See, *Pico,* at 415.

Moreover, defendants have offered no examples of how their reading of D-130 to encompass all forms of political expression is "justified only by a conclusion, based upon reasonable inferences flowing from concrete facts and not abstractions, that the interests of discipline or sound education are materially and substantially jeopardized." *James*, at 571.

It is clear that defendants could regulate the partisan political activity of DOE employees far more narrowly simply be interpreting D-130 in a manner consistent with the DOE's prior proclamations about D-130 and the plain meaning of D-130. See, *supra.*

## B. Defendants' Unfair and Arbitrary Administration of D-130 Demonstrates that Defendants' Unconstitutional Purpose is to Regulate Viewpoints

It is well settled that "the erratic, unfair and arbitrary administration of policy with regard to speech in schools is as much to be feared as the contents of the policy itself as a source of First Amendment violations." *Pico*, at 417. This Circuit requires "sensitivity to some of the teaching reflected in relevant constitutional doctrine and to the dangers lurking in improper and unconstitutional administration" of such regulations. *Eisner v. Stamford Board of Education*, 440 F.2d 803, 809-10 (2d Cir. 1971). "Not only must there be 'narrow specificity' in the criteria applied, but there must be the use of 'sensitive tools' in their application." *Pico*, at 417 (citing *Keyishian v. Board of Regents*, 385 U.S. 589, 603-04 [1967]).

The Second Circuit has provided guidance on how to determine whether a regulation that restricts speech is unconstitutionally administered in order to restrict certain viewpoints:

> [Where] evidence that the decisions made were based on defendants' moral or political beliefs appears together with evidence of procedural and substantive irregularities sufficient to suggest an unwillingness on the part of school officials to subject their political and personal judgments to the same sort of scrutiny as that accorded other decisions relating to the education of their charges, an inference emerges that political views and personal taste are being asserted not in the interests of the children's well-being, but rather for the purpose of establishing those views as the correct and orthodox ones for all purposes in the particular community."

*Pico*, *supra*, at 417.

The Supreme Court has also articulated ways to identify unconstitutional administration of policies that restrict speech for improper purposes:

> The historical background of the decision is one evidentiary source.... The specific sequence of events leading up to the challenged decision also may shed some light on the decision makers' purposes.... Departures from the normal procedural sequence also might afford evidence that improper purposes are playing a role. Substantive departures too may be relevant, particularly if the factors usually considered important by the decision maker strongly favor a decision contrary to the one reached.

*Village of Arlington Heights v. Metropolitan Housing Development Corporation*, 429 U.S. 252, 267 (1977)

Here, defendants' administration of D-130 against plaintiff and others at PSC was arbitrary and irregular, as demonstrated by countless other examples of DOE employees engaged in Democratic Party political activities that did not result in D-130 investigations. For example, on February 7, 2017 students from several DOE schools, including Beacon High School, walked out of class in a mass protest against President Trump's immigration ban, with the support of their schools' staff and administration. The students and teachers met at Foley Square, during school hours, where the students were addressed by Public Advocate Leticia James who stated, "My scholars, you've got to rise like so many have done before you. You have to resist like so many before you and when you rise up, your class, your assignment is to organize." She then led them in a chant "Rise up! Resist! Repeat!" (Bloomberg Aff. ¶ 21). In addition, on Wednesday, October 19, 2016, the DOE organized a Hillary Clinton Campaign event at Mayor DeBlasio's house with 20 DOE students in attendance, which was live-streamed through the DOE's Facebook page. (Bloomberg Aff. ¶ 21). Several additional examples exist where the DOE or DOE employees engaged in overtly Democratic political activities, yet these activities were not

considered meritorious of initiating a D-130 investigation, or any other type of sanction. (See, Bloomberg Aff. ¶ 21).

The only inference that can be drawn from defendants' irregular administration of D-130 is that the DOE's purpose is not really to regulate "all political expression," but rather, to regulate certain viewpoints that it does not agree with, including radical leftist political and ideological viewpoints, such as those that support what May Day stands for, what the Black Lives Matters movement stands for, and what the film Profiled stands for. See, *Pico*, at 417.

**IV.     Plaintiff Has Been, and Continues to be Harmed By the DOE's Application of D-130**

Plaintiff's constitutional rights have been adversely affected by the DOE's application of D-130 against her. The D-130 Investigation that ultimately resulted in plaintiff's discipline, defendants' false statements to the press about the D-130 investigation, and the chill that began and continues to remain over plaintiff and the PSC staff as a result of the activities the OSI targeted as violations of D-130.

As an initial matter, the D-130 investigation and the consequential discipline, continuing COIB investigation, harm to her professional reputation, continued chilling effect at her job, all amount to a deprivation of plaintiff's constitutionally protected interest in her employment. In *Kramer*, cited *supra*, on defendants' motion for summary judgment, the court found that the plaintiff, a DOE teacher, had established a vagueness challenge to Chancellor's Regulation A-421 because, although she was not ultimately disciplined after an OSI investigation into whether she had violated Chancellor's Regulation A-421, the initiation of the OSI investigation and the incidental consequences surrounding the investigation were sufficient "to constitute a significant deprivation of her constitutionally protected interest in her employment." *Kramer*, at 372.

23

Moreover, with regard to the discipline imposed upon plaintiff, it bears highlighting that discipline imposed against a tenured employee is considered a deprivation of a constitutionally protected property interest. *Marino v. Shoreham-Wading River Cent. Sch. Dist.*, 2008 U.S. Dist. LEXIS 95178, at *11 (E.D.N.Y. 2008) (Education Law § 3020-a's "prohibition against written reprimands, fines, suspensions for a fixed time without pay or dismissals without written charges and a hearing are sufficient to create a protected property interest in a hearing before any of those actions are taken"). The disciplinary letter received by plaintiff specifically states "you are hereby reprimanded for the above described conduct." Plaintiff was also explicitly advised that the letter was not an administrative letter in her file. (Bloomberg Aff. ¶ 20, Ex. H). The letter was clearly a "written reprimand" under Education Law § 3020-a. *Marino,* at *13 (factors to be considered in determining whether a document constitutes a disciplinary reprimand include, *inter alia*, "whether the letter is directed towards an improvement in performance or is a formal reprimand for prior misconduct" and "whether the letter is in the nature of a performance evaluation or a castigation for misconduct.") Moreover, as the D-130 investigation was based on allegations that plaintiff had engaged in improper political activities, that the ultimate determination against her was in no way related to the initial allegations is problematic because of the principle that "no person may lose substantial rights because of wrongdoing shown by the evidence, but not charged." *Murray v. Murphy*, 24 N.Y.2d 150, 157 (N.Y. 1969). This principle applies here because plaintiff was ultimately disciplined without a due process hearing, and the total disconnect between the OSI allegations and the ultimate penalty completely denied plaintiff the opportunity to defend herself of the ultimate discipline.

Further, as discussed *supra*, plaintiff's First Amendment rights have been violated by the DOE's improper application of D-130 and continuing COIB investigation. Because of

defendants' overbroad reading of D-130, plaintiff and other PSC staff members have been, and continue to be severely chilled from engaging in protected speech and expression. (Bloomberg Aff. ¶ 28). See *Laird v. Tatum*, 408 U.S. 1, 12-13 (1972) (stating that "constitutional violations may arise from the deterrent, or 'chilling' effect of governmental regulations that fall short of a direct prohibition against the exercise of First Amendment rights.")

## CONCLUSION

Based on the foregoing, plaintiff respectfully requests the Court to declare that D-130 is limited in scope to partisan, electoral political advocacy.

Plaintiff further requests that the Court determine the D-130 investigation void *ab initio*, and any information gleaned from this improper investigation be expunged from plaintiff's records, and the discipline that was imposed upon plaintiff be formally withdrawn.

Furthermore, plaintiff requests that the Court enjoin the DOE from enforcing Chancellor's Regulation D-130 in order to suppress viewpoints that it does not agree with.

Dated:  New York, New York
        October 23, 2017

<div style="margin-left:40%">

Respectfully submitted,

MIRER MAZZOCCHI JULIEN &
CHICKEDANTZ, PLLC

By:_____
        Maria L. Chickedantz

150 Broadway, Suite 1200
New York, NY 10038
Tel. (212) 231-2235
Fax (212) 409-8338
*Attorneys for Plaintiff*
maria@mmsjlaw.com

</div>