UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JILL BLOOMBERG,<br><br>     Plaintiff,<br><br> - against -<br><br>THE NEW YORK CITY DEPARTMENT<br>OF EDUCATION and CARMEN FARINA,<br><br>     Defendants. | **MEMORANDUM**<br>**OPINION & ORDER**<br><br>17 Civ. 3136 (PGG) |

PAUL G. GARDEPHE, U.S.D.J.:

    Plaintiff Jill Bloomberg – a high school principal – brings this action against the New York City Department of Education (the "DOE") and its chancellor. Bloomberg claims that a DOE investigation of her conduct – purportedly premised on her violation of a DOE regulation governing DOE personnel's activity on behalf of political organizations – was retaliatory and in violation of her First Amendment rights. Bloomberg further contends that the DOE regulation on which the investigation was based does not apply to her alleged conduct and, in any event, is unconstitutionally vague. The Amended Complaint asserts claims for retaliation in violation of the First Amendment, Title VI of the Civil Rights Act of 1964 ("Title VI"), 42 U.S.C. §§ 2000d-1 et seq., and the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code § 8-101 et seq. Bloomberg also challenges the DOE regulation on Due Process grounds. (Am. Cmplt. (Dkt. No. 39))

    Defendants have moved to dismiss Plaintiff's First Amendment and Title VI claims, and her Due Process claim. (Mot. (Dkt. No. 77)) Plaintiff has cross-moved for partial judgment on the pleadings seeking, inter alia, a declaration as to the DOE regulation's scope. (Cross-Mot. (Dkt. No. 81); Pltf. Br. (Dkt. No. 82))

For the reasons stated below, Defendants' motion to dismiss will be granted in its entirety, and Plaintiff's cross-motion will be terminated as withdrawn.

## BACKGROUND

I. **FACTS**

Plaintiff Bloomberg is the principal of Park Slope Collegiate ("PSC"), a secondary school in Park Slope, Brooklyn. (Am. Cmplt. (Dkt. No. 39) ¶¶ 1, 4, 21, 28) Plaintiff has served as the principal of PSC since 2004, and has been employed by the DOE since 1998. (Id. ¶¶ 9-10)

PSC is located at a facility known as the "John Jay Campus." The John Jay Campus houses PSC and three other schools: the Secondary School for Journalism ("Journalism"); The John Jay School for Law ("Law"); and Millennium Brooklyn High School ("Millennium"). (Id. ¶ 4; Bloomberg Aff., Ex. 3 (Dkt. No. 10-3)) Millennium joined the John Jay Campus in 2011. (Am. Cmplt. (Dkt. No. 39) ¶¶ 33, 36; Bloomberg Aff., Ex. 3 (Dkt. No. 10-3)) PSC's student body is 85 percent Black or Latino, while Millennium has a "high percentage" of white students, although the majority of the student body is Black or Latino.[1] (Am. Cmplt. (Dkt. No. 39) ¶ 56) Park Slope – where the schools are located – is "an increasingly affluent neighborhood . . . with a majority [w]hite population." (Id. ¶ 30)

"Since the outset of her tenure at PSC," Plaintiff "has encouraged desegregation of the school and opposed measures that reinforce and perpetuate de facto segregation." For example, Bloomberg opposed the addition of Millennium to the John Jay Campus. (Id. ¶ 32; see id. ¶¶ 33-52)

---

[1] Millenium is an offshoot of Millennium High School in Manhattan ("Millennium-Manhattan"). The student body of Millennium-Manhattan is approximately 25 percent Black or Latino. (Am. Cmplt. (Dkt. No. 39) ¶ 56)

A. **Plaintiff's January 10, 2017 Email**

The Campus operates two sports programs. One program is for students at PSC, Journalism, Law, and a neighboring school – Brooklyn High School of the Arts ("Arts") – and the second program is for students at Millennium and Millennium-Manhattan. (Id. ¶ 56; Bloomberg Aff., Ex. 3 (Dkt. No. 10-3))

According to Plaintiff, "[i]t is part of a principal's . . . regular job duties to request sports teams of the [Public School Athletic League ("PSAL")]. For years[,] principals and coaches in the John Jay Program had been making these formal requests but [their] requests were regularly rejected." (Bloomberg Supp. Aff. (Dkt. No. 21) ¶ 5)

On January 10, 2017, Plaintiff sent the following email to Eric Goldstein, the chief executive officer of the DOE sports programs, and Michael Prayor, the District Superintendent,[2] concerning sports programs at the John Jay Campus:

> Dear CEO Goldstein and Superintendent Prayor,
>
> I am writing to request your assistance in uniting the PSAL sports teams on the John Jay Campus in Brooklyn. Our campus houses [Journalism, Law, Millennium, and PSC]. Currently, the John Jay Campus Schools PSAL teams include students from [Journalism, Law, PSC and students from [Arts] on Dean Street. [Millennium] students belong to the Millennium High School PSAL teams that also include students from [Millennium-Manhattan]. These separate sports programs, both of which practice and compete at the John Jay Campus ([Millennium-Manhattan] does not have a gym) offer vastly unequal opportunities to students.

(Bloomberg Aff., Ex. 3 (Dkt. No. 10-3))

The email includes the following chart:

---

[2] Four other DOE employees are copied on the email, including Donald Douglas, the executive director of the PSAL. (Bloomberg Aff., Ex. 3 (Dkt. No. 10-3); Bloomberg Supp. Aff. (Dkt. No. 21) ¶ 7)

| School or Program | Number of PSAL Teams | Enrollment (SY 15-16) | % Black & Hispanic |
|---|---|---|---|
| [Law] | | 357 | 90.4 |
| [Journalism] | | 222 | 87.0 |
| PSC | | 356 (HS only) | 85 |
| [Arts] | | 924 | 90.7 |
| **John Jay Campus PSAL** | **9** | **1859** | |
| [Millennium] | | 620 | 51.5 |
| [Millennium-Manhattan] | | 641 | 25.2 |
| **Millennium High School PSAL** | **17** | **1261** | |

(Id. (emphasis in original))  The email goes on to state:

> Prior to this school year, the John Jay Campus had only four teams.  We were recently granted girls' cross-country, and girls' and boys' indoor and outdoor track[,] though we requested and were denied girls' and boys' swimming, girls' softball, flag football, double-dutch and JV volleyball as well as boys' volleyball and soccer.  Meanwhile, the number of [Millennium-Manhattan] teams continues to grow.

> The Principals of the schools at the John Jay Campus meet weekly to manage our shared campus.  From the time that [Millennium] joined our campus community in 2011, I have argued that they should be a part of our PSAL team.  Nonetheless, they opted to join with [Millennium-Manhattan] (which opened in 2002) and, over the years, have been granted 17 teams.  In spite of repeated requests to unite the teams and open up the opportunities that exist on the campus, but that are denied to students from three of the four schools, [Millennium] maintains its exclusive alliance with [Millennium-Manhattan].

> The PTA at PSC has also raised these inequities with Executive Director Donald Douglas but have heard nothing in response.

> The benefits of these separate and unequal programs to the students at [Millennium] and [Millennium-Manhattan] do not justify the disadvantages imposed on the students from [Arts, Law, Journalism,] and PSC.  Nor do whatever logistical difficulties may arise from uniting them.  The students at all six schools are equally deserving of opportunities to participate in extracurricular sports and it is the responsibility of the DOE and PSAL to facilitate that equity.

> I look forward to hearing from you soon.

(Id.)

According to Plaintiff, her "primary protest" in this email "was the segregation of the programs based on race."  (Am. Cmplt. (Dkt. No. 39) ¶ 57; see also id. ¶ 56 (the January 10,

2017 email "accus[ed] the DOE of race discrimination and segregation within the sports programs in her building"); Bloomberg Supp. Aff. (Dkt. No. 21) ¶ 9 ("The Complaint I made to PSAL was designed to address what I believe was a violation of the law. . . ."))[3]

According to Plaintiff, she "received no meaningful response" to her January 10, 2017 email. (Id. ¶ 58) As a result, PSC's PTA organized a February 13, 2017 "leafleting action," distributing flyers containing language from the January 10, 2017 email on the sidewalk outside of the John Jay Campus building "to inform the community about the race discrimination and segregation that [P]laintiff had complained about." (Id. ¶ 59)

On March 3, 2017, Donald Douglas – the executive director of the PSAL, who had been copied on Plaintiff's January 10, 2017 email – met with the principals of the schools located at the John Jay Campus. Although he "refused to combine the programs between the PSC and other John Jay programs with the programs at Millennium," he did "grant[] John Jay an additional five teams," and asked Plaintiff "if that made [her] happy." (Bloomberg Supp. Aff. (Dkt. No. 21) ¶¶ 7, 10)

Plaintiff describes her January 10, 2017 email as a "Title VI Complaint." (Am. Cmplt. (Dkt. No. 39) ¶ 59) Plaintiff further alleges, "[u]pon information and belief," that "all Title VI complaints made to DOE officials are immediately referred to the Office of Civil Rights ('OCR')." (Id. ¶ 60) Accordingly, "[b]ased on DOE policy and upon information and belief,

---

[3] The Amended Complaint also notes that on November 29, 2016, Plaintiff "sent a letter to Ramon Garcia, Assistant Commissioner of the School Safety Division, NYPD, and other DOE officials," in connection with an incident in which the John Jay Campus girls' volleyball team "had been singled out, humiliated, and treated like criminals by the school safety agents at another, predominately White school." (Am. Cmplt. (Dkt. No. 39) ¶¶ 54-55) In her letter to Garcia, Plaintiff notes that the principal of the other school "sent a letter of apology . . . [and] agreed to host . . . a Unity Game"; the commander of the school safety personnel "also offered an apology to the team." (Bloomberg Aff., Ex. 2 (Dkt. No. 10-2))

"[P]laintiff's Title VI Complaint . . . was referred to OCR by at least on or about January 15, 2017." (Id. ¶ 61) Robin Greenfield – DOE's Executive Deputy Counsel for Employment and General Practice – is "directly responsible for responding to OCR complaints on behalf of DOE." (Id. ¶ 60)[4]

**B.    The OSI Investigation**

On May 12, 2016 – eight months before Plaintiff's January 10, 2017 email – the Special Commissioner of Investigation for the New York City School District ("SCI") received an anonymous complaint concerning Plaintiff. SCI is independent of DOE, and its "sole function" "is to investigate allegations of corruption, conflicts of interest, unethical conduct[,] and other misconduct in the DOE." (Guerra Decl. (Dkt. No. 13) ¶¶ 6, 11; see also Am. Cmplt. (Dkt. No. 39) ¶¶ 69, 87) The anonymous complaint alleged that Plaintiff "was a member of a political organization known as the [Progressive] Labor Party ('PLP') and was actively recruiting students into the organization and inviting them to participate in organizational activities including marches for her political organization." (Guerra Decl. (Dkt. No. 13) ¶ 11)

SCI is authorized by law to refer certain complaints to the Office of Special Investigations ("OSI"), an internal DOE investigatory unit overseen by DOE's Office of General Counsel. (Id. ¶¶ 5-6; Am. Cmplt. (Dkt. No. 39) ¶ 60; see also New York City Mayoral Executive Order 11, § 3)[5] SCI referred the anonymous complaint to OSI on May 13, 2016. (Guerra Decl. (Dkt. No. 13) ¶ 12) OSI concluded that there was insufficient information to pursue the complaint, and – given that the identity of the complainant was unknown – on May 17, 2016, OSI "marked the complaint as closed pending additional information." (Id. ¶ 13)

---

[4]  Greenfield's position is within DOE's Office of General Counsel. (Id. ¶ 60)
[5]  Mayoral Executive Order 11 is available at
https://www.nycourts.gov/library/queens/PDF_files/Orders/ord11.pdf.

On December 20, 2016, the anonymous complainant provided additional information to SCI, reporting, inter alia, that Plaintiff's husband was the president of the Len Ragozin Foundation (the "Foundation"), an organization associated with the Progressive Labor Party; that Plaintiff's husband included images of students and staff in a documentary he filmed for the Foundation, without the students' and staff's authorization; and that this documentary had been screened at PSC, with a $20 admission fee.[6] (Guerra Decl. (Dkt. No. 13) ¶¶ 14-15)[7] SCI referred the new report to OSI on January 25, 2017, about two weeks after Plaintiff had sent her January 10, 2017 email about sports programs at the John Jay Campus. (Id. ¶ 17)

Equipped with this new information, OSI re-opened its investigation of the complaint concerning Plaintiff, and assigned the investigation to Confidential Investigator Michelle Archie. (Id. ¶¶ 18, 21) As a result of the additional information provided on December 20, 2016, OSI was also able to identify and interview the complainant. (Id. ¶ 19)

Plaintiff asserts that, "[b]ecause Robin Greenfield would have received the information about [P]laintiff's January 10, 2017 Title VI Complaint on at least January 15, 2017, as she is the person responsible for receiving . . . all Title VI complaints[], and she also received

---

[6] On May 4, 2016, about a week before SCI received the May 12, 2016 anonymous complaint, the Foundation applied for an "extended use" permit for a June 3, 2016, 6:00 p.m. "film screening and panel discussion" at the PSC auditorium. The application requested permission to sell goods and solicit donations. The application does not provide a description of the Foundation. The application form states, however, that "[s]chool buildings cannot be used for . . . [p]olitical events, activities or meetings[,] including those conducted on behalf of an elected official, candidate, slate of candidates or political organizations. . . ." (Extended Use Permit App. (Dkt. No. 21-4)) The application was approved. (Permit Confirmation (Dkt. No. 21-3))

[7] The anonymous complainant also alleged that, under Plaintiff's watch, a bake sale was held at PSC to raise money for a May Day march; that PSC was failing to teach a required course; and that "students who voice opinions different from those of [P]laintiff are not allowed to express them." (Guerra Decl. (Dkt. No. 13) ¶ 16) Plaintiff denies all of these allegations. (Am. Cmplt. (Dkt. No. 39) ¶¶ 86-87)

the information regarding the complaints from OSI, she had specific knowledge of both the Title VI Complaint and the OSI complaints prior to the time the investigation was officially commenced." (Am. Cmplt. (Dkt. No. 39) ¶ 78)

On March 2, 2017, Archie informed Plaintiff that she was under investigation, but stated "that the allegations against her and the subject of the investigation could not be disclosed to her." (Id. ¶¶ 24, 63) That same day, however, Archie informed PSC's assistant principal, Carla Laban, "that the investigation . . . related to 'communist activities taking place at the school.'" (Id. ¶ 64) Archie showed Laban "a list of names" – including, among others, Plaintiff, her family members, current and former PSC teachers, and former students – and asked Laban to identify those she had seen "engag[e] in communist activities." (Id. ¶¶ 64-65) Laban disclosed the substance of her conversation with Archie at a PSC PTA meeting on March 16, 2017. (Id. ¶ 67)

On March 22, 2017, Plaintiff's counsel (and Caban) sent a letter to DOE's General Counsel asserting that Plaintiff "[was] . . . under investigation by the OSI" "[a]s a result of and in retaliation for her advocacy against segregation." (Bloomberg Aff., Ex. 5 (Dkt. No. 10-5) at 2; see also Am. Cmplt. (Dkt. No. 39) ¶ 68) Noting Plaintiff's January 10, 2017 email about sports programs at the John Jay Campus, and the February 13, 2017 "leafleting action," Plaintiff's letter asserted that there was "no question that it is illegal for an investigation to be instituted in direct retaliation for [Plaintiff's] recent actions protesting race discrimination." Plaintiff "demand[ed] that the OSI immediately close its retaliatory investigation," and threatened to file suit if DOE did not respond by March 27, 2017. (Bloomberg Aff., Ex. 5 (Dkt. No. 10-5) at 3-4)

On March 27, 2017, Robin Greenfield responded to Plaintiff's letter. (Bloomberg

Aff., Ex. 6 (Dkt. No. 10-6)) Greenfield informed Plaintiff that "[t]he substance of the complaint

that OSI is investigating is unrelated to [Plaintiff's] complaint." Greenfield noted that "the

complaint being investigated initially was filed in May 2016, long before [Plaintiff] lodged a

complaint about the sports teams on the John Jay Campus." Greenfield also stated that "OSI has

no knowledge of any complaint lodged by [Plaintiff] with the [PSAL] concerning racial

segregation in the sports teams." (Id.) Finally, Greenfield stated that it was "entirely proper for

the OSI investigator to ask questions about communist activities at [Plaintiff's] school and about

whether staff is engaging students in an inappropriate manner," because "it would not be

appropriate for school staff to solicit students to participate in any political events or to

encourage them to support a particular political group or party." (Id.)

In a March 28, 2017 letter to Greenfield, Plaintiff's counsel stated that

Greenfield's response "in fact makes us believe that retaliation is indeed the motive for this

investigation," as "[t]here could be no other reason for the OSI to sit on a complaint . . . for

almost one year, only to commence the investigation within two weeks" of Plaintiff's January

10, 2017 email. (Bloomberg Aff., Ex. 7 (Dkt. No. 10-7); Am. Cmplt. (Dkt. No. 39) ¶ 70)

Counsel "insist[ed] that [DOE] share . . . the exact nature of the allegations, including which

specific activity violated which specific regulation." (Bloomberg Aff., Ex. 7 (Dkt. No. 10-7))

In an April 6, 2017 letter, Greenfield addressed Plaintiff's demand for specifics

concerning the complaint OSI was investigating:

> The complaint being investigated is that [Plaintiff] and two teachers at the Park
> Slope Collegiate School are members of a communist organization known as the
> Progressive Labor Party, that they are actively recruiting students into the
> organization during school hours, and that they invite students to participate in the
> organization's activities, including marches for communism. If substantiated, this
> could constitute a violation of Chancellor's Regulation D-130, which provides, in

part, that staff may not be involved in any activities on behalf of a political organization during working hours.

(Bloomberg Aff., Ex. 8 (Dkt. No. 10-8); Am. Cmplt. (Dkt. No. 39) ¶ 72)

Greenfield's letter also explains that "[t]he complaint was initially filed with [SCI] in May of 2016 [and] . . . referred . . . to OSI. The complainant supplied further information in December 2016, and thereafter, OSI began its investigation. (Bloomberg Aff., Ex. 8 (Dkt. No. 10-8))

### C.  Chancellor's Regulation D-130

Regulation D-130 (the "Regulation") "governs the use of school buildings by candidates, elected officials, and political organizations and the conduct of school employees and officers with respect to political campaigns and elections." (Regulation D-130 (Abstract) (Dkt. No. 79-3)) The Regulation's introduction provides:

> School buildings are not public forums for purposes of community or political expression. The following sets forth the rules which govern: (1) the use of, or access to, Department of Education school buildings by elected officials, candidates for elective office, or organizations working on behalf of such officials or candidates, both during school and non-school hours; (2) use of school facilities, equipment and supplies for political purposes by school employees, personnel, or staff members and officials; and (3) conduct of school employees, personnel, or staff members and officials with respect to political campaigns and elections.

(Id. (Introduction) (footnote omitted)).

Section I.B of the Regulation addresses the use of school facilities, equipment, and supplies, and provides that – generally – these resources "may not be used on behalf of any candidate, candidates, slate of candidates, or political organization/committee." (Id. at § I(B)) In particular,

1. The use of any Department of Education school during school/business hours by any person, group, organization, committee, etc., on behalf of, or for the benefit of any elected official, candidate, candidates, slate of candidates or political organization/committee is prohibited.

2. No rallies, forums, programs, etc., on behalf of, or for the benefit of any elected official, particular candidate, candidates, slate of candidates or political organization/committee may be held in a school building.

3. No material supporting any candidate, candidates, slate of candidates or political organization/committee may be distributed, posted, or displayed in any school building
   . . . .

   . . . .

8. No Department of Education . . . equipment may be used to produce, reproduce, record, or disseminate information on behalf of any candidate, candidates, slate of candidates or political organization/committee.

(Id.)

Section I.C addresses the conduct of school personnel. It provides:

1. While on duty or in contact with students, all school personnel shall maintain a posture of complete neutrality with respect to all candidates. Accordingly, while on duty or in contact with students, school personnel may not wear buttons, pins, articles of clothing, or any other items advocating a candidate, candidates, slate of candidates or political organization/committee.

2. Personnel may not be involved in any activities, including fundraising, on behalf of any candidate, candidates, slate of candidates or political organization/committee during working hours.

3. Any campaigning by any personnel on Department of Education time is strictly prohibited. . . .

4. This regulation does not preclude school personnel from discussing or distributing information about election issues in connection with legitimate instructional programs and activities.

(Id. at § I(C))

Section II of Regulation D-130 addresses use of school buildings during non-

school hours. Subsection A provides that "[t]he use of any Department of Education school after

school/business hours by any person, group, organization, committee, etc., on behalf of, or for

the benefit of any elected official, candidate, candidates, slate of candidates or political

organization/committee is prohibited," although there is an exception for "candidate forums."

(Id. § II(A))

Plaintiff contends that the supplemental allegations "regarding the May 2016 SCI complaint are false[] on their face," but that "even if they were true[,] there would be no violation of [Regulation] D-130." (Am. Cmplt. (Dkt. No. 39) ¶¶ 87-88)

## II.    PROCEDURAL HISTORY

The Complaint was filed on April 28, 2017, and asserts claims for retaliation under the First Amendment, Title VI, and the NYCHRL. (Cmplt. (Dkt. No. 1)) On April 29, 2017, Plaintiff moved for a temporary restraining order and preliminary injunction enjoining the DOE's investigation of her pending the outcome of this case. (Mot. (Dkt. No. 3))

On May 1 and May 3, 2017, this Court conducted a hearing on Plaintiff's application for injunctive relief. On May 3, 2017, the Court denied the application, finding that Plaintiff had not shown a likelihood of success or irreparable injury with respect to her retaliation claims under the First Amendment, Title VI, and the NYCHRL. (See May 1, 2017 Hearing Tr. (Dkt. No. 33); May 3, 2017 Hearing Tr. (Dkt. No. 36) at 37; see also Order (Dkt. No. 31))

On May 23, 2017, Plaintiff filed the Amended Complaint. (Am. Cmplt. (Dkt. No. 39)) The Amended Complaint includes the causes of action originally pled, but also asserts that OSI's investigation violates Plaintiff's Due Process rights, because Regulation D-130 does not address Plaintiff's alleged conduct, and because the Regulation is unconstitutionally vague. (Id.)

Defendants have moved to dismiss Plaintiff's First Amendment and Title VI retaliation claims, as well as her Due Process claim. (Def. Mot. (Dkt. No. 77)) Plaintiff has cross-moved for partial judgment on the pleadings, with respect to "the applicable scope" of Regulation D-130. (Pltf. Mot. (Dkt. No. 81)) Since filing her cross-motion, however, Plaintiff has acknowledged that her motion is procedurally improper, because the pleadings in this case have not yet closed. Accordingly, Plaintiff "[does] not oppose the Court finding Plaintiff's 12(c) motion premature." (See Pltf. Reply Br. (Dkt. No. 86) at 4; see also Fed. R. Civ. P. 12(c) ("After

the pleadings are closed – but early enough not to delay trial – a party may move for judgment on the pleadings." (emphasis added)) Accordingly, the Court deems Plaintiff's cross-motion for judgment on the pleadings withdrawn.

## DISCUSSION

### I.   LEGAL STANDARDS

"To survive a motion to dismiss [pursuant to Fed. R. Civ. P. 12(b)(6)], a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "In considering a motion to dismiss . . . , the court is to accept as true all facts alleged in the complaint," Kassner v. 2nd Ave. Delicatessen Inc., 496 F.3d 229, 237 (2d Cir. 2007) (citing Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals, 282 F.3d 83, 87 (2d Cir. 2002)), and must "draw all reasonable inferences in favor of the plaintiff." Id. (citing Fernandez v. Chertoff, 471 F.3d 45, 51 (2d Cir. 2006)).

A complaint is inadequately pled "if it tenders 'naked assertion[s]' devoid of 'further factual enhancement,'" Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 557), and does not provide factual allegations sufficient "to give the defendant fair notice of what the claim is and the grounds upon which it rests." Port Dock & Stone Corp. v. Oldcastle Northeast, Inc., 507 F.3d 117, 121 (2d Cir. 2007) (citing Twombly, 550 U.S. at 555).

"When determining the sufficiency of plaintiff['s] claim for Rule 12(b)(6) purposes, consideration is limited to the factual allegations in plaintiff['s] amended complaint, . . . to documents attached to the complaint as an exhibit or incorporated in it by reference, to matters of which judicial notice may be taken, or to documents either in plaintiff['s] possession or of which plaintiff[] had knowledge and relied on in bringing suit." Brass v. Am. Film Tech., Inc., 987 F.2d 142, 150 (2d Cir. 1993).

"To be incorporated by reference, the Complaint must make a clear, definite and substantial reference to the documents." Helprin v. Harcourt, Inc., 277 F. Supp. 2d 327, 330-31 (S.D.N.Y. 2003) "[L]imited quotation" of a document, Goldman v. Belden, 754 F.2d 1059, 1066 (2d Cir. 1985), or a mere passing reference to a document, does not incorporate the document into the complaint. See, e.g., Sira v. Morton, 380 F.3d 57, 67 (2d Cir. 2004); Cosmas v. Hassett, 886 F.2d 8, 13 (2d Cir. 1989).

"Where a document is not incorporated by reference, the court may never[the]less consider it where the complaint 'relies heavily upon its terms and effect,' thereby rendering the document 'integral' to the complaint." DiFolco v. MSNBC Cable L.L.C., 622 F.3d 104, 111 (2d Cir. 2010) (quoting Mangiafico v. Blumenthal, 471 F.3d 391, 398 (2d Cir. 2006)). For a document to be integral to a complaint, "the plaintiff must have (1) 'actual notice' of the extraneous information and (2) 'relied upon th[e] document[ ] in framing the complaint.'" DeLuca v. AccessIT Grp., Inc., 695 F. Supp. 2d 54, 60 (S.D.N.Y. 2010) (quoting Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002) (internal quotation marks omitted)); see also Williams v. City of New York, No. 14 Civ. 5123 (NRB), 2015 WL 4461716, at *2 (S.D.N.Y. July 21, 2015) ("A document is not 'integral' simply because its contents are highly relevant to a plaintiff's allegations, but only when it is clear that the plaintiff relied on the document in preparing his complaint." (emphasis in original)).

## II.  ANALYSIS

### A.  First Amendment Retaliation Claim

The Amended Complaint alleges that, as a result of "the letter of complaint [Plaintiff] wrote on January 10, 2017," Plaintiff "is now subjected to an investigation in which she is . . . labeled as a communist." "By engaging in this investigation . . . defendant[s] ha[ve] violated plaintiff's rights to freedom of expression under the First Amendment." (Am. Cmplt.

14

(Dkt. No. 39) ¶¶ 137, 141-42) Defendants seek dismissal of this claim on the ground that, "as a matter of law, . . . [Plaintiff] cannot demonstrate that any speech alleged in the complaint was made as a citizen, not as an employee." (Def. Br. (Dkt. No. 78) at 5)

A public employee asserting a First Amendment retaliation claim "must establish that: '(1) h[er] speech or conduct was protected by the First Amendment; (2) the defendant took an adverse action against h[er]; and (3) there was a causal connection between this adverse action and the protected speech.'" Matthews v. City of New York, 779 F.3d 167, 172 (2d Cir. 2015) (quoting Cox v. Warwick Valley Cent. School Dist., 654 F.3d 267, 272 (2d Cir. 2011)). "The inquiry into the protected status of speech is one of law, not fact." Connick v. Myers, 461 U.S. 138, 148 n.7 (1983).

Analyzing whether speech is protected by the First Amendment "encompasses two separate subquestions: '(1) whether the subject of the employee's speech was a matter of public concern and (2) whether the employee spoke "as a citizen" rather than solely as an employee.'" Matthews, 779 F.3d at 172 (quoting Jackler v. Byrne, 658 F.3d 225, 235 (2d Cir. 2011)). "If the answer to either question is no, that is the end of the matter." Id. "'[B]efore asking whether the subject matter of particular speech is a topic of public concern, [a] court must decide whether the plaintiff was speaking 'as a citizen'. . . .'" Agyeman v. Roosevelt Union Free Sch. Dist., 254 F. Supp. 3d 524, 534 (E.D.N.Y. 2017) (quoting Mills v. City of Evansville, 452 F.3d 646, 647 (7th Cir. 2006), and citing Benvenisti v. City of N.Y., No. 04-CV-3166 (JGK), 2006 WL 2777274, at *7 (S.D.N.Y. Sept. 23, 2006) ("First, the Court must determine whether the plaintiff was speaking as a 'citizen' for First Amendment purposes. After that, the Court . . . ask[s] whether . . . the plaintiff's speech was made . . . upon 'matters of public concern.'" (citations omitted))

In determining whether a plaintiff was speaking as an employee or as a citizen, courts consider whether (1) the speech "fall[s] outside of the employee's 'official responsibilities,'" and (2) whether a "civilian analogue" for the speech exists. Matthews, 779 F.3d at 173. A plaintiff speaks pursuant to her official job duties when the speech at issue "owe[s] its existence to" those job duties," Garcetti v. Ceballos, 547 U.S. 410, 421-22, 423 (2006), or when the speech is "'part-and-parcel of [the employee's] concerns' about [her] ability to 'properly execute [her] duties.'" Weintraub v. Bd. of Educ. of City Sch. Dist. of City of N.Y., 593 F.3d 196, 203 (2d Cir. 2010) (citation omitted). "[S]peech can be 'pursuant to' a public employee's official job duties even though it is not required by, or included in, the employee's job description or in response to a request by the employer." Id. Here, "the key question in determining whether [Plaintiff] spoke as an employee or as a citizen is whether h[er] speech was 'undertaken in the course of performing . . . h[er] primary employment responsibility' and was aired 'in furtherance of the execution of one of [her] core duties as [principal].'" Morey v. Somers Cent. Sch. Dist., No. 06 CIV.1877 (PGG), 2010 WL 1047622, at *6 (S.D.N.Y. Mar. 19, 2010) (quoting Weintraub, 535 F.3d at 203 (internal quotation marks and citation omitted)), aff'd, 410 F. App'x 398 (2d Cir. 2011).

The Amended Complaint asserts that the January 10, 2017 email "was not something plaintiff was 'employed to do,' nor . . . 'part and parcel' of her regular job." (Am. Cmplt. (Dkt. No. 39) ¶ 137) This conclusory assertion is belied by Plaintiff's own statements, however, and by the email itself.

In an affidavit that is discussed in the Amended Complaint (see, e.g., Am. Cmplt. (Dkt. No. 39) ¶ 86), Plaintiff asserts that "[i]t is part of a principal's . . . regular job duties to request sports teams of the PSAL." Indeed, "[f]or years[,] principals and coaches in the John Jay

program had been making these formal requests." (Bloomberg Supp. Aff. (Dkt. No. 21) ¶ 5)  In

Plaintiff's January 10, 2017 email – which she sent by internal email to six DOE employees –

Plaintiff did just that:  she "request[ed] [the] assistance" of Goldstein – who is in charge of

DOE's sports programs – and Superintendent Prayor "in uniting the PSAL sports teams on the

John Jay Campus." (Bloomberg Aff., Ex. 3 (Dkt. No. 10-3))

      Plaintiff reminded Goldstein, Prayor, and the other DOE employees that "[p]rior

to [the 2016-17] school year, the John Jay campus had only four teams," while the sports

program for the Millennium schools "ha[d] been granted 17 teams."  As such, the two programs

"offer vastly unequal opportunities to students."  Plaintiff also submitted a chart reflecting the

percentage of Black or Latino students at each of the schools in the two sports programs.

Plaintiff told her DOE colleagues that "[t]he students at all [the] schools are equally deserving of

opportunities to participate in extracurricular sports and it is the responsibility of the DOE and

PSAL to facilitate that equity." (Bloomberg Aff., Ex. 3 (Dkt. No. 10-3))

      As this Court stated in ruling on Plaintiff's application for a temporary restraining

order and preliminary injunction, Plaintiff's January 10, 2017 email to her DOE colleagues was

"a plea for resources and a plea for fairness as to the availability of extracurricular sports teams"

for Plaintiff's students. (May 3, 2017 Hearing Tr. (Dkt. No. 36) at 18)[8]  Such a request is

---

[8]  Plaintiff maintains that while her job duties include "request[ing] sports teams of the PSAL,"
they "do not include formulating, implementing or providing feedback on PSAL policy."
(Bloomberg Supp. Aff. (Dkt. No. 21) ¶ 6)  Plaintiff's January 10, 2017 email does not
"formulat[e]" or "implement[]" PSAL policy, however.  While one could read Plaintiff's
complaints about the sports program as "providing feedback," her email is, in essence, a focused
plea for resources, rather than a "policy oriented complaint," as she now asserts.  (Id. ¶ 8, Am.
Cmplt. (Dkt. No. 39) ¶ 137)  As is common whenever someone requests more resources –
whether at DOE or in the private sector – Plaintiff supports her plea for more resources by
contrasting what her students have received to the resources provided to other schools.  But
Plaintiff's request for more resources cannot be fairly read as a "policy oriented complaint."
And even if her request could be construed in that fashion, any "policy oriented complaint" "was

"'undertaken in the course of performing . . . [Plaintiff's] primary employment responsibility,'"

and is "'in furtherance of the execution of one of [Plaintiff's core duties as [principal].'" Morey,

2010 WL 1047622, at *6 (quoting Weintraub, 535 F.3d at 203). See Ehrlich v. Dep't of Educ. of

City of New York, No. 11 CIV. 4114 RMB KNF, 2012 WL 424991, at *3 (S.D.N.Y. Feb. 6,

2012) ("[C]ourts have routinely held as a matter of law that a teacher's advocacy on behalf of her

students falls squarely within her official duties as a teacher."); Verdi v. City of New York, 306

F. Supp. 3d 532, 548 (S.D.N.Y. 2018) ("Plaintiff's objections to the alleged [racially]

discriminatory practices at P.S. 24 were lodged by him as part of his duties as a public employee

to protect his students' and his putative students' rights. . . . Plaintiff's speech constituted

advocacy on behalf of his students and putative students and was part-and-parcel of his duties as

Assistant Principal at P.S. 24. Accordingly, his speech is not protected for the purposes of his

[First Amendment] retaliation claim. . . ."); see also Agyeman, 254 F. Supp. 3d at 535 ("[T]he

record and the case law demonstrate that plaintiff indisputably spoke as a public employee in her

internal e-mails complaining about student discipline, the conduct of other teachers and District

personnel, and the lack of resources and support. . . .")[9]

---

'undertaken in the course of performing . . . [Plaintiff's] primary employment responsibility' and
was aired 'in furtherance of the execution of one of [her] core duties.'" Morey, 2010 WL
1047622, at *6 (quoting Weintraub, 535 F.3d at 203).

[9] Plaintiff also contends that her e-mail "accus[es] the DOE of race discrimination and
segregation within the sports programs in her building," and that her "primary protest" in the
email "was the segregation of the programs based on race." (Am. Cmplt. (Dkt. No. 39) ¶¶ 56,
57) In her brief opposing Defendants' motion to dismiss, Plaintiff likewise argues that "[s]he
was seeking in th[e January 10, 2017] e-mail to raise a racially discriminatory condition
prevailing in the John Jay Campus building regarding the racial segregation and racially
discriminatory allocation of sports teams. . . . The fact that principals have to make an
application to PSAL in order to get sports teams in general does not convert plaintiff's complaint
about racial segregation and the racially disparate assignment of teams into one of her ordinary
duties." (Pltf. Opp. Br. (Dkt. No. 80) at 19)

The cases Plaintiff cites (Pltf. Opp. Br. (Dkt. No. 80) at 19-23) are not to the contrary. In <u>Matthews v. City of New York</u>, 779 F.3d 167 (2d Cir. 2015), the Second Circuit held that a police officer – in complaining to a supervisor about a precinct-wide quota system, which he argued was "causing unjustified stops" and harming the precinct's relationship with the community – had engaged in speech in his capacity as a private citizen and not as a police officer. <u>Matthews</u>, 779 F.3d at 173-75. The <u>Matthews</u> court found that the police officer's "speech to the Precinct's leadership . . . was not what he was 'employed to do,' . . . nor was it 'part-and-parcel' of his regular job. . . . [The officer's] policy-oriented speech was neither part of his job description nor part of the practical reality of his everyday work." <u>Id.</u> at 174.

---

Whatever Plaintiff's intentions or motivations may have been in composing her email, Plaintiff's alleged "primary" concern about racial discrimination and segregation is not made manifest in the email. Indeed, there is no reference to discrimination or segregation – or to comparable terms – in her email. While Plaintiff includes a chart listing the percentage of Black or Hispanic students at each school in the two sports programs, the email does not address these statistics in any fashion. Instead, the crux of the email is that (1) students at PSC and the other schools in its sports program deserve an opportunity to participate in extracurricular sports; (2) they are not being given this opportunity; and (3) the failure to offer them this opportunity is inequitable, because other students – including students at another school in the same building – have these opportunities. While pointing out the "inequities," however, Plaintiff does not assert that they are the product of racial discrimination or a desire to segregate sports teams.

It also appears that the DOE recipients of Plaintiff's email understood her to be requesting that PSAL make more sports teams available to PSC and the other schools that are part of its sports program. According to Plaintiff, Donald Douglas – a recipient of the email and the executive director of the PSAL – "granted John Jay an additional five teams," and asked Plaintiff "if that made [her] happy." (Bloomberg Supp. Aff. (Dkt. No. 21) ¶¶ 7, 10)

Finally, even if Plaintiff had alleged racial discrimination and segregation more pointedly in her email, such allegations would not change the fact that she spoke as a public employee. <u>See</u> <u>Verdi</u>, 306 F. Supp. 3d at 548 (where assistant principal "publicly complained that efforts have been and are being made to keep poor and minority children . . . out of [his school]," including by "wr[iting] to the Schools Chancellor . . . and DOE's Special Commissioner of Investigation regarding his concerns about the kindergarten enrollment process," he spoke as a public employee, rather than as a citizen).

Here, by contrast, Plaintiff concedes that "[i]t is part of a principal's . . . regular job duties to request sports teams of the PSAL" (Bloomberg Supp. Aff. (Dkt. No. 21) ¶ 5), and – as discussed above – Plaintiff's January 10, 2017 email was thus part of her "regular job duties."

The other cases Plaintiff cites likewise do not demonstrate that Plaintiff spoke as a citizen rather than as PSC's principal. (See Pltf. Opp. Br. (Dkt. No. 80) at 21-23)[10]

---

[10] In Dillon v. Suffolk Cty. Dep't of Health Servs., 917 F. Supp. 2d 196 (E.D.N.Y. 2013), the court concluded that the plaintiff physician – in voicing concerns that Suffolk County's Health Department was deliberately indifferent to the medical needs of prisoners, to abuse of prisoners, and to alteration of medical records at a correctional facility – was not speaking pursuant to her job duties. In so ruling, the court emphasized that "unlike the complaint in Weintraub [, 593 F.3d at 203,] which referred to incidents in the teacher's own classroom, the Plaintiff's complaints referred to systemic mistreatment and corruption extending outside of her own personal duties and affecting inmates with whom she had no personal or job connection. The Court finds that this speech was . . . that of a concerned citizen seeking to bring certain wrongdoing to light." Dillon, 917 F. Supp. 2d at 210. Here, as in Weintraub – but unlike in Dillon – Plaintiff's January 10, 2017 email "refer[s] to [the sports programs] in [Plaintiff's] own [school]," and not to "systemic" failings "extending outside of [Plaintiff's] own personal duties and affecting [students] with whom she had no . . . job connection." See id.

Similarly, in Ramirez v. Hempstead Union Free Sch. Dist. Bd. of Educ., 33 F. Supp. 3d 158 (E.D.N.Y. 2014), the court concluded that the director of technology and chief information officer for a school district did not act pursuant to his job duties when he wrote letters accusing defendants of improperly inflating student grades to procure funding from local governments. The court emphasized that plaintiff's job was only to "maintain and upgrade the Board of Education's technological capabilities," and accordingly his job responsibilities were far removed from the conduct about which he complained. Ramirez, 33 F. Supp. 3d at 172-73. Here, as Plaintiff concedes, Plaintiff's email falls within the duties of a school principal.

Likewise in Griffin v. City of New York, 880 F. Supp. 2d 384 (E.D.N.Y. 2012), where a former New York City Police Department detective alleged retaliation after he reported a colleague's misconduct, the court concluded the plaintiff spoke as citizen, because plaintiff's job duties did not involve reporting such misconduct. Griffin, 880 F. Supp. 2d at 394-99.

Finally, in Smith v. County of Suffolk, 776 F.3d 114 (2d Cir. 2015), the Second Circuit did not analyze whether plaintiff spoke as a citizen. Smith, 776 F.3d at 125 ("[B]ecause defendants do not [raise the issue] on appeal, we do not revisit the district court's conclusions that Smith's media communications enjoyed First Amendment protection as citizen speech. . . .").

The Court concludes that Plaintiff's January 10, 2017 email to her DOE colleagues falls squarely within the scope of her duties as PSC principal.

Plaintiff argues, however, that her email falls within what she refers to as "the Givhan carve[-]out" to First Amendment retaliation doctrine. (Pltf. Opp. Br. (Dkt. No. 80) at 14-19) According to Plaintiff, since the Supreme Court's decision in Garcetti v. Ceballos, 547 U.S. 410 (2006), courts have "reinforced what might be called the Givhan 'carve[-]out in Garcetti protecting employees who were retaliated against after raising issues of public concern . . . and in particular issues of race discrimination, which is quintessentially a matter of public concern." (Pltf. Opp. Br. (Dkt. No. 80) at 15)

Garcetti never mentions race discrimination, however. And while the Supreme Court's 1979 decision in Givhan v. Western Line Consol. School Dist., 439 U.S. 410 (1979) – in which the Supreme Court ruled in favor of a schoolteacher fired for criticizing school practices allegedly impeding integration efforts – concerns speech about race discrimination, Garcetti cites Givhan only for the proposition that "[e]mployees in some cases may receive First Amendment protection for expressions made at work," provided those expressions are not made pursuant to the employees' job duties. Garcetti, 547 U.S. at 421. To the extent that Plaintiff contends that Garcetti's cite to Givhan indicates "that when a public employee raises concerns of racial discrimination, the employee [invariably] does so as a citizen" (Pltf. Opp. Br. (Dkt. No. 80) at 18), nothing in Garcetti or its progeny supports that claim. Indeed, the two cases Plaintiff cites for this proposition – Lane v. Franks, 573 U.S. 228 (2014), and Jackler v. Byrne, 658 F.3d 225 (2d Cir. 2011) – do not involve complaints about race discrimination, and do not suggest that any "carve-out" or exception applies when a public employee's speech involves allegations of race discrimination.

The Court concludes that the Amended Complaint does not state a claim for First Amendment retaliation, because Plaintiff's email was sent pursuant to her duties as the principal of PSC, rather than as a citizen. Defendants' motion to dismiss Plaintiff's First Amendment retaliation claim will be granted.[11]

## B.    TITLE VI CLAIM

"Title VI prohibits intentional discrimination based on race in any program that receives federal funding." Verdi, 306 F. Supp. 3d at 542 (internal quotation marks and citation omitted). "Title VI does not contain an explicit anti-retaliation provision, but courts have

---

[11]  In her opposition brief, Plaintiff contends – for the first time – that the Amended Complaint "alleges that retaliatory actions which occurred after she filed th[is] case violated her First Amendment Right to Petition," and that the Amended Complaint states a claim pursuant to the Petition Clause of the Constitution, which extends First Amendment protection not only to "freedom of speech," but to "the right of the people . . . to petition the Government for a redress of grievances." (Pltf. Opp. Br. (Dkt. No. 80) at 11-13; U.S. Const. amend. I)

The Amended Complaint does not state a Petition Clause claim, however. Indeed, the word "petition" does not appear in the Amended Complaint. In any event, the Supreme Court has stated that while "[c]ourts should not presume there is always an essential equivalence between [the Petition Clause] and [the Speech Clause] or that Speech Clause precedents necessarily and in every case resolve Petition Clause claims[,] . . . claims of retaliation by public employees do not call for this divergence. . . . The considerations that shape the application of the Speech Clause to public employees apply with equal force to claims by those employees under the Petition Clause." Borough of Duryea, Pa. v. Guarnieri, 564 U.S. 379, 388, 389 (2011). District courts in this Circuit have construed Guarnieri as indicating that a Petition Clause claim – like a First Amendment retaliation claim – will fail where a public employee's "petition" was pursuant to her job duties. See Ross v. New York City Dep't of Educ., 935 F. Supp. 2d 508, 526 (E.D.N.Y. 2013) ("[A] public employee asserting a claim under the Petition Clause must prove that his petitioning activity was made as a citizen and not pursuant to his official duties."); Lenox v. Town of N. Branford, No. 3:08CV01448 DJS, 2012 WL 6102470, at *10 (D. Conn. Dec. 7, 2012) ("This Court will analyze the Plaintiff's alleged protected petition under the same test it would use to analyze allegedly protected speech."), order vacated in part on reconsideration on other grounds, No. 3:08CV01448 DJS, 2013 WL 2155523 (D. Conn. May 16, 2013).

In sum, even if the Amended Complaint asserted a claim pursuant to the Petition Clause, that claim would fail along with Plaintiff's First Amendment retaliation claim.

generally construed the statute as creating an implied private right of action for retaliation."
Palmer v. Penfield Cent. Sch. Dist., 918 F. Supp. 2d 192, 199 (W.D.N.Y. 2013) (collecting cases).

To plead a claim for retaliation under Title VI, a plaintiff must "plausibly allege: '(1) participation in a protected activity known to the defendants; (2) adverse action by the defendants against the plaintiff; and (3) a causal connection between the plaintiff's protect[ed] activity and defendants' adverse action.'" Diaz v. City Univ. of New York, No. 15 Civ. 1319 (PAC) (MHD), 2016 WL 958684, at *2 (S.D.N.Y. Mar. 8, 2016).

In support of their motion to dismiss Plaintiff's Title VI claim, Defendants argue that the Amended Complaint does not plead sufficient facts about the federal funding DOE receives. (Def. Br. (Dkt. No. 78) at 22-23) According to Defendants, Plaintiff is required to plausibly allege "that the defendant received federal funding, identify the primary objective of the federal funding, and [demonstrate] that the alleged discrimination or retaliation was related to the primary objective of the program or subject benefiting from federal funding," and has not done so. (Id.)

Plaintiff responds that "[t]he cases cited by defendants relate to cases of employment discrimination," and that while these cases "add a requirement that a plaintiff must plead that federal funds are used for employment," Plaintiff "has not claimed employment discrimination." (Pltf. Opp. Br. (Dkt. No. 80) at 10) Plaintiff further asserts that "[i]t is uncontested that the DOE receives federal money for student programs from the Federal Department of Education." (Id.)

Title VI provides that "[n]othing contained in [it] shall be construed to authorize action under [Title VI] . . . with respect to any employment practice of any employer . . . except

where a primary objective of the Federal financial assistance is to provide employment." 42 U.S.C. § 2000d-3. "[T]his section essentially 'requires a logical nexus between the use of federal funds and the practice toward which [the] action is directed.'" Johnson v. Cty. of Nassau, 411 F. Supp. 2d 171, 175 (E.D.N.Y. 2006) (quoting Ass'n Against Discrimination in Employment, Inc. v. City of Bridgeport, 647 F.2d 256, 276 (2d Cir. 1981)). In the Title VI employment discrimination context, courts have construed Section 2000d-3 as imposing "a threshold requirement . . . that the employer be the recipient of federal funds aimed primarily at providing employment." Ass'n Against Discrimination in Employment, Inc., 647 F.2d at 276; see also Sulehria v. New York, No. 13-CV-6990 AJN, 2014 WL 4716084, at *5 (S.D.N.Y. Sept. 19, 2014) ("To state a claim under Title VI, a plaintiff must plausibly allege . . . that the defendant was an entity receiving federal funding . . . [and] that the federal funds have been made available primarily for providing employment.").

Few cases have addressed this pleading requirement where plaintiff alleges that her employer retaliated against her after she raised concerns about race discrimination affecting others, including non-employees. "It is unsettled . . . whether retaliation claims _affecting_ employment – in which an individual who voices concerns about discrimination against others is retaliated against with respect to his or her employment – should be treated the same as straight retaliation for employment discrimination claims. . . ." Verdi, 306 F. Supp. 3d at 544-45 (emphasis in original).

Verdi v. City of New York presents the most thorough analysis of this question to date. In Verdi, plaintiff – an assistant principal employed by DOE – alleged that he was retaliated against for opposing discriminatory admissions practices at his school. The court concluded that the "'primary objective of providing employment' requirement does not apply

24

when analyzing an employment-based retaliation claim where the victims of the discrimination about which the claimant complained (and for which complaining the claimant suffered retaliation) are the intended beneficiaries of the federal funding." Id. at 545-46. The court reasoned that "[r]ecognizing a retaliation claim based on harms to a claimant's employment where the complained-of discrimination was against the intended beneficiaries of the relevant federal funding would vindicate rather than undermine the intent and spirit of § 2000d-3." Id. at 545.

The reasoning in Verdi is persuasive, but that reasoning does not obviate the need for Plaintiff to plead a "logical nexus between the use of federal funds and the practice to which [the] action is directed." Johnson, 411 F. Supp. 2d at 175 (internal quotation marks and citation omitted). Accordingly, Plaintiff must plead a nexus between the use of federal funds and the alleged discriminatory practice about which Plaintiff allegedly complained, and for which complaints she allegedly suffered retaliation: discrimination in the PSAL's sports programs.

The Amended Complaint alleges only that "[a]t all times relevant the DOE was and is a recipient of federal funding for purposes of Title VI," and that "[t]he New York City DOE receives Federal Financial Assistance." (Am. Cmplt. (Dkt. No. 37) ¶¶ 23, 125) These allegations do not sufficiently plead the requisite "logical nexus." See Verdi, 306 F. Supp. 3d at 546 (dismissing Verdi's Title VI claim because his "allegations regarding federal funding are bare and conclusory and do not describe the federal funding the DOE received, let alone link that funding to the students whose discrimination was the subject of Plaintiff's complaints").

Accordingly, Defendants' motion to dismiss Plaintiff's Title VI claim will be granted.

## C.    **DUE PROCESS CLAIM**

The Amended Complaint asserts that Regulation D-130 applies "exclusively to partisan electoral politics" (Am. Cmplt. (Dkt. No. 39) ¶ 115), and does not reach the conduct upon which the OSI investigation purportedly was predicated.  (Id. ¶¶ 112-14)  Plaintiff further contends that "[t]he DOE's application of [Regulation] D-130 does not give notice to a reasonable person in [P]laintiff's shoes that the conduct [P]laintiff is under investigation for is a violation of [the regulation]," and "[t]o the extent defendants assert D-130 is the basis for th[e] investigation [of Plaintiff]," Regulation D-130 "is void for vagueness and violates Plaintiff's right to due process."  (Id. 119-20)

Defendants have moved to dismiss Plaintiff's Due Process claim, noting that the standards regarding vagueness challenges are "considerably . . . relaxed" where the regulation in question is civil, and where the government is acting as an employer.  (Def. Br. (Dkt. No. 78) at 17)  Defendants also assert that if this Court finds Regulation D-130 ambiguous, "the court must defer to the agency's interpretation of its own regulation, unless that interpretation is plainly erroneous."  (Id.)

"The vagueness doctrine voids on due process grounds a rule that contains 'prohibitions [that] are not clearly defined.'"  Kramer v. New York City Bd. of Educ., 715 F. Supp. 2d 335, 356 (E.D.N.Y. 2010).  "A punitive enactment is unconstitutionally vague when it (1) does not allow a person of ordinary intelligence a reasonable opportunity to know what is prohibited, or (2) lacks explicit standards, thus permitting arbitrary or discriminatory enforcement."  Id.  As to the second prong, "[a] statute or rule is inadequate . . . when it 'fails to provide sufficiently explicit standards for those who apply it,' and 'impermissibly delegates basic policy matters . . . for resolution on an ad hoc and subjective basis.'"  Id.

"In meeting these requirements, . . . 'the degree of linguistic precision . . . varies with the nature – and in particular, with the consequences of enforcement – of the statutory provision [or regulation].'" NYC C.L.A.S.H., Inc. v. City of New York, 315 F. Supp. 2d 461, 484 (S.D.N.Y. 2004) (quoting General Media Communications, Inc. v. Cohen, 131 F.3d 273, 286 (2d Cir. 1997)). Accordingly, "'[t]he standards of certainty in statutes punishing for offenses is higher than in those depending primarily upon civil sanction for enforcement.'" Gen. Media Commc'ns, Inc., 131 F.3d at 286 (quoting Winters v. New York, 333 U.S. 507, 515 (1948).

"At the same time, statutes that implicate constitutionally protected rights, including the freedoms protected by the First Amendment, are subject to 'more stringent' vagueness analysis. Id. (quoting Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 499 (1982)); see also Marchi v. Bd. of Coop. Educ. Servs. of Albany, 173 F.3d 469, 480 (2d Cir. 1999) ("'[W]here a statute's literal scope . . . is capable of reaching expression sheltered by the First Amendment, the doctrine demands a greater degree of specificity than in other contexts.'" (quoting Smith v. Goguen, 415 U.S. 566, 573 (1974)). "Aware that precise delineation of sanctionable conduct is close to impossible, [however,] courts have granted schools, acting in their capacity as employers, significant leeway." Marchi, 173 F.3d at 480.

Here, the Court concludes that Regulation D-130 unambiguously encompasses the reported conduct that instigated OSI's investigation. The regulation prohibits the "use of any [DOE] school during school/business hours by any person, group, organization, committee, etc., on behalf of, or for the benefit of any elected official, candidate, candidates, slate of candidates or political organization/committee." (Regulation D-130 (Dkt. No. 79-3) § I(B)(1)) It also prohibits personnel from being "involved in any activities, including fundraising, on behalf of

any candidate, candidates, slate of candidates or political organization/committee during working hours." (Id. § I(C)(2)) The regulation further prohibits "[t]he use of any Department of Education school after school/business hours by any person, group, organization, committee, etc., on behalf of, or for the benefit of any elected official, candidate, candidates, slate of candidates or political organization/committee." (Id. § II(A))

Here, OSI received information alleging that Plaintiff was a "member[] of a communist organization known as the Progressive Labor Party," and was "actively recruiting students into the organization during school hours," and was "invit[ing] students to participate in the organization's activities." (Bloomberg Aff., Ex. 8 (Dkt. No. 10-8); Am. Cmplt. (Dkt. No. 39) ¶ 72) "[A] communist organization known as the Progressive Labor Party" is a "political organization" for purposes of the Regulation.

Plaintiff attempts to distinguish between "ideological organizations which do[] not run candidates and are not engaged in electoral politics," and organizations that are engaged in "electoral partisan politics," and insists that the term "political organization/committee" used throughout Regulation D-130 encompasses only the latter kind of organization. (Am. Cmplt. (Dkt. No. 39) ¶¶ 4, 118, 135) While Regulation D-130 contains references to campaigns and elections, it does not qualify or limit the scope of "political organization/committee" – a term that, on its face, encompasses the "Progressive Labor Party" – in the manner Plaintiff proposes. Moreover, Plaintiff's distinction between "ideological organizations which . . . do[] not run candidates" and "those engaged in electoral politics" is unclear and impractical. For example, the name "Progressive Labor Party" suggests that the organization is engaged in "partisan politics." And if Regulation D-130's application were to turn on whether a particular "party" is then engaged in "electioneering" (see Am. Cmplt. (Dkt. No. 39) ¶¶ 1, 143), the same

organization might fall within the ambit of the term "political organization/committee" at some times, but not at others – an absurd result.

Nor is Regulation D-130 void for vagueness. As an initial matter, the Regulation provides adequate notice of the conduct it prohibits. Indeed, the Regulation sets forth a detailed list of prohibited and permissible conduct. To the extent Plaintiff contends that the term "political organization" is impermissibly vague, the Court concludes that – although the term "political organization" is not defined in Regulation D-130 – a reasonable person would surely understand that "a communist organization known as the Progressive Labor Party" is a "political organization."

Finally, Regulation D-130 does not "lack[] explicit standards, thus permitting arbitrary or discriminatory enforcement." Kramer, 715 F. Supp. 2d at 356. As noted, the regulation sets out a detailed, specific list of prohibited and permissible conduct. Although the Amended Complaint suggests that the Regulation is enforced in an arbitrary and discriminatory manner, Plaintiff has not pled facts demonstrating that OSI ignored conduct comparable to that in which she allegedly engaged.

Accordingly, Defendants' motion to dismiss Plaintiff's Due Process claim will be granted.

## CONCLUSION

For the reasons stated above, Defendants' motion to dismiss (Dkt. No. 77) is granted in its entirety, and Plaintiff's cross-motion for judgment on the pleadings (Dkt. No. 81) is deemed withdrawn. The Clerk of Court is directed to terminate the motions.

Any motion for leave to file a Second Amended Complaint is to be served and filed by October 23, 2019. The proposed Second Amended Complaint is to be attached as an exhibit to the motion.

Defendants will submit their Answer to the surviving claim in the Amended Complaint by September 30, 2019.

A conference pursuant to Fed. R. Civ. P. 16 will be held on October 21, 2019 at 12:30 p.m. in Courtroom 705 of the Thurgood Marshall United States Courthouse, 40 Foley Square, New York, New York.

Dated: New York, New York
       September 24, 2019

SO ORDERED.

_Paul G. Gardephe_
Paul G. Gardephe
United States District Judge